# In the United States Court of Appeals for the Federal Circuit

LISA AFOLAYAN, widow of Nathaniel Afolayan, on behalf of herself and her minor daughter; NATALEE AFOLAYAN, daughter of Nathaniel Afolayan,

Petitioners

v.

DEPARTMENT OF JUSTICE,

Respondent

On Petition for Review of a Decision of the
Bureau of Justice Assistance PSOB Claim No. 2010-022

## OPENING BRIEF FOR PETITIONERS

John P. Elwood
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Nicole L. Masiello
Arnold & Porter Kaye Scholer LLP
250 W. 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Petitioners*

July 23, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CORRECTED CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 24-1692 |
| **Short Case Caption** | Afolayan v. DOJ |
| **Filing Party/Entity** | LISA AFOLAYAN, widow of Nathaniel Afolayan, deceased, on behalf of herself and her minor daughter; NATALEE AFOLAYAN, daughter of Nathaniel Afolayan |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/03/2024

Signature: /s/ Nicole L. Masiello

Name: Nicole L. Masiello

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| LISA AFOLAYAN, widow of Nathaniel Afolayan, deceased, on behalf of herself and her minor daughter | | |
| NATALEE AFOLAYAN, daughter of Nathaniel Afolayan | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF RELATED CASES ....................................................viii

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ................................................................2

I.    LEGAL BACKGROUND.................................................................7

     A.    Public Safety Officers' Benefits Act ........................................7

     B.    Genetic Information Nondiscrimination Act ........................11

II.   FACTUAL BACKGROUND............................................................12

     A.    Nathaniel Afolayan .........................................................12

          1.    Border Patrol Training Academy ................................13

          2.    Sickle Cell Trait ........................................................15

     B.    Expert Medical Opinions .....................................................17

          1.    Dr. Sridhar Natarajan ................................................17

          2.    Dr. Stephen Cina........................................................18

          3.    Dr. Kris Sperry..........................................................18

          4.    Dr. Darinka Mileusnic-Polchan ..................................20

     C.    Procedural History ...............................................................21

          1.    Lisa Afolayan's First Public Safety Officer's Benefits Claim Process and Agency Appeal ..............................21

          2.    The Director's Initial Determination............................22

          3.    This Court's Decision and Remand ..............................23

4. The BJA's Decision on Remand ...................................24

SUMMARY OF THE ARGUMENT ........................................29

ARGUMENT ..........................................................................33

I. STANDARD OF REVIEW ............................................34

II. THE BJA'S DECISION IS CONTRARY TO THE PSOB STATUTE.....................................................................35

III. ALL CLIMATIC CONDITIONS, NOT ONLY THOSE THAT ARE "UNUSUALLY ADVERSE," CAN CAUSE A QUALIFYING INJURY ................................................43

IV. THE BJA'S DECISION WAS ARBITRARY AND CAPRICIOUS.49

A. The BJA Failed to Consider Whether the Combination of Heat, Altitude, and Humidity Created Unusually Adverse Work Conditions....................................................50

B. The BJA's Decision Is Contrary to the Evidence .................53

C. BJA Should Have *Included* The Other Contributing Factors In Determining Agent Afolayan's Eligibility ..........55

V. THE BJA IMPROPERLY CONSIDERED AGENT AFOLAYAN'S SICKLE CELL TRAIT IN DENYING THE CLAIM FOR DEATH BENEFITS .................................59

CONCLUSION .......................................................................67

CERTIFICATE OF SERVICE.................................................69

CERTIFICATE OF COMPLIANCE........................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afolayan v. DOJ,*
No. 2021-1452, 2022 WL 1124965
(Fed. Cir. Apr. 15, 2022) ..................................23, 24, 34, 36, 47, 48, 50

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
586 F.3d 1372 (Fed. Cir. 2009) ............................................... 35, 54, 59

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019)............................................................................ 46

*Baum v. Dunmire Prop. Mgmt.,*
No. 21-CV-00964, 2022 WL 889097 (D. Colo. Mar. 25,
2022)..................................................................................................... 60

*Bruesewitz v. Wyeth,*
562 U.S. 223 (2011)............................................................................ 48

*DiFranco v. City of Chicago,*
589 F. Supp. 3d 909 (N.D. Ill. 2022)................................................... 61

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018)............................................................................ 46

*Exby-Stolley v. Bd. of Cnty. Comm'rs,*
979 F.3d 784 (10th Cir. 2020)....................................................... 11, 64

*Flores v. Morehead Dotts Rybak, Inc.,*
No. 2:21-CV-00265, 2022 WL 4740076 (S.D. Tex. Sept. 29,
2022)..................................................................................................... 61

*Fourstar v. Garden City Grp., Inc.,*
875 F.3d 1147 (D.C. Cir. 2017) .......................................................... 47

*Glover v. West,*
185 F.3d 1328 (Fed. Cir. 1999) ..................................................... 44, 45

iii

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) ........................................................ 12, 66

*INS v. Yueh-Shaio Yang,*
519 U.S. 26 (1996) ............................................................. 56

*Juneau v. Dep't of Justice,*
583 F.3d 777 (Fed. Cir. 2009) ................................ 34, 47, 48

*Lockheed Corp. v. Widnall,*
113 F.3d 1225 (Fed. Cir. 1997) ........................................ 44

*Lomax v. Ortiz-Marquez,*
140 S. Ct. 1721 (2020) ...................................................... 44

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (U.S. 2024) ............................ 29, 35, 36, 38

*Meeks v. West,*
216 F.3d 1363 (Fed. Cir. 2000) .................................. 30, 43

*Meritor Savs. Bank, FSB v. Vinson,*
477 U.S. 57 (1986) ...................................................... 12, 65

*Molzof v. United States,*
502 U.S. 301 (1992) ........................................................... 39

*Morris v. Nielsen,*
374 F. Supp. 3d 239 (E.D.N.Y. 2019) ............................... 39

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y,*
135 F.3d 1260 (9th Cir. 1998) ........................................... 59

*Ortiz v. City of San Antonio Fire Dep't,*
806 F.3d 822 (5th Cir. 2015) ............................................. 60

*Parham v. Sw. Bell Telephone Co.,*
433 F.2d 421 (8th Cir. 1970) ............................................. 65

*Procopio v. Wilkie,*
913 F.3d 1371 (Fed. Cir. 2019) ........................................ 40

iv

*Robinson v. Sedgwick Claims Mgmt. Serv.*,
No. 23-CV-10782, 2024 WL 2784318 (S.D.N.Y. May 28, 2024) ................................................................ 60

*Rogers v. EEOC*,
454 F.2d 234 (5th Cir. 1971) ................................... 65

*Schlafly v. Saint Louis Brewery, LLC*,
909 F.3d 420 (Fed. Cir. 2018) ................................ 45

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ............................................... 40

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ......................................... 29, 40

*Stevens v. Principi*,
289 F.3d 814 (Fed. Cir. 2002) ................................ 67

*Thai I-Mei Frozen Foods Co.. v. United States*,
616 F.3d 1300 (Fed. Cir. 2010) ..................... 34, 51, 59

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ............................................... 38

*Wright ex rel. Wright v. United States*,
914 F. Supp.2d 837 (S.D. Miss. 2012) ................... 62

## Statutes

28 U.S.C.
§ 2106 ............................................................ 42, 68

34 U.S.C.
§ 10142 ................................................................ 63
§ 10281 ........................................ 7, 29, 36, 41, 63
§ 10281(a) ............................................... 7, 35, 38
§ 10284(13) .......................................................... 62
§ 10284(14) ................................................ 7, 62, 63
§ 10285(a) .............................................................. 7

42 U.S.C.
    § 2000e-2(a)(1) ..................................................... 65
    § 2000e-16(a) ................................................. 11, 62
    § 2000ff-1(a)........................................... 11, 61, 65
    § 2000ff(2)(B)(v)......................................... 11, 62
    § 2000ff(4)(A)(i) ................................................ 11

**Regulations**

28 C.F.R. § 32.3.........................3, 5, 8, 30, 28, 40, 43, 48, 57, 58

28 C.F.R. § 32.5...................................................... 8, 35

**Other Authorities**

Bureau of Justice Assistance, *Public Safety Officers' Benefit Program, Coronavirus / COVID-19 Update* (Apr. 2020), https://perma.cc/JT6Q-QG9G ........................................... 10

*Climatic*, Merriam-Webster New International Dictionary (2d ed. 1960) ....................................................... 44

Elizabeth Pendo, *Race, Sex, and Genes at Work: Uncovering the Lessons of Norman-Bloodsaw*, 10 Hous. J. Health L. & Pol'y 227 (2010) ................................................. 60

Filing a Civil Rights Complaint, U.S. Dep't of Just., Office of Just. Programs, Office for Civil Rights (June 2, 2023), https://bit.ly/46d12iZ.......................................... 64

Glenn E. Griffith et al., U.S. Geological Survey, *Ecoregions of New Mexico* (2006), https://bit.ly/4ff7DgY ......................................... 13

*List of highest United States cities by state or territory*, https://perma.cc/7KLG-E29T .............................................. 51

Nancy E. Gist, *BJA Fact Sheet: Public Safety Officers' Benefits Program* 1 U.S. Dep't of Just., Office of Just Programs, Bureau of Just. Assistance (Feb. 1999), https://perma.cc/F4XK-RTCN....................................... 65, 66

*Personal injury*, Black's Law Dictionary (rev'd 4th ed. 1968)...............37

*Proximate cause*, Black's Law Dictionary (11th ed. 2019) ....................39

## STATEMENT OF RELATED CASES

An appeal from the same Bureau of Justice Assistance ("BJA" or "Bureau") proceeding was previously before this Court. *See Afolayan v. Department of Justice*, No. 21-1452. A panel of this court, composed of Judges Newman, Dyk, and Hughes, rendered a decision vacating and remanding the prior BJA decision on April 15, 2022. That decision is not reported in the Federal Reporter, but can be found at 2022 WL 1124965 (Fed. Cir. Apr. 15, 2022). Counsel is not aware of any other case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this matter.

## STATEMENT OF JURISDICTION

Appellant appeals from a decision of the Director of the Bureau of Justice Assistance denying her death benefits under 34 U.S.C. § 10281. Appellant timely filed a notice of appeal and this Court has jurisdiction under 34 U.S.C. § 10287.

## STATEMENT OF THE ISSUES

1.     Whether the BJA unlawfully limited application of the Public Safety Officers' Benefits Act, which provides for a death benefit whenever an officer dies as "the direct and proximate result of an injury sustained in the line of duty," so that the benefit is available only when a statutory factor is the "single most significant cause" of the injury.

2.     Where BJA regulations provide for death benefits whenever "climatic conditions" cause an injury in the line of duty resulting in an officer's death, whether the BJA erred by requiring proof not only that climatic conditions caused the injury, but also that they were "unusually adverse."

3.     Whether the BJA acted arbitrarily and capriciously in failing to consider the cumulative impact of three adverse climatic conditions, rendering a decision contrary to the evidence, and by recognizing, but

failing to consider, other factors relevant to the injury that may have contributed to Agent Afolayan's death.

4.    Whether the Bureau of Justice Assistance erred by considering Agent Afolayan's sickle cell trait as a factor in denying his family's claim for death benefits, contrary to federal law prohibiting genetic discrimination.

## STATEMENT OF THE CASE

In May 2009, Agent Nate Afolayan collapsed and died after a mandatory 1.5-mile run at an altitude of 3,400 feet in the afternoon sun of the New Mexico desert just days before he was set to graduate from the Border Patrol training academy.  Over fifteen years later, his widow, Lisa Afolayan, and their two children, Natalee and a minor daughter, are still being denied the death benefits that Congress provides to the families of officers who die in the line of duty.  The Bureau of Justice Assistance has twice denied their claim, and this Court already vacated that denial once.

According to the Bureau, Agent Afolayan did not die "as the direct and proximate result of a personal injury sustained in the line of duty." Appx1 (quoting 34 U.S.C. § 10281(a)).  BJA does not deny that the

implementing regulations define "injury" as a "traumatized physical condition of the body[] directly and proximately caused by … climatic conditions," 28 C.F.R. § 32.3, or that Agent Afolayan's death certificate listed his cause of death as "Heat Illness," Appx4. Nor does it deny that every expert to look at this case has concluded that but for those climatic conditions, Afolayan would be alive today.

But the Bureau saw an out: Agent Afolayan, like 8% of all African Americans, had sickle cell trait. Sickle cell trait is a benign condition. *Every* branch of the Armed Forces and *every* law enforcement agency accepts recruits with sickle cell trait—it is *not* sickle cell disease. But those who have the trait are slightly more vulnerable to the risks that arid climates, high temperature, and high altitude pose to everyone. So the Bureau concluded that the Afolayans were not entitled to benefits because Agent Afolayan's death was not "the direct and proximate result" of mandatory high-altitude afternoon training in a hot desert. Instead, the BJA reasoned, his death was caused by a combination of factors, the most prevalent of which was likely his sickle cell trait rather than any "injury" sustained in the line of duty.

The BJA's decision was wrong for at least four reasons. First, the BJA regulations are in conflict with the PSOB Act in two different ways. They redefine "injury" to have a more narrow meaning than how the term has always been ordinarily understood, and the regulations only allow for a single "direct and proximate" cause of an injury or death. This Court is obligated to examine independently the plain statutory text and determine the its meaning. Any regulations that contravene that plain statutory text are invalid. And it is well established that events often have multiple proximate causes. Words are to be given their ordinary meaning, and when Congress uses a legal term of art in a statute, that term has the meaning it is normally ascribed by law, absent any indications otherwise. The regulation specifying that benefits are available only if a covered factor was *the single greatest factor in a specific kind of injury* conflicts with the statute Congress wrote.

Second, the regulation defining what constitutes a qualifying "injury" under the PSOB Act states that injuries can be caused by "climatic conditions." The BJA, without textual support in either the statute or regulation, considers that term to mean only "unusually adverse" climatic conditions—not just adverse enough to cause death, but

unusually adverse for that geographic area and time of year. The regulation's text is plain and clear, and it contains no such qualification. The BJA acted contrary to law when it employed an atextual limitation that was not incorporated into the regulation through the formal, legal rulemaking process.

Third, even if the BJA regulation were a proper interpretation of the PSOB Act and the Director properly interpreted the regulation, the BJA repeatedly acted arbitrarily and capriciously in reaching its decision. To begin, even if the climatic conditions had to be unusually adverse to cause a qualifying "injury," the BJA failed to adequately consider whether the combination of high heat, high altitude, and low humidity were unusually adverse. Next, the BJA ignored substantial evidence that the climatic conditions were the "direct and proximate" cause of Agent Afolayan's death, instead reaching a conclusion that is impossible to square with that evidence. And, finally, the BJA regulation sets forth two means by which a factor can be the direct and proximate cause of an injury: when it "alone was sufficient to have caused the death [or] injury"; *or* when it was the single most significant factor in the death or injury. 28 C.F.R. § 32.3. The BJA failed to consider other contributing

factors, including viral illness, rhabdomyolysis, and antihistamine use, contributed to Agent Afolayan's death, instead focusing only on whether the climatic conditions were the single most significant factor in his death.

Fourth, the Genetic Information Nondiscrimination Act ("GINA") prohibits federal employers from considering genetic information, such as sickle cell trait, in deciding whether to grant or deny terms, conditions, and benefits of employment. The BJA thus erred in considering—indeed, *extensively* considering—Agent Afolayan's sickle cell trait in denying him PSOB Act death benefits. This genetic information should have been wholly absent from the BJA's decision, and its inclusion created a decision that cannot withstand review.

The Afolayans should be the model recipients of PSOB death benefits. Their husband and father served his country and died in the line of duty. Congress chose to reward the kind of sacrifice that Agent Afolayan made with death benefits for his family. But a decade and a half after his death, the BJA is still denying them the life-changing benefits to which they are entitled. It is well past time for this Court to fulfill Congress's promise. This Court should reverse the Bureau's

decision and direct that the Afolayans' claim be granted so that they can finally receive the death benefits for Agent Afolayan's 2009 death.

## I.     LEGAL BACKGROUND

### A.     Public Safety Officers' Benefits Act

In 1976, Congress enacted the PSOB Act, 34 U.S.C. § 10281.  Under that statute, when a public safety officer dies "as the direct and proximate result of a personal injury sustained in the line of duty," the Bureau  shall pay a benefit to the surviving family of the officer.  34 U.S.C. § 10281(a). A "public safety officer" under the Act is defined as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, or as a chaplain."  34 U.S.C. § 10284(14)(A).

The statute delegates to the Bureau the authority "to establish such rules, regulations, and procedures as may be necessary to carry out the purposes of this subchapter."  34 U.S.C. § 10285(a).  The Bureau has promulgated extensive regulations governing when the spouse and children of a public safety officer are entitled to benefits.  Those regulations define the elements a claimant must satisfy in order to receive benefits:  that they suffered (1) an injury; (2) that directly and proximately caused disability or death; and (3) was sustained in the line

of duty.  *See* 28 C.F.R. § 32.3.  The regulations provide that "a claimant has the burden of persuasion as to all material issues of fact, and by the standard of proof of 'more likely than not.'"  28 C.F.R. § 32.5.  In making the determination, "the PSOB determining official may, at his discretion, consider (but shall not be bound by) the factual findings of a public agency."  *Id.*

*Injury:*  The regulations define when an "injury" is compensable. The regulation says, "[i]njury means a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virus, or bacteria."  28 C.F.R. § 32.3.  The regulations specifically carve out two exceptions that do not qualify as injuries eligible for benefits.  First, injury "does not include— (1) Any occupational disease," meaning "a disease (including an ailment or condition of the body) that routinely constitutes a special hazard in, or is commonly regarded as concomitant of, an individual's occupation."  *Id.* Second, injury does not include "[a]ny condition of the body caused or occasioned by stress or strain," which "includes physical stress or strain,

mental stress or strain, post-traumatic stress disorder, and depression."
*Id.* The regulations do not exclude anything else from the category of injuries eligible for benefits, nor do they define the different causes of an injury, including "climatic conditions."

***Directly and Proximate Cause:*** The regulations define when an injury "directly and proximately causes disability or death" by defining "direct and proximate cause," "direct and proximate result of an injury," and "substantial contributing factor." To begin, "something directly and proximately causes a wound, condition, or cardiac-event, if it is a substantial factor in bringing the wound, condition, or cardiac-event about." 28 C.F.R. § 32.3. Once the cause of the wound, condition, or cardiac-event is ascertained, "a death or disability results directly and proximately from an injury if the injury is a substantial factor in bringing it about." *Id.* Finally, the regulation states that "[a] factor substantially brings about a death, injury, disability, wound, condition … or stroke if— (1) The factor alone was sufficient to have caused the death, injury … or (2) [n]o other factor (or combination of factors) contributed to the death, injury … to so great a degree as it did." *Id.*

**Line of Duty:** As relevant here, an officer acts in the "line of duty" when engaged in an "activity or an action that [the officer] is obligated or authorized … to perform." *Id.*

Recently, in light of the COVID-19 pandemic, the Bureau issued guidance explaining that "[i]n general, BJA will find that the evidence shows that a public safety officer with COVID-19 contracted it in the line of duty, when (1) the officer had engaged in line of duty action or activity under circumstances that indicate that it was medically possible that the officer was exposed to the virus … while so engaged; and (2) the officer did contract the disease … within a time-frame where it was medically possible to contract the disease from that exposure." *See* Bureau of Justice Assistance, *Public Safety Officers' Benefit Program, Coronavirus/COVID-19 Update* (Apr. 2020), https://perma.cc/JT6Q-QG9G. Additionally, "in the absence of evidence showing a different cause of death, BJA generally will find that the evidence shows a public safety officer who died while suffering from COVID-19 died as the direct and proximate result of COVID-19." *Id.*

## B. Genetic Information Nondiscrimination Act

Congress passed the Genetic Information Nondiscrimination Act of 2008 to prohibit certain types of genetic discrimination. Title II of GINA states that it is unlawful for an employer:

> (1) to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or
>
> (2) to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.

42 U.S.C. § 2000ff-1(a). GINA defines "genetic information" as "with respect to any individual, information about … such individual's genetic tests." *Id.* § 2000ff(4)(A)(i). "Employer" is defined to include entities described by 42 U.S.C. § 2000e-16(a), which includes federal agencies like BJA. *See id.* § 2000ff(2)(B)(v).

Although GINA does not define "terms, conditions, or privileges of employment," "the Supreme Court has noted that … the inclusion of 'terms, conditions, [and] privileges of employment' language in a statutory provision … signals that the provision at issue covers a wide range of conduct *within* the employment context." *Exby-Stolley v. Bd. of*

*Cnty. Comm'rs*, 979 F.3d 784, 817 (10th Cir. 2020) (brackets in original). Specifically, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment … in employment.'" *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). And the Supreme Court has held that something that entices entry into a job is a "term, condition, or privilege" of employment entitled to protection from discrimination. *See Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984).

## II. FACTUAL BACKGROUND

### A. Nathaniel Afolayan

Nathaniel Afolayan was born on March 26, 1980 in Nigeria. Appx510. He moved to the United States when he was eleven years old and became a United States citizen in 2001. Appx510. Nate was always an athlete and he played high school varsity basketball. Appx510. Nate graduated from high school in 1997 and from the California State University with a bachelor's degree in Political Science in 2001. Appx510. In 2003, Nate and Lisa Afolayan got married. Appx510. The Afolayans had two daughters, born in 2006 and 2007 respectively. Appx510. Natalee Afolayan is their elder daughter. Appx510.

After the birth of his second child, Nate realized he wanted to serve his country and began filling out applications for law enforcement positions.  Appx510.  He focused on his physical fitness, spending hours at the gym every day, to excel in law enforcement.  Appx510.  In 2009, after being declared medically fit, Afolayan was accepted into the United States Border Patrol, a component of United States Customs and Border Protection.  Appx510.  On February 16, 2009, Nate was sworn in as a Border Patrol Agent and was sent to the twelve-week program at the training academy in southern New Mexico.  Appx510.

### 1.    Border Patrol Training Academy

The Border Patrol Academy is located in Artesia, New Mexico, in the Chihuahuan Desert.  Appx3; s*ee also* Glenn E. Griffith et al., U.S. Geological Survey, *Ecoregions of New Mexico* (2006), *available at* https://bit.ly/4ff7DgY.  While at the academy, Agent Afolayan was ranked among the top five trainees in his class in physical fitness.  Appx511.  He was nominated by his instructors and his peers to give the graduation speech for his border patrol class.  Appx511, 411.  Agent Afolayan's classmates described him as "in really good shape and ripped," Appx418; "in excellent shape, probably the best shape in the class," Appx407; "top-

notch; he was like a machine," Appx428; "top physical condition," Appx441; "a stallion – very strong and well in shape," Appx453; and "in excellent shape," Appx465.

On April 30, 2009, five days before he was supposed to graduate, Agent Afolayan's class went on a mandatory 1.5 mile run, part of their "final physical fitness test" before graduation. Appx1. The day was sunny, and all of Agent Afolayan's classmates remembered that it was "[r]eally hot. Very hot." Appx429; *see also* Appx465 ("It was hot. I don't remember the exact temperature, but it was hot."); Appx453 ("It was very hot."); Appx442 ("It was really hot. I remember the dirt just being like really dusty."); Appx418 ("Hot and dry."). The highest recorded temperature that day was 92 degrees (and it was around 88 degrees at the time of the run), the relative humidity was 7%, and the run took place in the afternoon sun at 2:45 pm, at approximately 3400 feet above sea level. Appx514, 3-4. The class ran in "thick" "[b]lack cotton" shirts despite protests from some agents, including Agent Afolayan, that "it was going to be too hot to wear black shirts." Appx453, 419.

Agent Afolayan completed the run in 11 minutes and 6 seconds. Appx87. A classmate, Agent Mora, noted that he finished his run before

Agent Afolayan, and "this was not normal because [Afolayan] was *always* ahead of [Mora] during all [their] runs." Appx455 (emphasis added). After completing the run, Agent Afolayan experienced shortness of breath. Appx87, 454. A minute later, he collapsed. Appx88. Agent Afolayan was taken to the Medical Unit, where the staff attempted to get his vital signs. Appx90. Agent Afolayan became combative, uncooperative, and unresponsive. Appx90. The Medical Unit called an ambulance to take him to the hospital. Appx90. After arriving at the hospital, Agent Afolayan stopped breathing and was placed on a ventilator. Appx90. Agent Afolayan was then airlifted to Lubbock, Texas for further treatment. Appx91. On May 1, 2009, Agent Afolayan died. Appx92. The initial death certificate listed no cause of death; the amended death certificate listed the cause of death as "Heat Illness," and identified "cardiomegaly (cardiac disease)" as a "significant condition[] contributing to death." Appx4 (quoting Appx51-52).

## 2. Sickle Cell Trait

Almost two years before Agent Afolayan passed away, genetic testing revealed that Nate Afolayan had the sickle cell trait. Appx341. Lisa Afolayan was informed of her husband's test results in a letter dated

January 17, 2008.  Appx341. The letter informed the Afolayans that Nate "is a carrier of sickle cell trait (AS), which is NOT a disease."  Appx341. The letter further explained that Nate's "[h]emoglobin traits are clinically benign carrier conditions."  Appx342.

"Sickle cell trait is an inherited blood disorder that affects about 8 percent of African Americans."  Appx514.  "In general, these individuals enjoy normal life spans with no medical problems related to the trait."  Appx514.  Nate Afolayan, in particular, had "the heterozygous genotype, which meant that his hemoglobin composition was 56 percent Hemoglobin A (normal allele) and 41 percent Hemoglobin S (abnormal allele)."  Appx514.  "Sickle cell trait phenotype with this particular AS genotype ratio did not prevent [A]gent Afolayan from living a normal life filled with usual activities including enrollment in either military or law enforcement service."  Appx514.

To Appellant's knowledge—and as confirmed by Appellant's experts—no law enforcement service excludes applicants with the sickle cell trait.  *See* Appx371.  The U.S. Marine Corps does test for sickle cell trait "in order to identify individuals who may be at risk for a sickle cell crisis if placed in extreme environmental conditions."  Appx371.  But the

Marines only consider separating a recruit from training if his percentage of Hemoglobin S is over 45%.  Appx371.  Because Agent Afolayan's blood levels were only 41% Hemoglobin S, "he would not have been separated from training had he been a Marine recruit."  Appx371.

"Although it is recognized by the U.S. Military that individuals with sickle cell trait have an increased statistical risk for death (although these deaths are extremely rare), it has also been shown that prevention of heat-related illness and extensive education on proper hydration and avoidance of heat stroke has essentially eliminated this risk among military recruits."  Appx371.

## B.  Expert Medical Opinions

Four doctors offered opinions on the cause of Agent Afolayan's death.

### 1.  Dr. Sridhar Natarajan

Dr. Sridhar Natarajan, M.D., M.S. is the Chief Medical Examiner of Lubbock County, Texas.  Appx70.  He performed an autopsy on Agent Afolayan's body shortly after his death and filed both the death certificate and an Autopsy Examination Report.  Appx51-52, 63.  Dr. Natarajan concluded that "the Cause of Death of Nathaniel Afolayan … was due to Heat Illness."  Appx70.  Dr. Natarajan noted that "[d]uring a period of

strenuous physical exertion in a hot environment he began to exhibit signs of not feeling well." Appx70. Agent Afolayan "showed signs and symptoms of heat illness and rapidly deteriorated." Appx70. "At autopsy his heart was enlarged which made him more sensitive to a strenuous environment." Appx70.

## 2. Dr. Stephen Cina

In 2011, Dr. Stephen Cina, M.D., a forensic pathology consultant, performed a medical review of Agent Afolayan's medical records at the Justice Department's request for the purpose of evaluating Lisa Afolayan's PSOB claims. Appx228-233. Dr. Cina concluded that Agent Afolayan's "collapse and subsequent demise were brought about by the combination of a congenital condition (sickle cell trait or disease) and exercise in a hostile environment. Antihistamine use, dehydration, and a viral illness could also have played a smaller role in this death." Appx232-233. Dr. Cina testified that Agent Afolayan "would not have collapsed on 4/30/09 if he was not exercising in an adverse environment and that the climate played some role in his death." Appx232.

## 3. Dr. Kris Sperry

Forensic pathologist Dr. Kris Sperry, M.D. also reviewed Agent Afolayan's medical records and provided an opinion on the causes of his

death.   Appx370-372.   Dr. Sperry found that "the clinical symptoms exhibited by Mr. Afolayan following his 1.5 mile run in hot weather, followed by the development of respiratory and neurological deterioration, renal failure, rhabdomyolysis and death, is a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition, which evolves in to a sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration.   Fortunately, these deaths are rarely encountered." Appx371.

Dr. Sperry concluded "to a reasonable degree of medical certainty, that Nathaniel A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run." Appx371.  "This physical training took place in a hot environment, which is a known contributing factor in the evolution of a sickle cell crisis." Appx371-372.  "Thus, [Dr. Sperry was] in agreement with both Drs. Cina and Natarajan, that Nathanial A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of

running 1.5 miles in a hot environment, he would not have died." Appx372.

### 4. Dr. Darinka Mileusnic-Polchan

Finally, Dr. Darinka Mileusnic-Polchan, M.D., the Chief Medical Examiner at the Knox County, Tennessee Regional Forensic Center, offered an opinion on Agent Afolayan's death. Appx513-518. Dr. Mileusnic-Polchan noted that, on the day Agent Afolayan collapsed, "the highest recorded temperature was 92° Fahrenheit with a relative humidity of 7%." Appx514. "Another important factor ... was the Artesia, New Mexico altitude of about 3500 feet." Appx515. "[A] combination of altitude and exertion in a hot environment is a dangerous triad" that, in "people with sickle cell trait ... could also initiate a vicious cycle of exertional rhabdomyolysis." Appx515.

As Dr. Mileusnic-Polchan recognized, "Agent Afolayan was fit and accustomed to strenuous exercise prior to his relocation to Artesia, New Mexico." Appx517. Afolayan's "sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation." Appx517. While in New Mexico, Agent Afolayan "pushed himself hard during workouts without having experienced any troubles until the second and

third months of his training." Appx517. Dr. Mileusnic-Polchan explained that "[t]he only new variables that created a different set of circumstances for [Afolayan] were the climatic condition (heat), exertional dehydration (dry environment) and altitude that together initiated the vicious cycle of rhabdomyolysis and acute renal failure. Ultimately, these events led to organ system failure and precipitated [Afolayan's] demise." Appx517.

## C. Procedural History

### 1. Lisa Afolayan's First Public Safety Officer's Benefits Claim Process and Agency Appeal

Lisa Afolayan filed a claim for death benefits on behalf of herself and her children under the PSOB Act, 34 U.S.C. § 10281, in October 2009.[1] Appx45. In March 2012, the claim was denied. Appx256-258. Lisa appealed the denial and requested a Hearing Officer Determination. In January 2014, the Hearing Officer denied Lisa's appeal. Appx500. The Hearing Officer determined that climatic conditions likely were not

---

[1] Ms. Afolayan also separately applied for, and was granted, worker's compensation benefits under the Federal Employees' Compensation Act, administered by the Office of Workers' Compensation Programs of the Department of Labor. *See* Appx630-631. Relying on Dr. Natarajan's opinion, the agency concluded that Agent Afolayan died "while in the performance of duty." Appx631.

the cause of Agent Afolayan's death because "while the temperature was what many might consider 'hot,' it was not extremely hot or extraordinarily hot." Appx496. The Hearing Officer then determined that completing a 1.5-mile run at "the approximate equivalent of an eight and one-half minute mile" pace "would appear to qualify as 'physical stress or strain.'" Appx497. The Hearing Officer concluded that the "'climatic condition' (the hot day) was not a 'substantial factor' as that term is described in" the regulations because "the largest contributor of death here" was "a sickle cell crisis." Appx499.

Lisa Afolayan appealed the Hearing Officer Determination to the Bureau Director.

## 2. The Director's Initial Determination

The Acting Director of the Bureau of Justice Assistance denied the Afolayans' claim for PSOB benefits. Appx610-611. The Director acknowledged that Agent Afolayan was a covered "public safety officer," Appx621, and did not dispute that his death occurred "in the line of duty." Appx622. But the Director concluded that Agent Afolayan had not sustained an "injury" because, he concluded, "Agent Afolayan died—not from a wound or condition shown to have itself been 'the direct and

proximate result' of climatic conditions, such as heat, or another external force/factor cognizable as an 'injury' under PSOB regulations—but, rather, as a result of several factors acting together, including physical exertion, sickle cell trait, heat, altitude, and dehydration."  Appx610. Based on his conclusion that "climatic conditions" were not "the single biggest contributor" to Afolayan's death, Appx626, the Director denied benefits.

### 3.    This Court's Decision and Remand

Lisa Afolayan appealed the Director's decision to this Court.  *See Afolayan v. DOJ*, No. 2021-1452, 2022 WL 1124965 (Fed. Cir. Apr. 15, 2022).  This Court vacated the Director's decision and remanded.  This Court noted that the "first questions here are whether the Bureau made a determination that climatic conditions were such an injury (or factor) that could support recovery if it were the predominant factor and what the relevant standard is for making that determination."  *Id.* at *2.  And the Court noted that the "Bureau's decision [was] less than clear as to whether the climatic conditions qualified as a direct and proximate cause if they were the predominant factor," instead "skipp[ing] straight to concluding that Agent Afolayan's death was not 'the direct and proximate

result' of climatic conditions because several factors, including sickle cell trait, 'act[ed] together' to cause his death." *Id.* (second alteration in original). This Court advised that "[t]he Bureau should first address a predicate question—whether Agent Afolayan suffered a compensable injury as a result of 'climatic conditions.'" *Id.* at *3.

The Court continued that, after the Bureau determines whether Agent Afolayan's death was the direct and proximate result of an injury caused by climatic conditions, it must then consider "whether sickle cell trait is appropriately considered in determining whether another factor contributed to the death to so great a degree as unusual climatic conditions." *Id.* at *4 (cleaned up). This Court noted that "[t]here is support for the view that … genetic traits," such as sickle cell trait, "should not be taken into consideration" in PSOB claims. *Id.* at *5.

### 4. The BJA's Decision on Remand

On remand, the BJA Director concluded he was "not persuaded that it is more likely than not that Border Patrol Agent Nathaniel Afolayan sustained an 'injury,' as that term is defined in the PSOB Act and its implementing regulations, and thus [was] unable to conclude that he 'died as the direct and proximate result of a personal injury sustained in

the line of duty.'"  Appx1-2 (quoting 34 U.S.C. § 10281(a)).  The Director, thus, denied Lisa's claim.  Appx26.

The Director began by examining the "three climatic conditions" at issue here:  the heat, low humidity, and high altitude.  Appx5.  The Director noted that "for PSOB purposes, such conditions needed to be 'unusually adverse.'"  Appx5.  The Director acknowledged that the temperature at the time of the mandatory run was "just below 88 degrees, with humidity between 6 and 7 percent, at an elevation of approximately 3,400 feet."  Appx5.  The Director looked at weather patterns in Artesia throughout April 2009 to determine whether temperature and humidity, considered separately, were unusual for the time period in that area. Appx5-6.  The Director then used information such as the National Oceanic and Atmospheric Administration ("NOAA") Heat Index and the wet bulb black globe temperature index ("WBGT") to assess how heat and humidity may impact the human body.  Appx6.  While several of the expert witnesses had blamed Agent Afolayan's death on dehydration caused by exertion in a high desert, the Director did not discuss that; indeed, the word "dehydration" does not appear in his entire discussion of climatic conditions.  Instead, he focused on how low humidity could

lower perceived temperature. Appx11. The Director also looked at standards posted by the United States Army, U.S. Soccer, and the American College of Sports Medicine to assess whether he believed the heat and humidity could have caused Agent Afolayan's injury. Appx6-9. None of these sources considered altitude or the effects of dehydration caused by exertion in dry climates. The Director concluded that he was "unpersuaded that it is 'more likely than not' that the temperature in the area during Agent Afolayan's 1.5-mile run … was 'intensely high' or 'unusually adverse.'" Appx11.

The Director next found that the altitude was not "so 'unusually adverse' as to constitute a 'climatic condition' within the meaning of the term *Injury*." Appx11. The Director looked to standards for the aviation industry regarding altitude's effect on aircraft passengers and the Marine Corps standards for physical fitness tests at altitude, Appx12, as well as more general standards related to when altitude impacts a human's body, Appx13. None of these sources considered the combined effects of exertion at high temperatures and low humidity at high altitude. The Director found that the altitude was "not unusual enough"

to amount to a "climatic condition" within the meaning of the term "injury." Appx14.

None of the sources the Director discussed considered the combined effects of heat, humidity, and altitude. Nor did the Director's discussion of climatic conditions in a high desert mention "dehydration." The Director nonetheless summarily concluded that "consider[ing] the temperature, Heat Index, and WBGT … *in combination* with Artesia's roughly 3,400-foot elevation," Appx14, he was "not persuaded that it is 'more likely than not' that any of the conditions would materially alter the significance of any (or all) of the others," Appx14. He then concluded that the altitude, heat, and humidity "were [not] so 'unusually adverse,' 'intense[],' or severe as to constitute a 'climatic condition,' as that term is used in the definition of *Injury*." Appx14 (alteration in original).

The Director then considered whether, even if the external factors were unusually adverse enough to be considered "climatic conditions," Agent Afolayan's injury was "directly and proximately caused" by those climatic conditions. Appx15. After reviewing the varying medical experts' reports and testimony—all of which concluded that climatic conditions contributed to Agent Afolayan's death, Appx15-18—the

Director was "persuaded that a combination of pre-existing rhabdomyolysis from an unknown cause, sickle cell trait, and physical stress or -strain, all together, contributed to the medical crisis to a greater degree than any other factors, including the weather/altitude conditions." Appx22. Although the Director did not analyze the interaction of the heat, temperature, and altitude, he concluded that those factors did not "contribute[] much to Agent Afolayan's fatal medical crisis." Appx23. Instead, he "conclude[d] that it is 'more likely than not' that sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia all contributed *to some extent* to Agent Afolayan's medical crisis." Appx26. The Director explicitly noted that he did not believe rhabdomyolysis was a "line of duty injury," because it was of unknown cause, Appx26, but the Director did not address whether the viral illness Agent Afolayan experienced during his ten weeks at the camp was a line-of-duty injury.

Finally, the Director addressed the Afolayans' GINA argument. Appx27-28. The Director found that GINA did not apply because (1) the BJA denied the claim and it was not Agent Afolayan's "employer;" and

(2) PSOB Act death benefits are not "compensation, terms, conditions, or privileges of [] employment." Appx27.

## SUMMARY OF THE ARGUMENT

**I.** The Bureau of Justice Assistance's regulation limiting the term "injury" and defining the PSOB Act's "direct and proximate cause" language to mean only the single factor that was most significant in bringing about an injury or death represents an unreasonable interpretation of the PSOB Act. Under the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, this Court must exercise its "independent judgment" to determine the best meaning of the statutory text. 144 S. Ct. 2244, 2273 (2024). Here, the PSOB Act is clear; benefits are warranted when an officer dies as the "direct and proximate result of a personal injury." 34 U.S.C. § 10281. "Injury" means any physical harm to the body, and "direct and proximate cause" is ordinarily understood not to be limited to a single or "most substantial" cause, as the Supreme Court has repeatedly noted that events often have multiple proximate causes. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). Because the PSOB Act is clear that the meaning of both "injury" and "direct and proximate" should be the same one given to the words in the

law, the Bureau's crabbed and atextual understanding embodied in its regulation must fall.

**II.** The BJA erred by requiring the climatic conditions that caused Agent Afolayan's injury to be "unusually adverse," although the applicable statute and regulation contain no such limitation. 28 C.F.R. § 32.3 states that "injury" means "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force … , chemicals, electricity, *climatic conditions*, infectious disease, radiation, virus, or bacteria." (emphasis added). There is no reference to "unusually adverse" conditions, so the plain text indicates all climatic conditions apply. "In construing a statute or regulation, [courts] begin by inspecting its language for plain meaning." *Meeks v. West*, 216 F.3d 1363, 1366 (Fed. Cir. 2000). Here, the plain meaning is all "climatic conditions" can cause an "injury."

**III.** Even if the climatic conditions must be "unusually adverse" to justify an award of benefits, the BJA acted arbitrarily and capriciously in its conclusion that no line-of-duty injury was the direct and proximate cause of Agent Afolayan's death.

**A.**  The BJA failed to properly consider whether the cumulative effect of the conditions here were unusually adverse, as it used poor and improper comparators.  The BJA did not cite any evidence that looked at the impact high heat and low humidity *at a high altitude* have on the human body, let alone a human body that is undergoing physical exertion.  The BJA considered the role of humidity in lowering perceived temperature, not its role in causing dangerous dehydration. The BJA thus essentially assessed each factor alone.  That assessment cannot yield a conclusion regarding whether and to what extent the combination of all three factors was unusually adverse.

**B.**  The BJA's decision also runs counter to the evidence before the agency.  The Afolayans presented extensive evidence and expert reports explaining that the climatic conditions caused Agent Afolayan's medical crisis and death.  Several medical experts—including the government's own expert—conceded that Afolayan would still be alive but for the climatic conditions at the Academy that day.  *See* Appx233; Appx372; Appx517.  But the BJA looked the other way and ruled that the climatic conditions could not have been the "biggest factor" in Agent Afolayan's death when it is undeniable that without them, he would still be alive.

**C.** The BJA erroneously refused to consider other contributing factors in determining whether Agent Afolayan died from a line-of-duty injury. The Director and BJA's experts recognized a number of factors that contributed to Agent Afolayan's death: "sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia." Appx26. All of these, with the exception of sickle cell trait, arose during Agent Afolayan's tenure at the Border Patrol Academy. Yet the Director saw them all as unrelated to the line of duty, and, thus, detracting from Agent Afolayan's claim for benefits. This failure to properly consider other contributing factors was reversible error.

**IV.** The BJA erroneously considered sickle cell trait in assessing Agent Afolayan's PSOB claim, in violation of the Genetic Information Nondiscrimination Act. Agent Afolayan was a federal employee and the federal government discriminated against him in the "'terms, conditions, [and] privileges of employment" because of genetic information. Discrimination based on sickle cell trait was one of the specific motivations behind Congress passing GINA, and the BJA's consideration of sickle cell trait ignores that congressional prohibition. The BJA should

have removed all consideration of sickle cell trait from its decisionmaking, and its failure to do so warrants reversal.

## ARGUMENT

It is undisputed that Agent Afolayan was a "public safety officer" who died "in the line of duty." *See* Appx621-622. The only question is whether his death was "directly and proximately caused" by "an injury" under the PSOB. In concluding on remand that it was not, the BJA for a second time failed to properly assess the Afolayans' claims and denied Lisa Afolayan and her children the death benefits that they should have received fifteen years ago.

There are four separate reasons why this Court must reverse the BJA's decision. First, the Bureau regulations impermissibly define "direct and proximate cause" contrary to the PSOB Act's plain text. Second, the Director failed to comply with the plain language of the statute and regulations by improperly limiting the term "climatic conditions" to include only "unusually adverse" conditions. Third, the Director acted arbitrarily and capriciously many times over. And fourth, the Director improperly relied upon Agent Afolayan's sickle cell trait to deny Lisa and Natalee Afolayan's claim, which is precisely the type of

genetic discrimination Congress sought to eradicate when it passed GINA.

Based on any one of these reasons, it is clear that, once again, the BJA's "decision must be set aside." *Afolayan*, 2022 WL 1124965, at *2.

## I. STANDARD OF REVIEW

This Court's "review of a denial of benefits under the PSOB Act by the BJA is limited to three inquiries: '(1) whether there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and (3) whether substantial evidence supports the decision denying the claim.'" *Juneau v. Dep't of Justice*, 583 F.3d 777, 780 (Fed. Cir. 2009) (quoting *Amber-Messick v. United States*, 483 F.3d 1316, 1321 (Fed. Cir. 2007)). This Court looks "for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion," *Thai I-Mei Frozen Foods Co.. v. United States*, 616 F.3d 1300, 1304 (Fed. Cir. 2010) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998)), and must find an agency decision arbitrary and capricious if the government

"entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"[A] claimant has the burden of persuasion as to all material issues of fact, and by the standard of proof of 'more likely than not.'" 28 C.F.R. § 32.5.

## II. THE BJA'S DECISION IS CONTRARY TO THE PSOB STATUTE

In enacting the PSOB Act, Congress stated that the BJA "shall" pay a death benefit to surviving family when "a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C. § 10281(a). This case fundamentally turns on a question of statutory interpretation and the meaning of the phrase "direct and proximate result of a personal injury" in that statute. The Director's decision must be reversed because it contradicts the "best reading" of the statute, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct.

2244, 2263 (U.S. 2024), for two distinct reasons. First, the BJA's regulations unduly limit the term "personal injury" to include a more narrow category of injuries than the statutory text dictates. Second, the BJA improperly reads the term "direct and proximate cause" to mean there can be only *one* direct and proximate cause of an injury and death. *See* Appx22 (finding that the climatic conditions needed to be "the biggest factor in causing" Agent Afolayan's medical crisis). Neither interpretation can be squared with the plain text of the PSOB Act, which this Court is required to examine with its "independent judgment," *Loper Bright*, 144 S. Ct. at 2273, employing "the traditional tools of statutory construction," *id.* at 2268.

The Supreme Court recently clarified that federal courts must "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 2263. Here, Congress directed that when an officer dies "as the direct and proximate result of a personal injury," then the officer's family is entitled to benefits. 34 U.S.C. § 10281. That congressional mandate has one clear meaning. *See Loper Bright*, 144 S. Ct. at 2266 ("[S]tatutes, no matter how impenetrable, do—in fact, must—have a single best meaning. That is the whole point of having

written statutes; 'every statute's meaning is fixed at the time of enactment.'" (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))). This Court, thus, must determine the best meaning of the two-part phrase "direct and proximate result of a personal injury."

Looking first at the meaning of "personal injury," the PSOB Act allows recovery for any death that directly and proximately results from "a personal injury." Congress did not qualify that term at all, and this Court must "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent.*, 585 U.S. at 277 (cleaned up). At the time of enactment, "Personal injury" meant "[a] hurt or damage done to a man's *person*, such as a cut or bruise, a broken limb, or the like, as distinguished from an injury to his property or his reputation." *Personal injury*, Black's Law Dictionary (rev'd 4th ed. 1968). So the term was plainly understood to mean a physical injury to one's person.

Despite this clear textual mandate, the BJA regulations re-define "injury" as "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force …, chemicals, electricity, climatic conditions, infectious disease,

radiation, virus, or bacteria." 28 C.F.R. § 32.3. This definition changes the statute's plain text to narrow the universe of qualifying injuries—and the BJA lacks authority to amend federal statutes.

To be clear, Petitioners do not dispute that Congress granted BJA authority to promulgate regulations to implement the PSOB Act. But the statutory text was set by Congress and any perceived "ambiguity is not a delegation to anybody." *Loper Bright*, 144 S. Ct. at 2266. The Bureau cannot amend that statutory text with regulations that displace the plain meaning of statutory terms. *See Wis. Cent.*, 585 U.S. at 284 ("Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law."). Thus, the plain meaning of "personal injury" applies, not the Bureau's narrower definition.

Turning next to the first half of the definition, the PSOB Act says, succinctly, that a public safety officer's family is entitled to death benefits if the officer "died as the direct and proximate result" of an injury. 34 U.S.C. § 10281(a). This Court must thus determine the best meaning of

the term "direct and proximate."  Fortunately, the Court is not working

from a blank slate, as "[a] cardinal rule of statutory construction holds

that:

> '[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.'

*Molzof v. United States*, 502 U.S. 301, 307 (1992) (quoting *Morissette v.*

*United States*, 342 U.S. 246, 263 (1952)).  "[T]he phrase … 'direct and

proximate,' is a term of art with 'a long pedigree in the law.'"  *Morris v.*

*Nielsen*, 374 F. Supp. 3d 239, 250 (E.D.N.Y. 2019) (quoting *Molzof*, 502

U.S. at 306).  Black's Law Dictionary defines a direct and proximate

cause as "[a] cause that directly produces an event and without which the

event would not have occurred."  *Proximate cause*, Black's Law Dictionary

(11th ed. 2019) (listing "direct and proximate cause" as having the same

meaning as "proximate cause").  This "phrase has appeared in every

edition of Black's Law Dictionary—with substantially the same

definition—since 1979."  *Nielsen*, 374 F. Supp. 3d at 250.  Similarly, the

Supreme Court has explained, "Proximate cause is causation substantial

enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004). In other words: there can be multiple direct and proximate causes of an injury.

Despite this plain meaning, under the BJA regulations, the only way an injury or factor can be a "direct and proximate cause" is if it either 1) "alone was sufficient to have caused the death [or] injury;" or 2) was the single most significant factor in the death or injury. 28 C.F.R. § 32.3. Accordingly, the Bureau's regulations are directly at odds with the longstanding understanding of "direct and proximate cause" since the regulations allow for only one proximate cause. As the Supreme Court has said, "it is common for injuries to have multiple proximate causes." *Staub*, 562 U.S. at 420. And there is no indication that Congress intended to depart from the well-recognized meaning of "direct and proximate." The longstanding definition of "direct and proximate" is clear, and "that is the end of the matter." *Procopio v. Wilkie*, 913 F.3d 1371, 1381 (Fed. Cir. 2019) (quotation marks omitted). An "injury" under the PSOB Act can result from multiple direct and proximate causes.

The BJA acted outside its statutory authority in redefining the term "direct and proximate" cause, and that error was dispositive here. Multiple experts testified that Agent Afolayan would not have died if not for the severe atmospheric conditions under which his mandatory run occurred. Appx70, 232, 371-372, 517. And the Director recognized that a number of factors: "sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia[—]all contributed" to Agent Afolayan's injuries, concluding that the presence of multiple causes meant Agent Afolayan did not suffer a qualifying "injury." Appx26-27. But because the PSOB Act only asks whether an officer died "as the direct and proximate result of a personal injury," 34 U.S.C. § 10281, the relevant question should have been whether any one of those factors "directly produce[d] [Agent Afolayan's death] and without which [it] would not have occurred"—not which factor was the single most important cause. The agency's interpretation that a factor can only directly and proximately cause an "injury" if it is the most significant factor is contrary to the statute's plain text.

At minimum, this Court should reverse so that the Bureau can reevaluate the Afolayans' case under the clear textual meaning of "direct and proximate cause." But, because the evidence in this case overwhelmingly demonstrates that Agent Afolayan died as the result of a compensable "injury," this Court should remand with instructions that the Bureau of Justice Assistance award the Afolayans death benefits for Agent Afolayan's death.

Appellants respectfully request that if the Court reverses and remands, it order the BJA to expedite proceedings on remand. *See* 28 U.S.C. § 2106 (appellate court may "require such further proceedings to be had [on remand] as may be just under the circumstances"). Nearly two years elapsed between this Court's prior remand and the BJA's most recent decision, and it has been fifteen years since Lisa Afolayan originally filed a claim for benefits. Appx45. The Afolayan's daughters, who were quite young when their father died, are now approaching college age and prompt resolution of their claims would materially assist in supporting the family. All parties would benefit from prompt resolution on remand.

## III. ALL CLIMATIC CONDITIONS, NOT ONLY THOSE THAT ARE "UNUSUALLY ADVERSE," CAN CAUSE A QUALIFYING INJURY

Even if this Court concludes that the BJA has statutory authority to define the term "personal injury," the decision below still must be reversed because the Director misinterpreted the regulatory text. The BJA regulations define "injury" to include "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force …, chemicals, electricity, *climatic conditions*, infectious disease, radiation, virus, or bacteria." 28 C.F.R. § 32.3 (emphasis added). The BJA, on remand, injected the qualifier "unusually adverse" before "climatic conditions." There was no basis for that addition. The plain language of the regulation states that an injury directly and proximately caused by *climatic conditions* qualifies as an "injury" that can support a PSOB claim. The regulation is clear. By inserting a limitation nowhere in the regulation, the Director did not comply with the governing law, and the denial of benefits must be vacated.

"In construing a statute or regulation, [courts] begin by inspecting its language for plain meaning." *Meeks*, 216 F.3d at 1366. Courts "look

at [a provision's] plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). "If we conclude that the terms of the statute or regulation are unambiguous, no further inquiry is usually required." *Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999). Courts "attempt to give full effect to all words contained within that statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible." *Id.* But, at the same time, neither courts nor agencies may "narrow a provision's reach by inserting words" the implementing body "chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

The regulation here is not ambiguous. It states that a "climatic condition" can directly and proximately cause an "injury." Climatic has long been defined as "of or pertaining to a climate," and climate is defined as "[t]he average course or condition of the weather at a particular place, over a period of many years, as exhibited in absolute extremes, means, and frequencies of given departures from these means, of temperature, wind velocity, precipitation, and other weather elements." *Climatic*, Merriam-Webster New International Dictionary (2d ed. 1960). Thus, the

common meaning of the word "climatic" means things concerning the weather—and indeed *average* weather conditions. This is a far cry from "unusually adverse." That means that, per the regulation's clear text, things related to average weather conditions can cause an "injury" for purposes of PSOB benefits.

Nowhere in the plain text or the common dictionary definition of that word is it suggested that the climatic condition be "unusually adverse," any more than it requires that chemicals be especially noxious, electricity be particularly high-voltage, or infectious diseases be singularly virulent. A plain reading of the statute shows the Bureau's definition of injury expressly includes "climatic conditions," and the absence of any qualifiers "excludes [that qualifier] left unmentioned." *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018) (quoting *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017)). Because the language was unambiguous, "no further inquiry" is needed and the inquiry is "complete." *Glover*, 185 F.3d at 1332. Climatic conditions means *all* conditions related to the weather. Of course, as a descriptive matter, "climatic conditions" that result in physical injury are likely to be harsh; people are unlikely to suffer fatal injuries from ordinary

climatic conditions, any more than they are to die from mild chemicals or benign viruses. But there is no regulatory requirement that climatic conditions be unusually adverse.

To be sure, the prior panel of this Court, in its unpublished decision, noted that it was "generally correct" to "requir[e] that conditions be unusual" because "[t]he reference to 'climatic conditions' in the regulations refers to nonroutine 'climatic conditions,' that is, conditions different from the typical conditions prevailing in the work environment," and later referred to them as "unusually adverse." *Afolayan*, 2022 WL 1124965, at *3. The parties did not brief the issue nor present it to this Court for resolution, nor were those statements essential to the Court's holding.

To reach this conclusion, the prior panel pointed to three factors, but none is persuasive. First, the panel looked to the legislative history and the history of the regulation. But "legislative history"—much less regulatory history—"is not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018), and ambiguous legislative history cannot be used "to muddy clear statutory language," *Azar v. Allina Health Servs.*, 587 U.S. 566, 579-80 (2019) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572

(2011)).  "[It] is not a judge's job to add to or otherwise re-mold … text to try to meet a [text's] perceived policy objectives."  *Fourstar v. Garden City Grp., Inc.*, 875 F.3d 1147, 1152 (D.C. Cir. 2017) (Kavanaugh, J.).  Courts must take statutes and legislation as they are written, and the regulation at issue here facially encompasses all "climatic conditions."  Second, the Court wrote that "this court has previously construed the regulations as requiring 'unusually adverse' climatic conditions."  *Afolayan*, 2022 WL 1124965, at *3 (citing *Juneau v. Dep't of Justice*, 583 F.3d 777, 783 (Fed. Cir. 2009)).  But *Juneau* did not concern climatic conditions, and that issue was not before the Court.  The Court simply noted that "[n]one of the[] causes" listed in 28 C.F.R. § 32.3 were present in that case, and stated in passing that "the record shows no evidence of Mr. Juneau's having been shot, stabbed, hit, involved in an explosion, exposed to chemicals, electricity, or unusually adverse climatic conditions, infected with any disease-causing agent, or subjected to radiation."  *Juneau*, 583 F.3d at 782-83.  There, the words were just thrown in to convey that the climatic conditions that day did not factor in the officer's death.  This Court has never before been asked to consider the scope of the "climatic conditions" language, and that issue has not been before this Court before

now. Neither this court nor any other court has ever been presented with argument and held, in a precedential decision, that, as used in § 32.3, "climatic conditions" only means those that are "unusually adverse."

Third, the panel stated that its limiting interpretation was "consistent with the overall statutory purpose." *Afolayan*, 2022 WL 1124965, at *3-4. The evidence of "statutory purpose" shed no light on the meaning of "climatic conditions." The Court referred to legislative history accompanying *later additions* to other portions of the statute involving other types of injury, added many years after the language at issue. *See id.* at *4. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation" and is entitled to no weight. *Bruesewitz v. Wyeth*, 562 U.S. 223, 242 (2011). Moreover, "laws designed to compensate employees for 'personal injuries and deaths occurring in the course of their work' are 'deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results.'" *Juneau*, 583 F.3d at 784 (Newman, J., dissenting) (quoting *Balt. & Phila. Steamboat Co. v. Norton*, 284 U.S. 408, 414 (1932)). The PSOB Act was designed to compensate government

employees for injuries caused in the line of duty. That purpose should not be unduly curtailed with limitations that neither Congress nor the BJA, through its proper rulemaking process, saw fit to impose.

Agent Afolayan died as a result of having to complete a training exercise in high heat and low humidity, at high altitude. His death certificate notes he died of "heat illness." Appx52. As every medical expert noted, climatic conditions caused his death. Several said that but for the climatic conditions, Agent Afolayan would still be alive today. That is sufficient to establish that he suffered an "injury" entitled to PSOB benefits, and the BJA erred in reaching the opposite conclusion.

## IV. THE BJA'S DECISION WAS ARBITRARY AND CAPRICIOUS

Even if this Court concludes that the BJA's regulation is consistent with the PSOB Act and that climatic conditions must be "unusually adverse" to cause a qualifying "injury," the Court should still reverse because the BJA engaged in arbitrary and capricious decisionmaking in three distinct ways. First, the agency failed to properly consider whether the combination of high altitude, high temperature, and low humidity were unusually adverse working conditions for a border patrol agent. Second, the BJA reached a decision contrary to the evidence when it

found the cumulative impact of the altitude, temperature, and humidity was not a "substantial factor" in Agent Afolayan's death. And third, the BJA failed to consider whether any of the other contributing factors it identified, including a viral illness that Agent Afolayan presumably contracted while on duty at the training camp, could have been the "direct and proximate cause" of his death. Any one of these reasons is independently grounds for reversal.

### A. The BJA Failed to Consider Whether the Combination of Heat, Altitude, and Humidity Created Unusually Adverse Work Conditions

If this Court holds that only unusual climatic conditions can cause an "injury" under the PSOB Act, that means those conditions needed to have been "different from the typical conditions prevailing in the work environment." *Afolayan*, 2022 WL 1124965, at *3. A timed running exercise in the mid-day sun in high heat, high altitude, and low humidity of the Chihuahuan desert created a condition unusual "in the work environment" of a Border Patrol officer. The BJA never considered that factor, and instead focused on whether the temperatures were unusual *for that area* at that time of year. Appx26. Instead, the BJA should have looked to ordinary employment conditions, not ordinary conditions for

Artesia.  The BJA's decision erroneously lacks any discussion regarding what is the relevant "typical" working condition.

Moreover, those conditions *were* severe.  BJA concedes "the temperature was just below 88 degrees Fahrenheit, the relative humidity was between 6 and 7 percent," and Agent Afolayan was at "approximately 3,400 feet above sea level," Appx3-4, higher than the highest habitations in over 30 of the 50 states.  *See List of highest United States cities by state or territory*, https://perma.cc/7KLG-E29T (last visited July 21, 2024).  The BJA considered each of these factors individually, but it did not provide a "reasoned analysis," *Thai I-Mei Frozen Foods*, 616 F.3d at 1304, as to why the climatic conditions created by the three factors *combined* were not unusually adverse, and it failed to consider whether those conditions when combined were unusual for the workplace.

While heat, a dry environment, or high altitude alone may have been harmful, the combination of the three was so uniquely dangerous that it created an "unusually adverse" working environment.  Extreme weather conditions are especially dangerous at higher altitudes, and the BJA failed to consider how altitude interacts with heat and humidity.  Moreover, BJA considered the lack of humidity entirely as a *good* thing,

because it reduces perceived temperature, without considering how exercising under such conditions can cause dangerous levels of dehydration; indeed, BJA's entire analysis of climatic conditions does not mention "dehydration" *once*. Even when the BJA looked at the NOAA Heat Index and the WBGT to assess how heat and relative humidity may affect the human body, Appx6, neither of those sources considered how high altitude changes those impacts. Similarly, the BJA's cited standards from the United States Army, U.S. Soccer, and the American College of Sports Medicine may have spoken to the expected effect of the heat and humidity, but they were silent as to altitude. Appx6-9. None of the BJA's sources support the proposition that the high temperature and low humidity did not create "unusually adverse" climatic conditions *at a high altitude*. That is the relevant question to determining whether the climatic conditions were unusually adverse, and the BJA's decision did not provide a reasoned answer to it.

The same conclusion follows for the BJA's analysis of why the high altitude of Artesia was not unusually adverse. The BJA looked at aviation guidelines and Marine Corps standards to see the altitude level at which the relevant organizations accounted for high altitude. Appx12.

It also looked to an American College of Cardiology publication and the U.S. Army's hypoxia guidelines. Appx13. Yet those sources looked at altitude in the abstract. None consider whether a combination of heat, altitude, and extremely low humidity together create such an unusual working environment that they could affect an individual's health, especially when that individual is tasked with running at high altitude in the midday sun in the hot, dry Chihuahuan desert.

To be sure, the BJA's decision did include *two sentences* summarily concluding that, looking at "temperature, Heat Index, and WBGT in the Artesia area … *in combination* with Artesia's roughly 3,400-foot elevation," it was not "'more likely than not' that any of the conditions would materially alter the significance of any (or all) of the others." Appx14. But neither sentence included additional analysis. Instead the decision merely referenced the Director's preceding discussion of each of the factors in isolation.

## B.    The BJA's Decision Is Contrary to the Evidence

Reversal is independently warranted because the BJA ignored substantial evidence regarding whether the combined impact of high heat, high altitude, and low humidity—the full climatic conditions—

could have caused Agent Afolayan's death. The BJA's explanation that the heat, altitude, and low humidity combined could not have caused Agent Afolayan's death "runs counter to the evidence before the agency." *Ala. Aircraft Indus.*, 586 F.3d at 1375.

As the medical experts in this case explained, heat, a dry environment, and altitude were all factors that caused Agent Afolayan's death. Appx233; 517. And Dr. Mileusnic-Polchan explicitly concluded that heat, a dry environment, and altitude were *the* factors that caused Agent Afolayan's death—not exertion. Appx517. She noted that Agent Afolayan's "sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation," and that "[t]he only new variables … were the climatic condition (heat), exertional dehydration (dry environment) and altitude[.]" Appx517. Dr. Sperry similarly found Agent Afolayan "died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died." Appx372.

The BJA ignored this mountain of evidence largely because of Dr. Cina's testimony. Dr. Cina stated he "could *not* say that the climate was

the biggest factor" since sickle cell trait, antihistamine use, dehydration, and a viral illness also contributed. Appx21. But even Dr. Cina testified that Agent Afolayan "would not have collapsed on 4/30/09 if he was not exercising in an adverse environment" and that he "believe[d], more likely than not, that exercise in an adverse climate contributed to death." Appx232-233. These statements confirm that the adverse climatic conditions *were* a substantial factor in, and indeed the but-for cause of, Agent Afolayan's death. The BJA's decision runs counter to the overwhelming weight of the evidence in this case.

Lisa and Natalee Afolayan only needed to show that it is more likely than not that climatic conditions were the substantial cause of Agent Afolayan's death. The evidence in the record goes beyond that. That the climatic conditions, combined, caused Agent Afolayan's death is the only sound conclusion. No evidence in the record supports the Director's decision to continue to deny the Afolayans the death benefits they should have received fifteen years ago.

## C. BJA Should Have *Included* The Other Contributing Factors In Determining Agent Afolayan's Eligibility

The BJA denied Agent Afolayan's claim in part because a number of other factors besides climatic conditions "contributed *to some extent* to

Agent Afolayan's medical crisis": "sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia," as well as "rhabdomyolysis from an unknown cause[.]" Appx26.

BJA erred by not considering the "viral illness" and rhabdomyolysis, as well as the "antihistamine use" to treat the former, Appx24, 26, as additional factors *supporting* the award of benefits. After all, all arose during the ten weeks preceding his medical crisis while Agent Afolayan was at the training academy, when his whereabouts and activities were under the control of the Border Patrol. *See* Appx510 (stating Agent Afolayan was sent to camp on February 16). Under the agency's COVID-19 policies, the BJA generally finds that illness was contracted in the line of duty if there is no showing of an alternate cause of the illness. BJA has offered no explanation why that reasoning would not apply a fortiori to an agent who has spent ten weeks on duty at an immersive training camp. *Cf. INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (holding "an irrational departure from [an agency] policy" could "constitute action that must be overturned as arbitrary, capricious, or an abuse of discretion") (cleaned up). The Director did not establish a cause

of Agent Afolayan's viral illness or rhabdomyolysis unrelated to the line of duty, so both his viral illness and his rhabdomyolysis should have qualified as a "personal injury sustained in the line of duty" under § 32.3's definition.

Instead, the BJA believed that Agent Afolayan's viral illness—and the use of antihistamines to treat it—was a factor detracting from his claim for benefits. Appx24. That was precisely backwards. Given that Agent Afolayan had spent ten weeks on duty, living at the training academy, the overwhelming likelihood was that the virus was contracted in the line of duty, and that his antihistamine use was to mitigate its effects on his respiratory system so he could perform the exercise that was expected of him. Thus, his injury was "directly and proximately caused by … infectious disease" and a "virus." 28 C.F.R. § 32.3.

So too with rhabdomyolysis. BJA asserted it "was of 'unknown cause,' and therefore cannot be found to be a 'line of duty injury.'" Appx26. But, as the BJA acknowledged, Dr. Mileusnic-Polchan's opinion stated that "exertional rhabdomyolysis is precipitated by strenuous physical exertion," Appx17 (cleaned up), and that the high altitude, dehydration, and heat contributed to contracting it, Appx18. Thus, Agent

Afolayan's rhabdomyolysis was caused by training camp activities—even if it began a few days earlier and was exacerbated by the April 30 run. The BJA's conclusion that the rhabdomyolysis cannot be a line-of-duty injury because its precise cause is unknown flies in the face of the regulatory definition of "line of duty injury," which includes any injury "sustained in the course of [p]erformance of line of duty activity or a line of duty action." 28 C.F.R. § 32.3. Agent Afolayan was finishing ten weeks at the training academy, meaning it is all but certain he developed rhabdomyolysis as a result of his training camp activities. It thus was a line-of-duty injury, and the Director needed to consider whether it alone could have caused death.[2]

By neglecting to ask whether the additional contributing factors it identified supported Agent Afolayan's claim to benefits, the BJA committed reversable error. It "failed to consider an important aspect of the problem." *Ala. Aircraft Indus.*, 586 F.3d at 1375. The absence of such

---

[2] Petitioners also note that, as presented to the BJA, the agency has approved PSOB claims based on heat stroke, dehydration, overexertion, and exhaustion, all of which indicated rhabdomyolysis. Appx519-520.

"reasoned analysis" renders the BJA's decision arbitrary and capricious.

*See Thai I-Mei Frozen Foods*, 616 F.3d at 1304.

## V. THE BJA IMPROPERLY CONSIDERED AGENT AFOLAYAN'S SICKLE CELL TRAIT IN DENYING THE CLAIM FOR DEATH BENEFITS

Finally, the BJA erred when the Director improperly considered Agent Afolayan's sickle cell trait in denying the Afolayans' claim. This is precisely the type of genetic discrimination that GINA prohibits, and the consideration of sickle cell is reversible error.

Many African Americans carry sickle cell trait and, historically, faced discrimination for their status as a carrier despite sickle cell trait being a completely benign condition. *See* Appx596 (collecting scholarly articles describing how sickle cell trait was used to discriminate against African Americans). In 1998, the Ninth Circuit held that African American employees could sue their employer for racial discrimination under Title VII if their employer discriminated against them based on sickle cell trait. *See Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1272 (9th Cir. 1998). Congress then passed GINA, in part, to combat the precise discrimination highlighted in *Norman-Bloodsaw*. *See* Elizabeth Pendo, *Race, Sex, and Genes at Work: Uncovering the Lessons*

*of Norman-Bloodsaw*, 10 Hous. J. Health L. & Pol'y 227, 228 (2010). It is thus directly contrary to GINA for BJA to consider sickle cell trait when denying PSOB claims.

As the Afolayans explained to the Director, if Agent Afolayan's sickle cell trait is considered in assessing their PSOB claim, they could readily state a claim under GINA. *See* Appx27-28. "GINA prohibits an employer from discriminating or taking adverse actions against an employee 'because of genetic information with respect to the employee.'" *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 826 (5th Cir. 2015) (quoting 42 U.S.C. § 2000ff–1(a)(1), (2)); *see also Robinson v. Sedgwick Claims Mgmt. Serv.*, No. 23-CV-10782, 2024 WL 2784318, at *4 (S.D.N.Y. May 28, 2024) (a plaintiff can "state a claim under the GINA" if they should "Defendant was aware of Plaintiff's genetic information or acted unlawfully in reliance on" that information). GINA prohibits employers from "t[aking] an adverse action *because of* the employee's qualifying genetic information." *Baum v. Dunmire Prop. Mgmt.*, No. 21-CV-00964, 2022 WL 889097, at *6 (D. Colo. Mar. 25, 2022). The law bars discrimination "with respect to the compensation, terms, conditions, or privileges of employment[.]" 42 U.S.C. § 2000ff-1(a)(1). Here, the federal

government denied the family of Agent Afolayan (a federal employee) PSOB death benefits (an adverse action) because of his sickle cell trait (unquestionably, qualifying genetic information). This shows that, consistent with GINA, the Bureau cannot consider sickle cell trait.

The BJA erroneously determined that GINA does not apply here, for two reasons. Appx27. First, the Director concluded that BJA was not Agent Afolayan's employer, so Agent Afolayan was not an "employee" of the Bureau. Appx27. Second, he concluded that PSOB death benefits are a "federal gratuity" rather than "compensation, terms, conditions, or privileges" of employment. Appx27. Both conclusions are contrary to law.

To begin, the argument that GINA does not apply here because BJA was not Agent Afolayan's employer defies the statutory text.[3] The PSOB

_____

[3] The Director also claimed "[i]t has not been shown that GINA prohibits an employer from taking any action as to a *deceased* employee." Appx27. But courts have repeatedly held that survivors of a deceased employee may file antidiscrimination claims on their behalf. *See DiFranco v. City of Chicago*, 589 F. Supp. 3d 909, 915 (N.D. Ill. 2022); *Flores v. Morehead Dotts Rybak, Inc.*, No. 2:21-CV-00265, 2022 WL 4740076, at *4 (S.D. Tex. Sept. 29, 2022). This is especially true because Agent Afolayan necessarily could not have brought a claim regarding genetic discrimination in administering death benefits while he was alive. *Contra Wright ex rel. Wright v. United States*, 914 F. Supp.2d 837, 842-

Act says a "public safety officer" is "an individual serving a public agency in an official capacity." 34 U.S.C. § 10284(14). "Public agency," in turn, means "*the United States* … or any unit of local government, department, agency, or instrumentality of … the foregoing." *Id.* § 10284(13) (emphasis added). The PSOB Act, thus, views Agent Afolayan as an employee of the federal government. His public-agency employer was the United States. Further adding viability to this argument, GINA defines "employer" to include "an entity to which section 2000e-16(a) of this title applies," 42 U.S.C. § 2000ff(2)(B)(v), and Section 2000e-16(a) is the provision of Title VII prohibiting discriminatory practices in federal government employment, *see* 42 U.S.C. § 2000e-16(a). There is little doubt that GINA applies to federal government employment decisions.

Agent Afolayan was a federal employee, and Congress and the President have delegated the power to administer PSOB death benefits to the BJA. There is no dispute that the BJA is the agency within the federal government responsible for administering the Public Safety Officers' Benefits Program throughout the federal government. *See* 34

_____

43 (S.D. Miss. 2012) (finding estate's Title VII claim untimely because the decedent *could* have brought the claim while alive).

U.S.C. §§ 10142, 10281. Program recipients are individuals "serving a public agency"—the same language used in the PSOB Act, and not just those serving in the BJA—"in an official capacity." *Id.* § 10284(14). The BJA is part of the federal government, and thus part of the same "public agency" that employed Agent Afolayan.

The Director's opinion tries to split hairs within this statutorily defined public agency. The Director's opinion essentially asserts that the BJA is free to discriminate against any applicant to a BJA-administered program, and federal employees—whose employer mandated that they are eligible for such programs and whose employer empowered the BJA to administer the program—are powerless against such discrimination. In fewer words, the Director is asking the Court to allow BJA to freely discriminate in the administration of PSOB benefits. That is incompatible with the antidiscrimination laws, which broadly apply to government employment, and the PSOB Act, which says the United States as a whole is a public agency.[4]

_____

[4] The Office of Justice Program's own website indicates that the BJA is unable to discriminate in the administration of government programs. *See* Filing a Civil Rights Complaint, U.S. Dep't of Just., Office of Just.

Next, the Director asserts the PSOB death benefits are a "federal gratuity" and not "compensation, terms, conditions, or privileges" or employment with Customs and Border Patrol. Appx27. GINA does not define the terms "compensation, terms, conditions, or privileges," but there is precedent indicating those terms should be read broadly. "[T]he Supreme Court has noted that ... the inclusion of 'terms, conditions, [and] privileges of employment' language in a statutory provision ... signals that the provision at issue covers a wide range of conduct *within* the employment context." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 817 (10th Cir. 2020) (second and third alteration in original). Specifically, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment ... ' in employment.'" *Meritor Savs. Bank*, 477 U.S. at 64 (quoting *L.A. Dep't of Water & Power*, 435 U.S. at 707 n.13).

Notably, the phrase "compensation, terms, conditions, or privileges of employment," was borrowed from Title VII, a statute referenced in GINA's text more than once. *Compare, e.g.,* 42 U.S.C. § 2000ff-1(a)(1),

---

Programs, Office for Civil Rights (June 2, 2023), https://bit.ly/46d12iZ (last visited July 21, 2024).

*with id.* § 2000e-2(a)(1).  And courts have long held that Title VII's words must "be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of … discrimination."  *E.g., Parham v. Sw. Bell Telephone Co.*, 433 F.2d 421, 425 (8th Cir. 1970).  That includes the "terms" and "conditions" of employment.  *See, e.g., Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971).  Because Congress incorporated Title VII principles in GINA, this Court should read the same text the same way in GINA.

PSOB death benefits are unquestionably a "term or condition" of service as a public safety officer.  The PSOB Act was passed "to assist in recruitment and retention" of public safety officers.  Nancy E. Gist, *BJA Fact Sheet: Public Safety Officers' Benefits Program* 1 U.S. Dep't of Just., Office of Just Programs, Bureau of Just. Assistance (Feb. 1999), *available at* https://perma.cc/F4XK-RTCN.  "Congress was concerned with the hazards inherent in [such jobs] and the low level of state and local death benefits might discourage qualified individuals from seeking careers in these fields, thus hampering the ability of communities to provide for public safety."  *Id.*  The Act was thus "designed to offer peace of mind to men and women seeking careers in public safety[.]"  *Id.*  Agent Afolayan,

like so many other public safety officers, signed up to serve as a border patrol agent knowing of this promise. PSOB death benefits assure individuals like Agent Afolayan to enlist in these risky careers.

The Supreme Court's decision in *Hishon v. King & Spalding*, 467 U.S. 69 (1984), is instructive here. Four decades ago, the Court found that a promise made by an employer to an employee that "induced her to accept employment" qualified as a "term, condition, or privilege" of employment. *Id.* at 75. The Supreme Court found that since the benefit was promised at the time of employment, it "may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Id.* Just like the promise in *Hishon*, public safety officers, including Agent Afolayan, were enticed into dangerous federal government employment through the promise of PSOB benefits for line-of-duty injuries. And under *Hishon*, PSOB death benefits are undoubtedly a term or condition of public-safety-officer employment, and the BJA may not discriminate in the doling out of such benefits.

Finally, the Director noted that "[t]o the extent that the Claimants here may believe that my determination of their PSOB claim is in

violation of GINA, their remedy, if any, would be pursuant to the procedures established by GINA itself." Appx28. But the Afolayans are not bringing a freestanding claim for a GINA violation. Instead, they are asking the court to determine whether sickle cell trait can lawfully be considered in determining whether to award PSOB death benefits and, if it cannot, to correct the BJA's error.

Because the Bureau improperly considered sickle cell trait as a factor in denying recovery, the decision should be reversed. At minimum, the decision could be remanded for reconsideration after excluding improper considerations. *See Stevens v. Principi*, 289 F.3d 814, 818-19 (Fed. Cir. 2002) (affirming remand of case to agency where the agency applied the incorrect standard). But, the decision should be remanded with instruction to award the Afolayans PSOB death benefits because, once sickle cell trait is removed as a consideration, it is clear that Agent Afolayan suffered a cognizable injury in the line of duty.

## CONCLUSION

For the reasons stated above, this Court should reverse BJA's denial of death benefits and order the Bureau to award the Afolayans the

benefits to which they are entitled. This Court should direct the Bureau

to act promptly on remand. *See* 28 U.S.C. § 2106.


July 23, 2024                                      Respectfully submitted,

John P. Elwood                          Nicole L. Masiello
Arnold & Porter Kaye Scholer LLP        Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW              250 W. 55th Street
Washington, DC 20001                    New York, NY 10019
Telephone: (202) 942-5000               Telephone: (212) 836-8000
Facsimile: (202) 942-5999               Facsimile: (212) 836-8689
john.elwood@arnoldporter.com            nicole.masiello@arnoldporter.com


*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically on July 23, 2024 and will, therefore, be served electronically upon all counsel.

*/s/ Nicole L. Masiello*
Nicole L. Masiello

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 32(g) and Federal Circuit Rule 32(b), the undersigned counsel for appellant certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,340 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

/s/ *Nicole L. Masiello*
Nicole L. Masiello



# Director Determination (on remand)

Border Patrol Agent Nathaniel Afolayan
PSOB Claim No. 2010-022

Before me is a claim from Lisa Afolayan, on behalf of herself and her two minor daughters, N███ and L█ (the "Claimants"), seeking benefits under 34 U.S.C. § 10281(a), based on the May 1, 2009, death of her husband (and their father), Border Patrol Agent Nathaniel Afolayan. After the Acting Director of the Bureau of Justice Assistance issued a Determination denying the claim, the Claimants filed a petition for review in the United States Court of Appeals for the Federal Circuit, which, on April 15, 2022, issued a decision remanding the matter to the Bureau. *Afolayan* v. *Dep't of Justice*, No. 2021-1452, 2022 WL 1124965.

Pursuant to the PSOB Act and the PSOB implementing regulations, and as the Director of the Bureau of Justice Assistance, I have reviewed the entire record in this claim (including the Claimants' post-remand submission) as described in the evidence log at the end of the attached Appendix, and, as elaborated in that Appendix (incorporated here by reference), I have considered the matters noted for remand by the Federal Circuit.

The record shows that, Agent Afolayan was enrolled in Session 856 of the Border Patrol Academy at Artesia, New Mexico. The Border Patrol Academy is roughly twelve weeks in length, and Agent Afolayan was in the last week of the training when he died. At about 2:45 p.m. on April 30, 2009, he and his fellow agents-in-training were in their final physical fitness test, which included a required 1.5-mile run. After completing the run (in 11 minutes and 6 seconds), Agent Afolayan indicated that he did not feel well and soon thereafter collapsed. Despite receiving medical treatment, he died the next day.

To establish eligibility for a PSOB death benefit, the evidence must show that the decedent died as the direct and proximate result of a "personal injury" sustained in the line of duty. Based on the evidence of record and the requirements of the PSOB Act, for the reasons discussed in detail in the attached Appendix, I am not persuaded that it is more likely than not that Border Patrol Agent Nathaniel Afolayan sustained an "injury," as that term is defined in the PSOB Act and its implementing regulations, and thus am unable to conclude that he "died as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C.

§ 10281(a). Accordingly, it is my determination that this claim for PSOB Act benefits must be, and hereby is, **denied**.

KARHLTON MOORE
Digitally signed by KARHLTON MOORE
Date: 2024.02.08 18:20:09 -05'00'

Karhlton F. Moore
Director
Bureau of Justice Assistance

### Appeal Rights

Relief from this determination may be sought via appeal to the United States Court of Appeals for the Federal Circuit, pursuant to 34 U.S.C. § 10287. Such appeal must be filed "not later than 90 days after the date of which the Bureau [of Justice Assistance] serves notice" of this determination on the Claimants. *Id.* Notice of this determination is served by the PSOB Office on the date that it is "(1) [m]ailed, by U.S. mail, addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office]; . . . (2) [d]elivered to a courier or other delivery service, addressed to the individual (or to his representative) at his (or his representative's) last address known to such Office[,]" 28 C.F.R. § 32.2(c); or (3) having been so prescribed, sent "by the PSOB Office [to] an individual by electronic means (such as by telefacsimile or electronic mail addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office])[,]" 28 C.F.R. § 32.2(g)(2).

### Fees for Representation

If a representative (such as an attorney) has provided any services in connection with this claim, the representative *must* obtain authorization pursuant to 28 C.F.R. § 32.7 before seeking any compensation whatsoever for such services from the Claimant. *See* 34 U.S.C. § 10285(a).

2

Appx2

**Director Determination (on remand)**
Border Patrol Agent Nathaniel Afolayan
PSOB Claim No. 2010-022

    Lisa Afolayan filed a claim with the Public Safety Officers' Benefits ("PSOB") Office of the Bureau of Justice Assistance ("BJA" or the "Bureau"), seeking benefits, under the PSOB Act of 1976, on behalf of herself and her two minor daughters, N█████ and L█, (the "Claimants"), based on the May 1, 2009, death of her husband, Border Patrol Agent Nathaniel Afolayan. After the Acting Director of the Bureau issued a Determination denying the claim,[1] the Claimants filed a petition for review in the United States Court of Appeals for the Federal Circuit, which, on April 15, 2022, issued a decision remanding the matter to the Bureau, *Afolayan* v. *Dep't of Justice*, No. 2021-1452, 2022 WL 1124965, to determine (1) "whether the climatic conditions surrounding Agent Afolayan's death were a 'direct and proximate' cause of his injuries,"[2] and, if so, (2) "whether Agent Afolayan's sickle cell trait could properly be considered in evaluating alternate causation." *See Afolayan*, slip op. at 14. The Bureau invited the Claimants to file whatever evidence or argument that they would like to be considered following the remand. On August 1, 2022, the Claimants filed additional argument but no further evidence.

**Background**

    Nathaniel Afolayan, a resident of San Jacinto, California, pursued employment with U.S. Customs and Border Protection in 2008. He was hired as a Border Patrol Agent (Intern) and enrolled in Session 856 of the Border Patrol Academy at Artesia, New Mexico, which has an elevation of approximately 3,400 feet above sea level. The Border Patrol Academy is roughly twelve weeks in length; Agent Afolayan was in the last week of the training when he died. At about 2:45 p.m. on April 30, 2009, Agent Afolayan and his fellow agents-in-training were in their final physical fitness test, which included a required 1.5-mile run that had to be completed

---

[1] As stated on page 3, n. 1, of the Appendix to that Determination (revised here for recent statutory changes),

    [t]he PSOB Act generally is applied as in effect on the line-of-duty injury on which the claim is predicated. *See generally* 28 C.F.R. § 32.4(d). As explained in text below, however, this approach is not possible with respect to the instant claim, as the actual occurrence of such an injury, and hence the date thereof, cannot be ascertained from the record. Except as otherwise may be expressly noted, therefore, references herein to the statute are as in effect on the date of death, including as may be applicable pursuant to [Pub. L. No. 117-172, § 3(b)(1)(B), 136 Stat. 2098, 2100–2101 (2022); Pub. L. No. 117-61, § 8(b)(2), 135 Stat. 1474, 1479 (2021);] Pub. L. No. 115-36, § 6(2), 131 Stat. 849, 852 – 853 (2017); and Pub. L. No. 112-239, § 1086(d), 126 Stat. 1632, 1969 (2013), as amended. In contrast, and except as may be noted otherwise, the PSOB implementing regulations (which are codified at 28 C.F.R. part 32) are referred to herein as in effect on the date of this determination. *See* 34 U.S.C. § 10287.

[2] In this connection, the Court queried "whether the prevailing conditions were the type of unusual or out-of-the-ordinary climatic conditions that would qualify for compensation under the regulations." *Afolayan*, No. 2021-1452, slip op. at 9.

in 13 minutes or less.  At around the time of Agent Afolayan's run, the temperature was just below 88 degrees Fahrenheit, the relative humidity was between 6 and 7 percent,[3] and the wind was blowing at about 8 to 9 mph.[4]

After completing the run (in 11 minutes and 6 seconds), Agent Afolayan indicated that he did not feel well and soon thereafter collapsed.  Agent Afolayan was initially taken, shortly before 3:00 p.m., to the Border Patrol Academy's health unit for medical assistance.  His condition declined, and he was taken to Artesia General Hospital.  Later, he was airlifted, at 7:10 p.m., to Covenant Medical Center in Lubbock, Texas.  He died the next day, at 10:41 p.m.  Treatment records for Agent Afolayan from Covenant Medical Center indicate diagnoses related to heat illness and/or rhabdomyolysis.

The initial death certificate, issued on May 5, 2009, listed the cause of Agent Afolayan's death as "pending."  The September 1, 2009, amendment to the death certificate listed the immediate cause of death as "Heat Illness," and identified "other significant conditions contributing to death" as "cardiomegaly (cardiac disease)."[5]

The Claimants bear the burden of establishing that it is "more likely than not"[6] that Agent Afolayan "died as the direct and proximate result of a personal injury sustained in the line of duty."  *See* 34 U.S.C. § 10281(a).  The PSOB implementing regulations, at 28 C.F.R. § 32.3, define "injury," in pertinent part, as follows:

> *Injury* means a traumatic physical wound (or traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virus, or bacteria . . . but does not include—
>
>     \* \* \*
>
>     (2) Any condition of the body caused or occasioned by stress or strain.

The same section of the regulations defines *Stress or strain* as "includ[ing] physical stress or strain, mental stress or strain, post-traumatic stress disorder, and depression."

---

[3]    *See* Hearing Officer Determination, dated January 10, 2014, where Hearing Officer Joseph B. Mistrett wrote, "According to weather records for Artesia, New Mexico on April 30, 2009, the temperature at 2:30 p.m. was 87.8 degrees, with a relative humidity of 6% or 7%."

[4]    https://www.wunderground.com/history/daily/us/nm/roswell/KROW/date/2009-4-30 (last visited January 12, 2024).

[5]    Certificate of Death for Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Sridhar Natarajan, MD, MS, Lubbock County Medical Examiner, Date Issued September 1, 2009.

[6]    28 C.F.R. § 32.5(a).

**Climatic Conditions**

The Claimants assert that three climatic conditions brought about Agent Afolayan's fatal medical crisis—heat, low humidity, and altitude. That crisis occurred after he completed a 1.5-mile run, in roughly 11 minutes, in conditions that included a temperature of just below 88 degrees, with humidity between 6 and 7 percent, at an elevation of approximately 3,400 feet.

The Federal Circuit observed in its remand decision that "ordinary [and] routine"[7] weather conditions are not what the definition of *Injury* contemplates, citing *Juneau*, where it was recognized that, for PSOB purposes, such conditions needed to be "unusually adverse[.]"[8] Thus, in determining whether the heat in Artesia on April 30, 2009, constituted a "climatic condition," I have considered whether it was "intensely high" or "unusually adverse" heat.[9]

In an apparent effort to show that the temperature was unusual when Agent Afolayan suffered his medical crisis, the Claimants' post-remand submission asserts that in Artesia "the average April temperature [was] 20 degrees lower than it was on the day of his death"[10] and that, "[i]n the two months before Agent Afolayan's death, the temperature only reached even 88 degrees on two other occasions."[11] These assertions are problematic. In the two months before Agent Afolayan's physical fitness run on April 30, 2009, the temperature in the Artesia area reached 88 degrees on *five* occasions: April 29 (90 degrees), April 24 (89 degrees), April 22 (91 degrees), April 21 (88 degrees), and March 4 (88 degrees).[12] In addition to these (and April 30), nine *other* days in April 2009 and eight others in March 2009 also saw high temperatures there reach the low- or mid-80s.[13] Moreover, although the average temperature in the Artesia area in April 2009 was 62 degrees, the average daily high temperature there for April

---

[7]     *Afolayan,* No. 2021-1452, slip op. at 8.

[8]     *Juneau* v. *Dep't of Justice*, 583 F.3d 777, 783 (Fed. Cir. 2009).

[9]     *Cf. Afolayan,* No. 2021-1452, slip op. at 8–9, where the Court favorably observed, consonant with its holding in *Juneau*, that the Bureau looks for "intensely high or low temperatures" to distinguish injuries caused by "climatic conditions" (which the Act covers) from injuries caused by "stress and strain" (which it does not cover).

[10]    Claimants' Post-Remand Submission, p. 1.

[11]    *Id.* at 15. The testimony in the record from some of Agent Afolayan's fellow classmates gives their impressions that the temperature during their 1.5-mile run on April 30, 2009, was hot (or "very hot" or "really hot"); also opinions of certain physicians in the record call the temperature "hot" or "adverse" or "unfavorable."

[12]    *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024) and https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024). I note that Agent Afolayan's hometown of San Jacinto, also had four days in April 2009 on which the temperature reached 88 degrees, including two days on which it reached 98 degrees. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[13]    *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024) and https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024). San Jacinto also had four other days in April 2009 that reached the low- or mid-80s. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

3

2009 was 77 degrees.[14]  The normal high temperature for the area on April 30th, from 1991–2020, was 82 degrees.[15]  Going back to 2000, every April there has seen temperatures reach at least 87 degrees, with the vast majority of them reaching temperatures in the 90s and one of them seeing a temperature of 100 degrees.[16]  Eighty-eight degrees may have been on the warmer side, but these were "ordinary [and] routine"[17] April temperatures in the Artesia area and certainly were not "intensely high" or "unusually adverse"[18] for the time when Agent Afolayan was there.

The humidity when Agent Afolayan suffered his medical crisis was between 6 and 7 percent.  This low level of humidity is not unusual for the Artesia area.  Sixteen days in April 2009 had humidity that fell below 10 percent there,[19] and March 2009 had thirteen such days.[20]

There are various calculations that can be performed to take account of the effect, on human beings, of temperature in combination with humidity.  One common calculation is the Heat Index.  According to the Heat Index, 88 degrees, combined with 7 percent humidity, makes it feel like 83.2 degrees.[21]  According to the National Oceanic and Atmospheric Administration ("NOAA"), of the U.S. Department of Commerce, which groups the Heat Index "Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity" into four different categories ("Caution," "Extreme Caution," "Danger," and "Extreme Danger"), a Heat Index of 83 is in the least worrisome category.[22]

---

[14]    https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024).  I note that, in April 2009, the temperature in the Artesia area reached at least 70 degrees on *twenty-three* days—and reached or exceeded *75* degrees on *nineteen* of them.  *Id.*

[15]    https://www.weather.gov/wrh/Climate?wfo=maf (last visited January 12, 2024).  By comparison, the average high temperature for Agent Afolayan's hometown of San Jacinto on April 30th is an only slightly cooler 77 degrees. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[16]    https://www.weather.gov/wrh/Climate?wfo=maf (last visited January 12, 2024).  In the past 24 years, only six Aprils saw maximum temperatures between 87 and 89 degrees in the Artesia area; all the other eighteen Aprils saw maximum temperatures there reach 90 degrees or above.  *Id.*  In San Jacinto, by comparison, over those same 24 years, only four Aprils saw maximum temperatures there reach between 83 and 89 degrees; all the other twenty Aprils there saw maximum temperatures reach 90 degrees or above. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[17]    *Afolayan,* No. 2021-1452, slip op. at 8.

[18]    *See id.* at 9.

[19]    https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024).  The San Jacinto area had four such days in April 2009. https://www.wunderground.com/history/monthly/us/ca/san-bernardino/KSBD/date/2009-4 (last visited January 12, 2024).

[20]    https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024).

[21]    *See* https://www.wpc.ncep.noaa.gov/html/heatindex.shtml (last visited January 30, 2024).

[22]    *See* Hearing Officer Determination, dated January 10, 2014, p. 17; https://www.weather.gov/images/wrn/social_media/2017/heat_index.jpg (last visited January 12, 2024).  *Per* the National Weather Service, "Caution" indicates that "[f]atigue [is] possible with prolonged exposure and/or physical activity."  https://www.weather.gov/

4

Although NOAA's Heat Index is informative, the Claimants' own submissions show that there are better methods to calculate the weather's effect on the human body. The paper on sickle cell trait by Dr. John Kark, which was the Claimants' hearing Exhibit 3 before the Hearing Officer, identifies the "wet bulb black globe temperature index (WBGT)" as the heat index "best related to physiologic response to exercise in heat."[23] NOAA's National Weather Service explains that the WBGT "estimates the effect of temperature, relative humidity, wind speed, and solar radiation on humans[.]"[24] The WBGT is "most useful for active, acclimatized people such as outdoor workers, athletes, and anyone else performing strenuous outdoor activities – and has been used for decades by military agencies, OSHA [the Occupational Safety and Health Administration of the U.S. Department of Labor], and marathon organizers."[25]

Using the WBGT calculator provided by OSHA, if Agent Afolayan was running the 1.5 miles in direct sunlight, the estimated WBGT was 71 degrees.[26] The same calculator indicates that if he ran in the shade, the estimated WBGT was 63 degrees.[27]

The United States Army Training and Doctrine Command ("TRADOC")[28] has published TRADOC Regulation 350-29 to "prescribe[] policy and provide[] guidance to commanders for preventing, managing, and reporting environmental (heat or cold) casualties."[29] That regulation includes guidance on how to identify potential heat-related hazards, so that heat-related casualties may be avoided. To that end, the regulation provides the following Table B-1, Fluid

ama/heatindex (last visited January 12, 2024). The Heat Index must rise to 90 degrees or above for "[h]eat stroke, heat cramps, and heat exhaustion [to be] possible with prolonged exposure and/or physical activity." *Id.*

[23] *Sickle Cell Trait*, John Kark, M.D., Howard University School of Medicine, Center for Sickle Cell Disease, December 20, 2000.

[24] https://www.weather.gov/news/211009-WBGT (last visited January 12, 2024).

[25] *Id.*

[26] https://www.osha.gov/heat-exposure/wbgt-calculator (last visited January 12, 2024). The information supplied to do the calculation was the date (4/30/2009), the local time (14:30 MT), the latitude of Artesia, NM (32.84), the longitude of Artesia, NM (104.39), the air temperature (88 degrees), the relative humidity (7%), the wind speed (9 mph), and the barometric pressure (26.06).

[27] *Id.* The WBGT temperature for the afternoon of April 30, 2009, for the San Jacinto area, using the same OSHA calculator, was 71 degrees in direct sunlight and 61 degrees in the shade. The information supplied to do that calculation was the date (4/30/2009), the local time (14:30 PT), the latitude of San Jacinto, CA (33.78), the longitude of San Jacinto, CA (116.95), the air temperature (75 degrees), the relative humidity (31%), the wind speed (6 mph), and the barometric pressure (28.78). The San Jacinto area temperature, humidity, and wind speed for roughly 14:30 PT on April 30, 2009, was obtained from https://www.wunderground.com/history/daily/us/ca/san-bernardino/KSBD/date/2009-4-30 (last visited January 12, 2024).

[28] *Per* TRADOC Regulation 10-5 (https://adminpubs.tradoc.army.mil/regulations/TR10-5.pdf (last visited January 12, 2024)), "TRADOC recruits, trains, educates, develops, and builds the Army; establishes standard, drives improvement, and leads change to ensure the Army can deter, fight, and win on any battlefield now and into the future."

[29] ¶ 1-1. https://adminpubs.tradoc.army.mil/regulations/TR350-29.pdf (last visited January 12, 2024).

Replacement and Work-Rest Guidelines for Training in Warm and Hot Environments:

| Heat Category | WBGT Index (°F) | Easy Work | | Moderate Work | | Heavy Work | | Very Heavy Work | |
|---|---|---|---|---|---|---|---|---|---|
| | | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) |
| 1 (white) | 78 - 81.9 | NL | ½ | NL | ¾ | 40/20 | ¾ | 20/40 | 1 |
| 2 (green) | 82 - 84.9 | NL | ½ | NL | ¾ | 30/30 | 1 | 15/45 | 1 |
| 3 (yellow) | 85 - 87.9 | NL | ¾ | NL | ¾ | 30/30 | 1 | 10/50 | 1 |
| 4 (red) | 88 - 89.9 | NL | ¾ | 50/10 | ¾ | 20/40 | 1 | 10/50 | 1 |
| 5 (black) | > 90 | NL | 1 | 20/40 | 1 | 15/45 | 1 | 10/50 | 1 |

| Easy Work | Moderate Work | Heavy Work | Very Heavy Work |
|---|---|---|---|
| • Weapon maintenance<br>• Marksmanship training<br>• Drill and ceremony | • Patrolling with 30-pound load<br>• Low and high crawl<br>• Dig defensive position | • Patrolling with 45-pound load<br>• Four-person litter carry (180 pounds)<br>• Dig defensive position | • Two-person litter carry (150 pounds)<br>• Move under direct fire<br>• Obstacle course |

Legend:
hr = hour
qt = quart
NL = no limit to work per hour (up to 4 continuous hours). Notes:
- Applies for average-sized and heat-acclimatized Service member wearing the Operational Camouflage Pattern (OCP) uniform.
- The work-rest times and fluid replacement volumes will sustain performance and hydration for at least 4 hours of work in the specified heat category.
- Fluid needs can vary based on individual differences (± ¼ qt/hr) and exposure to full sun or full shade (± ¼ qt/hr).
- Rest means minimal physical activity (sitting or standing) accomplished in shade if possible.
- CAUTION: Hourly fluid intake should not exceed 1½ qt.
- CAUTION: Daily fluid intake should not exceed 12 qt.
- If wearing heavy protective clothing (mission-oriented protective posture (MOPP)), add 10 °F to WBGT index for easy work and 20 °F to WBGT index for moderate and heavy work.

The Table "[a]pplies to average-sized and heat-acclimatized Service member[s] wearing the Operational Camouflage Pattern (OCP) uniform." For Service members (*wearing the OCP uniform*) who are performing even "very heavy work"—which it describes as "Two-person litter carry (150 pounds)[,] Move under direct fire[, or] Obstacle course"—the Table provides no limitations until the WBGT reaches at least 78 degrees.[30] The first limitations provided in the Table are for when the WBGT is 78-81.9 degrees, and the Table limits "very heavy work" to 20 minutes per hour, with a 40-minute rest. With a WBGT of 82-84.9 degrees, the Table limits "very heavy work" to 15 minutes per hour, with a 45-minute rest.

Other WBGT guidelines have been proposed by various organizations. For example, US Soccer, the governing body for soccer in the United States, has developed "Heat Guidelines," which are provided below, to serve "as a guide for coaches, referees, and players for training in

---

[30]     As indicated above in text, the estimated WBGT (using the OSHA calculator) during Agent Afolayan's physical fitness run on April 30, 2009, was between 63 and 71 degrees, depending on the amount of sunlight.

warmer climates."[31]  The guidelines, which are based on the WBGT, divide the contiguous United States into three categories by climate and provide slightly different recommendations for each category.[32]  Some areas of New Mexico are Category 2, and other areas are Category 3.[33]  When—as pertinent here—the WBGT is under 79.8 degrees for Category 2 locations and under 82.1 degrees for Category 3 locations, US Soccer describes it as "Good Conditions" and recommends normal activities, with a 10-minute break every 40 minutes of training:[34]

| Alert Level | WBGT by Region (°F) | | | Event Conditions | Recommended Actions & Breaks |
|---|---|---|---|---|---|
| | Cat 1 | Cat 2 | Cat 3 | | |
| Black | >86.2° | >89.8° | >92.0° | Extreme Conditions | • No Outdoor Training, delay training until cooler, or Cancel Training |
| Red | 84.2-86.1° | 87.8-89.7° | 90.1-91.9° | High Risk for Heat Related Illness | • Maximum of 1 hour of training with 4 by 4 minute breaks within the hour. • No additional conditioning allowed. |
| Orange | 81.1-84.1° | 84.7-87.7° | 87.1-90.0° | Moderate Risk for Heat Related Illness | • Maximum of 2 hours of training with 4 by 4 minute breaks each hour, OR a 10 minute break every 30 minutes of training |
| Yellow | 76.3-81.0° | 79.9-84.6° | 82.2-87.0° | Less than Ideal Conditions | • 3 Separate 4 minute breaks each hour, OR a 12 minute break every 40 minutes of training |
| Green | <76.1° | <79.8° | <82.1° | Good Conditions | • Normal Activities • 3 Separate 3 minute breaks each hour of training, OR a 10 minute break every 40 minutes |

The American College of Sports Medicine has also published guidance on exertional heat illness, which was last updated in 2021.[35]  Based on that guidance, which is provided below, when the WBGT is between 50.1 and 72 degrees (as it was during Agent Afolayan's physical

---

[31]     https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf (last visited January 16, 2024).  The National Federation of State High School Associations recommends to its members WBGT heat guidelines almost identical to those of US Soccer. https://www.nfhs.org/articles/wet-bulb-globe-temperature-wbgt-why-should-your-school-be-using-it/ (last visited January 12, 2024).

[32]     https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf at 3–4 (last visited January 16, 2024)

[33]     Id. at 3.

[34]     Id. at 4.  The US Soccer guidelines contain a chart that provides estimated calculations of the WBGT, using humidity and temperature.  Using that chart, the WBGT at the time of Agent Afolayan's physical fitness run on April 30, 2009, would have been between 71.6 and 73.4 degrees.

[35]     See https://journals.lww.com/acsm-csmr/fulltext/2021/09000/acsm_expert_consensus_statement_on_exertional_heat.10.aspx (last visited February 2, 2024).

7

fitness run on April 30, 2009), fit, acclimatized, low-risk individuals may engage in normal training activities without any adjustments:[36]

| WGBT [b] | | Continuous activity & competition for highly fit & fully acclimatized to high heat conditions [b, c] | Training & noncontinuous activity | |
|---|---|---|---|---|
| °F | °C | | Non-acclimatized, unfit, high-risk individuals [c] | Acclimatized, fit, low-risk individuals [c, d] |
| ≤ 50.0 | ≤ 10.0 | Generally safe; EHS can occur associated with individual factors | Normal activity | Normal activity |
| 50.1 – 65.0 | 10.1 – 18.3 | Generally safe; EHS can occur in individuals who are not acclimatized or have risk factors | Normal activity | Normal activity |
| 65.1 – 72.0 | 18.4 – 22.2 | Risk of EHS and other heat illness begins to rise; high-risk individuals should be monitored or not compete | Increased risk. Increase the rest:work ratio. Monitor fluid intake. | Normal activity. |
| 72.1 – 78.0 | 22.3 – 25.6 | Risk for all competitors is increased | Moderate risk. Increase the rest:work ratio and decrease total duration of activity. Football: Players restricted to helmet, should pads, and shorts. | Normal activity. Monitor fluid intake. Football: Players restricted to helmet, should pads, and shorts. |
| 78.1 – 82.0 | 25.7 – 27.8 | Risk for unfit, non-acclimatized individuals is high. | Moderate-high risk. Increase the rest:work ratio; decrease intensity and total duration of activity. Football: No protective equipment during practice and no conditioning activities. | Normal activity. Increase rest breaks. Monitor fluid intake Football: Players restricted to helmet, shoulder pads, and shorts |
| 82.1 – 86.0 | 27.9 – 30.0 | Cancel level for EHS risk | Very high risk. [e] Increase the rest:work ratio to 1:1, decrease intensity and total duration of activity. Limit intense exercise. Watch at-risk individuals carefully | Increase the rest:work ratio and decreases total duration of activity. Plan intense or prolonged exercise with discretion [f]; watch at-risk individuals carefully. Football: no protective equipment during practice and no conditioning activities. |
| 86.1 – 90.0 | 30.1 – 32.2 | | Very High-risk. [e] Cancel or stop practice and competition. | Limit intense exercise [f] and total daily exposure to heat and humidity; watch for early signs and symptoms |
| | | | Extremely high risk. e | Extremely high risk. e |
| ≥ 90.1 | > 32.3 | | Cancel exercise. | Cancel exercise [f,g] |

[a]Revised from CASA, D. J., and E. R. EICHNER. Exertional heat illness and hydration. In: *Athletic Training and Sports Medicine*. C. Starkey and G. Johnson (Ed.) Boston, MA: Jones &amp; Bartlett Publishers, 2005, pp. 597-615.
[b]Regional geographical differences in climate and acclimatization to heat may require adjusting limits to lower WBGT levels for heat safety than outlined in the table, and some hotter regions may allow activity at higher levels, but athletes and coaches should be extremely cautious when exceeding these limits.
[c]High level athletes who have been acclimatized 12 wk, not applicable to events with unacclimatized participants.
[d]While wearing shorts, t-shirt, socks and sneakers.
[e]At least 3 wk in the heat.
[f]Risk of EHS and EHE.
[g]Internal heat production exceeds heat loss and core body temperature rises continuously, without a plateau.
These guidelines do not account for clothing. Although the effects of the uniform clothing and protective equipment (*i.e.*, American football) on sweating and body temperature in younger athletes are unknown, uniforms should be considered when determining playing/practice limitations based on the WBGT. Eight to 10 practices are recommended for heat acclimatization (30-45 min each; one per day or one every other day).
WBGT, wet bulb globe temperature.

Agent Afolayan had been residing in Artesia, New Mexico, for roughly ten weeks when

---

[36]    *Id.*, Table 7.  Above 65 degrees, even for non-acclimatized, unfit, high-risk individuals, training can continue, but it is recommended that the rest:work ratio increase and fluid intake be monitored.

he went on his physical fitness run on April 30, 2009. During that time, the temperatures in the area had been gradually increasing, as would be expected in the northern hemisphere for the period from February to May. In March 2009, the area encountered one day of 88 degrees or higher and eight days in the low- to mid-80s. In April 2009, more than 40 percent of the days hit at least 80 degrees there. And of the nine days prior to April 30, 2009, four warmed to at least 88 degrees. Even without this context—but *a fortiori* with it—I am unpersuaded that it is "more likely than not" that the temperature in the area during Agent Afolayan's 1.5-mile run on April 30, 2009 (*i.e.*, 87.8 degrees), was "intensely high" or "unusually adverse."[37]

My thinking in this is strengthened by the fact that the dry climate of Artesia *lessened* the effects of the 87.8-degree temperature. When the relative humidity is factored in with the temperature, the Heat Index in the Artesia area when Agent Afolayan ran his 1.5-mile run on April 30, 2009, was 83 degrees. And when the 9-mph breeze, among other things, is factored in, the WBGT at the time of his run was 71 degrees (and that is assuming that the run occurred with no shade at all). At a WBGT of 71 degrees, neither the Army, US Soccer nor the American College of Sports Medicine would have placed any restrictions on Agent Afolayan's training activity on that day. Bearing these well-accepted heat indices (which incorporate various aspects of the weather conditions in order to account for the combined effects of the weather on human beings) in mind, I am unable to conclude that it is "more likely than not" that the weather conditions in that area during Agent Afolayan's run were so severe as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

Furthermore, the record of this claim does not persuade me that it is "more likely than not" that the *altitude* was so "unusually adverse" as to constitute a "climatic condition" within the meaning of the term *Injury*. The elevation of Artesia, New Mexico, is just under 3,400 feet above sea level.[38] With different elevations, surrounding weather conditions may differ, as well as the air pressure. At sea level, the air pressure is roughly 101,353 Pascal ("Pa") or 14.70 pounds-per-square-inch ("PSI").[39] At 3,400 feet, the air pressure is roughly 89,504 Pa or

---

[37]     *Afolayan*, No. 2021-1452, slip op. at 8–9; *Juneau*, 583 F.3d at 783. As indicated above in text, the Artesia temperature was about 6 degrees higher than the normal high temperature (from 1991–2020) for that date in that area; to be merely a 6-degree deviation (from that norm) is "ordinary [and] routine." *Cf. Durco* v. *United States*, 14 Cl. Ct. 424, 426 (1988) (affirming denial of PSOB benefits where there was brief exposure to very cold conditions that allegedly caused a fatal heart attack); PSOB determ. *re:* Watkins, No. 2014-002 (April 11, 2019), p. 9 (directing a large crowd of people for four hours in "90 plus degree weather," was not an injury causing the officer's fatal heart attack), *aff'd on other grounds* sub nom. *Watkins* v. *Dep't of Justice*, 809 Fed. App'x 923 (Fed. Cir. 2020).

[38]     See Exhibit 8 to the Hearing Officer's hearing transcript. By comparison, the elevation of San Jacinto, California, is roughly 1,500 feet above sea level, https://elevation.maplogs.com/poi/san_jacinto_ca_usa.38018.html (last visited January 16, 2024); and the highest point of the National Park Service's famous Skyline Drive is at Skyland, in Luray, Virginia, at 3,680 feet above sea level, https://www.nps.gov/places/000/highest-point-on-skyline-drive.htm#:~:text=The%20highest%20point%20along%20Skyline,Hawksbill%20Mountain%20at%204%2C050%20feet (last visited February 2, 2024).

[39]     Calculation obtained using this website: https://www.mide.com/air-pressure-at-altitude-calculator (last visited January 16, 2024)

12.98 PSI.[40]  The oxygen available at 3,400 feet is roughly 89 percent of the oxygen that is available at sea level.[41]

In attempting to assess whether an elevation of 3,400 feet is sufficient to create weather conditions (including air pressure and oxygen availability) so "unusually adverse" as to constitute a "climatic condition" within the meaning of the term *Injury*, I have looked at standards in the aviation industry, where the issue of altitude's effect on the body is of paramount importance.  In its 2012 Manual of Civil Aviation Medicine, the International Civil Aviation Organization reported that "most passenger aircraft[,]" when at cruising level, maintain a cabin pressure that "corresponds to an ambient altitude of 1,500 to 2,450 m (5,000 to 8,000 ft)."[42]  The Manual also indicates that the "threshold of hypoxia is generally considered to be 1,000 m (3,300 ft) since *no demonstrable physiological reaction to decreased atmospheric pressure has been reported below that altitude*."[43]

I also have looked at military standards.  The Marine Corps physical fitness test includes a timed 3-mile run, or (for older Marines) a timed 5,000-meter row on a rowing machine.[44]  For each, the Marine Corps specifies a score that is assigned for the time to complete the run or the row.  In apparent recognition of the effect that altitude can have on exercise, the Marine Corps adjusts those times and scores when the run or the row occurs at or above *4,500 feet*; no adjustment is made for anything lower than that.[45]  The Air Force also makes an adjustment to its aerobic fitness assessment (a 1.5-mile run), but it does so only when the assessment is performed at an elevation of *5,250 feet* or higher.[46]

---

[40]      *Id*.  Using the same website for the calculation, at 1,500 feet above sea level, such as in San Jacinto, the air pressure is roughly 95,975 Pa or 13.92 PSI.  *Id*.

[41]      Calculation obtained using this website: https://baillielab.net/critical_care/air_pressure/ (last visited February 2, 2024).  San Jacinto (at 1,500 feet above sea level) has roughly 95 percent of the oxygen available at sea level.  *Id*.

[42]      Manual of Civil Aviation Medicine, p. 92 (II-1-8), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).  The Federal Aviation Administration requires that passenger aircraft "be equipped to provide a cabin pressure altitude of not more than *8,000 feet* under normal operating conditions."  14 C.F.R. § 25.841 (emphasis added).  At 5,000 feet above sea level, the oxygen available is 84 percent of what is available at sea level; and at 8,000 feet the oxygen available is 76 percent of what is available at sea level.  https://baillielab.net/critical_care/air_pressure/?useralt=5000&units=ft (last visited February 2, 2024).

[43]      Manual of Civil Aviation Medicine, p. 92 (II-1-8) (emphasis added), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).

[44]      Marine Corps Order 6100.13A, available at https://www.marines.mil/Portals/1/Publications/MCO%206100.13A%20CH-4.pdf?ver=apBfaIwjs4S4eppmoUgt-g%3d%3d (last visited January 16, 2024).

[45]      *Id*. at 2-8. The Marine Corps combat fitness test similarly makes an adjustment to the scores when such test takes place at or above 4,500 feet. *Id*. at 3-9. Similarly, the U.S. Navy also scores its Physical Readiness Test differently when that test is taken below 5,000 feet compared to when taken above 5,000 feet.  https://www.mynavyhr.navy.mil/Portals/55/Support/Culture%20Resilience/Physical/Guide_5-Physical_Readiness_Test_PRT_JAN_2023.pdf?ver=OlmOLoZTfCA641JUkAnIaw (last visited January 16, 2024).

[46]      Air Force Manual 36-2905, ¶ 3.6, available at https://www.afpc.af.mil/Portals/70/documents/FITNESS/afman36-2905.pdf?ver=e2q87ionZmRdxK0rm1SWEQ%3d%3d (last visited January 16, 2024).

In addition, I looked to understand at what elevation significant or detectable physiologic changes of the body begin to occur. According to the American College of Cardiology, the lower air pressure (as elevation increases) "creates a graded physiologic stressor with increasing elevation, one which occurs at rest and is exacerbated by the demands of exercise . . . . For purposes of clinical care, the degree of altitude can be defined in terms of these physiologic changes and their limits. *Intermediate altitude* (1,500–2,500 m[eters (*i.e.*, 5,000 to 8,000 feet) above sea level]) is where detectable physiological changes *begin*. High altitude, typically defined as an elevation above 2,500 m[eters above sea level], is the point above which altitude illnesses tend to occur."[47]

The U.S. Army identifies the "threshold altitude at which hypobaric hypoxia becomes functionally and medically significant" as 1,200 meters or 3,937 feet above sea level.[48] It considers sea level to 1,200 meters to be "'low' altitude" and notes that "[i]n this range, arterial oxyhemoglobin saturation (SaO$_2$) is generally above 96 percent in healthy people . . . . Only at the highest range of low altitude is maximal aerobic work performance minimally impaired."[49]

The Claimants' post-remand submission argues that the elevation of Artesia is "well above the height at which most Americans live."[50] The submission also contrasts Artesia's elevation with New York City's, Chicago's, and Washington, D.C.'s, asserting that Artesia is "higher than the highest habitations in 35 of the 50 states[,]" and argues that Artesia's elevation is unusual for the United States.[51] Artesia's elevation well may be unusual when compared to much of the United States, but the Claimants' post-remand comparisons here are inapposite.

For example, Agent Afolayan's own hometown of San Jacinto has an elevation (1,500 feet) that is higher than those of all of the cities cited by the Claimants and higher than the highest elevation in 42 of the 50 largest cities (by population) in the United States.[52] By the measure indicated in the Claimants' post-remand submission, San Jacinto's elevation would be rather unusual. In addition, Artesia is at an elevation lower than most of New Mexico. "More

---

[47]   https://www.acc.org/latest-in-cardiology/articles/2021/03/15/13/39/exercise-and-elevation (last visited January 16, 2024) (emphases added; footnotes omitted from quoted text). *See also* Mountain Leader's Guide to Mountain Warfare Operations 2016, Appendix A "Altitude and Environmental Hazards," at Table A-1, p. 132, https://www.marines.mil/Portals/1/Publications/MCTP%2012-10A%20GN.pdf?ver=2020-02-12-122939-143 (last visited February 5, 2024) (noting no effects of acute altitude exposure from sea level to 4,000 feet and characterize that altitude level as "low").

[48]   Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 1-1, https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024).

[49]   *Id.* at ¶ 2-2.e.

[50]   Claimants' Post-Remand Submission, p. 1.

[51]   *Id.* at 13–14.

[52]   https://www.usgs.gov/educational-resources/elevations-50-largest-cities-population-1980-census (last visited January 16, 2024).

than four-fifths of the state is higher than 4,000 feet above sea level."[53] Thus, for New Mexico, along with many other states in the mountainous regions of the country, living at an elevation of 3,400 feet or higher is quite common. This kind of comparison simply does not speak to the pertinent issue here in this claim, which is whether Artesia's elevation created surrounding weather conditions (including air pressure and oxygen availability) that were so "unusually adverse" as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

As discussed above, the effects of being at an elevation of 3,400 feet are not unusual enough for the Marines, Navy, or Air Force to alter their ordinary physical- or combat-fitness/readiness tests. And according to various sources referenced above, there is little to no detectible physiological effect on individuals at 3,400 feet. The marginally reduced oxygen availability in Artesia (roughly 89% of what is available at sea level), moreover, has no effect (or next to no effect) on oxygen saturation (still remaining above 96%) in healthy individuals and has more oxygen availability than what is typically provided in pressurized cabins by our commercial airlines. I am not able to conclude that it is "more likely than not" that an elevation of 3,400 feet is so "unusually adverse" as to amount to a "climatic condition," within the meaning of the term, *Injury*.[54]

I have also considered the temperature, Heat Index, and WBGT in the Artesia area when Agent Afolayan went on his physical fitness run on April 30, 2009, *in combination* with Artesia's roughly 3,400-foot elevation. Based on the discussion, above, however, about the lack of (or minimal) effect of a 3,400-foot elevation on the human body (particularly after roughly ten weeks at that elevation), and mindful of what the temperature, Heat Index, and WBGT in the Artesia area actually were when Agent Afolayan went on his physical fitness run on April 30, 2009 (and had been in the preceding days), I am not persuaded that it is "more likely than not" that any of the conditions would materially alter the significance of any (or all) of the others.

In sum, I am unpersuaded that it is "more likely than not" that the weather/altitude conditions (either alone or in combination) on April 30, 2009, that the Claimants have identified in their filings in this claim were so "unusually adverse," "intense[]," or severe as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

**Medical Opinions**

Even if the weather/altitude conditions (either alone or in combination) encountered by

---

[53]   https://www.britannica.com/place/New-Mexico (last visited January 16, 2024).

[54]   Exposure to lower oxygen availability at elevations over 1,200 meters (3,937 feet) leads to physiological changes in those not acclimatized to such elevations. Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 2-3.a., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024). Over time, that exposure results in "physiological adaptation" that is "associated with the absence of or very low susceptibility to altitude illness." *Id.* "Between 70 and 80 percent of this [adaptation] occurs in the *first week* at a specific altitude." *Id.* (*see* Table insert at ¶ 2-3 (emphasis added)). Because of this physiological adaptation over time, whether the ascent to a higher elevation occurred yesterday versus ten weeks earlier would be a relevant consideration in assessing the adversity posed by a particular elevation.

Agent Afolayan during his 1.5-mile run on April 30, 2009, and identified by the Claimants *were* so "unusually adverse," "intense[]," or severe as to amount to a "climatic condition," within the meaning of the term *Injury*, that "climatic condition" would constitute an *Injury* under the PSOB Act *only if* Agent Afolayan's medical crisis on April 30, 2009, was a "traumatized physical condition of the body[] directly and proximately caused" by that "climatic condition."[55] Accordingly, I turn to examine the evidence in the record as to the cause and nature of that medical crisis.

In the May 2009 autopsy report, Dr. Sridhar Natarajan stated, "[Agent] Afolayan showed signs and symptoms of heat illness and rapidly deteriorated," noted an enlarged heart, "which made him more sensitive to a strenuous environment," and concluded the cause of death was "heat illness" with "cardiomegaly (cardiac disease)" as a contributing factor.[56] Dr. Natarajan stated that the "[i]nitial available recorded body temperatures [were] not significantly elevated."[57] He reported that "[d]uring a period of strenuous physical exertion in a hot environment [Agent Afolayan] began to exhibit signs of not feeling well[,]" and his enlarged heart made him "more sensitive to a strenuous environment."[58] Dr. Natarajan's report did not note any evidence of sickling in Agent Afolayan's blood, or anything that would have indicated the involvement of a sickle-cell condition.

At the November 2012 hearing, Dr. Kris Sperry, a forensic pathologist, testified on behalf of the Claimants that, "to a reasonable degree of medical certainty . . . Nathaniel A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run."[59] Dr. Sperry acknowledged that individuals with sickle cell trait, "when they may be subjected to extremes of physical exertion and become dehydrated, and especially at an increased altitude, this may precipitate a sickle cell crisis."[60] He explained that dehydration was a "relative kind of thing" that can be caused by running in a hot environment, and can initiate a sickle cell crisis even if it "is not severe or profound dehydration."[61]

Dr. Sperry's November 15, 2012, report states that "the clinical symptoms exhibited by Mr. Afolayan following his 1.5 mile run in hot weather, followed by the development of respiratory and neurological deterioration, renal failure, rhabdomyolysis and death, is a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition,

---

[55]     28 C.F.R. § 32.3 (defining *Injury*).

[56]     Autopsy Examination Report, conducted Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009.

[57]     *Id.*

[58]     *Id.*

[59]     November 27, 2012, Hearing Officer Transcript, pp. 39–40.

[60]     *Id.* at 46–47.

[61]     *Id.* at 47.

which evolves in to sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration."[62]  He also concluded that the physical training performed by Agent Afolayan in a hot environment was a "known contributing factor in the evolution of a sickle cell crisis in persons who carry the sickle cell trait."[63]  He ended by stating that he agreed with Drs. Stephen Cina (*post*) and Sridhar Natarajan (*ante*) in "that Nathani[e]l A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died."[64]

Dr. Stephen Cina, an independent forensic pathologist, reviewed records at the request of the Bureau, documenting his findings in three separate medical opinions, the last one dated February 22, 2013.[65]  Following his review of the record, Dr. Cina stated that he was unable to conclude "to a reasonable degree of medical probability" that Agent Afolayan died from a heatstroke.  He wrote that "[Agent Afolayan's] symptoms leading up to his collapse were somewhat atypical for heatstroke and he did not complain of being hot prior to losing consciousness" and "though there was a clinical impression of heat-related illness, an elevated body temperature was not recorded."[66]  Dr. Cina, however, acknowledged that "adverse climatic conditions contributed at some level to [Agent Afolayan's] death."[67]

In response to a question as to whether "any other factor or combination of factors (for example, chronic, congenital, progressive, or preexisting condition, illness, or disease) contribute[d] to the death as much as [the injury identified in a previous question,]"[68] Dr. Cina responded—

Yes.  There is microscopic evidence of severe sickle cell disease.  The combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure could have triggered a sickle cell crisis.[69]

Acknowledging that Agent Afolayan's exercise in an adverse climate contributed to his death, Dr. Cina ultimately concluded that "the most significant factor contributing to death in this case

---

[62]    Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated November 15, 2012.

[63]    *Id.* at 2–3.

[64]    *Id.* at 3.

[65]    The first such review, performed on April 14, 2011, was largely for purposes of determining whether Agent Afolayan's death was the result of a heart attack, which was relevant under 42 U.S.C. § 3796(k)—now 34 U.S.C. § 10281(k).  *See* Independent Medical Review, Dr. Stephen Cina, dated April 14, 2011.

[66]    Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated July 15, 2011.

[67]    *Id.*

[68]    *See* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[69]    Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated July 15, 2011.

14

was a sickle cell crisis."[70]

After reviewing evidence gathered during the hearing officer's review to include Dr. Sperry's report, Dr. Cina stated in his last report that "essentially, my opinion is unchanged and my microscopic diagnosis of sickle cell disease/trait has been confirmed."[71] He opined, "To within a reasonable degree of medical probability, [Agent Afolayan] would not have died if he did not have pre-existent sickle cell trait. He also would not have died if he was not exercising in a hot, hostile environment. Each of these factors was a contributory factor in his death."[72]

In a later amended report, dated May 23, 2013, Dr. Sperry stated that "[he] continue[d] to be in agreement with the opinions of Drs. Cina and Natarajan, that Nathani[e]l A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from him having the Sickle Cell Trait."[73] Dr. Sperry also described it as a "serious error" that the autopsy did not mention sickle cell trait.[74] Finally, he concluded that Agent Afolayan's "death would have been preventable if he had been offered proper hydration and appropriate rest during the course of his exertion-related activities, as these measures have been proven to ameliorate the onset and progression of Sickle-Cell Trait-induced crises, and are utilized regularly during the training of soldiers in all branches of the United States Military."[75]

Dr. Mileusnic-Polchan, Chief Medical Examiner at the Knox County Regional Forensic Center in Knoxville, Tennessee, also provided a medical opinion, dated January 28, 2019, at the request of the Claimants.[76] Her opinion included a more expansive discussion of rhabdomyolysis than that offered by either Dr. Sperry or Dr. Cina. Dr. Mileusnic-Polchan saw the histopathologic findings of the autopsy to be "well aligned with the clinical findings of rhabdomyolysis that was described in [Agent Afolayan's] medical records."[77] She explained that "[e]xertional rhabdomyolysis . . . is precipitated by strenuous physical exertion" and "presents with muscle aches, weakness and dark urine."[78] Agent Afolayan was having these

---

[70]    *Id.* at 6.

[71]    Independent Medical Evaluation, Dr. Stephen Cina, p. 6, dated February 22, 2013 ("The microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait. Microscopically this is identical to a crisis from sickle cell disease.").

[72]    *Id.*

[73]    Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated May 22, 2013.

[74]    *Id.* at 1.

[75]    *Id.* at 2. Dr. Sperry did not specify what "proper hydration" and "appropriate rest" would have been. According to TRADOC Regulation 350-29, Table B-1, reproduced above in text, Agent Afolayan's 11-minute run with a WBGT of 71 degrees would not have dictated the need for rest if he were in the Army. And the record is silent as to the amount of water that Agent Afolayan consumed prior to his run.

[76]    Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019.

[77]    *Id.* at 4.

[78]    *Id.* at 2. Dr. Mileusnic-Polchan also describes it as "dark red-brown, bloody-appearing urine." *Id.*

15

rhabdomyolysis symptoms, Dr. Mileusnic-Polchan stated, "for days prior to his terminal collapse[,]" but the diagnosis "was missed on several occasions, particularly on April 28, 2009, when [he] presented at the FLETC Health Unit[.]"[79]

According to Dr. Mileusnic-Polchan, sickle cell trait "has been associated with episodes of sudden collapse during or immediately after strenuous physical activity[,]" although such exertional collapse and death is "frequently multifactorial and related to exertional heat stress (or heat stroke) and exertional dehydration with or without rhabdomyolysis."[80] Sickle cell trait also has been "associated with a 54 percent greater risk of exertional rhabdomyolysis, a potentially fatal syndrome associated with strenuous physical activity."[81]

Noting that Agent Afolayan had not encountered difficulties in strenuous exercise prior to arriving in Artesia, Dr. Mileusnic-Polchan stated that "[n]onetheless, the sickle cell trait coupled with the physical exertion under a new set of unfavorable circumstances that included environmental and atmospheric conditions (dry heat and altitude) made agent Afolayan more susceptible to develop catastrophic rhabdomyolysis and die."[82] She concluded that "Agent Nathaniel Afolayan died of complications of rhabdomyolysis due to strenuous physical activity in a hot dry environment."[83] She added that "[t]he underlying contributing factors were sickle cell trait in combination with high altitude, which made the agent more susceptible to developing the catastrophic form of rhabdomyolysis."[84]

Dr. Mileusnic-Polchan both described Agent Afolayan's health issues as beginning "to manifest approximately two months after his training-relocation to Artesia" and separately described him "experiencing repeated episodes of weakness and muscle pain in March and April of 2009."[85] These statements, however, are not entirely consistent with the information in the record.

Agent Afolayan was hired as a Border Patrol Agent and reported to Artesia for training on or about February 16, 2009. According to the earliest information in the record, Agent Afolayan reported to the health unit on March 5, 2009, complaining of a "runny nose, sneezing, etc. since last night. Requests Claritin." The assessment was that he was having allergy symptoms and treated accordingly.

---

[79]    *Id.*

[80]    *Id.* at 5.

[81]    *Id.*

[82]    *Id.* As evidence that the circumstances in Artesia were unlike anything encountered by Agent Afolayan, Dr. Mileusnic-Polchan noted that "Mrs. Afolayan confirmed that the sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation" and went on to state that "in his case, the sickle cell trait was an incidental finding following the birth of their second child."

[83]    *Id.* at 5–6.

[84]    *Id.* at 6.

[85]    *Id.* at 2, 5.

On March 25, 2009, Agent Afolayan went to the health unit because he rolled his ankle while running and requested a refill of previously provided nasal decongestant. It appears that his allergy medications were refilled, and he was treated for a rolled ankle. Dr. Mileusnic-Polchan described this visit as involving "generalized soreness and weakness," but that is not what the record shows. The record contains *no* mention of generalized soreness or weakness; instead, it is specific in stating that "right ankle rolled. Bottom of foot inward[,] no snap or pop. Just soreness, states feels a little weak. While running."

Agent Afolayan was back at the health unit on April 8, 2009, for dizziness and nausea that he thought was caused by being under water too long and swallowing water. He was given Gatorade, apparently to elevate his blood sugar, and left the unit with his dizziness and nausea resolved. Dr. Mileusnic-Polchan stated that, on this occasion, Agent Afolayan "experienced dizziness, nausea and weakness." The record from the visit, however, says nothing whatsoever about weakness being experienced or mentioned. On April 20, 2009, Agent Afolayan reported to the health unit with "'cold symptoms,' cough, sore throat, no energy, nasal congestion, bodyaches. Onset Saturday night."[86] Four days later Agent Afolayan returned to the health unit saying he felt much better, but still had congestion, cough, and sneezing. He also complained that he had been sprayed with pepper spray the day before. Finally, on the afternoon of April 28, 2009,[87] Agent Afolayan was back at the health unit and treated for bilateral muscle strain that apparently arose from (or followed) running, weight training, and basketball, and was found to be caused by "overuse" and "stretch[ing] beyond [the] norm." This evidence from Agent Afolayan's visits to the health unit, therefore, shows that some health issues began within three weeks of his arrival in Artesia, and that the general weakness and muscle pain that Dr. Mileusnic-Polchan refers to was not present until a few days before Agent Afolayan's 1.5-mile run on April 30, 2009.

---

[86]     Dr. Mileusnic-Polchan asserts that not all symptoms were recorded by the health unit at every visit because this visit did not mention chills or bloody sputum, which the health unit reported four days later as having cleared up. It may be that the healthcare professional intended "cold symptoms" to include these other symptoms, or it may be that not every symptom was disclosed by Agent Afolayan or recorded by the healthcare professional. In any event, any failure of the health unit to record all symptoms discussed by Agent Afolayan (if that is what happened) would not serve as a legitimate basis to attribute symptoms to him that are not mentioned in the record. PSOB claims are to be "determine[d] on the basis of legally-sufficient objective evidence, and after reasonable diligence and inquiry" and "decide[d] based on real, objective, and legally sufficient evidence that objectively meets the standards of proof set forth in the law, rather than speculation, fancied legislative intent, uncorroborated assertions, biased evidence, a slanted record, incomplete information, or sympathy, however understandable or deeply felt." H.R. Rep. No. 112548 at 7, 8 (2012) (internal quotation marks omitted); *cf., e.g.*, *Tafoya* v. *United States*, 8 Cl. Ct. 256, 262 263 (1985) ("account of events" offered by PSOB claimant's expert was "based primarily on speculation, which is inadequate evidence of what occurred"); *Brister* v. *United States*, No. 01180C, slip op. at 2–6 (Fed. Cl., Mar. 27, 2002) (rejecting the use of "speculation" as evidence, and stating that "Congress intended that benefits under [the PSOB Act not be granted] arbitrarily or speculatively").

[87]     On April 28th, the high temperature in the Artesia area was 76 degrees with an average relative humidity of 65 percent. *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 16, 2024).

The point is not merely that Dr. Mileusnic-Polchan got details of Agent Afolayan's medical history while in Artesia wrong, but she relied on her inaccurate factual predicate to support her medical conclusion. That is, she asserted that Agent Afolayan "experienced repeated episodes of weakness and muscle pain" almost since his arrival in Artesia and then used that as a basis to assert that, "for the first time in his life, Agent Afolayan was exposed to a different set of circumstances that initiated repeated episodes of weakness, muscle pains and myoglobinuria from rhabdomyolysis." But the medical information in the record does not show repeated episodes of weakness, muscle pain, myoglobinuria or rhabdomyolysis. Aside from a description of Agent Afolayan's ankle as feeling weak after he rolled it in March, there is no report of any occurrence of weakness, muscle pain, or mygloblinuria until late April.

I am not persuaded that the "different set of circumstances" presented by Artesia caused a physical condition that first manifested over two months after he arrived in Artesia. According to the statement provided by one of Agent Afolayan's classmates, Victor Manuel Santomauro, Agent Afolayan "was usually in the top 5 in the runs," until a "few days before [April 30th]" when "he was struggling with the run [and h]e came in the back of the section and his time was not his normal time."[88] Even in the circumstances presented in Artesia, according to Mr. Santomauro and others, Agent Afolayan was excelling in physical exercise. Plus, his weeks of living in Artesia and engaging in frequent and vigorous exercise, with gradually increasing temperatures, would have acclimated Agent Afolayan to the conditions there *before* he began to experience weakness, muscle pain, myoglobinuria or rhabdomyolysis.[89]

Notably, Dr. Mileusnic-Polchan reported that Agent Afolayan was manifesting exertional rhabdomyolysis when he reported to the health unit the afternoon of April 28th, experiencing bilateral muscle strain and myoglobinuria after extensive exercise.[90] The high temperature that

---

[88]    Statement of Victor Manuel Santomauro, dated June 29, 2011.

[89]    To begin with, the weather conditions and elevation in Artesia were not significantly different from the weather conditions and elevation that Agent Afolayan had encountered for years in his hometown of San Jacinto—although the weather in Artesia generally was a little warmer and drier, and the elevation was about 1,900 feet higher, than what Agent Afolayan was accustomed to at home. Any acclimatization that he may have needed, therefore, was minimal. In any event, roughly ten weeks would have provided time for him to become acclimated to the environment of Artesia. *See* National Athletic Trainers' Association Position Statement: Exertional Heat Illnesses, 2015, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4639891/ (last visited January 16, 2024) ("Heat acclimatization is a physiological response to repeated heat exposure during exercise over the course of 10 to 14 days . . . . The rate of acclimatization is related to aerobic conditioning and fitness; in general, a better conditioned athlete will acclimatize to the heat more quickly."); Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 2-3.i. & j., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024) ("The sequence of physiological changes that produce acclimatization to high altitude"—and the elevation of Artesia is not even considered "high altitude" in TB Med 505— "takes time to complete . . . and 80 to 90 percent of [a soldier's] overall acclimatization is accomplished by 2 weeks to a month.").

[90]    Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019, p. 4 ("Exertional rhabdomyolysis is characterized by skeletal muscle breakdown, muscle enzyme and myoglobin release and subsequent acute renal failure that is precipitated by strenuous physical exertion . . . . All three of these symptoms were present in Nathaniel Afolayan's case for days prior to his terminal collapse. It is unfortunate that

day was 76 degrees and the humidity of the day averaged 65 percent, which are conditions that he would have encountered quite frequently in his hometown of San Jacinto—hardly a "different set of circumstances" for him. So how does Dr. Mileusnic-Polchan explain that Agent Afolayan was suffering exertional rhabdomyolysis in the absence of the heat and low humidity that she identifies as factors in his succumbing to the condition a few days later? She does not tell us.

The Claimants' post-remand submission attempts to argue that "high heat" was the cause of Agent Afolayan's medical crisis on April 30th and points to Dr. Natarajan's description of the cause of death as "heat illness." It is unclear what precisely "heat illness" may mean (*e.g.*, failure to regulate metabolic heat occasioned by his exertion? —rhabdomyolysis? —heat stroke?), however, particularly because Dr. Natarajan does not offer or discuss any evidence that Agent Afolayan had an elevated body temperature. And Dr. Cina affirmatively stated that an elevated body temperature was *not* recorded for Agent Afolayan. Furthermore, exercise-related heat illness can occur in "'normal' environmental conditions."[91] As was discussed above, the temperature at the time Agent Afolayan's medical crisis began was hot, but not particularly so. And the WBGT at the time was such that no particular caution would have been advised by the Army, the American College of Sports Medicine, or US Soccer for individuals engaging in vigorous exercise or training. Thus, although I believe that the temperature on April 30th contributed to *some* extent to Agent Afolayan's medical crisis, I do not understand Dr. Natarajan to be saying that the temperature was the primary or biggest contributor.[92]

Dr. Cina opined that exercising in an adverse climate (also described as a hot, hostile environment) at altitude contributed to Agent Afolayan's sickle cell crisis and death, but Dr. Cina expressly stated that he could *not* say that the climate was the biggest factor. Agent Afolayan's sickle cell trait also contributed to his sickle cell crisis and death, according to Dr. Cina, who noted that antihistamine use, dehydration, and a viral illness also "played a smaller role in his death."[93] Dr. Cina, therefore, pointed to various contributing causes to Agent Afolayan's medical crisis, but he did not identify any of these causes as being sufficient enough to bring about his fatal injury or as contributing to that fatal injury to a greater degree than any other factor.[94]

Dr. Sperry indicated that he agreed that Agent Afolayan "died as a consequence of a heat related illness," and stated that was "the precipitation of a sickle cell crisis that arose from him

---

the diagnosis was missed . . . , particularly on April 28, 2009, when [he] presented at the FLETC Health Unit having experienced the triad.").

[91]    National Athletic Trainers' Association Position Statement: Exertional Heat Illnesses, 2015. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4639891/ (last visited January 16, 2024) ("The risk of [exertional heat illnesses] is ever present during exercise in the heat but can occur in 'normal' environmental circumstances.").

[92]    *Cf.* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[93]    Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated February 22, 2013.

[94]    *Cf.* 28 C.F.R. § 32.3 (defining *Substantial factor*).

having Sickle Cell Trait."[95] Dr. Sperry also opined that Agent Afolayan's clinical symptoms were "a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition, which evolves in to sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration." Dr. Sperry, however, never opined whether it was the sickle cell trait, exertion, the heat, or exertion-related dehydration that was the most significant factor in bringing about the fatal medical crisis.

Dr. Mileusnic-Polchan, whose report I discuss in substantial detail above, identified various contributing factors to Agent Afolayan's medical crises, but she also did not identify the "substantial factor" that brought about Agent Afolayan's medical crises and death.

In sum, the doctors who reviewed records and opined as to this claim stated that Agent Afolayan's sickle cell trait and vigorous exertion contributed in some way to his medical crisis on April 30, 2009, and identified other contributing factors, including heat (or dry heat), altitude, dehydration (or relative- or exertional dehydration), antihistamine use, and viral illness;[96] but *none* of them said that the climatic conditions (singularly or together) were the biggest factor in causing that crisis. One doctor—Dr. Cina—expressly stated that he could *not* say that the climatic conditions were the biggest factor. And I am not persuaded that it is "more likely than not" that the weather/altitude conditions were the substantial factor in bringing about Agent Afolayan's death. Instead, I am persuaded that a combination of pre-existing rhabdomyolysis from an unknown cause, sickle cell trait, and physical stress or -strain, all together, contributed to the medical crisis to a greater degree than any other factors, including the weather/altitude conditions.

No medical expert concluded that the weather/altitude conditions were sufficient by themselves to bring about the fatal medical crisis or that those conditions contributed to the onset of the crisis to a greater degree than any other factor (or factors, combined) did. In fact, every medical opinion in the record cites multiple reasons for Agent Afolayan's fatal medical crisis, and, to the extent that weather/altitude conditions are mentioned at all, they are mentioned only in conjunction with other factors. Furthermore, all members of the training class were subjected to the same weather/altitude conditions, and none other than Agent Afolayan was reported as suffering any medical crises. If the weather/altitude conditions during the run on April 30, 2009, had been so severe or extreme, one would expect to see more than one trainee sickened by those conditions during the run. Finally, as discussed above, the temperature at the time of the run was hot, but not "intensely" so. Furthermore, the low humidity during the run resulted in more efficient evaporation of sweat, which has a cooling effect on the body. Both the Heat Index and

---

[95]     Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated May 22, 2013.

[96]     Dr. Cina noted that a viral illness also could have played some role in Agent Afolayan's medical crisis. It is recommended that individuals with sickle cell trait should limit maximal exertion when feeling ill, "and such activities should be limited for ≥ 1–2 weeks after viral syndromes or respiratory infections." *Sickle Cell Trait and Sudden Death – Bringing It Home*, Bruce Mitchell, M.D., Journal of the National Medical Association, March 2007 (Exhibit 2 to the Hearing Officer's hearing transcript). Agent Afolayan had been seen in the health unit on April 20th with cold symptoms, and he still was not feeling well when he participated in the run on April 30th. *Statement of Anthony Fazio*.

the WBGT indicate that the feel of the temperature was somewhat lower (or much lower) than the reading on the thermometer. The WBGT, which the record shows is the heat index "best related to physiologic response to exercise in heat[,]"[97] tells us that the temperature at the time of the run felt like 71 degrees Fahrenheit. The U.S. Army guidelines for training would have *no* restrictions on soldiers engaging in "very heavy work" with a WBGT of 71 degrees. US Soccer and the American College of Sports Medicine similarly would not have recommended any restrictions on exercise for an individual like Agent Afolayan in these conditions.

It has been argued that the black short-sleeve T-shirt that Agent Afolayan wore during the run made the conditions even hotter for him. Again, I am not persuaded that it is "more likely than not" that the clothes that he wore contributed much, if at all, to his fatal medical crisis. The U.S. Army guidelines assume that soldiers are wearing an operational camouflage uniform, which includes pants and a shirt. As compared to the shorts and short-sleeve T-shirt that Agent Afolayan was wearing during the run, this operational camouflage uniform would result in *less* skin exposure, and thus *less* sweat evaporation and *less* cooling of the body. But even under those *less* favorable conditions, the Army (as indicated above) imposes *no* restrictions on its soldiers' training when there is a WBGT of 71 degrees; and it does not even *begin* to impose restrictions until the WBGT reaches 78 degrees (and such work/rest restrictions as it imposes at that level would not have affected Agent Afolayan's run anyway, as it was completed in just over eleven minutes).

Low humidity (*i.e.*, a more arid environment) generally may contribute, more than moderate humidity does, to some level of dehydration if an individual does not drink extra fluids. Of course, as I noted above, exercise in an environment with lower humidity results in more efficient cooling of the body, which in turn results in less sweating (as compared to a more humid environment). Exercising in a hot dry environment, therefore, generally is a favorable thing (*i.e.*, less likely to lead to dehydration than exercising in a humid environment would), and the Heat Index and WBGT bear this out with "feels like" temperatures going lower as the humidity goes lower (when the ambient temperature remains constant). Accordingly, I am not persuaded that it is "more likely than not" that the low humidity during his April 30th run contributed much, if anything at all, to Agent Afolayan's fatal medical crisis.

Nor am I persuaded that it is "more likely than not" that the elevation of Artesia contributed much to Agent Afolayan's fatal medical crisis. Prior to the training, Agent Afolayan resided in a town with an elevation of approximately 1,500 feet. Artesia is about 1,900 feet higher in elevation. With time, individuals adjust to their elevation, and adjusting to this sort of elevation change does not appear to me, based on the information discussed above, as unusual or something that would be likely to cause significant medical problems after an adjustment period of roughly ten weeks. If Agent Afolayan were to be significantly affected by the elevation of Artesia, it is much more likely that any difficulties while exercising would have been apparent early on, but they were not. By all accounts, he was one of the most physically fit trainees in his

---

[97]     *Sickle Cell Trait*, John Kark, M.D., Howard University School of Medicine, Center for Sickle Cell Disease, December 20, 2000.

class, finishing near the top of most of the class's runs for roughly two months, up until a few days before his final run.

In addition, until an individual reaches roughly the elevation of Artesia, there has been no report of a "demonstrable physiological reaction to the decrease in atmospheric pressure."[98] The American College of Cardiology indicates that physiological changes from decreased atmospheric pressure are more likely to occur only as one nears 5,000 feet in elevation. According to the U.S. Army, the oxygen saturation of blood remains at roughly 96% in individuals until they reach an elevation of roughly 4,000 feet. The Army's TB Med 505 also states that only as one approaches 3,900 feet of elevation does "maximal aerobic work performance [become even] minimally impaired."[99] Thus, it seems that the reduction in oxygen availability at the elevation of Artesia has negligible effect on the ability of individuals to oxygenate their bodies. The Air Force and the Marines, consistent with these data points, do not expect elevation materially to affect aerobic fitness completion-times until 4,500 feet (for the Marines) or 5,250 feet (for the Air Force) and, therefore, do not make any adjustment in their respective completion times until an individual is engaged in aerobic fitness tests at or above those elevations. For all of these reasons, I am not persuaded that the elevation of Artesia was a substantial factor in bringing about Agent Afolayan's medical crisis.[100]

Two other factors are mentioned in the record as possibly contributing to Agent Afolayan's medical crisis on April 30, 2009, although to a lesser extent: viral illness and his taking of antihistamines. Antihistamines "can affect your body's 'temperature regulation and interfere with sweating and cooling mechanisms[.]'"[101] A viral illness can affect the body in various ways, depending on the nature of the virus, but, generally speaking, when presenting as an upper respiratory infection a virus typically affects "multiple body systems, including cardiac, pulmonary, muscular, fluid status, and temperature regulation."[102] These factors, therefore, could have interfered with Agent Afolayan's body's ability to regulate its temperature and, separately or in combination, contributed to a loss of fluids and dehydration.

A word about dehydration and its possible contribution to Agent Afolayan's fatal medical crisis. Drs. Cina, Sperry, and Mileusnic-Polchan each identified dehydration as a possible factor

---

[98]    Manual of Civil Aviation Medicine, p. 92 (II-1-8), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).

[99]    Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, ¶ 2-2.e., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024).

[100]    *See* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[101]    Stacey Colino, "Is your medicine ruining your workout?", *U.S. News & World Report* (May 4, 2016), quoting Dr. John Higgins, a sports cardiologist, available at https://www.usnews.com/wellness/articles/2016-05-04/is-your-medicine-ruining-your-workout (last visited January 16, 2024).

[102]    Christopher A. McGrew, "What recommendations should be made concerning exercising with a fever and/or acute infection?", in EVIDENCE-BASED SPORTS MEDICINE (Domhall MacAuley and Thomas Best 2d ed. 2007) (citations omitted), available at https://onlinelibrary.wiley.com/doi/epdf/10.1002/9780470988732 (last visited February 5, 2024).

or a factor in that medical crisis. For Dr. Cina, dehydration was a "possible" factor in Agent Afolayan's sickle cell crisis. Dr. Mileusnic-Polchan referred to it as "exertional dehydration (dry environment)." Dr. Sperry, however, gave a fuller explanation, indicating that "[d]ehydration is a relative kind of thing. That is, someone who is running 1½ miles in a hot environment is going to sweat, and the degree of dehydration that's necessary to initiate a sickle cell crisis is not severe or profound dehydration that would cause someone, say, to collapse just because of a lack of fluids in their system."[103] I find Dr. Sperry's more detailed explanation to be especially helpful, and I understand the other doctors to be employing the word "dehydration" and "exertional dehydration" in a similar manner, because I am unpersuaded that it is "more likely than not" that eleven minutes of exercise—even intense exercise—with a Heat Index of 83 degrees or WBGT of 71 degrees would ordinarily result in severe or profound dehydration from a lack of fluids[104] (unless, perhaps, the individual began exercising already at a significant fluid deficit).[105] In any event, his intense physical exertion (*i.e.*, physical stress and strain), the heat, and possibly his viral illness and antihistamines all seem to have contributed, at least somewhat, to the fluid loss (*i.e.,* relative dehydration) that factored into his medical crisis on April 30, 2009.

As indicated above, I conclude that sickle cell trait contributed, to *some* extent, to Agent Afolayan's medical crisis. Although sickle cell trait, in general, is considered a benign condition, it "has been linked to an increased risk of exercise-associated sudden death in individuals undergoing intense physical exertion, and possibly rhabdomyolysis."[106] "Sickle Cell Trait continues to be the leading cause of sudden death for young African Americans in military basic training and civilian organized sports."[107] "[M]ultiple studies showed that large amounts of sickled cells formed during exercise" and this "formation of sickled cells support a causal relationship between sickle cell trait and exercise-related complications."[108] Not all individuals with sickle cell trait will develop complications, but a "subset . . . obviously ha[s] an increased risk of exercise-induced complications. Most researchers and clinicians working in this area appear to have concluded that the increased morbidity and mortality for individuals with sickle cell trait result from the confluence of poor conditioning, strenuous physical exertion (especially

---

[103]    Hearing Transcript, p. 47.

[104]    *E.g.*, US Soccer provides for hydration breaks 25–30 minutes into a match, instead of after 45minutes, only if the WBGT is 89.6 degrees or above, https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf (last visited January 16, 2024); and it is not uncommon for 5K running races to offer only one water station, usually near the midway point. *See generally*, *e.g.*, https://www.theraceuc.com/frequently-asked-questions (last visited January 16, 2024); https://www.riograndehalf.com/ (last visited January 16, 2024).

[105]    In this connection, I note that, according to his wife, Agent Afolayan told her, just days before his fatal medical crisis, that he was drinking a "'ton'" of water.

[106]    American College of Sports Medicine and NCAA Joint Statement Sickle Cell Trait and Exercise, available at https://www.ncaa.org/sports/2013/12/18/acsm-and-ncaa-joint-statement-sickle-cell-trait-and-exercise.aspx (last visited January 24, 2024).

[107]    Bruce Mitchell, M.D., "Sickle Cell Trait and Sudden Death—Bringing It Home", *Journal of the National Medical Association*, March 2007, p. 300 (Exhibit 2 to the Hearing Officer's hearing transcript).

[108]    *Id.*

in hot climates), dehydration and age."[109]  Studies have noted "[a]n age-associated increase in the death rate . . . for those with sickle cell trait; the death rate of 28–29 year-olds is eight-fold higher than that of 17–18-year-olds."[110]  I, therefore, conclude that Agent Afolayan's sickle cell trait was *a* factor, albeit not *the substantial factor*, in bringing about his fatal medical crisis.

Based on my assessment of the evidence in the record and as discussed above, I conclude that it is "more likely than not" that sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia all contributed *to some extent* to Agent Afolayan's medical crisis on April 30th.  But I also conclude that he was experiencing rhabdomyolysis in the days immediately before April 30th, and that this rhabdomyolysis from an unknown cause contributed to his medical crisis on April 30, 2009.

Although I find that rhabdomyolysis was a factor in bringing about the death, I conclude that the rhabdomyolysis was of "unknown cause," and therefore cannot be found to be a "line of duty injury" as that term is defined in the PSOB implementing regulations.  The first indication in the record that Agent Afolayan was experiencing the symptoms characteristic of rhabdomyolysis does not appear until around April 28th, when he disclosed to his wife that he had bloody-appearing urine and reported to the health unit that he was having bilateral thigh and hamstring muscle pain.  This also is consistent with the statement provided by one of Agent Afolayan's classmates, Victor Manuel Santomauro, who stated that Agent Afolayan "was usually in the top 5 in the runs," but a "few days before [April 30th]" Agent Afolayan "was struggling with the run [and h]e came in the back of the section and his time was not his normal time."[111]  We have no greater specificity than that about this run that Santomauro refers to, precisely when Agent Afolayan's rhabdomyolysis symptoms may have begun, or exactly what he may have been engaged in when such symptoms began.

According to the health unit's record, on April 28th Agent Afolayan was seen at 1700 and reported having engaged in running, basketball, and weight training that day.  Although the record does not establish when in the day he engaged in these activities, the temperature that day ranged from a low of 57 degrees Fahrenheit to a high of 76 degrees.  And the humidity ranged from 40 to 82 percent.  It has not been shown that these climatic conditions caused or contributed to his muscle weakness or bloody-appearing urine (it also has not been shown that he engaged in any of the activities *outdoors*; weight training more commonly takes place indoors, and perhaps the basketball and running did as well).[112]

In sum, I find it "more likely than not" that Agent Afolayan already was experiencing a

---

[109]    *Id.* at 303.

[110]    *Id.* at 301.

[111]    Statement of Victor Manuel Santomauro, dated June 29, 2011.

[112]    I do not find these weather/altitude conditions (regardless of the temperature/humidity combination) to be unusually adverse or sufficiently severe to amount to a "climatic condition," as that term is used in the definition of *Injury*.  Thus, even if the Claimants could establish that the weather/altitude conditions of April 28th caused his muscle weakness or bloody-appearing urine, they would not be an *Injury* for purposes of the PSOB Program.

24

milder version of the illness (rhabdomyolysis) whose *sequelæ*, in combination with sickle cell trait and physical stress or –strain, contributed to his medical crisis on April 30, 2009, to a greater extent than any combination of weather/altitude conditions did during his 1.5 mile run on that day—that is, I conclude that it is "more likely than not" that that medical crisis—the traumatized physical condition of [his] body" at that time—was not "directly and proximately caused" by those weather/altitude conditions.[113]

**Genetic Information Nondiscrimination Act**

The Genetic Information Nondiscrimination Act ("GINA") makes it an "unlawful employment practice" for an "employer[] to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee[.]"[114] The Claimants' post-remand submission argues that GINA prohibits me from denying their PSOB claim because of Agent Afolayan's sickle cell trait. I do not agree that GINA applies, here.

GINA prohibits an *employer* from taking (or failing to take) actions as to its *employees*. It has not been shown that GINA prohibits an employer from taking any action as to a *deceased* employee.[115] But in any event, the Bureau of Justice Assistance was *not* the "employer" (or an agent of the employer) of Agent Afolayan, and he was *not* an "employee" of the Bureau.

The PSOB Act death benefits, moreover, are not "compensation, terms, conditions, or privileges" of Agent Afolayan's employment with Customs and Border Protection.[116] The PSOB Act, rather, provides a federal gratuity[117] on behalf of a grateful nation to certain public

---

[113]    28 C.F.R. § 32.3 (defining *Injury*).

[114]    42 U.S.C. § 2000ff-1(a)(1).

[115]    *Cf., e.g., Silkwood* v. *Kerr-McGee Corp.*, 637 F.2d 43, 749 (10th Cir. 1980) ("the civil rights of a person cannot be violated once that person has died"). Even if GINA prohibited an employer from taking action as to a deceased employee, there would be no remedy available to a deceased federal employee. For a federal employee, enforcement of GINA requires *the employee* to initiate an EEO complaint. *See* https://www.eeoc.gov/laws/guidance/background-information-eeoc-final-rule-title-ii-genetic-information-nondiscrimination (last visited January 16, 2024); 29 C.F.R. part 1635. The EEOC has held that such a complaint must be initiated by the living employee and may not be done by his estate. *Cf. Estate of Monico Torrez* v. *Postmaster General, USPS*, Appeal No. 0120101573, 2010 WL 3137587 (July 27, 2010) (estate lacks standing where employee did not initiate the EEO process before death).

[116]    The Judiciary Committee of the U.S. House of Representatives recognized that, although the PSOB Act is an "important resource" for public safety officers and their families, it is not "an insurance program, a worker's compensation program, or a remedial program and never has been." H.R. Rep. No. 112-548, at 6. Claims for PSOB Act benefits should be decided "strictly in accordance with the PSOBA and the underlying law governing legal gratuities[.]" *Id.* at 8.

[117]    *See, e.g., Rose* v. *Ark. State Police*, 479 U.S. 1, 4 (1986) ("Congress intended that the [amount paid under the PSOB Act] would be a 'gratuity[]'") (internal citation omitted); *Ortiz-Lebrón* v. *United States*, 65 F.

safety officers for some—*but not all*—line-of-duty deaths. The federal gratuity is not provided by Customs and Border Protection; instead, it is provided under the terms of the PSOB Act, which entrusts the Bureau (without any reference to GINA)[118] to make the statutory determination of eligibility.[119] For the foregoing reasons, GINA is inapplicable to this claim.

**Conclusion**

Pursuant to the PSOB Act and its implementing regulations, I—as Director of the Bureau—have conducted a thorough, *de novo* review of this claim, including the record as described in the attached evidence log. Based on the evidence of record and the requirements of the PSOB Act, for the reasons discussed above, I am not persuaded that it is "more likely than not" that Border Patrol Agent Nathaniel Afolayan sustained an "injury," as that term is defined in the PSOB Act and implementing regulations, and thus am unable to conclude that he "died as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C. § 10281(a). Accordingly, this claim for PSOB Act benefits must be denied.

---

Supp.3d 305, 307 (D. P.R. 2014) ("Benefits under the PSOB Act are considered legal gratuities as opposed to a statutory right."); 28 C.F.R. § 32.0(b) (the PSOB Act "authorizes the payment of three different legal gratuities"); H.R. Rep. No. 112-548, at 7, 11 (the PSOB program is "a deliberately limited program that . . . provides for the payment of specific gratuity benefits arising from the death, or permanent and total disability, of some public safety officers" and PSOB claims are "gratuity claims against the Treasury").

[118]  As to GINA claims by federal employees, GINA established a specific set of enforcement procedures, which are codified at 42 U.S.C. §§ 2000ff-6 & 2000e-16. Those procedures do not call for allegations of GINA violations to be brought before the BJA Director (or before any other PSOB determining official, for that matter). BJA's statutory role under the PSOB Act is limited to adjudicating claims based on the requirements set forth in that Act; the PSOB forum is not appropriate for determining allegations of violation of GINA. To the extent that the Claimants here may believe that my determination of their PSOB claim is in violation of GINA, their remedy, if any, would be pursuant to the procedures established by GINA itself.

[119]  *See* 34 U.S.C. § 10285(b) ("Responsibility for making final determinations shall rest with the Bureau.").

The above determination is based upon the Bureau of Justice Assistance Director's *de novo* review of the record before the agency, which includes the following:

| | |
|---|---|
| 1 | Claim for Death Benefits submitted by Lisa Afolayan, dated October 28, 2009; |
| 2 | Report of Public Safety Officer's Death, submitted by Alan Bersin, Commissioner, U.S. Customs and Border Protection, dated May 14, 2010; |
| 3 | Certificate of Death for Agent Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, Date Issued September 1, 2009; |
| 4 | Certificate of Marriage, Nathanial Afolayan and Lisa Owen, dated November 22, 2003; |
| 5 | Certificate of Live Birth, N███ A███, dated January 17, 2006; |
| 6 | Certificate of Live Birth, L█ A███, dated October 12, 2007; |
| 7 | U.S. Border Patrol Agent Badge, Agent Nathanial Afolayan, dated May 6, 2009; |
| 8 | Letter from Brad Mayberry, Senior Claims Examiner, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 30, 2009; |
| 9 | Letter from Jan Miller, Hearing Representative, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 21, 2009, attaching Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, dated October 21, 2009; |
| 10 | Autopsy Examination Report, conducted by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009; |
| 11 | Federal Employees Compensation System, Agent Nathaniel Afolayan, dated January 6, 2010; |
| 12 | Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, Law Enforcement Authority and Arrest Powers, |

dated March 15, 2011, enclosing 8 C.F.R. Chapter 1 § 287, Field Officers Powers and Duties, undated;

13      Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, from May 2010, with the following:

      a.  Letter from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, dated May 2, 2009;

      b.  Significant Incident Report, dated April 30, 2009;

      c.  Border Patrol Operations Courses, undated;

      d.  Position Description, undated;

      e.  Safety Investigation Data Form, dated April 30, 2009;

      f.  Medical Document, Illness Detail and Procedures Performed, undated;

      g.  Medical Document, Illness Detail and Procedures Performed, dated April 30, 2009;

      h.  The Officer Down Memorial Page, dated May 14, 2009;

      i.  Miri Marshall, *Border Patrol Agent Dies in Training*, KFOXTV.com, May 10, 2009;

14      Individual Injury Report, Nathaniel Afolayan, dated April 28, 2009;

15      Patient Visit Data, FLETC Health Unit, dated from March 5, 2009, through April 30, 2009;

16      Letter from Health Unit Staff to PT Instructor, dated from March 5, 2009, through April 20, 2009;

17      Health Questionnaire, dated February 18, 2009;

18      Medical Documents, Artesia General Hospital, dated from April 30, 2009 through May 15, 2009;

19      Aerocare Transport Worksheet, dated April  0, 2009;

20      Authorization for Examination And/Or Treatment, Covenant Medical Center, signed by Arturo Agero, Supervisory Border Patrol Agent, dated May 1, 2009;

21      Medical Documents, Covenant Health System, dated from April 30, 2009, through May 1, 2009;

22      Orthopaedic Medical Group of Riverside, Inc., Dr. Donald Kim, dated October 8, 2008;

23      Pacific Sleep Medicine Services, Dr. Stuart Menn, dated November 11, 2008;

24      Psychiatry Evaluation, Dr. Prakashchandra Patel, dated October 8, 2008;

25      Medical Notes and Prescription, dated January 2, 2008;

26      Medical Documents, Quest Diagnostics Incorporated, dated from April 4, 2007, through August 19, 2008;

27      Medical Documents, United Familycare Rialto, dated from April 19, 2006, through November 7, 2007;

28      Medical Notes, Physical Exam, dated from October 2, 2006 through August 18, 2008;

29      Letter from Felicia Wintz, PSOB Benefits Specialist, to Dr. Sridhar Natarajan, dated March 29, 2011;

30      Questions for Medical Review, undated;

31      Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated April 14, 2011;

32      Letter by Anthony Fazio, U.S. Border Patrol Academy Class #856, undated;

33      Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated July 15, 2011;

34      *Curriculum Vitæ*, Dr. Stephen Cina, forensic pathologist;

35      PSOB Office Determination, dated March 6, 2012;

36      Notification of Public Safety Officers' Benefits Office Determination from Hope Janke, PSOB Director, to Lisa Afolayan, dated April 4, 2012;

37      Notification of Public Safety Officers' Benefits Office Determination from Hope Janke, PSOB Director, to Alan Bersin, Commissioner, U.S. Custom and Border Protection, dated April 4, 2012;

38      Facsimile Transmittal Sheet from Michael Baranic, to Felicia Logan-Epps, PSOB Appeal Specialist, dated May 4, 2012;

39      Request for Hearing Officer Appeal from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated May 4, 2012;

40      Letter from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated June 13, 2012;

41      Letter from Hope Janke, PSOB Director, to Michael Baranic, Case Assigned to Hearing Officer Joseph Mistrett, dated July 25, 2012;

42      Claimant's Expert and Witness List, dated November 27, 2012;

43      Hearing Transcript, dated November 27, 2012, with the following Exhibits:

     a. Exhibit 1—Letter from Molly Dunn, M.S., Certified Genetic Counselor, to Lisa Afolayan, dated January 17, 2008, and Hemoglobinopathy Reference Laboratory, Children's Hospital & Research Center Oakland, Dr. Caralyn Hoppe, dated December 28, 2009;

     b. Exhibit 2—Dr. Bruce Mitchell, *Sickle Cell Trait and Sudden Death, Bringing it Home*, Journal of the National Medical Association, Vol. 99, No. 3, dated March 2007;

     c. Exhibit 3—Dr. John Kark, *Sickle Cell Trait*, dated December 20, 2000, sickle.bwh.harvard.edu/sickle_trait.html;

     d. Exhibit 4—*Sickle Cell Trait, Sickle Cell Disease, What is the Difference?* California Department of Health Services, undated;

     e. Exhibit 5—Independent Medical Evaluation, Dr. Kris Sperry, dated November 15, 2012;

     f. Exhibit 6— *Curriculum Vitæ*, Dr. Kris Sperry, forensic pathologist;

     g. Exhibit 7—Weather History for Artesia, New Mexico, dated April 30, 2009;

     h. Exhibit 8—City Data, Artesia, New Mexico, dated November 27, 2012;

30

        i.   Exhibit 9—Affidavit, Alex Jacob Alderman, dated July 7, 2011;

        j.   Exhibit 10—Affidavit, Victor Hugo Muglia Arias, dated July 8, 2011;

        k.   Exhibit 11—Affidavit, Jeffrey Carl Austin, dated July 7, 2011;

        l.   Exhibit 12—Affidavit, Reyna Del Carmen Cabrera, dated July 8, 2011;

        m.  Exhibit 13—Affidavit, Ginno Marcello Gallina Mora, dated July 5, 2011;

        n.   Exhibit 14—Affidavit, Victor Manuel Santomauro, dated June 29, 2011;

44      Independent Medical Evaluation, Dr. Stephen Cina, dated February 22, 2013;

45      Independent Medical Evaluation, Dr. Kris Sperry, dated May 22, 2013;

46      Hearing Officer Determination, dated January 10, 2014;

47      Letter from Hope Janke, PSOB Director, to Michael Baranic, Hearing Officer Denies Claim, dated February 10, 2014;

48      Letter from Hope Janke, PSOB Director, to Michael Baranic, Attorney Fees, dated February 10, 2014;

49      Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated;

50      Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated June 13, 2018;

51      Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Filing Period Extension Granted, dated December 10, 2018;

52      Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated February 4, 2019, with the following:

        a.   Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated;

        b.   Letter entitled Nathaniel Afolayan, An American Hero, undated;

53      Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

54      Historic Cases of PSOB Claims Paid, undated;

55  Email communication from Orlando Vasquez, PSOB Office, to Lisa Afolayan, dated February 7, 2019, with Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Acknowledgement of Receipt of Request for Appeal to BJA Director, dated February 7, 2019;

56  BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

57  Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

58  Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated January 27, 2020, with the following:

    a.  Letter from Lisa Afolayan to Hope Janke, PSOB Director, dated January 24, 2020, with the following:

        i.  Letter from William Powers, PSOB Director, to Chief Cosmo Spezzaferro, Pittsfield Police Department, *Timothy Shepard*, (claim number not provided) dated February 27, 1989;

        ii.  Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated February 27, 1989;

        iii.  Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated May 16, 1989;

        iv.  Article entitled, *Widow of cadet to get federal benefits*, undated;

        v.  Appeal Summary, *Charles McDonald*, 2001-201, dated October 5, 2004;

        vi.  Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

        vii.  Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

        viii.  Letter from Hope Janke, PSOB Director, to Maria Gomez, *Lorenzo Gomez*, 2008-128, dated September 9, 2015; and

        ix.  BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

59  PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34; and

60      PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34
        (incomplete).

61      Letter to Claimants' counsel inviting further argument or evidence in light of the
        Court's opinion, dated June 2, 2022.

62      Claimants' post-remand submission, received August 1, 2022.