# In the United States Court of Appeals for the Federal Circuit

LISA AFOLAYAN, widow of Nathaniel Afolayan, on behalf of herself and her minor daughter; NATALEE AFOLAYAN, daughter of Nathaniel Afolayan,

Petitioners

v.

DEPARTMENT OF JUSTICE,

Respondent

On Petition for Review of a Decision of the
Bureau of Justice Assistance PSOB Claim No. 2010-022

## JOINT APPENDIX

John P. Elwood
Jillian M. Williams
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Nicole L. Masiello
Arnold & Porter Kaye Scholer LLP
250 W. 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Petitioners*

# TABLE OF CONTENTS

| Certified List Number | Document | Date | Appendix Pages |
|---|---|---|---|
| | Director Determination on Remand | Feb. 4, 2024 | 1-35 |
| | Certified List | May 6, 2024 | 36-44 |
| 1 | Claim for Death Benefits Submitted by Lisa Afolayan | Oct. 28, 2009 | 45-47 |
| 3 | Certificate of Death | Sept. 1, 2009 | 51-52 |
| 10 | Autopsy Examination Report | Aug. 28, 2009 | 63-70 |
| 13(a) | Letter from Angarita | May 2, 2009 | 87-88 |
| 13(b) | Significant Incident Report | Apr. 30, 2009 | 89-92 |
| 31 | Dr. Cina Medical Review | Apr. 14, 2011 | 215-225 |
| 33 | Dr. Cina Medical Review | July 15, 2011 | 228-233 |
| 35 | PSOB Claim Determination | Mar. 6, 2012 | 256-258 |
| 43 | Hearing Transcript | Nov. 27, 2012 | 269-270; 305-315 |
| 43(a) | Letter from Genetic Counselor to Lisa Afolayan | Jan. 17, 2008 | 341-342 |
| 43(e) | Dr. Sperry Medical Evaluation | Nov. 15, 2012 | 370-372 |
| 43(i) | Alderman Affidavit | July 7, 2011 | 403-411 |

| | | | |
|---|---|---|---|
| 43(j) | Muglia Arias Affidavit | July 8, 2011 | 414-419 |
| 43(k) | Austin Affidavit | July 7, 2011 | 425-429 |
| 43(l) | Cabrera Affidavit | July 8, 2011 | 438-442 |
| 43(m) | Mora Affidavit | July 5, 2011 | 449-455 |
| 43(n) | Santomauro Affidavit | June 29, 2011 | 462-465 |
| 44 | Dr. Cina Medical Evaluation | Feb. 22, 2013 | 475-476 |
| 45 | Dr. Sperry Medical Evaluation | May 22, 2013 | 478-479 |
| 46 | Hearing Officer Determination | Jan. 10, 2014 | 480-500 |
| 52(b) | Letter from Lisa Afolayan: Nathaniel Afolayan, An American Hero | | 509-512 |
| 53 | Dr. Mileusnic-Polchan Medical Evaluation | Jan. 28, 2019 | 513-518 |
| 54 | Historic Cases of PSOB Claims Paid | | 519-520 |
| 56 | BJA Director Determination, Lorenzo Gomez, 2008-128 | July 20, 2015 | 574-576 |
| 61 | Letter to Claimants' counsel inviting further argument or evidence in light of the Court's opinion | June 2, 2022 | 591 |
| 62 | Claimants' post-remand submission | Aug. 1, 2022 | 592-609 |
| | Original BJA Director Determination | Sept. 14, 2020 | 610-637 |



U.S. Department of Justice

Office of Justice Programs

Bureau of Justice Assistance

*Washington, D.C. 20531*

# Director Determination (on remand)

### Border Patrol Agent Nathaniel Afolayan
### PSOB Claim No. 2010-022

Before me is a claim from Lisa Afolayan, on behalf of herself and her two minor daughters, Natalee and L█ (the "Claimants"), seeking benefits under 34 U.S.C. § 10281(a), based on the May 1, 2009, death of her husband (and their father), Border Patrol Agent Nathaniel Afolayan. After the Acting Director of the Bureau of Justice Assistance issued a Determination denying the claim, the Claimants filed a petition for review in the United States Court of Appeals for the Federal Circuit, which, on April 15, 2022, issued a decision remanding the matter to the Bureau. *Afolayan* v. *Dep't of Justice*, No. 2021-1452, 2022 WL 1124965.

Pursuant to the PSOB Act and the PSOB implementing regulations, and as the Director of the Bureau of Justice Assistance, I have reviewed the entire record in this claim (including the Claimants' post-remand submission) as described in the evidence log at the end of the attached Appendix, and, as elaborated in that Appendix (incorporated here by reference), I have considered the matters noted for remand by the Federal Circuit.

The record shows that, Agent Afolayan was enrolled in Session 856 of the Border Patrol Academy at Artesia, New Mexico. The Border Patrol Academy is roughly twelve weeks in length, and Agent Afolayan was in the last week of the training when he died. At about 2:45 p.m. on April 30, 2009, he and his fellow agents-in-training were in their final physical fitness test, which included a required 1.5-mile run. After completing the run (in 11 minutes and 6 seconds), Agent Afolayan indicated that he did not feel well and soon thereafter collapsed. Despite receiving medical treatment, he died the next day.

To establish eligibility for a PSOB death benefit, the evidence must show that the decedent died as the direct and proximate result of a "personal injury" sustained in the line of duty. Based on the evidence of record and the requirements of the PSOB Act, for the reasons discussed in detail in the attached Appendix, I am not persuaded that it is more likely than not that Border Patrol Agent Nathaniel Afolayan sustained an "injury," as that term is defined in the PSOB Act and its implementing regulations, and thus am unable to conclude that he "died as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C.

§ 10281(a). Accordingly, it is my determination that this claim for PSOB Act benefits must be, and hereby is, **denied**.

KARHLTON MOORE
Digitally signed by
KARHLTON MOORE
Date: 2024.02.08
18:20:09 -05'00'

Karhlton F. Moore
Director
Bureau of Justice Assistance

## Appeal Rights

Relief from this determination may be sought via appeal to the United States Court of Appeals for the Federal Circuit, pursuant to 34 U.S.C. § 10287. Such appeal must be filed "not later than 90 days after the date of which the Bureau [of Justice Assistance] serves notice" of this determination on the Claimants. *Id.* Notice of this determination is served by the PSOB Office on the date that it is "(1) [m]ailed, by U.S. mail, addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office]; . . . (2) [d]elivered to a courier or other delivery service, addressed to the individual (or to his representative) at his (or his representative's) last address known to such Office[,]" 28 C.F.R. § 32.2(c); or (3) having been so prescribed, sent "by the PSOB Office [to] an individual by electronic means (such as by telefacsimile or electronic mail addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office])[,]" 28 C.F.R. § 32.2(g)(2).

## Fees for Representation

If a representative (such as an attorney) has provided any services in connection with this claim, the representative *must* obtain authorization pursuant to 28 C.F.R. § 32.7 before seeking any compensation whatsoever for such services from the Claimant. *See* 34 U.S.C. § 10285(a).

2

Lisa Afolayan filed a claim with the Public Safety Officers' Benefits ("PSOB") Office of the Bureau of Justice Assistance ("BJA" or the "Bureau"), seeking benefits, under the PSOB Act of 1976, on behalf of herself and her two minor daughters, Natalee and L█, (the "Claimants"), based on the May 1, 2009, death of her husband, Border Patrol Agent Nathaniel Afolayan.  After the Acting Director of the Bureau issued a Determination denying the claim,[1] the Claimants filed a petition for review in the United States Court of Appeals for the Federal Circuit, which, on April 15, 2022, issued a decision remanding the matter to the Bureau, *Afolayan* v. *Dep't of Justice*, No. 2021-1452, 2022 WL 1124965, to determine (1) "whether the climatic conditions surrounding Agent Afolayan's death were a 'direct and proximate' cause of his injuries,"[2] and, if so, (2) "whether Agent Afolayan's sickle cell trait could properly be considered in evaluating alternate causation."  *See Afolayan*, slip op. at 14.  The Bureau invited the Claimants to file whatever evidence or argument that they would like to be considered following the remand.  On August 1, 2022, the Claimants filed additional argument but no further evidence.

## Background

Nathaniel Afolayan, a resident of San Jacinto, California, pursued employment with U.S. Customs and Border Protection in 2008.  He was hired as a Border Patrol Agent (Intern) and enrolled in Session 856 of the Border Patrol Academy at Artesia, New Mexico, which has an elevation of approximately 3,400 feet above sea level.  The Border Patrol Academy is roughly twelve weeks in length; Agent Afolayan was in the last week of the training when he died.  At about 2:45 p.m. on April 30, 2009, Agent Afolayan and his fellow agents-in-training were in their final physical fitness test, which included a required 1.5-mile run that had to be completed

---

[1] As stated on page 3, n. 1, of the Appendix to that Determination (revised here for recent statutory changes),

[t]he PSOB Act generally is applied as in effect on the line-of-duty injury on which the claim is predicated.  *See generally* 28 C.F.R. § 32.4(d).  As explained in text below, however, this approach is not possible with respect to the instant claim, as the actual occurrence of such an injury, and hence the date thereof, cannot be ascertained from the record.  Except as otherwise may be expressly noted, therefore, references herein to the statute are as in effect on the date of death, including as may be applicable pursuant to [Pub. L. No. 117-172, § 3(b)(1)(B), 136 Stat. 2098, 2100–2101 (2022); Pub. L. No. 117-61, § 8(b)(2), 135 Stat. 1474, 1479 (2021);] Pub. L. No. 115-36, § 6(2), 131 Stat. 849, 852 – 853 (2017); and Pub. L. No. 112-239, § 1086(d), 126 Stat. 1632, 1969 (2013), as amended.  In contrast, and except as may be noted otherwise, the PSOB implementing regulations (which are codified at 28 C.F.R. part 32) are referred to herein as in effect on the date of this determination.  *See* 34 U.S.C. § 10287.

[2] In this connection, the Court queried "whether the prevailing conditions were the type of unusual or out-of-the-ordinary climatic conditions that would qualify for compensation under the regulations."  *Afolayan*, No. 2021-1452, slip op. at 9.

in 13 minutes or less.  At around the time of Agent Afolayan's run, the temperature was just below 88 degrees Fahrenheit, the relative humidity was between 6 and 7 percent,[3] and the wind was blowing at about 8 to 9 mph.[4]

After completing the run (in 11 minutes and 6 seconds), Agent Afolayan indicated that he did not feel well and soon thereafter collapsed.  Agent Afolayan was initially taken, shortly before 3:00 p.m., to the Border Patrol Academy's health unit for medical assistance.  His condition declined, and he was taken to Artesia General Hospital.  Later, he was airlifted, at 7:10 p.m., to Covenant Medical Center in Lubbock, Texas.  He died the next day, at 10:41 p.m. Treatment records for Agent Afolayan from Covenant Medical Center indicate diagnoses related to heat illness and/or rhabdomyolysis.

The initial death certificate, issued on May 5, 2009, listed the cause of Agent Afolayan's death as "pending."  The September 1, 2009, amendment to the death certificate listed the immediate cause of death as "Heat Illness," and identified "other significant conditions contributing to death" as "cardiomegaly (cardiac disease)."[5]

The Claimants bear the burden of establishing that it is "more likely than not"[6] that Agent Afolayan "died as the direct and proximate result of a personal injury sustained in the line of duty."  *See* 34 U.S.C. § 10281(a).  The PSOB implementing regulations, at 28 C.F.R. § 32.3, define "injury," in pertinent part, as follows:

> *Injury* means a traumatic physical wound (or traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virus, or bacteria . . . but does not include—
> * * *
> (2) Any condition of the body caused or occasioned by stress or strain.

The same section of the regulations defines *Stress or strain* as "includ[ing] physical stress or strain, mental stress or strain, post-traumatic stress disorder, and depression."

---

[3]    *See* Hearing Officer Determination, dated January 10, 2014, where Hearing Officer Joseph B. Mistrett wrote, "According to weather records for Artesia, New Mexico on April 30, 2009, the temperature at 2:30 p.m. was 87.8 degrees, with a relative humidity of 6% or 7%."

[4]    https://www.wunderground.com/history/daily/us/nm/roswell/KROW/date/2009-4-30 (last visited January 12, 2024).

[5]    Certificate of Death for Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Sridhar Natarajan, MD, MS, Lubbock County Medical Examiner, Date Issued September 1, 2009.

[6]    28 C.F.R. § 32.5(a).

**Climatic Conditions**

The Claimants assert that three climatic conditions brought about Agent Afolayan's fatal medical crisis—heat, low humidity, and altitude. That crisis occurred after he completed a 1.5-mile run, in roughly 11 minutes, in conditions that included a temperature of just below 88 degrees, with humidity between 6 and 7 percent, at an elevation of approximately 3,400 feet.

The Federal Circuit observed in its remand decision that "ordinary [and] routine"[7] weather conditions are not what the definition of *Injury* contemplates, citing *Juneau*, where it was recognized that, for PSOB purposes, such conditions needed to be "unusually adverse[.]"[8] Thus, in determining whether the heat in Artesia on April 30, 2009, constituted a "climatic condition," I have considered whether it was "intensely high" or "unusually adverse" heat.[9]

In an apparent effort to show that the temperature was unusual when Agent Afolayan suffered his medical crisis, the Claimants' post-remand submission asserts that in Artesia "the average April temperature [was] 20 degrees lower than it was on the day of his death"[10] and that, "[i]n the two months before Agent Afolayan's death, the temperature only reached even 88 degrees on two other occasions."[11] These assertions are problematic. In the two months before Agent Afolayan's physical fitness run on April 30, 2009, the temperature in the Artesia area reached 88 degrees on *five* occasions: April 29 (90 degrees), April 24 (89 degrees), April 22 (91 degrees), April 21 (88 degrees), and March 4 (88 degrees).[12] In addition to these (and April 30), nine *other* days in April 2009 and eight others in March 2009 also saw high temperatures there reach the low- or mid-80s.[13] Moreover, although the average temperature in the Artesia area in April 2009 was 62 degrees, the average daily high temperature there for April

---

[7]  *Afolayan,* No. 2021-1452, slip op. at 8.

[8]  *Juneau* v. *Dep't of Justice,* 583 F.3d 777, 783 (Fed. Cir. 2009).

[9]  *Cf. Afolayan,* No. 2021-1452, slip op. at 8–9, where the Court favorably observed, consonant with its holding in *Juneau,* that the Bureau looks for "intensely high or low temperatures" to distinguish injuries caused by "climatic conditions" (which the Act covers) from injuries caused by "stress and strain" (which it does not cover).

[10]  Claimants' Post-Remand Submission, p. 1.

[11]  *Id.* at 15. The testimony in the record from some of Agent Afolayan's fellow classmates gives their impressions that the temperature during their 1.5-mile run on April 30, 2009, was hot (or "very hot" or "really hot"); also opinions of certain physicians in the record call the temperature "hot" or "adverse" or "unfavorable."

[12]  *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024) and https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024). I note that Agent Afolayan's hometown of San Jacinto, also had four days in April 2009 on which the temperature reached 88 degrees, including two days on which it reached 98 degrees. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[13]  *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024) and https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024). San Jacinto also had four other days in April 2009 that reached the low- or mid-80s. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

2009 was 77 degrees.[14]  The normal high temperature for the area on April 30th, from 1991–2020, was 82 degrees.[15]  Going back to 2000, every April there has seen temperatures reach at least 87 degrees, with the vast majority of them reaching temperatures in the 90s and one of them seeing a temperature of 100 degrees.[16]  Eighty-eight degrees may have been on the warmer side, but these were "ordinary [and] routine"[17] April temperatures in the Artesia area and certainly were not "intensely high" or "unusually adverse"[18] for the time when Agent Afolayan was there.

The humidity when Agent Afolayan suffered his medical crisis was between 6 and 7 percent.  This low level of humidity is not unusual for the Artesia area.  Sixteen days in April 2009 had humidity that fell below 10 percent there,[19] and March 2009 had thirteen such days.[20]

There are various calculations that can be performed to take account of the effect, on human beings, of temperature in combination with humidity.  One common calculation is the Heat Index.  According to the Heat Index, 88 degrees, combined with 7 percent humidity, makes it feel like 83.2 degrees.[21]  According to the National Oceanic and Atmospheric Administration ("NOAA"), of the U.S. Department of Commerce, which groups the Heat Index "Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity" into four different categories ("Caution," "Extreme Caution," "Danger," and "Extreme Danger"), a Heat Index of 83 is in the least worrisome category.[22]

---

[14]    https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024).  I note that, in April 2009, the temperature in the Artesia area reached at least 70 degrees on *twenty-three* days—and reached or exceeded *75* degrees on *nineteen* of them.  *Id*.

[15]    https://www.weather.gov/wrh/Climate?wfo=maf (last visited January 12, 2024).  By comparison, the average high temperature for Agent Afolayan's hometown of San Jacinto on April 30th is an only slightly cooler 77 degrees. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[16]    https://www.weather.gov/wrh/Climate?wfo=maf (last visited January 12, 2024).  In the past 24 years, only six Aprils saw maximum temperatures between 87 and 89 degrees in the Artesia area; all the other eighteen Aprils saw maximum temperatures there reach 90 degrees or above.  *Id*.  In San Jacinto, by comparison, over those same 24 years, only four Aprils saw maximum temperatures there reach between 83 and 89 degrees; all the other twenty Aprils there saw maximum temperatures reach 90 degrees or above. https://www.weather.gov/wrh/Climate?wfo=sgx (last visited January 12, 2024).

[17]    *Afolayan,* No. 2021-1452, slip op. at 8.

[18]    *See id.* at 9.

[19]    https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 12, 2024).  The San Jacinto area had four such days in April 2009. https://www.wunderground.com/history/monthly/us/ca/san-bernardino/KSBD/date/2009-4 (last visited January 12, 2024).

[20]    https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited January 12, 2024).

[21]    *See* https://www.wpc.ncep.noaa.gov/html/heatindex.shtml (last visited January 30, 2024).

[22]    *See* Hearing Officer Determination, dated January 10, 2014, p. 17; https://www.weather.gov/images/wrn/social_media/2017/heat_index.jpg (last visited January 12, 2024).  *Per* the National Weather Service, "Caution" indicates that "[f]atigue [is] possible with prolonged exposure and/or physical activity."  https://www.weather.gov/

4

Although NOAA's Heat Index is informative, the Claimants' own submissions show that there are better methods to calculate the weather's effect on the human body. The paper on sickle cell trait by Dr. John Kark, which was the Claimants' hearing Exhibit 3 before the Hearing Officer, identifies the "wet bulb black globe temperature index (WBGT)" as the heat index "best related to physiologic response to exercise in heat."[23] NOAA's National Weather Service explains that the WBGT "estimates the effect of temperature, relative humidity, wind speed, and solar radiation on humans[.]"[24] The WBGT is "most useful for active, acclimatized people such as outdoor workers, athletes, and anyone else performing strenuous outdoor activities – and has been used for decades by military agencies, OSHA [the Occupational Safety and Health Administration of the U.S. Department of Labor], and marathon organizers."[25]

Using the WBGT calculator provided by OSHA, if Agent Afolayan was running the 1.5 miles in direct sunlight, the estimated WBGT was 71 degrees.[26] The same calculator indicates that if he ran in the shade, the estimated WBGT was 63 degrees.[27]

The United States Army Training and Doctrine Command ("TRADOC")[28] has published TRADOC Regulation 350-29 to "prescribe[] policy and provide[] guidance to commanders for preventing, managing, and reporting environmental (heat or cold) casualties."[29] That regulation includes guidance on how to identify potential heat-related hazards, so that heat-related casualties may be avoided. To that end, the regulation provides the following Table B-1, Fluid

ama/heatindex (last visited January 12, 2024). The Heat Index must rise to 90 degrees or above for "[h]eat stroke, heat cramps, and heat exhaustion [to be] possible with prolonged exposure and/or physical activity." *Id.*

23    *Sickle Cell Trait*, John Kark, M.D., Howard University School of Medicine, Center for Sickle Cell Disease, December 20, 2000.

24    https://www.weather.gov/news/211009-WBGT (last visited January 12, 2024).

25    *Id.*

26    https://www.osha.gov/heat-exposure/wbgt-calculator (last visited January 12, 2024). The information supplied to do the calculation was the date (4/30/2009), the local time (14:30 MT), the latitude of Artesia, NM (32.84), the longitude of Artesia, NM (104.39), the air temperature (88 degrees), the relative humidity (7%), the wind speed (9 mph), and the barometric pressure (26.06).

27    *Id.* The WBGT temperature for the afternoon of April 30, 2009, for the San Jacinto area, using the same OSHA calculator, was 71 degrees in direct sunlight and 61 degrees in the shade. The information supplied to do that calculation was the date (4/30/2009), the local time (14:30 PT), the latitude of San Jacinto, CA (33.78), the longitude of San Jacinto, CA (116.95), the air temperature (75 degrees), the relative humidity (31%), the wind speed (6 mph), and the barometric pressure (28.78). The San Jacinto area temperature, humidity, and wind speed for roughly 14:30 PT on April 30, 2009, was obtained from https://www.wunderground.com/history/daily/us/ca/san-bernardino/KSBD/date/2009-4-30 (last visited January 12, 2024).

28    *Per* TRADOC Regulation 10-5 (https://adminpubs.tradoc.army.mil/regulations/TR10-5.pdf (last visited January 12, 2024)), "TRADOC recruits, trains, educates, develops, and builds the Army; establishes standard, drives improvement, and leads change to ensure the Army can deter, fight, and win on any battlefield now and into the future."

29    ¶ 1-1. https://adminpubs.tradoc.army.mil/regulations/TR350-29.pdf (last visited January 12, 2024).

Replacement and Work-Rest Guidelines for Training in Warm and Hot Environments:

| Heat Category | WBGT Index (°F) | Easy Work | | Moderate Work | | Heavy Work | | Very Heavy Work | |
|---|---|---|---|---|---|---|---|---|---|
| | | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) |
| 1 (white) | 78 - 81.9 | NL | ½ | NL | ¾ | 40/20 | ¾ | 20/40 | 1 |
| 2 (green) | 82 - 84.9 | NL | ½ | NL | ¾ | 30/30 | 1 | 15/45 | 1 |
| 3 (yellow) | 85 - 87.9 | NL | ¾ | NL | ¾ | 30/30 | 1 | 10/50 | 1 |
| 4 (red) | 88 - 89.9 | NL | ¾ | 50/10 | ¾ | 20/40 | 1 | 10/50 | 1 |
| 5 (black) | > 90 | NL | 1 | 20/40 | 1 | 15/45 | 1 | 10/50 | 1 |

| Easy Work | Moderate Work | Heavy Work | Very Heavy Work |
|---|---|---|---|
| • Weapon maintenance<br>• Marksmanship training<br>• Drill and ceremony | • Patrolling with 30-pound load<br>• Low and high crawl<br>• Dig defensive position | • Patrolling with 45-pound load<br>• Four-person litter carry (180 pounds)<br>• Dig defensive position | • Two-person litter carry (150 pounds)<br>• Move under direct fire<br>• Obstacle course |

Legend:
hr = hour
qt = quart
NL = no limit to work per hour (up to 4 continuous hours). Notes:
- Applies for average-sized and heat-acclimatized Service member wearing the Operational Camouflage Pattern (OCP) uniform.
- The work-rest times and fluid replacement volumes will sustain performance and hydration for at least 4 hours of work in the specified heat category.
- Fluid needs can vary based on individual differences (± ¼ qt/hr) and exposure to full sun or full shade (± ¼ qt/hr).
- Rest means minimal physical activity (sitting or standing) accomplished in shade if possible.
- CAUTION: Hourly fluid intake should not exceed 1½ qt.
- CAUTION: Daily fluid intake should not exceed 12 qt.
- If wearing heavy protective clothing (mission-oriented protective posture (MOPP)), add 10 °F to WBGT index for easy work and 20 °F to WBGT index for moderate and heavy work.

The Table "[a]pplies to average-sized and heat-acclimatized Service member[s] wearing the Operational Camouflage Pattern (OCP) uniform." For Service members (*wearing the OCP uniform*) who are performing even "very heavy work"—which it describes as "Two-person litter carry (150 pounds)[,] Move under direct fire[, or] Obstacle course"—the Table provides no limitations until the WBGT reaches at least 78 degrees.[30] The first limitations provided in the Table are for when the WBGT is 78-81.9 degrees, and the Table limits "very heavy work" to 20 minutes per hour, with a 40-minute rest. With a WBGT of 82-84.9 degrees, the Table limits "very heavy work" to 15 minutes per hour, with a 45-minute rest.

Other WBGT guidelines have been proposed by various organizations. For example, US Soccer, the governing body for soccer in the United States, has developed "Heat Guidelines," which are provided below, to serve "as a guide for coaches, referees, and players for training in

---

[30]    As indicated above in text, the estimated WBGT (using the OSHA calculator) during Agent Afolayan's physical fitness run on April 30, 2009, was between 63 and 71 degrees, depending on the amount of sunlight.

warmer climates."[31]  The guidelines, which are based on the WBGT, divide the contiguous United States into three categories by climate and provide slightly different recommendations for each category.[32]  Some areas of New Mexico are Category 2, and other areas are Category 3.[33] When—as pertinent here—the WBGT is under 79.8 degrees for Category 2 locations and under 82.1 degrees for Category 3 locations, US Soccer describes it as "Good Conditions" and recommends normal activities, with a 10-minute break every 40 minutes of training:[34]

| Alert Level | WBGT by Region (°F) | | | Event Conditions | Recommended Actions & Breaks |
|---|---|---|---|---|---|
| | Cat 1 | Cat 2 | Cat 3 | | |
| Black | >86.2° | >89.8° | >92.0° | Extreme Conditions | • No Outdoor Training, delay training until cooler, or Cancel Training |
| Red | 84.2-86.1° | 87.8-89.7° | 90.1-91.9° | High Risk for Heat Related Illness | • Maximum of 1 hour of training with 4 by 4 minute breaks within the hour. <br> • No additional conditioning allowed. |
| Orange | 81.1-84.1° | 84.7-87.7° | 87.1-90.0° | Moderate Risk for Heat Related Illness | • Maximum of 2 hours of training with 4 by 4 minute breaks each hour, OR a 10 minute break every 30 minutes of training |
| Yellow | 76.3-81.0° | 79.9-84.6° | 82.2-87.0° | Less than Ideal Conditions | • 3 Separate 4 minute breaks each hour, OR a 12 minute break every 40 minutes of training |
| Green | <76.1° | <79.8° | <82.1° | Good Conditions | • Normal Activities <br> • 3 Separate 3 minute breaks each hour of training, OR a 10 minute break every 40 minutes |

The American College of Sports Medicine has also published guidance on exertional heat illness, which were last updated in 2021.[35]  Based on that guidance, which is provided below, when the WBGT is between 50.1 and 72 degrees (as it was during Agent Afolayan's physical

---

[31]     https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf (last visited January 16, 2024).  The National Federation of State High School Associations recommends to its members WBGT heat guidelines almost identical to those of US Soccer. https://www.nfhs.org/articles/wet-bulb-globe-temperature-wbgt-why-should-your-school-be-using-it/ (last visited January 12, 2024).

[32]     https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf at 3–4 (last visited January 16, 2024)

[33]     *Id.* at 3.

[34]     *Id.* at 4.  The US Soccer guidelines contain a chart that provides estimated calculations of the WBGT, using humidity and temperature.  Using that chart, the WBGT at the time of Agent Afolayan's physical fitness run on April 30, 2009, would have been between 71.6 and 73.4 degrees.

[35]     *See* https://journals.lww.com/acsm-csmr/fulltext/2021/09000/ acsm_expert_consensus_statement_on_exertional_heat.10.aspx (last visited February 2, 2024).

fitness run on April 30, 2009), fit, acclimatized, low-risk individuals may engage in normal training activities without any adjustments:[36]

| WBGT[b] | | Continuous activity & competition for highly fit & fully acclimatized to high heat conditions[b, c] | Training & noncontinuous activity | |
|---|---|---|---|---|
| °F | °C | | Non-acclimatized, unfit, high-risk individuals[c] | Acclimatized, fit, low-risk individuals[c, d] |
| ≤ 50.0 | ≤ 10.0 | Generally safe; EHS can occur associated with individual factors | Normal activity | Normal activity |
| 50.1 – 65.0 | 10.1 – 18.3 | Generally safe; EHS can occur in individuals who are not acclimatized or have risk factors | Normal activity | Normal activity |
| 65.1 – 72.0 | 18.4 – 22.2 | Risk of EHS and other heat illness begins to rise; high-risk individuals should be monitored or not compete | Increased risk. Increase the rest:work ratio. Monitor fluid intake. | Normal activity. |
| 72.1 – 78.0 | 22.3 – 25.6 | Risk for all competitors is increased | Moderate risk. Increase the rest:work ratio and decrease total duration of activity. Football: Players restricted to helmet, should pads, and shorts. | Normal activity. Monitor fluid intake. Football: Players restricted to helmet, should pads, and shorts. |
| 78.1 – 82.0 | 25.7 – 27.8 | Risk for unfit, non-acclimatized individuals is high. | Moderate-high risk. Increase the rest:work ratio; decrease intensity and total duration of activity. Football: No protective equipment during practice and no conditioning activities | Normal activity. Increase rest breaks. Monitor fluid intake. Football: Players restricted to helmet, shoulder pads, and shorts |
| 82.1 – 86.0 | 27.9 – 30.0 | Cancel level for EHS risk | Very high risk. [a] Increase the rest:work ratio to 1:1, decrease intensity and total duration of activity. Limit intense exercise. Watch at-risk individuals carefully | Increase the rest:work ratio and decreases total duration of activity. Plan intens or prolonged exercise with discretion [f]; watch at-risk individuals carefully. Football: no protective equipment during practice and no conditioning activities. |
| 86.1 – 90.0 | 30.1 – 32.2 | | Very High-risk. [a] Cancel or stop practice and competition. | Limit intense exercise [f] and total daily exposure to heat and humidity; watch for early signs and symptoms |
| | | | Extremely high risk. e | Extremely high risk. e |
| ≥ 90.1 | > 32.3 | | Cancel exercise. | Cancel exercise [f,g] |

[a]Revised from CASA, D. J., and E. R. EICHNER. Exertional heat illness and hydration. In: *Athletic Training and Sports Medicine*. C. Starkey and G. Johnson (Ed.) Boston, MA: Jones &amp; Bartlett Publishers, 2005, pp. 597-615.
[b]Regional geographical differences in climate and acclimatization to heat may require adjusting limits to lower WBGT levels for heat safety than outlined in the table, and some hotter regions may allow activity at higher levels, but athletes and coaches should be extremely cautious when exceeding these limits.
[c]High level athletes who have been acclimatized 12 wk, not applicable to events with unacclimatized participants.
[d]While wearing shorts, t-shirt, socks and sneakers.
[e]At least 3 wk in the heat.
[f]Risk of EHS and EHE.
[g]Internal heat production exceeds heat loss and core body temperature rises continuously, without a plateau.
These guidelines do not account for clothing. Although the effects of the uniform clothing and protective equipment (*i.e.*, American football) on sweating and body temperature in younger athletes are unknown, uniforms should be considered when determining playing/practice limitations based on the WBGT. Eight to 10 practices are recommended for heat acclimatization (30-45 min each; one per day or one every other day).
WBGT, wet bulb globe temperature.

Agent Afolayan had been residing in Artesia, New Mexico, for roughly ten weeks when

---

[36]     *Id.*, Table 7. Above 65 degrees, even for non-acclimatized, unfit, high-risk individuals, training can continue, but it is recommended that the rest:work ratio increase and fluid intake be monitored.

he went on his physical fitness run on April 30, 2009. During that time, the temperatures in the area had been gradually increasing, as would be expected in the northern hemisphere for the period from February to May. In March 2009, the area encountered one day of 88 degrees or higher and eight days in the low- to mid-80s. In April 2009, more than 40 percent of the days hit at least 80 degrees there. And of the nine days prior to April 30, 2009, four warmed to at least 88 degrees. Even without this context—but *a fortiori* with it—I am unpersuaded that it is "more likely than not" that the temperature in the area during Agent Afolayan's 1.5-mile run on April 30, 2009 (*i.e.*, 87.8 degrees), was "intensely high" or "unusually adverse."[37]

My thinking in this is strengthened by the fact that the dry climate of Artesia *lessened* the effects of the 87.8-degree temperature. When the relative humidity is factored in with the temperature, the Heat Index in the Artesia area when Agent Afolayan ran his 1.5-mile run on April 30, 2009, was 83 degrees. And when the 9-mph breeze, among other things, is factored in, the WBGT at the time of his run was 71 degrees (and that is assuming that the run occurred with no shade at all). At a WBGT of 71 degrees, neither the Army, US Soccer nor the American College of Sports Medicine would have placed any restrictions on Agent Afolayan's training activity on that day. Bearing these well-accepted heat indices (which incorporate various aspects of the weather conditions in order to account for the combined effects of the weather on human beings) in mind, I am unable to conclude that it is "more likely than not" that the weather conditions in that area during Agent Afolayan's run were so severe as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

Furthermore, the record of this claim does not persuade me that it is "more likely than not" that the *altitude* was so "unusually adverse" as to constitute a "climatic condition" within the meaning of the term *Injury*. The elevation of Artesia, New Mexico, is just under 3,400 feet above sea level.[38] With different elevations, surrounding weather conditions may differ, as well as the air pressure. At sea level, the air pressure is roughly 101,353 Pascal ("Pa") or 14.70 pounds-per-square-inch ("PSI").[39] At 3,400 feet, the air pressure is roughly 89,504 Pa or

---

[37]     *Afolayan,* No. 2021-1452, slip op. at 8–9; *Juneau,* 583 F.3d at 783. As indicated above in text, the Artesia temperature was about 6 degrees higher than the normal high temperature (from 1991–2020) for that date in that area; to be merely a 6-degree deviation (from that norm) is "ordinary [and] routine." *Cf. Durco* v. *United States*, 14 Cl. Ct. 424, 426 (1988) (affirming denial of PSOB benefits where there was brief exposure to very cold conditions that allegedly caused a fatal heart attack); PSOB determ. *re*: Watkins, No. 2014-002 (April 11, 2019), p. 9 (directing a large crowd of people for four hours in "90 plus degree weather," was not an injury causing the officer's fatal heart attack), *aff'd on other grounds* sub nom. *Watkins v. Dep't of Justice*, 809 Fed. App'x 923 (Fed. Cir. 2020).

[38]     See Exhibit 8 to the Hearing Officer's hearing transcript. By comparison, the elevation of San Jacinto, California, is roughly 1,500 feet above sea level, https://elevation.maplogs.com/poi/san_jacinto_ca_usa.38018.html (last visited January 16, 2024); and the highest point of the National Park Service's famous Skyline Drive is at Skyland, in Luray, Virginia, at 3,680 feet above sea level, https://www.nps.gov/places/000/highest-point-on-skyline-drive.htm#:~:text=The%20highest%20point%20along%20Skyline,Hawksbill%20at%204%2C050%20feet (last visited February 2, 2024).

[39]     Calculation obtained using this website: https://www.mide.com/air-pressure-at-altitude-calculator (last visited January 16, 2024)

12.98 PSI.[40]  The oxygen available at 3,400 feet is roughly 89 percent of the oxygen that is available at sea level.[41]

In attempting to assess whether an elevation of 3,400 feet is sufficient to create weather conditions (including air pressure and oxygen availability) so "unusually adverse" as to constitute a "climatic condition" within the meaning of the term *Injury*, I have looked at standards in the aviation industry, where the issue of altitude's effect on the body is of paramount importance.  In its 2012 Manual of Civil Aviation Medicine, the International Civil Aviation Organization reported that "most passenger aircraft[,]" when at cruising level, maintain a cabin pressure that "corresponds to an ambient altitude of 1,500 to 2,450 m (5,000 to 8,000 ft)."[42]  The Manual also indicates that the "threshold of hypoxia is generally considered to be 1,000 m (3,300 ft) since *no demonstrable physiological reaction to decreased atmospheric pressure has been reported below that altitude.*"[43]

I also have looked at military standards.  The Marine Corps physical fitness test includes a timed 3-mile run, or (for older Marines) a timed 5,000-meter row on a rowing machine.[44]  For each, the Marine Corps specifies a score that is assigned for the time to complete the run or the row.  In apparent recognition of the effect that altitude can have on exercise, the Marine Corps adjusts those times and scores when the run or the row occurs at or above *4,500 feet*; no adjustment is made for anything lower than that.[45]  The Air Force also makes an adjustment to its aerobic fitness assessment (a 1.5-mile run), but it does so only when the assessment is performed at an elevation of *5,250 feet* or higher.[46]

---

[40]  *Id*.  Using the same website for the calculation, at 1,500 feet above sea level, such as in San Jacinto, the air pressure is roughly 95,975 Pa or 13.92 PSI.  *Id*.

[41]  Calculation obtained using this website: https://baillielab.net/critical_care/air_pressure/ (last visited February 2, 2024).  San Jacinto (at 1,500 feet above sea level) has roughly 95 percent of the oxygen available at sea level.  *Id*.

[42]  Manual of Civil Aviation Medicine, p. 92 (II-1-8), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).  The Federal Aviation Administration requires that passenger aircraft "be equipped to provide a cabin pressure altitude of not more than *8,000 feet* under normal operating conditions."  14 C.F.R. § 25.841 (emphasis added).  At 5,000 feet above sea level, the oxygen available is 84 percent of what is available at sea level; and at 8,000 feet the oxygen available is 76 percent of what is available at sea level.  https://baillielab.net/critical_care/air_pressure/?useralt=5000&units=ft (last visited February 2, 2024).

[43]  Manual of Civil Aviation Medicine, p. 92 (II-1-8) (emphasis added), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).

[44]  Marine Corps Order 6100.13A, available at https://www.marines.mil/Portals/1/Publications/MCO%206100.13A%20CH-4.pdf?ver=apBfalwjs4S4eppmoUgt-g%3d%3d (last visited January 16, 2024).

[45]  *Id*. at 2-8.  The Marine Corps combat fitness test similarly makes an adjustment to the scores when such test takes place at or above 4,500 feet.  *Id*. at 3-9.  Similarly, the U.S. Navy also scores its Physical Readiness Test differently when that test is taken below 5,000 feet compared to when taken above 5,000 feet.  https://www.mynavyhr.navy.mil/Portals/55/Support/Culture%20Resilience/Physical/Guide_5-Physical_Readiness_Test_PRT_JAN_2023.pdf?ver=OlmOLoZTfCA641JUkAnIaw (last visited January 16, 2024).

[46]  Air Force Manual 36-2905, ¶ 3.6, available at https://www.afpc.af.mil/Portals/70/documents/FITNESS/afman36-2905.pdf?ver=e2q87ionZmRdxK0rm1SWEQ%3d%3d (last visited January 16, 2024).

In addition, I looked to understand at what elevation significant or detectable physiological changes of the body begin to occur. According to the American College of Cardiology, the lower air pressure (as elevation increases) "creates a graded physiologic stressor with increasing elevation, one which occurs at rest and is exacerbated by the demands of exercise . . . . For purposes of clinical care, the degree of altitude can be defined in terms of these physiologic changes and their limits. *Intermediate altitude* (1,500–2,500 m[eters (*i.e.*, 5,000 to 8,000 feet) above sea level]) is where detectable physiological changes *begin*. High altitude, typically defined as an elevation above 2,500 m[eters above sea level], is the point above which altitude illnesses tend to occur."[47]

The U.S. Army identifies the "threshold altitude at which hypobaric hypoxia becomes functionally and medically significant" as 1,200 meters or 3,937 feet above sea level.[48] It considers sea level to 1,200 meters to be "'low' altitude" and notes that "[i]n this range, arterial oxyhemoglobin saturation ($SaO_2$) is generally above 96 percent in healthy people . . . . Only at the highest range of low altitude is maximal aerobic work performance minimally impaired."[49]

The Claimants' post-remand submission argues that the elevation of Artesia is "well above the height at which most Americans live."[50] The submission also contrasts Artesia's elevation with New York City's, Chicago's, and Washington, D.C.'s, asserting that Artesia is "higher than the highest habitations in 35 of the 50 states[,]" and argues that Artesia's elevation is unusual for the United States.[51] Artesia's elevation well may be unusual when compared to much of the United States, but the Claimants' post-remand comparisons here are inapposite.

For example, Agent Afolayan's own hometown of San Jacinto has an elevation (1,500 feet) that is higher than those of all of the cities cited by the Claimants and higher than the highest elevation in 42 of the 50 largest cities (by population) in the United States.[52] By the measure indicated in the Claimants' post-remand submission, San Jacinto's elevation would be rather unusual. In addition, Artesia is at an elevation lower than most of New Mexico. "More

---

[47]     https://www.acc.org/latest-in-cardiology/articles/2021/03/15/13/39/exercise-and-elevation (last visited January 16, 2024) (emphases added; footnotes omitted from quoted text). *See also* Mountain Leader's Guide to Mountain Warfare Operations 2016, Appendix A "Altitude and Environmental Hazards," at Table A-1, p. 132, https://www.marines.mil/Portals/1/Publications/MCTP%2012-10A%20GN.pdf?ver=2020-02-12-122939-143 (last visited February 5, 2024) (noting no effects of acute altitude exposure from sea level to 4,000 feet and characterize that altitude level as "low").

[48]     Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 1-1, https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024).

[49]     *Id.* at ¶ 2-2.e.

[50]     Claimants' Post-Remand Submission, p. 1.

[51]     *Id.* at 13–14.

[52]     https://www.usgs.gov/educational-resources/elevations-50-largest-cities-population-1980-census (last visited January 16, 2024).

than four-fifths of the state is higher than 4,000 feet above sea level."[53] Thus, for New Mexico, along with many other states in the mountainous regions of the country, living at an elevation of 3,400 feet or higher is quite common. This kind of comparison simply does not speak to the pertinent issue here in this claim, which is whether Artesia's elevation created surrounding weather conditions (including air pressure and oxygen availability) that were so "unusually adverse" as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

As discussed above, the effects of being at an elevation of 3,400 feet are not unusual enough for the Marines, Navy, or Air Force to alter their ordinary physical- or combat-fitness/readiness tests. And according to various sources referenced above, there is little to no detectible physiological effect on individuals at 3,400 feet. The marginally reduced oxygen availability in Artesia (roughly 89% of what is available at sea level), moreover, has no effect (or next to no effect) on oxygen saturation (still remaining above 96%) in healthy individuals and has more oxygen availability than what is typically provided in pressurized cabins by our commercial airlines. I am not able to conclude that it is "more likely than not" that an elevation of 3,400 feet is so "unusually adverse" as to amount to a "climatic condition," within the meaning of the term, *Injury*.[54]

I have also considered the temperature, Heat Index, and WBGT in the Artesia area when Agent Afolayan went on his physical fitness run on April 30, 2009, *in combination* with Artesia's roughly 3,400-foot elevation. Based on the discussion, above, however, about the lack of (or minimal) effect of a 3,400-foot elevation on the human body (particularly after roughly ten weeks at that elevation), and mindful of what the temperature, Heat Index, and WBGT in the Artesia area actually were when Agent Afolayan went on his physical fitness run on April 30, 2009 (and had been in the preceding days), I am not persuaded that it is "more likely than not" that any of the conditions would materially alter the significance of any (or all) of the others.

In sum, I am unpersuaded that it is "more likely than not" that the weather/altitude conditions (either alone or in combination) on April 30, 2009, that the Claimants have identified in their filings in this claim were so "unusually adverse," "intense[]," or severe as to constitute a "climatic condition," as that term is used in the definition of *Injury*.

**Medical Opinions**

Even if the weather/altitude conditions (either alone or in combination) encountered by

---

[53]     https://www.britannica.com/place/New-Mexico (last visited January 16, 2024).

[54]     Exposure to lower oxygen availability at elevations over 1,200 meters (3,937 feet) leads to physiological changes in those not acclimatized to such elevations. Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 2-3.a., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024). Over time, that exposure results in "physiological adaptation" that is "associated with the absence of or very low susceptibility to altitude illness." *Id.* "Between 70 and 80 percent of this [adaptation] occurs in the *first week* at a specific altitude." *Id.* (*see* Table insert at ¶ 2-3 (emphasis added)). Because of this physiological adaptation over time, whether the ascent to a higher elevation occurred yesterday versus ten weeks earlier would be a relevant consideration in assessing the adversity posed by a particular elevation.

Agent Afolayan during his 1.5-mile run on April 30, 2009, and identified by the Claimants *were* so "unusually adverse," "intense[]," or severe as to amount to a "climatic condition," within the meaning of the term *Injury*, that "climatic condition" would constitute an *Injury* under the PSOB Act *only if* Agent Afolayan's medical crisis on April 30, 2009, was a "traumatized physical condition of the body[] directly and proximately caused" by that "climatic condition."[55] Accordingly, I turn to examine the evidence in the record as to the cause and nature of that medical crisis.

In the May 2009 autopsy report, Dr. Sridhar Natarajan stated, "[Agent] Afolayan showed signs and symptoms of heat illness and rapidly deteriorated," noted an enlarged heart, "which made him more sensitive to a strenuous environment," and concluded the cause of death was "heat illness" with "cardiomegaly (cardiac disease)" as a contributing factor.[56] Dr. Natarajan stated that the "[i]nitial available recorded body temperatures [were] not significantly elevated."[57] He reported that "[d]uring a period of strenuous physical exertion in a hot environment [Agent Afolayan] began to exhibit signs of not feeling well[,]" and his enlarged heart made him "more sensitive to a strenuous environment."[58] Dr. Natarajan's report did not note any evidence of sickling in Agent Afolayan's blood, or anything that would have indicated the involvement of a sickle-cell condition.

At the November 2012 hearing, Dr. Kris Sperry, a forensic pathologist, testified on behalf of the Claimants that, "to a reasonable degree of medical certainty . . . Nathaniel A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run."[59] Dr. Sperry acknowledged that individuals with sickle cell trait, "when they may be subjected to extremes of physical exertion and become dehydrated, and especially at an increased altitude, this may precipitate a sickle cell crisis."[60] He explained that dehydration was a "relative kind of thing" that can be caused by running in a hot environment, and can initiate a sickle cell crisis even if it "is not severe or profound dehydration."[61]

Dr. Sperry's November 15, 2012, report states that "the clinical symptoms exhibited by Mr. Afolayan following his 1.5 mile run in hot weather, followed by the development of respiratory and neurological deterioration, renal failure, rhabdomyolysis and death, is a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition,

---

[55]    28 C.F.R. § 32.3 (defining *Injury*).

[56]    Autopsy Examination Report, conducted Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009.

[57]    *Id.*

[58]    *Id.*

[59]    November 27, 2012, Hearing Officer Transcript, pp. 39–40.

[60]    *Id.* at 46–47.

[61]    *Id.* at 47.

which evolves in to sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration."[62]  He also concluded that the physical training performed by Agent Afolayan in a hot environment was a "known contributing factor in the evolution of a sickle cell crisis in persons who carry the sickle cell trait."[63]  He ended by stating that he agreed with Drs. Stephen Cina (*post*) and Sridhar Natarajan (*ante*) in "that Nathani[e]l A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died."[64]

Dr. Stephen Cina, an independent forensic pathologist, reviewed records at the request of the Bureau, documenting his findings in three separate medical opinions, the last one dated February 22, 2013.[65]  Following his review of the record, Dr. Cina stated that he was unable to conclude "to a reasonable degree of medical probability" that Agent Afolayan died from a heatstroke.  He wrote that "[Agent Afolayan's] symptoms leading up to his collapse were somewhat atypical for heatstroke and he did not complain of being hot prior to losing consciousness" and "though there was a clinical impression of heat-related illness, an elevated body temperature was not recorded."[66]  Dr. Cina, however, acknowledged that "adverse climatic conditions contributed at some level to [Agent Afolayan's] death."[67]

In response to a question as to whether "any other factor or combination of factors (for example, chronic, congenital, progressive, or preexisting condition, illness, or disease) contribute[d] to the death as much as [the injury identified in a previous question,]"[68] Dr. Cina responded—

> Yes.  There is microscopic evidence of severe sickle cell disease.  The combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure could have triggered a sickle cell crisis.[69]

Acknowledging that Agent Afolayan's exercise in an adverse climate contributed to his death, Dr. Cina ultimately concluded that "the most significant factor contributing to death in this case

---

[62]     Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated November 15, 2012.

[63]     *Id.* at 2–3.

[64]     *Id.* at 3.

[65]     The first such review, performed on April 14, 2011, was largely for purposes of determining whether Agent Afolayan's death was the result of a heart attack, which was relevant under 42 U.S.C. § 3796(k)—now 34 U.S.C. § 10281(k).  *See* Independent Medical Review, Dr. Stephen Cina, dated April 14, 2011.

[66]     Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated July 15, 2011.

[67]     *Id.*

[68]     *See* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[69]     Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated July 15, 2011.

14

was a sickle cell crisis."[70]

After reviewing evidence gathered during the hearing officer's review to include Dr. Sperry's report, Dr. Cina stated in his last report that "essentially, my opinion is unchanged and my microscopic diagnosis of sickle cell disease/trait has been confirmed."[71] He opined, "To within a reasonable degree of medical probability, [Agent Afolayan] would not have died if he did not have pre-existent sickle cell trait. He also would not have died if he was not exercising in a hot, hostile environment. Each of these factors was a contributory factor in his death."[72]

In a later amended report, dated May 23, 2013, Dr. Sperry stated that "[he] continue[d] to be in agreement with the opinions of Drs. Cina and Natarajan, that Nathani[e]l A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from him having the Sickle Cell Trait."[73] Dr. Sperry also described it as a "serious error" that the autopsy did not mention sickle cell trait.[74] Finally, he concluded that Agent Afolayan's "death would have been preventable if he had been offered proper hydration and appropriate rest during the course of his exertion-related activities, as these measures have been proven to ameliorate the onset and progression of Sickle-Cell Trait-induced crises, and are utilized regularly during the training of soldiers in all branches of the United States Military."[75]

Dr. Mileusnic-Polchan, Chief Medical Examiner at the Knox County Regional Forensic Center in Knoxville, Tennessee, also provided a medical opinion, dated January 28, 2019, at the request of the Claimants.[76] Her opinion included a more expansive discussion of rhabdomyolysis than that offered by either Dr. Sperry or Dr. Cina. Dr. Mileusnic-Polchan saw the histopathologic findings of the autopsy to be "well aligned with the clinical findings of rhabdomyolysis that was described in [Agent Afolayan's] medical records."[77] She explained that "[e]xertional rhabdomyolysis . . . is precipitated by strenuous physical exertion" and "presents with muscle aches, weakness and dark urine."[78] Agent Afolayan was having these

---

[70]     *Id.* at 6.

[71]     Independent Medical Evaluation, Dr. Stephen Cina, p. 6, dated February 22, 2013 ("The microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait. Microscopically this is identical to a crisis from sickle cell disease.").

[72]     *Id.*

[73]     Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated May 22, 2013.

[74]     *Id.* at 1.

[75]     *Id.* at 2. Dr. Sperry did not specify what "proper hydration" and "appropriate rest" would have been. According to TRADOC Regulation 350-29, Table B-1, reproduced above in text, Agent Afolayan's 11-minute run with a WBGT of 71 degrees would not have dictated the need for rest if he were in the Army. And the record is silent as to the amount of water that Agent Afolayan consumed prior to his run.

[76]     Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019.

[77]     *Id.* at 4.

[78]     *Id.* at 2. Dr. Mileusnic-Polchan also describes it as "dark red-brown, bloody-appearing urine." *Id.*

15

rhabdomyolysis symptoms, Dr. Mileusnic-Polchan stated, "for days prior to his terminal collapse[,]" but the diagnosis "was missed on several occasions, particularly on April 28, 2009, when [he] presented at the FLETC Health Unit[.]"[79]

According to Dr. Mileusnic-Polchan, sickle cell trait "has been associated with episodes of sudden collapse during or immediately after strenuous physical activity[,]" although such exertional collapse and death is "frequently multifactorial and related to exertional heat stress (or heat stroke) and exertional dehydration with or without rhabdomyolysis."[80] Sickle cell trait also has been "associated with a 54 percent greater risk of exertional rhabdomyolysis, a potentially fatal syndrome associated with strenuous physical activity."[81]

Noting that Agent Afolayan had not encountered difficulties in strenuous exercise prior to arriving in Artesia, Dr. Mileusnic-Polchan stated that "[n]onetheless, the sickle cell trait coupled with the physical exertion under a new set of unfavorable circumstances that included environmental and atmospheric conditions (dry heat and altitude) made agent Afolayan more susceptible to develop catastrophic rhabdomyolysis and die."[82] She concluded that "Agent Nathaniel Afolayan died of complications of rhabdomyolysis due to strenuous physical activity in a hot dry environment."[83] She added that "[t]he underlying contributing factors were sickle cell trait in combination with high altitude, which made the agent more susceptible to developing the catastrophic form of rhabdomyolysis."[84]

Dr. Mileusnic-Polchan both described Agent Afolayan's health issues as beginning "to manifest approximately two months after his training-relocation to Artesia" and separately described him "experiencing repeated episodes of weakness and muscle pain in March and April of 2009."[85] These statements, however, are not entirely consistent with the information in the record.

Agent Afolayan was hired as a Border Patrol Agent and reported to Artesia for training on or about February 16, 2009. According to the earliest information in the record, Agent Afolayan reported to the health unit on March 5, 2009, complaining of a "runny nose, sneezing, etc. since last night. Requests Claritin." The assessment was that he was having allergy symptoms and treated accordingly.

---

[79]    *Id.*

[80]    *Id.* at 5.

[81]    *Id.*

[82]    *Id.* As evidence that the circumstances in Artesia were unlike anything encountered by Agent Afolayan, Dr. Mileusnic-Polchan noted that "Mrs. Afolayan confirmed that the sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation" and went on to state that "in his case, the sickle cell trait was an incidental finding following the birth of their second child."

[83]    *Id.* at 5–6.

[84]    *Id.* at 6.

[85]    *Id.* at 2, 5.

16

On March 25, 2009, Agent Afolayan went to the health unit because he rolled his ankle while running and requested a refill of previously provided nasal decongestant. It appears that his allergy medications were refilled, and he was treated for a rolled ankle. Dr. Mileusnic-Polchan described this visit as involving "generalized soreness and weakness," but that is not what the record shows. The record contains *no* mention of generalized soreness or weakness; instead, it is specific in stating that "right ankle rolled. Bottom of foot inward[,] no snap or pop. Just soreness, states feels a little weak. While running."

Agent Afolayan was back at the health unit on April 8, 2009, for dizziness and nausea that he thought was caused by being under water too long and swallowing water. He was given Gatorade, apparently to elevate his blood sugar, and left the unit with his dizziness and nausea resolved. Dr. Mileusnic-Polchan stated that, on this occasion, Agent Afolayan "experienced dizziness, nausea and weakness." The record from the visit, however, says nothing whatsoever about weakness being experienced or mentioned. On April 20, 2009, Agent Afolayan reported to the health unit with "'cold symptoms,' cough, sore throat, no energy, nasal congestion, bodyaches. Onset Saturday night."[86] Four days later Agent Afolayan returned to the health unit saying he felt much better, but still had congestion, cough, and sneezing. He also complained that he had been sprayed with pepper spray the day before. Finally, on the afternoon of April 28, 2009,[87] Agent Afolayan was back at the health unit and treated for bilateral muscle strain that apparently arose from (or followed) running, weight training, and basketball, and was found to be caused by "overuse" and "stretch[ing] beyond [the] norm." This evidence from Agent Afolayan's visits to the health unit, therefore, shows that some health issues began within three weeks of his arrival in Artesia, and that the general weakness and muscle pain that Dr. Mileusnic-Polchan refers to was not present until a few days before Agent Afolayan's 1.5-mile run on April 30, 2009.

---

[86]     Dr. Mileusnic-Polchan asserts that not all symptoms were recorded by the health unit at every visit because this visit did not mention chills or bloody sputum, which the health unit reported four days later as having cleared up. It may be that the healthcare professional intended "cold symptoms" to include these other symptoms, or it may be that not every symptom was disclosed by Agent Afolayan or recorded by the healthcare professional. In any event, any failure of the health unit to record all symptoms discussed by Agent Afolayan (if that is what happened) would not serve as a legitimate basis to attribute symptoms to him that are not mentioned in the record. PSOB claims are to be "determine[d] on the basis of legally-sufficient objective evidence, and after reasonable diligence and inquiry" and "decide[d] based on real, objective, and legally sufficient evidence that objectively meets the standards of proof set forth in the law, rather than speculation, fancied legislative intent, uncorroborated assertions, biased evidence, a slanted record, incomplete information, or sympathy, however understandable or deeply felt." H.R. Rep. No. 112548 at 7, 8 (2012) (internal quotation marks omitted); *cf.*, *e.g.*, *Tafoya* v. *United States*, 8 Cl. Ct. 256, 262 263 (1985) ("account of events" offered by PSOB claimant's expert was "based primarily on speculation, which is inadequate evidence of what occurred"); *Brister* v. *United States*, No. 01180C, slip op. at 2–6 (Fed. Cl., Mar. 27, 2002) (rejecting the use of "speculation" as evidence, and stating that "Congress intended that benefits under [the PSOB Act not be granted] arbitrarily or speculatively").

[87]     On April 28th, the high temperature in the Artesia area was 76 degrees with an average relative humidity of 65 percent. *See* https://www.wunderground.com/history/monthly/KROW/date/2009-4 (last visited January 16, 2024).

The point is not merely that Dr. Mileusnic-Polchan got details of Agent Afolayan's medical history while in Artesia wrong, but she relied on her inaccurate factual predicate to support her medical conclusion. That is, she asserted that Agent Afolayan "experienced repeated episodes of weakness and muscle pain" almost since his arrival in Artesia and then used that as a basis to assert that, "for the first time in his life, Agent Afolayan was exposed to a different set of circumstances that initiated repeated episodes of weakness, muscle pains and myoglobinuria from rhabdomyolysis." But the medical information in the record does not show repeated episodes of weakness, muscle pain, myoglobinuria or rhabdomyolysis. Aside from a description of Agent Afolayan's ankle as feeling weak after he rolled it in March, there is no report of any occurrence of weakness, muscle pain, or myglobinuria until late April.

I am not persuaded that the "different set of circumstances" presented by Artesia caused a physical condition that first manifested over two months after he arrived in Artesia. According to the statement provided by one of Agent Afolayan's classmates, Victor Manuel Santomauro, Agent Afolayan "was usually in the top 5 in the runs," until a "few days before [April 30th]" when "he was struggling with the run [and h]e came in the back of the section and his time was not his normal time."[88] Even in the circumstances presented in Artesia, according to Mr. Santomauro and others, Agent Afolayan was excelling in physical exercise. Plus, his weeks of living in Artesia and engaging in frequent and vigorous exercise, with gradually increasing temperatures, would have acclimated Agent Afolayan to the conditions there *before* he began to experience weakness, muscle pain, myoglobinuria or rhabdomyolysis.[89]

Notably, Dr. Mileusnic-Polchan reported that Agent Afolayan was manifesting exertional rhabdomyolysis when he reported to the health unit the afternoon of April 28th, experiencing bilateral muscle strain and myoglobinuria after extensive exercise.[90] The high temperature that

---

[88]     Statement of Victor Manuel Santomauro, dated June 29, 2011.

[89]     To begin with, the weather conditions and elevation in Artesia were not significantly different from the weather conditions and elevation that Agent Afolayan had encountered for years in his hometown of San Jacinto—although the weather in Artesia generally was a little warmer and drier, and the elevation was about 1,900 feet higher, than what Agent Afolayan was accustomed to at home. Any acclimatization that he may have needed, therefore, was minimal. In any event, roughly ten weeks would have provided time for him to become acclimated to the environment of Artesia. *See* National Athletic Trainers' Association Position Statement: Exertional Heat Illnesses, 2015, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4639891/ (last visited January 16, 2024) ("Heat acclimatization is a physiological response to repeated heat exposure during exercise over the course of 10 to 14 days . . . . The rate of acclimatization is related to aerobic conditioning and fitness; in general, a better conditioned athlete with acclimatize to the heat more quickly."); Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, at ¶ 2-3.i. & j., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024) ("The sequence of physiological changes that produce acclimatization to high altitude"—and the elevation of Artesia is not even considered "high altitude" in TB Med 505— "takes time to complete . . . and 80 to 90 percent of [a soldier's] overall acclimatization is accomplished by 2 weeks to a month.").

[90]     Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019, p. 4 ("Exertional rhabdomyolysis is characterized by skeletal muscle breakdown, muscle enzyme and myoglobin release and subsequent acute renal failure that is precipitated by strenuous physical exertion . . . . All three of these symptoms were present in Nathaniel Afolayan's case for days prior to his terminal collapse. It is unfortunate that

day was 76 degrees and the humidity of the day averaged 65 percent, which are conditions that he would have encountered quite frequently in his hometown of San Jacinto—hardly a "different set of circumstances" for him. So how does Dr. Mileusnic-Polchan explain that Agent Afolayan was suffering exertional rhabdomyolysis in the absence of the heat and low humidity that she identifies as factors in his succumbing to the condition a few days later? She does not tell us.

The Claimants' post-remand submission attempts to argue that "high heat" was the cause of Agent Afolayan's medical crisis on April 30th and points to Dr. Natarajan's description of the cause of death as "heat illness." It is unclear what precisely "heat illness" may mean (*e.g.*, failure to regulate metabolic heat occasioned by his exertion? —rhabdomyolysis? —heat stroke?), however, particularly because Dr. Natarajan does not offer or discuss any evidence that Agent Afolayan had an elevated body temperature. And Dr. Cina affirmatively stated that an elevated body temperature was *not* recorded for Agent Afolayan. Furthermore, exercise-related heat illness can occur in "'normal' environmental conditions."[91] As was discussed above, the temperature at the time Agent Afolayan's medical crisis began was hot, but not particularly so. And the WBGT at the time was such that no particular caution would have been advised by the Army, the American College of Sports Medicine, or US Soccer for individuals engaging in vigorous exercise or training. Thus, although I believe that the temperature on April 30th contributed to *some* extent to Agent Afolayan's medical crisis, I do not understand Dr. Natarajan to be saying that the temperature was the primary or biggest contributor.[92]

Dr. Cina opined that exercising in an adverse climate (also described as a hot, hostile environment) at altitude contributed to Agent Afolayan's sickle cell crisis and death, but Dr. Cina expressly stated that he could *not* say that the climate was the biggest factor. Agent Afolayan's sickle cell trait also contributed to his sickle cell crisis and death, according to Dr. Cina, who noted that antihistamine use, dehydration, and a viral illness also "played a smaller role in his death."[93] Dr. Cina, therefore, pointed to various contributing causes to Agent Afolayan's medical crisis, but he did not identify any of these causes as being sufficient enough to bring about his fatal injury or as contributing to that fatal injury to a greater degree than any other factor.[94]

Dr. Sperry indicated that he agreed that Agent Afolayan "died as a consequence of a heat related illness," and stated that was "the precipitation of a sickle cell crisis that arose from him

---

the diagnosis was missed . . . , particularly on April 28, 2009, when [he] presented at the FLETC Health Unit having experienced the triad.").

[91]     National Athletic Trainers' Association Position Statement: Exertional Heat Illnesses, 2015. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4639891/ (last visited January 16, 2024) ("The risk of [exertional heat illnesses] is ever present during exercise in the heat but can occur in 'normal' environmental circumstances.").

[92]     *Cf.* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[93]     Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated February 22, 2013.

[94]     *Cf.* 28 C.F.R. § 32.3 (defining *Substantial factor*).

19

having Sickle Cell Trait."[95] Dr. Sperry also opined that Agent Afolayan's clinical symptoms were "a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition, which evolves in to sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration." Dr. Sperry, however, never opined whether it was the sickle cell trait, exertion, the heat, or exertion-related dehydration that was the most significant factor in bringing about the fatal medical crisis.

Dr. Mileusnic-Polchan, whose report I discuss in substantial detail above, identified various contributing factors to Agent Afolayan's medical crises, but she also did not identify the "substantial factor" that brought about Agent Afolayan's medical crises and death.

In sum, the doctors who reviewed records and opined as to this claim stated that Agent Afolayan's sickle cell trait and vigorous exertion contributed in some way to his medical crisis on April 30, 2009, and identified other contributing factors, including heat (or dry heat), altitude, dehydration (or relative- or exertional dehydration), antihistamine use, and viral illness;[96] but *none* of them said that the climatic conditions (singularly or together) were the biggest factor in causing that crisis. One doctor—Dr. Cina—expressly stated that he could *not* say that the climatic conditions were the biggest factor. And I am not persuaded that it is "more likely than not" that the weather/altitude conditions were the substantial factor in bringing about Agent Afolayan's death. Instead, I am persuaded that a combination of pre-existing rhabdomyolysis from an unknown cause, sickle cell trait, and physical stress or -strain, all together, contributed to the medical crisis to a greater degree than any other factors, including the weather/altitude conditions.

No medical expert concluded that the weather/altitude conditions were sufficient by themselves to bring about the fatal medical crisis or that those conditions contributed to the onset of the crisis to a greater degree than any other factor (or factors, combined) did. In fact, every medical opinion in the record cites multiple reasons for Agent Afolayan's fatal medical crisis, and, to the extent that weather/altitude conditions are mentioned at all, they are mentioned only in conjunction with other factors. Furthermore, all members of the training class were subjected to the same weather/altitude conditions, and none other than Agent Afolayan was reported as suffering any medical crises. If the weather/altitude conditions during the run on April 30, 2009, had been so severe or extreme, one would expect to see more than one trainee sickened by those conditions during the run. Finally, as discussed above, the temperature at the time of the run was hot, but not "intensely" so. Furthermore, the low humidity during the run resulted in more efficient evaporation of sweat, which has a cooling effect on the body. Both the Heat Index and

---

[95]     Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated May 22, 2013.

[96]     Dr. Cina noted that a viral illness also could have played some role in Agent Afolayan's medical crisis. It is recommended that individuals with sickle cell trait should limit maximal exertion when feeling ill, "and such activities should be limited for ≥ 1–2 weeks after viral syndromes or respiratory infections." *Sickle Cell Trait and Sudden Death – Bringing It Home*, Bruce Mitchell, M.D., Journal of the National Medical Association, March 2007 (Exhibit 2 to the Hearing Officer's hearing transcript). Agent Afolayan had been seen in the health unit on April 20th with cold symptoms, and he still was not feeling well when he participated in the run on April 30th. *Statement of Anthony Fazio.*

the WBGT indicate that the feel of the temperature was somewhat lower (or much lower) than the reading on the thermometer. The WBGT, which the record shows is the heat index "best related to physiologic response to exercise in heat[,]"[97] tells us that the temperature at the time of the run felt like 71 degrees Fahrenheit. The U.S. Army guidelines for training would have *no* restrictions on soldiers engaging in "very heavy work" with a WBGT of 71 degrees. US Soccer and the American College of Sports Medicine similarly would not have recommended any restrictions on exercise for an individual like Agent Afolayan in these conditions.

It has been argued that the black short-sleeve T-shirt that Agent Afolayan wore during the run made the conditions even hotter for him. Again, I am not persuaded that it is "more likely than not" that the clothes that he wore contributed much, if at all, to his fatal medical crisis. The U.S. Army guidelines assume that soldiers are wearing an operational camouflage uniform, which includes pants and a shirt. As compared to the shorts and short-sleeve T-shirt that Agent Afolayan was wearing during the run, this operational camouflage uniform would result in *less* skin exposure, and thus *less* sweat evaporation and *less* cooling of the body. But even under those *less* favorable conditions, the Army (as indicated above) imposes *no* restrictions on its soldiers' training when there is a WBGT of 71 degrees; and it does not even *begin* to impose restrictions until the WBGT reaches 78 degrees (and such work/rest restrictions as it imposes at that level would not have affected Agent Afolayan's run anyway, as it was completed in just over eleven minutes).

Low humidity (*i.e.*, a more arid environment) generally may contribute, more than moderate humidity does, to some level of dehydration if an individual does not drink extra fluids. Of course, as I noted above, exercise in an environment with lower humidity results in more efficient cooling of the body, which in turn results in less sweating (as compared to a more humid environment). Exercising in a hot dry environment, therefore, generally is a favorable thing (*i.e.*, less likely to lead to dehydration than exercising in a humid environment would), and the Heat Index and WBGT bear this out with "feels like" temperatures going lower as the humidity goes lower (when the ambient temperature remains constant). Accordingly, I am not persuaded that it is "more likely than not" that the low humidity during his April 30th run contributed much, if anything at all, to Agent Afolayan's fatal medical crisis.

Nor am I persuaded that it is "more likely than not" that the elevation of Artesia contributed much to Agent Afolayan's fatal medical crisis. Prior to the training, Agent Afolayan resided in a town with an elevation of approximately 1,500 feet. Artesia is about 1,900 feet higher in elevation. With time, individuals adjust to their elevation, and adjusting to this sort of elevation change does not appear to me, based on the information discussed above, as unusual or something that would be likely to cause significant medical problems after an adjustment period of roughly ten weeks. If Agent Afolayan were to be significantly affected by the elevation of Artesia, it is much more likely that any difficulties while exercising would have been apparent early on, but they were not. By all accounts, he was one of the most physically fit trainees in his

---

[97]     *Sickle Cell Trait*, John Kark, M.D., Howard University School of Medicine, Center for Sickle Cell Disease, December 20, 2000.

class, finishing near the top of most of the class's runs for roughly two months, up until a few days before his final run.

In addition, until an individual reaches roughly the elevation of Artesia, there has been no report of a "demonstrable physiological reaction to the decrease in atmospheric pressure."[98] The American College of Cardiology indicates that physiological changes from decreased atmospheric pressure are more likely to occur only as one nears 5,000 feet in elevation. According to the U.S. Army, the oxygen saturation of blood remains at roughly 96% in individuals until they reach an elevation of roughly 4,000 feet. The Army's TB Med 505 also states that only as one approaches 3,900 feet of elevation does "maximal aerobic work performance [become even] minimally impaired."[99] Thus, it seems that the reduction in oxygen availability at the elevation of Artesia has negligible effect on the ability of individuals to oxygenate their bodies. The Air Force and the Marines, consistent with these data points, do not expect elevation materially to affect aerobic fitness completion-times until 4,500 feet (for the Marines) or 5,250 feet (for the Air Force) and, therefore, do not make any adjustment in their respective completion times until an individual is engaged in aerobic fitness tests at or above those elevations. For all of these reasons, I am not persuaded that the elevation of Artesia was a substantial factor in bringing about Agent Afolayan's medical crisis.[100]

Two other factors are mentioned in the record as possibly contributing to Agent Afolayan's medical crisis on April 30, 2009, although to a lesser extent: viral illness and his taking of antihistamines. Antihistamines "can affect your body's 'temperature regulation and interfere with sweating and cooling mechanisms[.]'"[101] A viral illness can affect the body in various ways, depending on the nature of the virus, but, generally speaking, when presenting as an upper respiratory infection a virus typically affects "multiple body systems, including cardiac, pulmonary, muscular, fluid status, and temperature regulation."[102] These factors, therefore, could have interfered with Agent Afolayan's body's ability to regulate its temperature and, separately or in combination, contributed to a loss of fluids and dehydration.

A word about dehydration and its possible contribution to Agent Afolayan's fatal medical crisis. Drs. Cina, Sperry, and Mileusnic-Polchan each identified dehydration as a possible factor

---

[98]    Manual of Civil Aviation Medicine, p. 92 (II-1-8), available at https://skybrary.aero/sites/default/files/bookshelf/2430.pdf (last visited February 2, 2024).

[99]    Technical Bulletin (TB Med 505), Altitude Acclimatization and Illness Management, ¶ 2-2.e., https://usariem.health.mil/assets/docs/partnering/TB-Med-505-Sept-2010.pdf (last visited January 16, 2024).

[100]    *See* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[101]    Stacey Colino, "Is your medicine ruining your workout?", *U.S. News & World Report* (May 4, 2016), quoting Dr. John Higgins, a sports cardiologist, available at https://health.usnews.com/wellness/articles/2016-05-04/is-your-medicine-ruining-your-workout (last visited January 16, 2024).

[102]    Christopher A. McGrew, "What recommendations should be made concerning exercising with a fever and/or acute infection?", in EVIDENCE-BASED SPORTS MEDICINE (Domhall MacAuley and Thomas Best 2d ed. 2007) (citations omitted), available at https://onlinelibrary.wiley.com/doi/epdf/10.1002/9780470988732 (last visited February 5, 2024).

or a factor in that medical crisis. For Dr. Cina, dehydration was a "possible" factor in Agent Afolayan's sickle cell crisis. Dr. Mileusnic-Polchan referred to it as "exertional dehydration (dry environment)." Dr. Sperry, however, gave a fuller explanation, indicating that "[d]ehydration is a relative kind of thing. That is, someone who is running 1½ miles in a hot environment is going to sweat, and the degree of dehydration that's necessary to initiate a sickle cell crisis is not severe or profound dehydration that would cause someone, say, to collapse just because of a lack of fluids in their system."[103] I find Dr. Sperry's more detailed explanation to be especially helpful, and I understand the other doctors to be employing the word "dehydration" and "exertional dehydration" in a similar manner, because I am unpersuaded that it is "more likely than not" that eleven minutes of exercise—even intense exercise—with a Heat Index of 83 degrees or WBGT of 71 degrees would ordinarily result in severe or profound dehydration from a lack of fluids[104] (unless, perhaps, the individual began exercising already at a significant fluid deficit).[105] In any event, his intense physical exertion (*i.e.*, physical stress and strain), the heat, and possibly his viral illness and antihistamines all seem to have contributed, at least somewhat, to the fluid loss (*i.e.,* relative dehydration) that factored into his medical crisis on April 30, 2009.

As indicated above, I conclude that sickle cell trait contributed, to *some* extent, to Agent Afolayan's medical crisis. Although sickle cell trait, in general, is considered a benign condition, it "has been linked to an increased risk of exercise-associated sudden death in individuals undergoing intense physical exertion, and possibly rhabdomyolysis."[106] "Sickle Cell Trait continues to be the leading cause of sudden death for young African Americans in military basic training and civilian organized sports."[107] "[M]ultiple studies showed that large amounts of sickled cells formed during exercise" and this "formation of sickled cells support a causal relationship between sickle cell trait and exercise-related complications."[108] Not all individuals with sickle cell trait will develop complications, but a "subset . . . obviously ha[s] an increased risk of exercise-induced complications. Most researchers and clinicians working in this area appear to have concluded that the increased morbidity and mortality for individuals with sickle cell trait result from the confluence of poor conditioning, strenuous physical exertion (especially

---

[103]    Hearing Transcript, p. 47.

[104]    *E.g.*, US Soccer provides for hydration breaks 25–30 minutes into a match, instead of after 45minutes, only if the WBGT is 89.6 degrees or above, https://cdn1.sportngin.com/attachments/document/0148/7430/USSF-Heat-Guidelines.pdf (last visited January 16, 2024); and it is not uncommon for 5K running races to offer only one water station, usually near the midway point. *See generally*, *e.g.*, https://www.theraceuc.com/frequently-asked-questions (last visited January 16, 2024); https://www.riograndehalf.com/ (last visited January 16, 2024).

[105]    In this connection, I note that, according to his wife, Agent Afolayan told her, just days before his fatal medical crisis, that he was drinking a "'ton'" of water.

[106]    American College of Sports Medicine and NCAA Joint Statement Sickle Cell Trait and Exercise, available at https://www.ncaa.org/sports/2013/12/18/acsm-and-ncaa-joint-statement-sickle-cell-trait-and-exercise.aspx (last visited January 24, 2024).

[107]    Bruce Mitchell, M.D., "Sickle Cell Trait and Sudden Death—Bringing It Home", *Journal of the National Medical Association*, March 2007, p. 300 (Exhibit 2 to the Hearing Officer's hearing transcript).

[108]    *Id.*

in hot climates), dehydration and age."[109]  Studies have noted "[a]n age-associated increase in the death rate . . . for those with sickle cell trait; the death rate of 28–29 year-olds is eight-fold higher than that of 17–18-year-olds."[110]  I, therefore, conclude that Agent Afolayan's sickle cell trait was *a* factor, albeit not *the substantial factor*, in bringing about his fatal medical crisis.

Based on my assessment of the evidence in the record and as discussed above, I conclude that it is "more likely than not" that sickle cell trait, intense physical stress or -strain, heat, relative dehydration, viral illness, antihistamine use, and the elevation of Artesia all contributed *to some extent* to Agent Afolayan's medical crisis on April 30th.  But I also conclude that he was experiencing rhabdomyolysis in the days immediately before April 30th, and that this rhabdomyolysis from an unknown cause contributed to his medical crisis on April 30, 2009.

Although I find that rhabdomyolysis was a factor in bringing about the death, I conclude that the rhabdomyolysis was of "unknown cause," and therefore cannot be found to be a "line of duty injury" as that term is defined in the PSOB implementing regulations.  The first indication in the record that Agent Afolayan was experiencing the symptoms characteristic of rhabdomyolysis does not appear until around April 28th, when he disclosed to his wife that he had bloody-appearing urine and reported to the health unit that he was having bilateral thigh and hamstring muscle pain.  This also is consistent with the statement provided by one of Agent Afolayan's classmates, Victor Manuel Santomauro, who stated that Agent Afolayan "was usually in the top 5 in the runs," but a "few days before [April 30th]" Agent Afolayan "was struggling with the run [and h]e came in the back of the section and his time was not his normal time."[111]  We have no greater specificity than that about this run that Santomauro refers to, precisely when Agent Afolayan's rhabdomyolysis symptoms may have begun, or exactly what he may have been engaged in when such symptoms began.

According to the health unit's record, on April 28th Agent Afolayan was seen at 1700 and reported having engaged in running, basketball, and weight training that day.  Although the record does not establish when in the day he engaged in these activities, the temperature that day ranged from a low of 57 degrees Fahrenheit to a high of 76 degrees.  And the humidity ranged from 40 to 82 percent.  It has not been shown that these climatic conditions caused or contributed to his muscle weakness or bloody-appearing urine (it also has not been shown that he engaged in any of the activities *outdoors*; weight training more commonly takes place indoors, and perhaps the basketball and running did as well).[112]

In sum, I find it "more likely than not" that Agent Afolayan already was experiencing a

---

[109]   *Id.* at 303.

[110]   *Id.* at 301.

[111]   Statement of Victor Manuel Santomauro, dated June 29, 2011.

[112]   I do not find these weather/altitude conditions (regardless of the temperature/humidity combination) to be unusually adverse or sufficiently severe to amount to a "climatic condition," as that term is used in the definition of *Injury*. Thus, even if the Claimants could establish that the weather/altitude conditions of April 28th caused his muscle weakness or bloody-appearing urine, they would not be an *Injury* for purposes of the PSOB Program.

24

milder version of the illness (rhabdomyolysis) whose *sequelæ*, in combination with sickle cell trait and physical stress or –strain, contributed to his medical crisis on April 30, 2009, to a greater extent than any combination of weather/altitude conditions did during his 1.5 mile run on that day—that is, I conclude that it is "more likely than not" that that medical crisis—the traumatized physical condition of [his] body" at that time—was not "directly and proximately caused" by those weather/altitude conditions.[113]

**Genetic Information Nondiscrimination Act**

The Genetic Information Nondiscrimination Act ("GINA") makes it an "unlawful employment practice" for an "employer[] to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee[.]"[114] The Claimants' post-remand submission argues that GINA prohibits me from denying their PSOB claim because of Agent Afolayan's sickle cell trait. I do not agree that GINA applies, here.

GINA prohibits an *employer* from taking (or failing to take) actions as to its *employees*. It has not been shown that GINA prohibits an employer from taking any action as to a *deceased* employee.[115] But in any event, the Bureau of Justice Assistance was *not* the "employer" (or an agent of the employer) of Agent Afolayan, and he was *not* an "employee" of the Bureau.

The PSOB Act death benefits, moreover, are not "compensation, terms, conditions, or privileges" of Agent Afolayan's employment with Customs and Border Protection.[116] The PSOB Act, rather, provides a federal gratuity[117] on behalf of a grateful nation to certain public

---

[113]     28 C.F.R. § 32.3 (defining *Injury*).

[114]     42 U.S.C. § 2000ff-1(a)(1).

[115]     *Cf., e.g., Silkwood* v. *Kerr-McGee Corp.*, 637 F.2d 43, 749 (10th Cir. 1980) ("the civil rights of a person cannot be violated once that person has died"). Even if GINA prohibited an employer from taking action as to a deceased employee, there would be no remedy available to a deceased federal employee. For a federal employee, enforcement of GINA requires *the employee* to initiate an EEO complaint. *See* https://www.eeoc.gov/laws/ guidance/background-information-eeoc-final-rule-title-ii-genetic-information-nondiscrimination (last visited January 16, 2024); 29 C.F.R. part 1635. The EEOC has held that such a complaint must be initiated by the living employee and may not be done by his estate. *Cf. Estate of Monico Torrez* v. *Postmaster General, USPS*, Appeal No. 0120101573, 2010 WL 3137587 (July 27, 2010) (estate lacks standing where employee did not initiate the EEO process before death).

[116]     The Judiciary Committee of the U.S. House of Representatives recognized that, although the PSOB Act is an "important resource" for public safety officers and their families, it is not "an insurance program, a worker's compensation program, or a remedial program and never has been." H.R. Rep. No. 112-548, at 6. Claims for PSOB Act benefits should be decided "strictly in accordance with the PSOBA and the underlying law governing legal gratuities[.]" *Id.* at 8.

[117]     *See, e.g., Rose* v. *Ark. State Police*, 479 U.S. 1, 4 (1986) ("Congress intended that the [amount paid under the PSOB Act] would be a 'gratuity[]'") (internal citation omitted); *Ortiz-Lebrón* v. *United States*, 65 F.

safety officers for some—*but not all*—line-of-duty deaths. The federal gratuity is not provided by Customs and Border Protection; instead, it is provided under the terms of the PSOB Act, which entrusts the Bureau (without any reference to GINA)[118] to make the statutory determination of eligibility.[119] For the foregoing reasons, GINA is inapplicable to this claim.

**Conclusion**

      Pursuant to the PSOB Act and its implementing regulations, I—as Director of the Bureau—have conducted a thorough, *de novo* review of this claim, including the record as described in the attached evidence log. Based on the evidence of record and the requirements of the PSOB Act, for the reasons discussed above, I am not persuaded that it is "more likely than not" that Border Patrol Agent Nathaniel Afolayan sustained an "injury," as that term is defined in the PSOB Act and implementing regulations, and thus am unable to conclude that he "died as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C. § 10281(a). Accordingly, this claim for PSOB Act benefits must be denied.

---

Supp.3d 305, 307 (D. P.R. 2014) ("Benefits under the PSOB Act are considered legal gratuities as opposed to a statutory right."); 28 C.F.R. § 32.0(b) (the PSOB Act "authorizes the payment of three different legal gratuities"); H.R. Rep. No. 112-548, at 7, 11 (the PSOB program is "a deliberately limited program that . . . provides for the payment of specific gratuity benefits arising from the death, or permanent and total disability, of some public safety officers" and PSOB claims are "gratuity claims against the Treasury").

[118]    As to GINA claims by federal employees, GINA established a specific set of enforcement procedures, which are codified at 42 U.S.C. §§ 2000ff-6 & 2000e-16. Those procedures do not call for allegations of GINA violations to be brought before the BJA Director (or before any other PSOB determining official, for that matter). BJA's statutory role under the PSOB Act is limited to adjudicating claims based on the requirements set forth in that Act; the PSOB forum is not appropriate for determining allegations of violation of GINA. To the extent that the Claimants here may believe that my determination of their PSOB claim is in violation of GINA, their remedy, if any, would be pursuant to the procedures established by GINA itself.

[119]    *See* 34 U.S.C. § 10285(b) ("Responsibility for making final determinations shall rest with the Bureau.").

The above determination is based upon the Bureau of Justice Assistance Director's *de novo* review of the record before the agency, which includes the following:

| | |
|---|---|
| 1 | Claim for Death Benefits submitted by Lisa Afolayan, dated October 28, 2009; |
| 2 | Report of Public Safety Officer's Death, submitted by Alan Bersin, Commissioner, U.S. Customs and Border Protection, dated May 14, 2010; |
| 3 | Certificate of Death for Agent Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, Date Issued September 1, 2009; |
| 4 | Certificate of Marriage, Nathanial Afolayan and Lisa Owen, dated November 22, 2003; |
| 5 | Certificate of Live Birth, Natalee Afolayan, dated ████████, 2006; |
| 6 | Certificate of Live Birth, L██ A██████, dated ████████ 2007; |
| 7 | U.S. Border Patrol Agent Badge, Agent Nathanial Afolayan, dated May 6, 2009; |
| 8 | Letter from Brad Mayberry, Senior Claims Examiner, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 30, 2009; |
| 9 | Letter from Jan Miller, Hearing Representative, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 21, 2009, attaching Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, dated October 21, 2009; |
| 10 | Autopsy Examination Report, conducted by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009; |
| 11 | Federal Employees Compensation System, Agent Nathaniel Afolayan, dated January 6, 2010; |
| 12 | Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, Law Enforcement Authority and Arrest Powers, |

dated March 15, 2011, enclosing 8 C.F.R. Chapter 1 § 287, Field Officers Powers and Duties, undated;

13 Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, from May 2010, with the following:

  a. Letter from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, dated May 2, 2009;

  b. Significant Incident Report, dated April 30, 2009;

  c. Border Patrol Operations Courses, undated;

  d. Position Description, undated;

  e. Safety Investigation Data Form, dated April 30, 2009;

  f. Medical Document, Illness Detail and Procedures Performed, undated;

  g. Medical Document, Illness Detail and Procedures Performed, dated April 30, 2009;

  h. The Officer Down Memorial Page, dated May 14, 2009;

  i. Miri Marshall, *Border Patrol Agent Dies in Training*, KFOXTV.com, May 10, 2009;

14 Individual Injury Report, Nathaniel Afolayan, dated April 28, 2009;

15 Patient Visit Data, FLETC Health Unit, dated from March 5, 2009, through April 30, 2009;

16 Letter from Health Unit Staff to PT Instructor, dated from March 5, 2009, through April 20, 2009;

17 Health Questionnaire, dated February 18, 2009;

18 Medical Documents, Artesia General Hospital, dated from April 30, 2009 through May 15, 2009;

19 Aerocare Transport Worksheet, dated April 0, 2009;

20 Authorization for Examination And/Or Treatment, Covenant Medical Center, signed by Arturo Agero, Supervisory Border Patrol Agent, dated May 1, 2009;

21      Medical Documents, Covenant Health System, dated from April 30, 2009,
        through May 1, 2009;

22      Orthopaedic Medical Group of Riverside, Inc., Dr. Donald Kim, dated October 8,
        2008;

23      Pacific Sleep Medicine Services, Dr. Stuart Menn, dated November 11, 2008;

24      Psychiatry Evaluation, Dr. Prakashchandra Patel, dated October 8, 2008;

25      Medical Notes and Prescription, dated January 2, 2008;

26      Medical Documents, Quest Diagnostics Incorporated, dated from April 4, 2007,
        through August 19, 2008;

27      Medical Documents, United Familycare Rialto, dated from April 19, 2006,
        through November 7, 2007;

28      Medical Notes, Physical Exam, dated from October 2, 2006 through August 18,
        2008;

29      Letter from Felicia Wintz, PSOB Benefits Specialist, to Dr. Sridhar Natarajan,
        dated March 29, 2011;

30      Questions for Medical Review, undated;

31      Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated
        April 14, 2011;

32      Letter by Anthony Fazio, U.S. Border Patrol Academy Class #856, undated;

33      Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated
        July 15, 2011;

34      *Curriculum Vitæ*, Dr. Stephen Cina, forensic pathologist;

35      PSOB Office Determination, dated March 6, 2012;

36      Notification of Public Safety Officers' Benefits Office Determination from Hope
        Janke, PSOB Director, to Lisa Afolayan, dated April 4, 2012;

37    Notification of Public Safety Officers' Benefits Office Determination from Hope
      Janke, PSOB Director, to Alan Bersin, Commissioner, U.S. Custom and Border
      Protection, dated April 4, 2012;

38    Facsimile Transmittal Sheet from Michael Baranic, to Felicia Logan-Epps,
      PSOB Appeal Specialist, dated May 4, 2012;

39    Request for Hearing Officer Appeal from Michael Baranic, to Felicia Logan-
      Epps, PSOB Appeals Specialist, dated May 4, 2012;

40    Letter from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist,
      dated June 13, 2012;

41    Letter from Hope Janke, PSOB Director, to Michael Baranic, Case Assigned to
      Hearing Officer Joseph Mistrett, dated July 25, 2012;

42    Claimant's Expert and Witness List, dated November 27, 2012;

43    Hearing Transcript, dated November 27, 2012, with the following Exhibits:

      a. Exhibit 1—Letter from Molly Dunn, M.S., Certified Genetic Counselor, to
         Lisa Afolayan, dated January 17, 2008, and Hemoglobinopathy Reference
         Laboratory, Children's Hospital & Research Center Oakland, Dr. Caralyn
         Hoppe, dated December 28, 2009;

      b. Exhibit 2—Dr. Bruce Mitchell, *Sickle Cell Trait and Sudden Death,
         Bringing it Home*, Journal of the National Medical Association, Vol. 99,
         No. 3, dated March 2007;

      c. Exhibit 3—Dr. John Kark, *Sickle Cell Trait*, dated December 20, 2000,
         sickle.bwh.harvard.edu/sickle_trait.html;

      d. Exhibit 4—*Sickle Cell Trait, Sickle Cell Disease, What is the Difference?*
         California Department of Health Services, undated;

      e. Exhibit 5—Independent Medical Evaluation, Dr. Kris Sperry, dated
         November 15, 2012;

      f. Exhibit 6— *Curriculum Vitæ*, Dr. Kris Sperry, forensic pathologist;

      g. Exhibit 7—Weather History for Artesia, New Mexico, dated April 30,
         2009;

      h. Exhibit 8—City Data, Artesia, New Mexico, dated November 27, 2012;

      i.   Exhibit 9—Affidavit, Alex Jacob Alderman, dated July 7, 2011;

      j.   Exhibit 10—Affidavit, Victor Hugo Muglia Arias, dated July 8, 2011;

      k.   Exhibit 11—Affidavit, Jeffrey Carl Austin, dated July 7, 2011;

      l.   Exhibit 12—Affidavit, Reyna Del Carmen Cabrera, dated July 8, 2011;

      m.  Exhibit 13—Affidavit, Ginno Marcello Gallina Mora, dated July 5, 2011;

      n.  Exhibit 14—Affidavit, Victor Manuel Santomauro, dated June 29, 2011;

44     Independent Medical Evaluation, Dr. Stephen Cina, dated February 22, 2013;

45     Independent Medical Evaluation, Dr. Kris Sperry, dated May 22, 2013;

46     Hearing Officer Determination, dated January 10, 2014;

47     Letter from Hope Janke, PSOB Director, to Michael Baranic, Hearing Officer Denies Claim, dated February 10, 2014;

48     Letter from Hope Janke, PSOB Director, to Michael Baranic, Attorney Fees, dated February 10, 2014;

49     Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated;

50     Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated June 13, 2018;

51     Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Filing Period Extension Granted, dated December 10, 2018;

52     Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated February 4, 2019, with the following:

      a.   Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated;

      b.   Letter entitled Nathaniel Afolayan, An American Hero, undated;

53     Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

54     Historic Cases of PSOB Claims Paid, undated;

55        Email communication from Orlando Vasquez, PSOB Office, to Lisa Afolayan, dated February 7, 2019, with Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Acknowledgement of Receipt of Request for Appeal to BJA Director, dated February 7, 2019;

56        BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

57        Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

58        Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated January 27, 2020, with the following:

      a.  Letter from Lisa Afolayan to Hope Janke, PSOB Director, dated January 24, 2020, with the following:

          i.  Letter from William Powers, PSOB Director, to Chief Cosmo Spezzaferro, Pittsfield Police Department, *Timothy Shepard*, (claim number not provided) dated February 27, 1989;

         ii.  Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated February 27, 1989;

       iii.  Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated May 16, 1989;

       iv.  Article entitled, *Widow of cadet to get federal benefits*, undated;

        v.  Appeal Summary, *Charles McDonald*, 2001-201, dated October 5, 2004;

       vi.  Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

      vii.  Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

     viii.  Letter from Hope Janke, PSOB Director, to Maria Gomez, *Lorenzo Gomez*, 2008-128, dated September 9, 2015; and

       ix.  BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

59        PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34; and

60        PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34
          (incomplete).

61        Letter to Claimants' counsel inviting further argument or evidence in light of the
          Court's opinion, dated June 2, 2022.

62        Claimants' post-remand submission, received August 1, 2022.

<u>ATTESTATION</u>

I hereby ATTEST that the attached certified list represents a list of the documents comprising the administrative record of the Bureau of Justice Assistance in the appeal of *Afolayan v. Department of Justice*, PSOB Case No. 2010-022, and that the administrative record is under my official custody and control on this date.

_____
Hope D. Janke
Director
Public Safety Officers' Benefits Office
Bureau of Justice Assistance
Department of Justice
810 7th Street, N.W.
Washington, D.C.  20531

May 06, 2024

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|-----|---------------------|
| 1 | Claim for Death Benefits submitted by Lisa Afolayan, dated October 28, 2009; |
| 2 | Report of Public Safety Officer's Death, submitted by Alan Bersin, Commissioner, U.S. Customs and Border Protection, dated May 14, 2010; |
| 3 | Certificate of Death for Agent Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, Date Issued September 1, 2009; |
| 4 | Certificate of Marriage, Nathanial Afolayan and Lisa Owen, dated November 22, 2003; |
| 5 | Certificate of Live Birth, Natalee Afolayan, dated ███████ 2006; |
| 6 | Certificate of Live Birth, L█ A█████, dated ███████, 2007; |
| 7 | U.S. Border Patrol Agent Badge, Agent Nathanial Afolayan, dated May 6, 2009; |
| 8 | Letter from Brad Mayberry, Senior Claims Examiner, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 30, 2009; |
| 9 | Letter from Jan Miller, Hearing Representative, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 21, 2009, attaching Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, dated October 21, 2009; |
| 10 | Autopsy Examination Report, conducted by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009; |
| 11 | Federal Employees Compensation System, Agent Nathaniel Afolayan, dated January 6, 2010; |

1

CERTIFIED LIST

PSOB Case No. 2010-022

| **No.** | **Document Description** |
|---|---|

12  Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, Law Enforcement Authority and Arrest Powers, dated March 15, 2011, enclosing 8 C.F.R. Chapter 1 § 287, Field Officers Powers and Duties, undated;

13  Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, from May 2010, with the following:

    a. Letter from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, dated May 2, 2009;

    b. Significant Incident Report, dated April 30, 2009;

    c. Border Patrol Operations Courses, undated;

    d. Position Description, undated;

    e. Safety Investigation Data Form, dated April 30, 2009;

    f. Medical Document, Illness Detail and Procedures Performed, undated;

    g. Medical Document, Illness Detail and Procedures Performed, dated April 30, 2009;

    h. The Officer Down Memorial Page, dated May 14, 2009;

    i. Miri Marshall, *Border Patrol Agent Dies in Training*, KFOXTV.com, May 10, 2009;

14  Individual Injury Report, Nathaniel Afolayan, dated April 28, 2009;

15  Patient Visit Data, FLETC Health Unit, dated from March 5, 2009 through April 30, 2009;

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|---|---|
| 16 | Letter from Health Unit Staff to PT Instructor, dated from March 5, 2009 through April 20, 2009; |
| 17 | Health Questionnaire, dated February 18, 2009; |
| 18 | Medical Documents, Artesia General Hospital, dated from April 30, 2009 through May 15, 2009; |
| 19 | Aerocare Transport Worksheet, dated April 30, 2009; |
| 20 | Authorization for Examination And/Or Treatment, Covenant Medical Center, signed by Arturo Agero, Supervisory Border Patrol Agent, dated May 1, 2009; |
| 21 | Medical Documents, Covenant Health System, dated from April 30, 2009, through May 1, 2009; |
| 22 | Orthopaedic Medical Group of Riverside, Inc., Dr. Donald Kim, dated October 8, 2008; |
| 23 | Pacific Sleep Medicine Services, Dr. Stuart Menn, dated November 11, 2008; |
| 24 | Psychiatry Evaluation, Dr. Prakashchandra Patel, dated October 8, 2008; |
| 25 | Medical Notes and Prescription, dated January 2, 2008; |
| 26 | Medical Documents, Quest Diagnostics Incorporated, dated from April 4, 2007, through August 19, 2008; |
| 27 | Medical Documents, United Familycare Rialto, dated from April 19, 2006, through November 7, 2007; |
| 28 | Medical Notes, Physical Exam, dated from October 2, 2006 through August 18, 2008; |

3

AFOLAYAN
V.
DOJ

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|---|---|
| 29 | Letter from Felicia Wintz, PSOB Benefits Specialist, to Dr. Sridhar Natarajan, dated March 29, 2011; |
| 30 | Questions for Medical Review, undated; |
| 31 | Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated April 14, 2011; |
| 32 | Letter by Anthony Fazio, U.S. Border Patrol Academy Class #856, undated; |
| 33 | Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated July 15, 2011; |
| 34 | Curriculum Vitae, Dr. Stephen Cina, forensic pathologist; |
| 35 | PSOB Claim Determination, dated March 6, 2012; |
| 36 | Notification of Public Safety Officers' Benefits Office Claim Determination from Hope Janke, PSOB Director, to Lisa Afolayan, dated April 4, 2012; |
| 37 | Notification of Public Safety Officers' Benefits Office Claim Determination from Hope Janke, PSOB Director, to Alan Bersin, Commissioner, U.S. Custom and Border Protection, dated April 4, 2012; |
| 38 | Facsimile Transmittal Sheet from Michael Baranic, to Felicia Logan-Epps, PSOB Appeal Specialist, dated May 4, 2012; |
| 39 | Request for Hearing Officer Appeal from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated May 4, 2012; |
| 40 | Letter from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated June 13, 2012; |

4

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|-----|---------------------|

41    Letter from Hope Janke, PSOB Director, to Michael Baranic, Case Assigned to Hearing Officer Joseph Mistrett, dated July 25, 2012;

42    Claimant's Expert and Witness List, dated November 27, 2012;

43    Hearing Transcript, dated November 27, 2012, with the following Exhibits:

    a.  Exhibit 1—Letter from Molly Dunn, M.S., Certified Genetic Counselor, to Lisa Afolayan, dated January 17, 2008, and Hemoglobinopathy Reference Laboratory, Children's Hospital & Research Center Oakland, Dr. Caralyn Hoppe, dated December 28, 2009;

    b.  Exhibit 2—Dr. Bruce Mitchell, *Sickle Cell Trait and Sudden Death, Bringing it Home*, Journal of the National Medical Association, Vol. 99, No. 3, dated March 2007;

    c.  Exhibit 3—Dr. John Kark, *Sickle Cell Trait*, dated December 20, 2000, sickle.bwh.harvard.edu/sickle_trait.html;

    d.  Exhibit 4—*Sickle Cell Trait, Sickle Cell Disease, What is the Difference?* California Department of Health Services, undated;

    e.  Exhibit 5—Independent Medical Evaluation, Dr. Kris Sperry, dated November 15, 2012;

    f.  Exhibit 6—Curriculum Vitae, Dr. Kris Sperry, forensic pathologist;

    g.  Exhibit 7—Weather History for Artesia, New Mexico, dated April 30, 2009;

    h.  Exhibit 8—City Data, Artesia, New Mexico, dated November 27, 2012;

    i.  Exhibit 9—Affidavit, Alex Jacob Alderman, dated July 7, 2011;

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|---|---|
| j. | Exhibit 10—Affidavit, Victor Hugo Muglia Arias, dated July 8, 2011; |
| k. | Exhibit 11—Affidavit, Jeffrey Carl Austin, dated July 7, 2011; |
| l. | Exhibit 12—Affidavit, Reyna Del Carmen Cabrera, dated July 8, 2011; |
| m. | Exhibit 13—Affidavit, Ginno Marcello Gallina Mora, dated July 5, 2011; |
| n. | Exhibit 14—Affidavit, Victor Manuel Santomauro, dated June 29, 2011; |
| 44 | Independent Medical Evaluation, Dr. Stephen Cina, dated February 22, 2013; |
| 45 | Independent Medical Evaluation, Dr. Kris Sperry, dated May 22, 2013; |
| 46 | Hearing Officer Determination, dated January 10, 2014; |
| 47 | Letter from Hope Janke, PSOB Director, to Michael Baranic, Hearing Officer Denies Claim, dated February 10, 2014; |
| 48 | Letter from Hope Janke, PSOB Director, to Michael Baranic, Attorney Fees, dated February 10, 2014; |
| 49 | Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated; |
| 50 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated June 13, 2018; |
| 51 | Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Filing Period Extension Granted, dated December 10, 2018; |
| 52 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated February 4, 2019, with the following: |
| a. | Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated; |

6

| No. | Document Description |
|-----|---------------------|

| | b. Letter entitled Nathaniel Afolayan, An American Hero, undated; |
| 53 | Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019; |
| 54 | Historic Cases of PSOB Claims Paid, undated; |
| 55 | Email communication from Orlando Vasquez, PSOB Office, to Lisa Afolayan, dated February 7, 2019, with Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Acknowledgement of Receipt of Request for Appeal to BJA Director, dated February 7, 2019; |
| 56 | BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015; |
| 57 | Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004; |
| 58 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated January 27, 2020, with the following: |
| | a. Letter from Lisa Afolayan to Hope Janke, PSOB Director, dated January 24, 2020, with the following: |
| |    i. Letter from William Powers, PSOB Director, to Chief Cosmo Spezzaferro, Pittsfield Police Department, *Timothy Shepard*, (claim number not provided) dated February 27, 1989; |
| |    ii. Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated February 27, 1989; |
| |    iii. Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated May 16, 1989; |
| |    iv. Article entitled, *Widow of cadet to get federal benefits*, undated; |

7

CERTIFIED LIST

PSOB Case No. 2010-022

| No. | Document Description |
|-----|---------------------|

<div style="margin-left:2em">

v.  Appeal Summary, *Charles McDonald*, 2001-201, dated October 5, 2004;

vi.  Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

vii.  Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

viii.  Letter from Hope Janke, PSOB Director, to Maria Gomez, *Lorenzo Gomez*, 2008-128, dated September 9, 2015; and

ix.  BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

</div>

| 59 | PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34; and |
| 60 | PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34 (incomplete). |
| 61 | Letter to Claimants' counsel inviting further argument or evidence in light of the Court's opinion, dated June 2, 2022. |
| 62 | Claimants' post-remand submission, received August 1, 2022. |

8

# PUBLIC SAFETY OFFICERS' BENEFITS PROGRAM

*Assisting America's Public Safety Community Since 1976*

## Administration Tools

🖶Print this page

## Application Details

**Claim for Death Benefits**

| | |
|---|---|
| Name: | Nathaniel Abidemi Afolayan |
| Submission Date: | 10/28/2009 |
| Application No: | 1596 |

### OFFICER INFORMATION

**1. NAME OF OFFICER (First, middle, last)**
Nathaniel Abidemi Afolayan

**2. OFFICER'S TITLE**
Border Patrol Agent

**3. SOCIAL SECURITY NUMBER**
█████████

**4. DATE OF INJURY**
04/30/2009

**5. DATE OF DEATH**
05/01/2009

**6. NAME AND PHYSICAL ADDRESS OF EMPLOYING AGENCY, ORGANIZATION OR UNIT IN WHOSE SERVICE DEATH OCCURRED**
U.S Custom and Border Protection
1300 Pennsylvania Avenue N.W.
Washington D.C., WA 20229

### PART I: INFORMATION ON SURVIVING BENEFICIARY

**7. ELIGIBLE BENEFICIARY**
1. Spouse
Lisa Elaine Afolayan



**8. MARITAL STATUS OF OFFICER AT TIME OF DEATH**
Married

**9. DO YOU HAVE REASON TO BELIEVE THAT THE OFFICER WAS MARRIED AT ANY TIME TO ANYONE ELSE?**

No

**9a. List number of times surviving spouse was previously married.**
0

**10. DO YOU HAVE REASON TO BELIEVE THAT THE OFFICER HAD A CHILD(REN) FROM A PREVIOUS MARRIAGE OR RELATIONSHIP?**
No

### PART II: SURVIVING CHILDREN INFORMATION

Appx45

11. If the officer was survived by a natural, out-of-wedlock, adopted or posthumous child, or stepchild (or children) at the time of death, complete this part. All surviving children should be listed regardless of age or dependency status at the time of the officer's death. Attach a certified copy of birth certificates, adoption papers, DNA results, or other evidence of parent-child relation, as appropriate.

Name (Last, First, Middle)
Afolayan, Natalee E

Date of Birth
01/17/2006

Social Security Number
███████

If over 18, educational status at the time of parent's death
N/A

Marital Status regardless of age
Single

Mailing Address
███████

Telephone Number
███████

Parent or Legal Guardian Name
Lisa E Afolayan

Social Security Number
███████

─────────────────────────

Name (Last, First, Middle)
Afolayan, ███████

Date of Birth
███████

Social Security Number
███████

If over 18, educational status at the time of parent's death
N/A

Marital Status regardless of age
Single

Mailing Address
███████

Telephone Number
███████

Parent or Legal Guardian Name



Lisa E Afolayan

**Social Security Number**

▇▇▇▇▇

## PART III

**Has claim been filed for benefits under**
(1) Federal Employees Compensation Act, Section 8191 title 5, U.S. Code?
Yes
(2) D.C. Retirement and Disability Act of September 1, 1916, Section 4-622?
No

**SIGNATURE OF CLAIMANT OR AUTHORIZED REPRESENTATIVE**
Signed

Claimant or Authorized Representative
Lisa Elaine Afolayan

Date
10/28/2009

E-mail
▇▇▇▇▇▇▇▇▇

Work number

Alternate number
▇▇▇▇▇

Home number
▇▇▇▇▇

Previous Page      Main Menu

Appx47



# City of Lubbock
## Texas

**STATE OF TEXAS** — **CERTIFICATE OF DEATH** — **STATE FILE NUMBER**

| | | |
|---|---|---|
| 1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last) | | (Maiden) | 2. DATE OF DEATH - ACTUAL OR PRESUMED |
| NATHANIEL ABIDEMI AFOLAYAN | | | 05/01/2009 |

| 3. SEX | 4. DATE OF BIRTH | 5. AGE-Last birthday (Years) | IF UNDER 1 YR MO DAYS | IF UNDER 1 DAY HOURS MIN | 6. BIRTHPLACE (City & State or Foreign Country) |
|---|---|---|---|---|---|
| MALE | 03/26/1980 | 29 | | | NIGERIA |

| 7. SOCIAL SECURITY NUMBER | 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (If Wife, give name prior to first marriage) |
|---|---|---|
| | ☒ Married ☐ Widowed ☐ Divorced ☐ Never Married ☐ Unknown | LISA ELAINE OWEN |

| 10a. RESIDENCE STREET ADDRESS | | 10b. APT. NO. | 10c. CITY OR TOWN |
|---|---|---|---|
| | | | SAN JACINTO |

| 10d. COUNTY | 10e. STATE | 10f. ZIP CODE | 10g. INSIDE CITY LIMITS? |
|---|---|---|---|
| RIVERSIDE | CALIFORNIA | 92582 | ☒ Yes ☐ No |

| 11. FATHER'S NAME | 12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE |
|---|---|
| DAVID AFOLAYAN | CATHERINE ADELAKUN |

| IF DEATH OCCURRED IN A HOSPITAL | IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL | |
|---|---|---|
| ☒ Inpatient ☐ ER/Outpatient ☐ DOA | ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify) | |

13. PLACE OF DEATH (CHECK ONLY ONE)

| 14. COUNTY OF DEATH | 15. CITY/TOWN, ZIP CODE (If outside city limits, give precinct no) | 16. FACILITY NAME (If not institution, give street address) |
|---|---|---|
| LUBBOCK | LUBBOCK, 79410 | COVENANT MEDICAL CENTER |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) |
|---|---|
| LISA AFOLAYAN - WIFE | SAN JACINTO, CA 92582 |

| 19. METHOD OF DISPOSITION | 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | 21. |
|---|---|---|
| ☒ Burial ☐ Cremation ☐ Donation | BENNY N. MILLER MR. .BY ELECTRONIC | Section GLE ☐ Unknown |
| ☐ Entombment ☐ Removed from state | SIGNATURE-10176 | Section |
| ☐ Other (Specify) | | Space |

| 22. PLACE OF DISPOSITION (Name of Cemetery, crematory, other place) | 23. LOCATION (City/Town, and State) |
|---|---|
| SAN JACINTO VALLEY CEMETERY | SAN JACINTO, CA |

| 24. NAME OF FUNERAL FACILITY | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City State, Zip Code) |
|---|---|
| MILLER M For: HEMET VALLEY MORTUARY | 202 AVE. Q, LUBBOCK, TX 79415 |

26. CERTIFIER (Check only one)
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (Mo/Day/Yr) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| | 05-05-2009 | J5422 | 2241 |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City,State,Zip) | 32. TITLE OF CERTIFIER |
|---|---|
| SRIDHAR NATARAJAN, MD, MS, 4434 S. LOOP 289, LUBBOCK, TX 79414 | CHIEF MEDICAL EXAMINER |

33. PART 1. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH LINE.

| CAUSE OF DEATH | | Approximate interval Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. PENDING — Due to (or as a consequence of): | |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | b. Due to (or as a consequence of): | |
| | c. Due to (or as a consequence of): | |

34. PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1.

| 35. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No | 36. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☒ Yes ☐ No |
|---|---|

| 36. MANNER OF DEATH | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: | 39. IF TRANSPORTATION INJURY, SPECIFY: |
|---|---|---|---|
| ☐ Natural | ☐ Yes | ☐ Not pregnant within past year | ☐ Driver/Operator |
| ☐ Accident | ☐ No | ☐ Pregnant at time of death | ☐ Passenger |
| ☐ Suicide | ☐ Probably | ☐ Not pregnant, but pregnant within 42 days of death | ☐ Pedestrian |
| ☐ Homicide | ☒ Unknown | ☐ Not pregnant, but pregnant 43 days to one year before death | ☐ Other (Specify) |
| ☒ Pending Investigation | | ☐ Unknown if pregnant within the past year | |
| ☐ Could not be determined | | | |

| 40a. DATE OF INJURY (Mo/Day/Yr) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? ☐ Yes ☐ No | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) |
|---|---|---|---|
| | | | |

| 40e. LOCATION (Street and Number, City, Stae e,Zip Code) | 40f. COUNTY OF INJURY |
|---|---|
| | |

41. DESCRIBE HOW INJURY OCCURRED

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 02 1067 | May 11, 2009 | Rebecca Garza |

EDR 000000671890

---

## AMENDMENT TO MEDICAL CERTIFICATION OF CERTIFICATE OF DEATH

**STATE OF TEXAS** — **STATE FILE NUMBER**

ENTER NAME OF DECEASED AND PLACE OF DEATH EXACTLY AS SHOWN ON ORIGINAL DEATH CERTIFICATE

| NAME OF DECEASED | DATE OF DEATH |
|---|---|
| NATHANIEL AFOLAYAN | MAY 1, 2009 |

| PLACE OF DEATH (City or Town and County) | IS THE DATE OF DEATH BEING CORRECTED? |
|---|---|
| LUBBOCK, LUBBOCK, TEXAS | ☐ Yes ☒ No |

26. CERTIFIER (Check only one)
☐ Certifying Physician - To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (mm/dd/yyyy) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| | 9/01/2009 | J5422 | 2241 |

| 31. Printed Name, Address of Certifier (Street and Number, City, State, Zip Code) | 32. TITLE OF CERTIFIER |
|---|---|
| SRIDHAR NATARAJAN, MD, MS, 4434 S. LOOP 289, LUBBOCK, TX 79414 | CHIEF MEDICAL EXAMINER |

33. PART 1. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONE CAUSE ON EACH LINE.

| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. HEAT ILLNESS |
|---|---|

VOID COPY ... (reproduction watermark appears throughout)

CAUSE GIVEN IN PART I.

| 35. MANNER OF DEATH | 37. CIGT/TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE | | 39. IF TRANSPORTATION |
|---|---|---|---|---|
| ☐ Natural | ☐ Yes | ☐ Not pregnant within past year | | ☐ Driver/Operator |
| ☐ Accident | ☐ No | ☐ Pregnant at time of death | | ☐ Passenger |
| ☐ Suicide | ☐ Probably | ☐ Not pregnant, but pregnant within 42 days of death | | ☐ Pedestrian |
| ☐ Homicide | ☐ Unknown | ☐ Not pregnant, but pregnant 43 days to one year before death | | ☐ Other (Specify) |
| ☐ Pending Investigation | | ☐ Unknown if pregnant within the past year | | |
| ☐ Could not be Determined | | | | |

| 40a. DATE OF INJURY (Mo/Day/Yr) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) | |
| | | ☐ Yes ☐ No | | 40f. COUNTY OF INJURY |

41. DESCRIBE HOW INJURY OCCURRED

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 02 1067 | May 11, 2009 | *Rebecca Garza* |

EDR    00000671880    DTP. NO 1

## AMENDMENT TO MEDICAL CERTIFICATION OF CERTIFICATE OF DEATH

STATE OF TEXAS

STATE FILE NUMBER

ENTER NAME OF DECEASED AND PLACE OF DEATH EXACTLY AS SHOWN ON ORIGINAL DEATH CERTIFICATE

NAME OF DECEASED
NATHANIEL APOLAYAN

DATE OF DEATH
MAY 1, 2009

PLACE OF DEATH (City or Town and County)
LUBBOCK, LUBBOCK, TEXAS

IS THE DATE OF DEATH BEING CORRECTED?
☐ Yes  ☒ No

35. CERTIFIER (Check only one):
☐ Certifying Physician - To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (mm/dd/yyyy) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| *signature* | 9/01/2009 | J5422 | 22:41 |

31. NAME, ADDRESS OF CERTIFIER (Signed and Number, City, State, Zip Code)
SRIDHAR NATARAJAN, MD, MS, 4434 S. LOOP 289, LUBBOCK, TX  79414

32. TITLE OF CERTIFIER CHIEF MEDICAL EXAMINER

33. PART I. ENTER THE CHAIN OF EVENTS – DISEASE, INJURIES, OR COMPLICATIONS – THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH LINE.

IMMEDIATE CAUSE (Final disease or condition → resulting in death)
a. HEAT ILLNESS

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST.

Due to (or as a consequence of):
b.

Due to (or as a consequence of):
c.

Due to (or as a consequence of):
d.

PART II. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I.
CARDIOMEGALY (CARDIAC DISEASE)

34. WAS AN AUTOPSY PERFORMED?
☒ Yes  ☐ No

35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH?  ☒ Yes  ☐ No

| 36. MANNER OF DEATH | 37. DID TOBACCO CONTRIBUTE TO DEATH? | 38. IF FEMALE | 39. IF TRANSPORTATION INJURY, (SPECIFY) |
|---|---|---|---|
| ☐ Natural | ☐ Yes | ☐ Not pregnant within past year | ☐ Driver/Operator |
| ☒ Accident | ☐ No | ☐ Pregnant at time of death | ☐ Passenger |
| ☐ Suicide | ☐ Probably | ☐ Not pregnant, but pregnant within 42 days of death | ☐ Pedestrian |
| ☐ Homicide | ☒ Unknown | ☐ Not pregnant, but pregnant 43 days to 1 year before death | ☐ Other (Specify) |
| ☐ Pending Investigation | | ☐ Unknown if pregnant within the past year | |
| ☐ Could Not Be Determined | | | |

| 40a. DATE OF INJURY (mm/dd/yyyy) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) | |
| 4/30/2009 | 15:00 MST | ☐ Yes  ☐ No | TRAINING AREA | |

40e. LOCATION (Street and Number, City, State, Zip Code)
1300 W. RICHEY, ARTESIA, NM  88210

40f. COUNTY OF INJURY
EDDY

41. DESCRIBE HOW INJURY OCCURRED
TRAINING IN THE HEAT

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 02 1067 | SEPTEMBER 2, 2009 | *Rebecca Garza* |

I hereby certify this to be a true copy of the permanent record
as filed in the City of Lubbock Vital Statistics office.

*Rebecca Garza*
Rebecca Garza, Registrar
Office of Vital Statistics
City of Lubbock, TX

ISSUED    SEP 0 2 2009

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

L10581

CITY OF LUBBOCK TEXAS (seal)

THE STATE OF TEXAS (seal)

American Bank Note Company

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# Lubbock County Medical Examiner
### 4434 South Loop 289
### Lubbock, Texas 79414
### (806) 687-9434

# AUTOPSY EXAMINATION REPORT

**Name:** Nathaniel Afolayan
**Date of Birth:** 03-26-1980
**Date/Time of Autopsy:** 05-03-09; 8:15 a.m.
**Pathologist:** Sridhar Natarajan, M.D., M.S.

**Autopsy No.:** FAL09-0159
**Place of Death:** Lubbock County, Texas
**Date/Time of Death:** 05-01-09; 2241 Hours

**Circumstances of Death:** According to the information presently available, the following are the circumstances surrounding the death of Nathaniel Afolayan. Mr. Afolayan was a 29 year old African American male who was on training duty (border patrol) and was performing a physical training test. He complained of not feeling well and was taken to receive medical attention. His condition continued to become worse and he was admitted to a local hospital in New Mexico. Subsequently he was transferred to Covenant Medical Center. He continued to deteriorate and died while an inpatient.

Because of the circumstances surrounding the death, the body was transported to the Lubbock County Medical Examiner's Office for postmortem examination.

**Authorization for Postmortem Examination: Lubbock County Medical Examiner.**

**Identification:** Identification information on body bag, hospital identification bracelet on left wrist, identification bracelet on left ankle and identification tag on left great toe.

**Assistant:** Abdul Samad and Honey Haney.

**Witnesses:** None.

**CAUSE OF DEATH: Heat Illness.**

**CONTRIBUTORY CAUSE OF DEATH: Cardiomegaly (Cardiac Disease).**

**MANNER OF DEATH: Accident.**

**FINAL AUTOPSY DIAGNOSES:**

I.  **Deterioration during exercise in hot environment (Artesia, NM Climatological Observations):**
    A. Mental status changes; acidotic; respiratory distress; hypoglycemic.
    B. Head CT and Chest CT negative: 04/30/2009.
    C. Delirium like initial presentation.
    D. Initial available recorded body temperatures not significantly elevated.
    E. Electrolyte imbalances.

NAME: Nathaniel Afolayan

    F.   Decreased urine output.
    G.   Metabolic imbalances.

II.   **Cardiomegaly:**
    A.   Heart weight 585 grams with hypertrophic changes.
    B.   Microscopically confirmed focal chronic ischemic changes.
    C.   Foci of mild pericarditis and mild myocarditis

III.   **Medical Complications:**
    A.   Ischemic bowel: Gastrointestinal hemorrhage with multifocal areas of superficial serosal hemorrhage.
    B.   Multiorgan system failure.
    C.   Serosanguineous bilateral pleural effusion.

IV.   **Iatrogenic changes:**
    A.   History of CPR.

V.   **Post mortem microbiology studies:**
    A.   Right lung anaerobic/aerobic: non contributory to death.
    B.   Left lung anaerobic/aerobic: non contributory to death.
    C.   Right and Left lung tissue negative for viral pathogen isolation testing: Influenza Types A and B, Parainfluenzae Types 1, 2 and 3, Adenovirus, Respiratory Syncytial Virus, Herpes Simplex Virus, Enterovirus, or Cytomegalovirus.

VI.   **Toxicology:**
    A.   Post mortem skeletal muscle non contributory.
    B.   Antemortem hospital serum (4/30/2009) QNS-quantity not sufficient for testing.
    C.   Urine Drug screen negative: 04/30/2009 16:43 hours.

## Clothing and Personal Effects

The deceased arrives in a white body bag and he is wrapped in a white sheet. He is otherwise naked.

Numerous pills of various colors were received by the Lubbock County Medical Examiner which had been retrieved as part of his personal belongings. These pills could not be identified by the Lubbock County Medical Examiner.

Accompanying the body in a plastic specimen transport bag are two tubes of blood; one tube which has a pink top containing 2 cc of blood and a second tube which has a lavender top containing 4 cc of blood. The dates of collection are 05-01-09 on the pink top and the lavender top tube indicates collected while in the MICU.

Hospital Serum 1.25 ml later received is dated 04/30/2009.

2

No other personal effects accompany the body.

## Evidence of Medical Treatment

A nasogastric tube enters through the right naris.

A pulse oximeter monitor is taped to the forehead.

An endotracheal tube is present.

An oropharyngeal airway is present.

Both antecubital fossae have bilateral dark purple-blue ecchymoses over a 4 x 5 cm area with centrally located puncture marks. The right antecubital fossa has gauze and tape.

An intravascular line enters the distal right wrist with an associated arm board.

A triple lumen catheter overlies the left femoral vessels.

A triple lumen catheter overlies the right femoral vessels.

A Foley catheter is present and contains approximately 100 cc of bloody colored urine.

There are remnants of EKG like impressions on the chest and abdomen.

There is tan gauze and a few layers of Coban wrapping around the knuckles and palm of the right hand.

## External Examination

The body is that of a well developed, muscular, well nourished, adult African American male, weighing 250 pounds, and whose height is 71 inches. Rigor mortis is present in the extremities. Fixed livor mortis is found over the dorsal dependent portions of the body.

The deceased has very short black hair averaging 0.25 inch in length. He is clean shaven. The ears, nose, and external auditory canals are normally formed. The eyes are closed; the conjunctivae are pale white and edematous; the corneas are slightly cloudy; and the irides are brown. The mouth is partially open and the teeth are natural. The lips and buccal mucosa are without evidence of significant acute trauma. The teeth appear intact and in good repair. There is slight swelling in the jaw area but on firm palpation there is no abnormal mobility and, on subsequent autopsy, no evidence of fracture or mass.

The neck is straight.

The chest and abdomen are normally formed.

3

The extremities are symmetric and normally formed. The left upper extremity has increased swelling; firm palpation is unremarkable. The fingernails are intact and of moderate length. The toenails are intact and unremarkable. The palms and soles are without evidence of significant acute trauma. The area of the skin overlying the proximal left upper extremity in the region of the deltoid and posterior shoulder has multiple irregular patches of hyperpigmented skin over a 14 x 10 cm zone. There are two horizontally oriented linear areas of purple-blue ecchymoses each approximately 2.5 x .25 cm in the area of the distal left arm and proximal right forearm respectively. The areas of the anterior shoulders and armpits show numerous stretch striae type changes. The posterior of the extremities is without evidence of significant acute trauma.

The genitalia are those of an adult circumcised male. The anus is atraumatic.

The upper back right and left of the midline has superficial abrasions in an oblique orientation (suggestive of placement of a firm C-collar). The remainder of the back is unremarkable.

**Significant well healed scars:**

> The left upper extremity distal wrist has a well defined linear 8 cm well healed scar along the radial aspect.

> Located along the distal aspect and approximately 3 cm medial on the flexor surface of the left forearm is a stellate puckered 3 x 2 cm well healed scar.

> Along the ulnar aspect of the left forearm adjacent to the wrist is a puckered linear well healed scar which is up to 2 cm in width.

> Overlying the right knee is a 2 cm well healed scar.

> Overlying the left knee is a linear, thin 1.5 cm well healed scar.

## Internal Examination

**Head:**  The scalp is incised and retracted. There are no scalp hemorrhages or skull fractures found. The cranial vault is opened. The epidural space is free of hemorrhage. The scalp is mildly edematous. The dura is thin, tough, and pliable. The cerebral spinal fluid is clear. The brain weighs 1575 grams and the cerebral hemispheres, mid brain, pons, and cerebellum are symmetrical and grossly unremarkable. The circle of Willis is unremarkable. On cross section of the brain parenchyma, there is no evidence of infection, tumor, or trauma. The dura is stripped from the basilar skull and no fractures are found.

**Neck:**  Anterior neck dissection shows focal areas of hemorrhage of the strap muscles (left side greater than right). Sectioning shows this to be superficial (approximately 1 mm). The upper airway is without evidence of hemorrhage or ulceration. The hyoid bone, laryngeal cartilages and cricoid cartilage are intact. The tongue on cross sectioning has a 3 x 3 x 2 cm area of hemorrhage

4

adjacent to the distal 1/3 of the tongue (left side).  Posterior neck dissection is performed without evidence of any significant gross traumatic injuries or major hemorrhages.

**Body:**  The body is opened with a Y-shaped incision to reveal an average chest wall fat thickness of 1 cm and abdominal wall fat thickness of .75 to 1 cm.  There is abundant skeletal muscle development of the chest muscles. The organs occupy the usual positions and relationships. On removal of the chest plate there is hemorrhage on the mid sternum over an 8 x 6 cm region (history of iatrogenic intervention). There is no evidence of rib fracture. There is a bloody watery fluid in each of the pleural cavities (right 225 cc, left 190 cc). There is a minimum amount of straw-colored fluid present within the pericardial sac.

**Cardiovascular System:**  The heart is enlarged and weighs 585 grams. There is a globoid appearance. External heart dimensions from the root of the aorta to the apex are 6.5 inches and from side to side is 7.0 inches. The epicardial and endocardial surfaces are translucent tan-white. There is a 1.5 x 1 cm area of thin, tan scarring on the anterior epicardial surface. Sectioning shows this to be very superficial (less than 2 mm). There are no pericardial adhesions. The pericardial sac is translucent tan-white. The anterior aspect of the pericardial sac shows emphysematous type changes. The myocardium on cross sectioning is firm and tan-brown. There is no gross evidence of acute myocardial infarction or gross scarring. The left ventricular wall exhibits hypertrophy with the free wall averaging 20 to 22 mm. The interventricular septal wall is 18 to 20 mm. The right ventricular wall averages 2 to 3 mm. There is no evidence of significant coronary artery disease on sectioning of the left main coronary, left anterior descending, left circumflex and right coronary arteries. The cardiac valves are unremarkable.

**Respiratory System:**  The right lung weighs 600 grams and the left lung weighs 475 grams. The pleural surfaces are smooth and glistening and have a dark pink-purple-red appearance. On cross section of the lungs, the parenchyma is dark red, and without evidence of tumor, trauma, or consolidation. There is no evidence of pulmonary thromboemboli. A sterile technique is utilized and viral, and aerobic/anaerobic microbiology cultures are submitted.

**Gastrointestinal System:**  The esophagus and stomach are unremarkable. Sectioning of the bowel shows watery but bloody colored fluid present in most of both the small and large bowel. The serosal lining shows multifocal areas of superficial serosal hemorrhage ranging from 2 to 10 mm in greatest diameter. The stomach contains 50 cc of viscous, brown, well digested material with non identifiable food content admixed with approximately 40 cc of bloody fluid. The gastric lining is unremarkable.

**Hepatobiliary System:**  The liver weighs 1800 grams. The capsule is translucent. The liver on cross sectioning shows diffuse, variegated areas of yellow central regions surrounded by dull brown parenchyma with multifocal areas of black hemorrhagic like discoloration. There is no obvious tumor mass or trauma.

**Pancreas:**  The pancreas has the usual size, shape, and location. On cross section, the pancreas is tan-pink, lobulated and unremarkable.

5

Genitourinary System: The right kidney weighs 210 grams and the left kidney weighs 220 grams. The capsules strip with ease revealing unremarkable smooth brown-red cortical surfaces. On cross section, the cortex and medullary components are distinct and unremarkable. The collecting systems, ureters and bladder are unremarkable. The bladder contains a small amount of clear yellow urine. The prostate on cross section has a tan-white surface without evidence of hemorrhage or necrosis.

Hemolymphatic System: The spleen weighs 225 grams and has a glistening dark blue capsular surface. On section, the parenchyma is dark red and soft. The lymph nodes systemically are unremarkable.

Musculoskeletal System: The examined muscles and bones are symmetric and without evidence of significant acute trauma.

Endocrine System: The thyroid gland on sectioning is unremarkable. The pituitary and adrenal glands are unremarkable.

## Specimens Retained

Histology: --- Eleven H & E glass slides are retained.

Toxicology: Blood, bile, vitreous, and urine are retained for toxicology examination. Fresh frozen tissues are retained of the spleen, liver, quadriceps, brain, lung and heart.

Microbiology: Samples submitted.

Special Studies: Head hair, pubic hair, chest hair, axillary hair pulled has been retained.

## Other Procedures

Digital photography is obtained.
Blood card is obtained.
Fingerprints are obtained.
Fresh frozen tissue.

## Microscopic Examination

Slide Key:

Slide #1#2: Liver:
Slide #3: Lung, all lobes:
Slide #4 - #6: Coronary arteries and multiple sections of heart:
Slide #7: Spleen, right and left kidney:
Slide #8: Right and left testes:
Slide #9: Adrenal gland and sections of bowel:
Slide #10: Cerebral cortex, basal ganglia, cerebellum and brainstem:

6

NAME:     **Nathaniel Afolayan**                    **AUTOPSY NO: FAL09-0159**

Slide #11: Quadriceps muscle:

Liver: Negative for significant fibrosis or inflammation. Centrilobular sinusoids engorged with blood with hemorrhage into the parenchymal space (extensive hemorrhage with focal necrosis). Palo staining hepatocytes.

Lungs:  Areas of atelectasis and vascular congestion; no significant inflammatory process or foci of intra-alveolar hemorrhages. Some anthracotic staining and pigmented macrophages present.

Heart:  Coronary arteries negative for vasculitis or significant stenosis. Multiple sections of myocardium examined: focal mild myocarditis. Hypertrophic changes noted. Foci of chronic ischemic changes noted. Pericardium with focal mild pericarditis.

Spleen: No significant pathological changes.

Right and Left Kidney: Acute tubular necrosis.

Testes: Negative for parenchymal trauma.

Adrenal glands:  Cortical expansion of layers.

Bowel:  Ischemic bowel with marked hemorrhages and areas of necrosis.

Cerebral cortex, basal ganglia, cerebellum, and brainstem: Early ischemic changes best seen in cerebellum.

Quadriceps muscle: No significant pathological changes. No significant evidence of muscle fiber necrosis noted.

### Toxicology Examination:

(See attached report)

7

NAME:    Nathaniel Afolayan                    AUTOPSY NO: FAL09-0159

OPINION:  It is our opinion that the Cause of Death of Nathaniel Afolayan, a 29 year old African American male, was due to Heat Illness. Contributory to his death was Cardiomegaly (Cardiac Disease).

During a period of strenuous physical exertion in a hot environment he began to exhibit signs of not feeling well. Mr. Afolayan was seen at a local clinic and then transported to a local hospital. He was subsequently transferred to the Covenant Medical Center in Lubbock and died approximately 32 hours post incident. Mr. Afolayan showed signs and symptoms of heat illness and rapidly deteriorated.

At autopsy his heart was enlarged which made him more sensitive to a strenuous environment; a focus of myocardial inflammation and pericardial inflammation was seen on microscopic examination.

Initial hospital admission blood available was very limited in quantity for sufficient toxicological analysis; due to extensive medical intervention, post mortem toxicology would not accurately reflect antemortem blood analysis. However, an initial hospital admission urine drug screen was negative for drugs of abuse. On external and internal examination of the body, there was no significant lethal evidence of acute blunt or penetrating trauma. Microbiologic studies were non contributory to his death. Microscopic slides of major organ systems were examined. Available investigative reports and medical records were reviewed.

The manner of death is classified as an Accident.

28 Aug 2009

Sridhar Natarajan, M.D., M.S.     Date
Lubbock County Chief Medical Examiner

8

Appx70

U.S. Department of Homeland Security
U.S. Border Patrol Academy
1300 West Richey
Artesia, New Mexico 88210

BPA/ART (20/6.2.4.2)



**U.S. Customs and
Border Protection**

May 2, 2009

MEMORANDUM FOR:     Scott A. Luck
                    Chief Patrol Agent
                    Border Patrol Academy

THROUGH:            DCPA Correa
                    ACPA Woody
                    (A)TOS Cosio

FROM:               Antonio J. Angarita
                    Border Patrol Agent
                    Physical Techniques Department
                    Border Patrol Academy

SUBJECT:            Border Patrol Intern Nathaniel Afolayan

On April 30, 2009, Session 856 was scheduled to perform the Physical Techniques Final
Examination. Supervisory Border Patrol Agent Bernie Valdez, Border Patrol Agent
Aaron Rubio and I, Border Patrol Agent Antonio Angarita were present to document and
record each intern's performance via camcorder during the examination. Bravo section
began the examination at approximately 2:45 pm.

The examination began with the 1.5 mile run. All the interns lined up at the starting line
accordingly. BPA (T) AFOLAYAN did not show any apparent signs of physical or
mental stress prior to starting the run. The class then began the run.

BPA(T) AFOLAYAN completed his 1.5 mile run in 11:06. Upon completing his run,
BPA (T) AFOLAYAN and the other interns displayed the common signs of physical
stress associated with exercising at such a heightened level of performance.

I then noticed that BPA (T) Antony FAZIO was helping BPA (T) AFOLAYAN walk
during the recuperation period by placing his arm around him. I told BPA (T) FAZIO to
remove his arm from BPA (T) AFOLAYAN so I could talk to him alone and determine
what he was experiencing. BPA (T) AFOLAYAN told me that he was fine but that he
needed some time to rest and breathe. I then asked him if he wanted to go to the Medical
Unit but he refused and stated that he wanted to finish his examination but that he needed
time to rest and catch his breath.

I then took BPA(T) AFOLAYAN to the shaded area of the track wall and asked him to place his hands on the wall and to keep breathing. I continued to ask him if he needed medical assistance but he continued to refuse and stated that he wanted to finish his examination. I then proceeded to ask him if he had taken any supplements, energy drinks, creatine, caffeine or any substances that could possibly help his performance during the examination. He stated that he had not taken anything prior to the final examination but that he had been suffering a respiratory infection for the past two weeks and he was taking an antiobiotic.

BPA(T) AFOLAYAN then fainted and fell onto the track. I then raised his head off of the ground, yelled for help and for someone to get a Gator transport vehicle so we could transport him to the Medical Unit. While I was waiting for the Gator, I was monitoring BPA (T) AFOLAYAN and reassuring him that he was going to be fine. BPA(T) AFOLAYAN was still receptive and coherent when answering all of my questions regarding his condition.

BPA(T) was then transported to the Medical Unit. As I waited for the Medical Unit staff to come outside, I kept talking to BPA (T) AFOLAYAN to ensure that he was still receptive and coherent as well as to keep him calm. The Medical Unit staff then arrived with a wheelchair, I placed him in the wheelchair, and then accompanied him into one of the Medical Unit rooms. I then helped place him onto an examination bed, debriefed the staff on the events that took place prior to him arriving at the Medical Unit. BPA(T) AFOLAYAN was still receptive and coherent but he kept stating that he couldn't breathe. I then left the Medical Unit to allow the staff render medical aid.

MAY 1 9 2010

# U.S. DEPARTMENT OF HOMELAND SECURITY
## U.S. Customs and Border Protection
### SIGNIFICANT INCIDENT REPORT
CBP Directive 3340-025C

| 1. | | | |
|---|---|---|---|
| DATE OF INCIDENT: 4/30/2009 | LOCATION OF INCIDENT: | | SIR NUMBER: |
| TIME OF INCIDENT: 3:00 PM | Artesia, New Mexico | | 09-HQART-04300900005 |

REPORTED TO COMMISSIONER'S SITUATION ROOM VIA PHONE ON:
DATE: 4/30/2009    TIME: 5:40 PM    TO: ARMANDO CERVANTES JR

| 2. REPORTING OFFICE: Customs and Border Protection | DFO/SECTOR: Office of Border Patrol | POE/STATION: Artesia (Academy) |
|---|---|---|

PERSON MAKING REPORT: MARTIN COSIO

| OFFICE PHONE: (575)746-8367 | CELL PHONE: | FAX NUMBER: 5757468369 |
|---|---|---|

POINT OF CONTACT: BRIAN D KIRKLAND

| OFFICE PHONE: (575)746-5905 | CELL PHONE: 5753082454 | FAX NUMBER: 5757468318 |
|---|---|---|

3. Type of Incident: ☑ ON DUTY ☐ OFF DUTY

| | | |
|---|---|---|
| ☐ Terrorist Related | ☐ Shots Fired at or by an Employee | ☐ Significant Agricultural Event | ☐ Suicide Atte... |
| ☐ Employee Arrested | ☐ Canine Incident | ☐ Conveyance/Aircraft Incident | ☐ Media Intere... |
| ☐ Employee Assaulted | ☐ Significant Seizure | ☐ Foreign Military/Police Incursion | ☐ Crew Desert... |
| ☐ Employee Death | ☐ Significant Arrest/Detention | ☐ Bomb Threat | ☐ Escape |
| ☑ Employee Injury | ☐ Non-Employee Injury/Death | ☐ Facility Disruptions | ☐ Other |
| ☐ Radiation Detection Event | ☐ Rescue | ☐ Technology Disruptions | |

4. SYNOPSIS: (USE CONTINUATION SHEET IF NECESSARY)

See Attached Continuation

| SEIZURE TYPE: | QUANTITY: | | VALUE: |
|---|---|---|---|
| NUMBER OF ARRESTS: | MALE: | FEMALE: | CITIZENSHIP: |

5. NOTIFICATIONS MADE:

| | | | |
|---|---|---|---|
| 1. ☑ TELEPHONIC REPORT TO COMMISSIONER'S SITUATION ROOM | (202) 344-3920 | 4/30/2009 5:40 PM |
| 2. ☑ DAVID V AGUILAR | (202)344-3159 | 5/21/2009 7:49 PM |
| 3. ☑ RONALD S COLBURN | (928)341-6500 | 5/21/2009 7:49 PM |

6. INJURIES/FATALITIES:

| NAME AND EXTENT OF INJURY: | AGENT | EAP ADVIS. |
|---|---|---|
| 1. | | |
| 2. | | |

NAME OF FATALITIES:
1.
2.

7. ACTION TAKEN:
(A) CPA Correa and ACPA Widner were notified.

8. MEDIA INTEREST EXPECTED:

CBP FORM 6 (

## SIGNIFICANT INCIDENT REPORT
### Continuation Sheet

| DATE OF INCIDENT: 4/30/2009 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 3:00 PM | Artesia, New Mexico | 09-HQART-043009000053 (6) |

Synopsis: (cont.):

On today's date Intern AFOLAYAN was taking his final PT exam that initiated at approximately 2:45pm.

After finishing his 1.5 mile run, Intern AFOLAYAN appeared to be distressed and was moved to the shade and provided assistance by detailed instructor ANGARITA. Approximately one minute later, Intern AFOLAYAN collapsed and appeared to be incoherent. SBPA Valdez and SPA ANGARITA called the FLETC Health Unit and transported Intern AFOLAYAN via a Gator to the Health Unit.

At approximately 3:00pm, SBPA VALDEZ and SPA Angarita assisted the Health Unit in moving Intern AFOLAYAN into the Health Unit. Once inside the Health Unit, the Staff tried to get the Interns vitals but Intern AFOLAYAN became combative. Intern AFOLAYAN would not cooperate as he kept becoming unresponsive. The Health Unit decided to call an ambulance to transport Intern AFOLAYAN to the Artesia General Hospital.

At approximately 4:45pm, as we were checking on the Interns condition from the hospital, the hospital emergency room advised that Intern AFOLAYAN was placed on a ventilator and would possibly be air lifted to Covenant Medical Center in Lubbock, Texas.

At approximately 5:15pm, we arrived at the Artesia General Hospital and spoke with Dr. Jorge Abalos.

He stated that it may have been that Intern AFOLAYAN might have suffered a heart attack. He also stated that Intern AFOLAYAN stopped breathing therefore was placed on a ventilator. Dr. Abalos advised that Intern AFOLAYAN would be air lifted to Covenant Medical Center in Lubbock, Texas.

As of 6:00pm, Intern AFOLAYAN was still at the Artesia General Hospital, and Dr. Abalos was still waiting for a confirmation and time frame for the transport to Covenant Medical Center in Lubboc Texas.

Appx90

The Border Patrol Academy Peer Support was activated and communication with Intern AFOLAYAN's

spouse has been initiated. Academy Peer Support is reaching out to San Diego Peer Support for

Interns AFOLAYAN's family in San Jacinto, California. Peer Support Facilitator Michael J. Diaz f

the

CBP FORM 6 (01/05)

# SIGNIFICANT INCIDENT REPORT
## Continuation Sheet

Page 3 c

| DATE OF INCIDENT: 4/30/2009 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 3:00 PM | Artesia, New Mexico | 09-HQART-043009000053 (6) |

San Diego Peer Support team has been advised and will be standing by for deployment or assistanc

Staff Duty Officer Supervisory Border Patrol Agent Steve Imrie was made aware of the situation a

will follow up with an SIR on any new information. SBPA Imrie may be reached at the following

numbers:

Office Phone: (575) 746-8486

Personal Cell Phone: (575) 513-5132

Updates will follow as they are received.

Update: At 7:10pm Intern AFOLAYAN was air lifted to Covenant Medical Center in Lubbock Texas. Dr

NGUYAN will be the primary physician/point of contact. At the time of airlift Intern AFOLAYAN's medical

condition had not changed.

At 7:35pm Intern APOLAYAN's spouse was notified by the Border Patrol Academy Peer Support

Facilitator of her husband's condition and the hospital where Intern AFOLAYAN is being air lifte

to. Mrs.

Afolayan was also provided with contact numbers for the Border Patrol Academy Peer Support

Facilitator.

At 7:50pm the Border Patrol Academy dispatched SBPA Joseph Caporale (PSP) and SBPA Dan Schutt

(Chaplain) to Lubbock Texas to assist there.

Intern AFOLAYAN is assigned to SDC/MUR

Update: 05/01/2009 7:20am SBPA J. Caporale Artesia Border Patrol Peer Support Coordinator in

Lubbock advised that Intern AFOLAYAN was placed on and removed from dialysis.

CBP FORM 6 (01/05)

# SIGNIFICANT INCIDENT REPORT
## Continuation Sheet

Page 4 c

| DATE OF INCIDENT: 4/30/2009 | LOCATION OF INCIDENT: | SIR NUMBER: |
|---|---|---|
| TIME OF INCIDENT: 3:00 PM | Artesia, New Mexico | 09-HQART-043009000053 (6) |

7:40am SBPA J. Caporale advised that Intern AFOLAYAN went into cardiac arrest.

7:55am SBPA J. Caporale advised that medical personnel were able to establish a regular heart rhythm

for Intern AFOLAYAN. He is still unstable but medical personnel were able to clear the code at t time.

Intern AFOLAYAN's spouse will arrive on flight United Airlines #2068 scheduled to land in Lubboc TX

at 1:45pm. Peer Support personnel have been notified and are awaiting her arrival.

Updates will follow as they are received.

Update: 05/01/2009

1:20pm SBPA J. Caporale called advised that Nathaniel was not able to go into surgery due to his critical status. He will be placed into ICU in the Surgical Unit.

7:25 pm SBPA J. Caporale called and advised that Nathaniel coded two more times but the doctors were able to bring him back.

10:00pm SBPA J. Caporale advised that Nathaniel Afolayan passed away in Lubbock, TX. It is uncertain at this time as to what the families wishes are for the funeral arrangements.

Update 4/2/2009

# Stephen J. Cina, M.D., P.C.
## Forensic Pathology Consultant

640 SW 167th Way
Pembroke Pines, FL 33027
E-mail: cinasj@pol.net

Monday-Friday
8am to 5pm
(W) (970) 231-9207
(F) (954) 239-9603

**Date: April 14, 2011**

**To:  Felicia Wintz, USDOJ, PSOB Office**

**From:  Stephen J. Cina, M.D.**

**Re: HH Review of case 2010-022 (Afolayan, Nathaniel)**

## RECORDS REVIEWED

The records reviewed for this case are a letter composed by Commissioner Alan Bersin addressed to Ms. Hope Janke dated May 2010; U.S. Customs and Border Protection agency memorandum for Border Patrol Intern Nathaniel Afolayan dated May 2, 2009; the U.S. Department of Homeland Security Significant Incident Report; CBP Border Patrol Academy operations course description; Border Patrol Agent job description; the Safety Investigation Data Form; the City of Lubbock, Texas Certificate of Death; the Amendment to Medical Certificate of Certificate of Death; the Lubbock County Medical Examiner's Autopsy Examination Report; numerous Covenant Health System medical records, laboratory results, consultation reports, radiology results, admission forms, and physician notes; U.S. Department of Labor Authorization for Examination and/or Treatment form; numerous FLSIC Health Unit Patient clinical notes; numerous Artesia General Hospital emergency room records, physician records, physical exam forms, radiology reports, patient notes, and laboratory results; Orthopaedic Medical Group of Riverside, Inc. office visit notes; Caring for Your Family Together clinic visit notes; the Pacific Sleep Medicine Services reports; Prakashchandra C. Patel, MD consultation report; and numerous United Family Care Rialto clinical notes.

## MEDICAL HISTORY

Right wrist compound fracture, (2005)
No tobacco or alcohol usage

## Medications as of (04/30/09)

Men's multiple vitamin
Doxycycline
Antihistamines

**Vital Sign Summary**

|  | 04/24/09 | 04/20/09 | 04/08/09 | 08/18/08 | 11/06/07 | 04/03/07 |
|---|---|---|---|---|---|---|
| BP | 115/75 | 110/77 | 127/84 | 120/86 | 130/80 | |
| Wt | | | | 222 | 238 | |
| BMI | | | | | | |
| Total Cholesterol | | | | | | 217 |
| LDL | | | | | | 154 |
| HDL | | | | | | 45 |
| Triglycerides | | | | | | 90 |
| Glucose | | | | 88 | | 90 |

**AUTOPSY FINDINGS**

**Pathologic Diagnoses:**

I.  DETERIORATION DURING EXERCISE IN HOT ENVIRONMENT (ARTESIA, NM CLIMATOLOGICAL OBSERVATION):
    A.  MENTAL STATUS CHANGES: ACIDOTIC; RESPIRATORY DISTRESS; HYPOGLYCEMIC
    B.  HEAD CT AND CHEST CT NEGATIVE (04/30/2009)
    C.  DELIRIUM-LIKE INITIAL PRESENTATION
    D.  INITIAL AVAILABLE RECORDED BODY TEMPERATURES NOT SIGNIFICANTLY ELEVATED
    E.  ELECTROLYTE IMBALANCE
    F.  DECREASED URINE OUTPUT
    G.  METABOLIC IMBALANCES

II.  CARDIOMEGALY
    A.  HEART WEIGHTS 585 GRAMS WITH HYPERTROPHIC CHANGES
    B.  MICROSCOPICALLY CONFIRMED FOCAL CHRONIC ISCHEMIC CHANGES
    C.  FOCI OF MILD PERICARDITIS AND MILD MYOCARDITIS

III.  MEDICAL COMPLICATIONS
    A.  ISCHEMIC BOWEL: GASTROINTESTINAL HEMORRHAGE WITH MULTIFOCAL AREAS OF SUPERFICIAL SEROSAL HEMORRHAGE
    B.  MULTIORGAN SYSTEM FAILURE
    C.  SEROSANGUINEOUS BILATERAL PLEURAL EFFUSION

IV.  IATROGENIC CHANGES
    A.  HISTORY OF CPR

V.  POST MORTEM MICROBIOLOGY STUDIES

Appx216

A. RIGHT LUNG ANAEROBIC/AEROBIC: NON CONTRIBUTORY TO DEATH
B. LEFT LUNG ANAEROBIC/AEROBIC: NON CONTRIBUTORY TO DEATH
C. RIGHT AND LEFT LUNG TISSUE: NEGATIVE FOR VIRAL PATHOGEN ISOLATION TESTING: INFLUENZA TYPE A AND B, PARAINFLUENZAE TYPES 1, 2 AND 3, ADENOVIRUS, RESPIRATORY SYNCYTIAL VIRUS, HERPES SIMPLEX VIRUS, ENTEROVIRUS, OR CYTOMEGALOVIRUS

VI. TOXICOLOGY
A. POST MORTEM SKELETAL MUSCLE NON CONTRIBUTORY
B. ANTEMORTEM HOSPITAL SERUM (04/30/2009) QNS-QUANTITY NOT SUFFICIENT FOR TESTING
C. URINE DRUG SCREEN NEGATIVE: (04/30/2009)

**Cause of Death:** HEAT ILLNESS

**Contributory Cause of Death:** CARDIOMEGALY (CARDIAC DISEASE)

**Manner of Death:** ACCIDENT

**CAUSE AND MANNER OF DEATH (per death certificate)**

**Cause of Death:** HEAT ILLNESS

**Contributory Factors:** CARDIOMEGALY (CARDIAC DISEASE)

**Manner of Death:** ACCIDENT

**MICROSCOPIC SLIDE REVIEW (case FAL09-159 numbered 1-11) by Dr. Cina**

1. Liver-marked centrilobular congestion with hepatocyte necrosis; sickled erythrocytes in sinusoids
2. Same as above
3. Lung-mild anthracosis; intravascular fibrin; sickled erythrocytes
4. Heart-unremarkable
5. Heart-focal myocardial hypereosinophilia with smudged cellular outlines but no inflammation
6. Heart-unremarkable
7. Spleen-congested by sickled erythrocytes; autolysis; Kidney-intratubular proteinaceous debris with occasional degenerating epithelial cells; sickled erythrocytes
8. Testes-age appropriate spermatogenesis; sickled erythrocytes
9. Adrenal gland and GI tract-autolysed
10. Brain-mild neuronal pyknosis
11. Skeletal muscle-minimal degenerative changes, no inflammation

3

## CIRCUMSTANCES OF DEATH

On 4/30/09 this 29-year-PSO was engaged in a Physical Techniques Final Examination as a Border Patrol Intern. At approximately 1445 he began a 1.5 mile run, completing it in just over eleven minutes. Prior to this activity he voiced no complaints. Following the run, the PSO required assistance but told a supervisor that he was fine but needed some time to rest. At that time he did not want to go to the Medical Unit. He had not taken any energy supplements, creatine, or caffeine.

After being brought to a shady area, the PSO fainted and fell onto the track. While waiting for the transport vehicle, the PSO was receptive and coherent. His symptoms and signs prior to his collapse did not include hyperpyrexia, clammy skin, excessive or diminished sweating, or complaints of feeling hot. When the Medical Staff arrived he was still responsive but stated that he couldn't breathe. By 1457, however, he was becoming combative and somewhat delirious. EMS arrived at the local clinic at 1510 and the PSO became unresponsive shortly afterward. At 1645 he was in a local hospital and being placed on a ventilator prior to being airlifted. At 1910 he was airlifted to a Medical Center in Lubbock and he went into cardiac arrest at 1940.

An elevated temperature was not noted in the medical records. It does not appear that cooling blankets were used on the PSO. Upon admission to the first hospital (Artesia General) at around 1545 he was obtunded, not breathing, not cyanotic, and tachycardic. His creatine kinase level (CK) at 1545 was elevated to 595 (normal = 22-269) and his CKMB was 8.5 (expected 0.3-4.0). His admitting cardiac troponin was normal (0.06) but he was hypoglycemic with a blood glucose = 60. His ECG was interpreted as ―normal sinus rhythm" at 1534 but a ―possible inferior infarct, age undetermined" was noted at 1552. A provider noted in an admitting note, however, that hyperthermia was the clinical impression. During his hospital admission, he developed swelling in his forearm with possible compartment syndrome. He also suffered from acute renal failure, hyperkalemia, and rhabdomyolysis. He pursued a downhill course and died in the hospital at 2200 on 5/1/09. An autopsy was performed.

His recent medical records indicate he was treated for an upper respiratory infection on 4/24/09 and 4/20/09. On 4/8/09 he presented to the Health Unit after complaining of nausea and dizziness following swimming. On 3/5/09 he had presented with allergy-type symptoms.

The patient did not have a history of sickle cell disease or sickle cell trait. He was an African-American male born in Nigeria.

At the time of his collapse, the temperature was approximately 90 degrees Fahrenheit with a relative humidity of 7%. Artesia, NM is approximately 3400 feet above sea level.

4

<u>Background</u>:  In order for the PSOB Office to determine whether this claim is payable under the PSOB Act (either under the presumption created by the Hometown Heroes provision[1] or under the general coverage provisions of the Act), the agency must make specific findings as a matter of law, and the opinion of competent medical experts is needed in order to make certain of these findings.[2]   In this connection, the PSOB Office requests that the independent medical expert review the medical records and other documentation relating to the death of the public safety officer (PSO) named in the attached cover memo and respond to the questions set forth below.

---

[1]     The "presumption" in 42 U.S.C. § 3796(k) provides that:

> [I]f a public safety officer dies as the direct and proximate result of a heart attack or stroke, that officer shall be presumed to have died as the direct and proximate result of a personal injury sustained in the line of duty, if –
>
> > (1) that officer, while on duty -
> >
> > > (A) engaged in a situation, and such engagement involved nonroutine stressful or strenuous physical law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity; or
> > >
> > > (B) participated in a training exercise, and such participation involved nonroutine stressful or strenuous physical activity;
> >
> > (2) that officer died as a result of a heart attack or stroke suffered -
> >
> > > (A) while engaging or participating as described under paragraph (1);
> > >
> > > (B) while still on that duty after so engaging or participating; or
> > >
> > > (C) not later than 24 hours after so engaging or participating; and
> >
> > (3) such presumption is not overcome by competent medical evidence to the contrary.

[2]     For example, the agency must make a finding as to whether or not, in the case of a PSO who died as a result of a heart attack or stroke, the PSO engaged in a situation or participated in a training involving nonroutine stressful or strenuous physical activity while on duty, as defined in the PSOB regulations.  These initial findings, *i.e.*, whether the PSO suffered a heart attack or stroke, and whether the PSO died as a direct and proximate result of that heart attack or stroke, require the agency to obtain the opinion(s)/conclusion(s) of competent medical experts.

# PART I

The question in this part relates to the issue of **whether the deceased PSO died as a direct and proximate result of a heart attack or stroke.** Definitions in the PSOB regulations (28 CFR Part 32) that are pertinent to this question are provided below.

> **Heart attack** means—
>
> > (1) A myocardial infarction; or
> > (2) A cardiac-event (*i.e.*, cessation, interruption, arrest, or other similar disturbance of heart function), not included in paragraph (1) of this definition, that is—
> > > (i) Acute; and
> > > (ii) Directly and proximately caused by a pathology (or pathological condition) of the heart or of the coronary arteries.

.

> **Stroke** means cerebral vascular accident.

> **Direct and proximate result of a heart attack or stroke** – A death results directly and proximately from a heart attack or stroke if the heart attack or stroke is a substantial factor in bringing it about.

> **Substantial factor** – A factor substantially brings about a death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke if -
>
> > (1) The factor alone was sufficient to have caused the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke; or
> >
> > (2) No other factor (or combination of factors) contributed to the death, injury, disability, heart attack, or stroke to so great a degree as it did.

> **Substantial contributing factor** – A factor substantially contributes to a death, injury, or disability, if the factor -
>
> > (1) Contributed to the death, injury, or disability to a significant degree; or
> >
> > (2) Is a substantial factor in bringing the death, injury, or disability about.

## QUESTION 1

Based on the medical records and other information reviewed with respect to the death of this PSO, did the PSO die as the ~~direct~~ and proximate result of a heart attack or stroke"? **No. It is unclear why the PSO collapsed and proceeded on a rapidly downhill medical course. There was no clinical or autopsy evidence of a stroke. Although the PSO showed evidence of acute myocardial injury over the course of his admission, this "heart attack" was secondary to his collapse rather than the cause of it. Although he was at risk for a cardiac dysrhythmia due to his enlarged heart, his symptoms do not support a cardiac death.**

6

(a) If the answer to the question above is ~~yes~~", on what date and at what approximate time did the PSO suffer or sustain the heart attack or stroke?  Please explain and identify the information in the record upon which you rely for your answer.  **N/A.**

(b) If the answer to the question above is ~~no~~", what was/were the cause(s) of the PSO's death?
**As noted above, the PSO was at risk for an arrhythmia based on his enlarged heart. His symptoms at the time of his collapse (agitation, combativeness, delirium), however, are not characteristic of an arrhythmic event.**

**Given that the PSO was involved in intense physical activity in warm weather prior to his collapse, heatstroke should be a consideration.  This diagnosis can be supported by clinically noted rhabdomyolysis and electrolyte abnormalities.  If the PSO was taking antihistamines (he was prescribed these medications recently at a local clinic), he would be at further risk for heat-related illness.  On the other hand, though heat-related illness was listed as a presumptive diagnosis, there is no documented elevation of body temperature or evidence that cooling measures were taken.**

**On the autopsy slides, I noted many of the organs contained sickled erythrocytes ("sickle cells").  His clinical course could also be explained by a sickle cell crisis occurring in the setting of intense physical activity, dehydration, and a possible viral illness.  I cannot find a note in the medical records where sickle cell disease was excluded by laboratory studies.**

**If records exist that exclude the possibility of sickle cell disease, then "complications of heatstroke" is the most likely cause of death.**


**IF THE ANSWER TO QUESTION 1(A) IS "YES", PLEASE ANSWER THE QUESTIONS IN PART II**

**PART II**
The questions in this part relate to the issue of whether there is ~~competent medical evidence to the contrary," as defined by the PSOB regulations; *i.e.*, whether there is evidence that indicates to a degree of ~~medical probability" **that circumstances other than** the PSO's on-duty engagement or participation (*i.e.*, line of duty actions or activity) in nonroutine stressful or strenuous physical activity were a substantial factor in bringing about the PSO's heart attack or stroke.  If there is evidence that indicates to a degree of medical probability that such other circumstances *did* constitute a ~~substantial factor" in causing the PSO's death, the presumption raised in 42 U.S.C. § 3796(k) is overcome.  In responding to the questions below, please see the PSOB regulatory definitions and guidance set forth below, in addition to the regulatory provisions provided for Question 1.

7

**Competent medical evidence to the contrary** - The presumption raised by the Act, at 42 U.S.C. § 3796(k), is overcome by competent medical evidence to the contrary, when evidence indicates to a degree of medical probability that extrinsic circumstances other than any engagement or participation described in the Act, at 42 U.S.C. § 3796(k)(1), considered in combination (as one circumstance) or alone, were a substantial factor in bringing the heart attack or stroke about.

**Circumstances other than engagement or participation** means: (1) an event or events; or (2) an intentional risky behavior or intentional risky behaviors.

**Event** includes occurrence, but does not include any engagement or participation described in the Act, at 42 U.S.C. § 3796(k)(1).

**Risky behavior** means -

> (1) Failure (without reasonable justification or excuse) to undertake treatment -
>
>> (i) Of any commonly-accepted cardiovascular-disease risk factor associated with clinical values, where such risk factor is -
>>
>>> (A) Known (or should be known) to be present; and
>>>
>>> (B) Present to a degree that substantially exceeds the minimum value commonly accepted as indicating high risk;
>>
>> (ii) Of any disease or condition commonly accepted to be associated with substantially-increased risk of cardiovascular disease, where such associated disease or condition is known (or should be known) to be present; or
>>
>> (iii) Where a biological parent, -sibling, or - first-generation offspring, is known to have (or have a history of) cardiovascular disease;
>
> (2) Smoking an average of more than one-half of a pack of cigarettes (or its equivalent) per day;
>
> (3) Excessive consumption of alcohol;
>
> (4) Consumption of controlled substances included on Schedule I of the drug control and enforcement laws (see 21 U.S.C. § 812(a)), where such consumption is commonly accepted to be associated with increased risk of cardiovascular disease; or
>
> (5) Abuse of controlled substances included on Schedule II, III, IV, or V of the drug control and enforcement laws (see 21 U.S.C. § 812(a)), where such abuse is

8

commonly accepted to be associated with increased risk of cardiovascular disease; or

(6)  Any activity or action, specified in the Act, at 42 U.S.C. 3796a(1), (2), or (3), that is commonly accepted to be associated with substantially-increased risk of cardiovascular disease.

**Commonly accepted** means generally agreed upon within the medical profession.

**Cardiovascular disease** includes heart attack and stroke.

**Excessive consumption of alcohol** – An individual is an excessive consumer of alcohol if he consumes alcohol in amounts commonly accepted to be associated with substantially-increased risk of cardiovascular disease.

**Undertaking of treatment** – An individual undertakes treatment, when he consults with a physician licensed to practice medicine in any jurisdiction described in the Act, at  42 U.S.C. § 3796b(8), and complies substantially with his recommendations.

**Medical probability** – A fact is indicated to a degree of medical probability, when, pursuant to a medical assessment, the fact is indicated by a preponderance of such evidence as may be available.[1]

**Substantial factor** – A factor substantially brings about a death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke if -

(1) The factor alone was sufficient to have caused the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke; or

(2) No other factor (or combination of factors) contributed to the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke to so great a degree as it did.

**QUESTION 2.**  Based on the review of the record, and applying the definitions set forth above, is there any evidence that an ‑event" (or events) (*e.g.,* lightening, gunshot wound, car accident) was a ‑substantial factor" in bringing about the heart attack or stroke suffered by the PSO?  **N/A.**

**QUESTION 3.**  Based on the review of the record, and applying the definitions set forth above, is there any evidence of any ‑intentional risky behavior" on the part of the PSO?  Specifically ---

(a) Please identify and explain any of the commonly-accepted cardiovascular-disease risk factors associated with clinical values that were present in the case of the PSO ‑to a

---

[1] The PSOB regulations explain at 71 F.R. 46028, 46035 (Aug. 10, 2006):  The ‑preponderance of evidence" standard is commonly understood to mean ‑more likely than not."

degree that substantially exceeds the minimum value commonly accepted as indicating high risk." **N/A.**

(b) Please identify and explain any evidence indicating that the PSO knew (or should have known) that the PSO was at risk for cardiovascular disease based on the factors identified in (a) of this question.  **N/A.**

(c) Please identify and explain any evidence indicating that the PSO undertook medical treatment - specifically by consulting with a licensed physician regarding any such risk factor(s) and complying substantially with the physician's recommendations with respect thereto.  **N/A.**

(d) Please identify and explain any evidence that indicates reasonable medical justification or excuse for failing to undertake medical treatment for such risk factors identified in (a).  **N/A.**

(e) Please identify and explain any disease or condition commonly accepted to be associated with substantially increased risk of cardiovascular disease present in the case of the PSO.  **N/A.**

(f)  Please identify and explain any evidence indicating that the PSO knew (or should have known) that the PSO was at risk for cardiovascular disease based on the disease(s) or condition(s) identified in (e).  **N/A.**

(g)  Please identify and explain any evidence indicating that the PSO undertook medical treatment - specifically by consulting with a licensed physician regarding such disease or condition and complying substantially with the physician's recommendations with respect thereto.   **N/A.**

(h) Please identify and explain any evidence that indicates reasonable medical justification or excuse for failing to undertake medical treatment for the disease(s) or condition(s) identified in (e).  **N/A.**

(i) Please identify and explain any evidence in the medical records or other information in the record reviewed indicating that a biological parent, biological sibling, or biological child of the PSO was known to have, or known to have a history of, cardiovascular disease.  **N/A.**

(j) If unable to provide its medical opinion with respect to any subpart of this question, please identify the subpart(s) and specify what additional medical records (or other type of information) needed in order to provide a response.  Also, if the reviewer believes that a medical record in the file is incomplete, or that a record or information that should exist has not been included in the file, please identify and explain.  **N/A.**

10

**QUESTION 4.** Based on the review of the record, and applying the definitions set forth above, please identify and explain any evidence or indication in the record that the PSO engaged in the types of behaviors listed below. (Please answer each subpart (a - d) with either a ―yes" or ―no" response. If the response to any of the subparts is ―yes", please identify and explain the evidence in the record relied upon for this answer. If unable to provide an opinion with respect to any subpart of this question, please also identify the additional medical records or other information that needed in order to provide a response. Also, if the reviewer believes that a medical record in the file is incomplete, or that a record or evidence that should exist has not been included in the file, please identify and explain.)

    (a) Smoking more than one-half pack of cigarettes a day (or its equivalent); **N/A.**

    (b) ―Excessive consumption of alcohol"; **N/A.**

    (c) Consumption of controlled substances included in Schedule I of the drug control and enforcement laws; **N/A.**

    (d) Abuse of controlled substances included on Schedules II through V of the drug control and enforcement laws. **N/A.**

**SUMMARY:**
This 29-year-old PSO collapsed after a 1.5 mile run in New Mexico on 4/30/09. The symptoms surrounding his collapse included disorientation, agitation, combative behavior, followed by an inability to breathe. The symptoms and his hospital course militate against an arrhythmia related to his enlarged heart. To a reasonable degree of medical probability, I can rule out both heart attack and stroke as the underlying cause of death.

In my review of the autopsy slides, abundant sickle cells were noted. His clinical course would be compatible with a sickle cell crisis brought on by intense physical exertion. Possible dehydration and a probable recent viral illness would be risk factors. The PSO was an African-American, but there is no documentation of sickle cell trait in the records provided.

Heat-related death is also a possibility. He was exerting himself in New Mexico in 90-degree weather prior to his collapse. Also, the records indicate he was recently prescribed antihistamines, medications that can increase the risk for heat stroke. No elevation in body temperature, however, is recorded in the medical records at the time of his collapse.

Respectfully,

Stephen J. Cina, M.D.



**Stephen J. Cina, M.D., P.C.**
Forensic Pathology Consultants

Date: July 15, 2011

To: Felicia Wintz, USDOJ, PSOB Office

From: Stephen J. Cina, M.D.

Re: Non-HH Review of case 2010-022 (Afolayan, Nathaniel)


## RECORDS REVIEWED

The records reviewed for this case are a letter composed by Commissioner Alan Bersin addressed to Ms. Hope Janke dated May 2010; U.S. Customs and Border Protection agency memorandum for Border Patrol Intern Nathaniel Afolayan dated May 2, 2009; the U.S. Department of Homeland Security Significant Incident Report; CBP Border Patrol Academy operations course description; Border Patrol Agent job description; the Safety Investigation Data Form; the City of Lubbock, Texas Certificate of Death; the Amendment to Medical Certificate of Certificate of Death; the Lubbock County Medical Examiner's Autopsy Examination Report; numerous Covenant Health System medical records, laboratory results, consultation reports, radiology results, admission forms, and physician notes; U.S. Department of Labor Authorization for Examination and/or Treatment form; numerous FLSIC Health Unit Patient clinical notes; numerous Artesia General Hospital emergency room records, physician records, physical exam forms, radiology reports, patient notes, and laboratory results; Orthopaedic Medical Group of Riverside, Inc. office visit notes; Caring for Your Family Together clinic visit notes; the Pacific Sleep Medicine Services reports; Prakashchandra C. Patel, MD consultation report; numerous United Family Care Rialto clinical notes; and a letter composed by Anthony Fazio.

## MEDICAL HISTORY

Right wrist compound fracture, (2005)
No tobacco or alcohol usage

## Medications as of (04/30/09)

Men's multiple vitamin
Doxycycline
Antihistamines

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org

Appx228



**AUTOPSY FINDINGS**

**Pathologic Diagnoses:**

I.      DETERIORATION DURING EXERCISE IN HOT ENVIRONMENT (ARTESIA, NM CLIMATOLOGICAL OBSERVATION):
    A.  MENTAL STATUS CHANGES: ACIDOTIC; RESPIRATORY DISTRESS; HYPOGLYCEMIC
    B.  HEAD CT AND CHEST CT NEGATIVE (04/30/2009)
    C.  DELIRIUM-LIKE INITIAL PRESENTATION
    D.  INITIAL AVAILABLE RECORDED BODY TEMPERATURES NOT SIGNIFICANTLY ELEVATED
    E.  ELECTROLYTE IMBALANCE
    F.  DECREASED URINE OUTPUT
    G.  METABOLIC IMBALANCES

II.     CARDIOMEGALY
    A.  HEART WEIGHTS 585 GRAMS WITH HYPERTROPHIC CHANGES
    B.  MICROSCOPICALLY CONFIRMED FOCAL CHRONIC ISCHEMIC CHANGES
    C.  FOCI OF MILD PERICARDITIS AND MILD MYOCARDITIS

III.    MEDICAL COMPLICATIONS
    A.  ISCHEMIC BOWEL: GASTROINTESTINAL HEMORRHAGE WITH MULTIFOCAL AREAS OF SUPERFICIAL SEROSAL HEMORRHAGE
    B.  MULTIORGAN SYSTEM FAILURE
    C.  SEROSANGULNEOUS BILATERAL PLEURAL EFFUSION

IV.     IATROGENIC CHANGES
    A.  HISTORY OF CPR

V.      POST MORTEM MICROBIOLOGY STUDIES
    A.  RIGHT LUNG ANAEROBIC/AEROBIC: NON CONTRIBUTORY TO DEATH
    B.  LEFT LUNG ANAEROBIC/AEROBIC: NON CONTRIBUTORY TO DEATH
    C.  RIGHT AND LEFT LUNG TISSUE: NEGATIVE FOR VIRAL PATHOGEN ISOLATION TESTING: INFLUENZA TYPE A AND B, PARAINFLUENZAE TYPES 1, 2 AND 3, ADENOVIRUS, RESPIRATORY SYNCYTIAL VIRUS, HERPES SIMPLEX VIRUS, ENTEROVIRUS, OR CYTOMEGALOVIRUS

VI.     TOXICOLOGY
    A.  POST MORTEM SKELETAL MUSCLE NON CONTRIBUTORY
    B.  ANTEMORTEM HOSPITAL SERUM (04/30/2009) QNS-QUANTITY NOT SUFFICIENT FOR TESTING
    C.  URINE DRUG SCREEN NEGATIVE: (04/30/2009)

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org

Appx229


**Cause of Death:** HEAT ILLNESS

**Contributory Cause of Death:** CARDIOMEGALY (CARDIAC DISEASE)

**Manner of Death:** ACCIDENT

**CAUSE AND MANNER OF DEATH (per death certificate)**

**Cause of Death:** HEAT ILLNESS

**Contributory Factors:** CARDIOMEGALY (CARDIAC DISEASE)

**Manner of Death:** ACCIDENT

**MICROSCOPIC SLIDE REVIEW (case FAL09-159 numbered 1-11) by Dr. Cina**

1. Liver-marked centrilobular congestion with hepatocyte necrosis; sickled erythrocytes in sinusoids
2. Same as above
3. Lung-mild anthracosis; intravascular fibrin; sickled erythrocytes
4. Heart-unremarkable
5. Heart-focal myocardial hypereosinophilia with smudged cellular outlines but no inflammation
6. Heart-unremarkable
7. Spleen-congested by sickled erythrocytes; autolysis; Kidney-intratubular proteinaceous debris with occasional degenerating epithelial cells; sickled erythrocytes
8. Testes-age appropriate spermatogenesis; sickled erythrocytes
9. Adrenal gland and GI tract-autolysed
10. Brain-mild neuronal pyknosis
11. Skeletal muscle-minimal degenerative changes, no inflammation

**CIRCUMSTANCES OF DEATH**
On 4/30/09, this 29-year-PSO was engaged in a Physical Techniques Final Examination as a Border Patrol Intern. At approximately 1445, he began a 1.5-mile run, completing it in just over eleven minutes. Prior to this activity, he voiced no complaints. Following the run, the PSO required assistance but told a supervisor that he was fine but needed some time to rest. At that time, he did not want to go to the Medical Unit. He had not taken any energy supplements, creatine, or caffeine.

After being brought to a shady area, the PSO fainted and fell onto the track. While waiting for the transport vehicle, the PSO was receptive and coherent. His symptoms and signs prior to his collapse did not include hyperpyrexia, clammy skin, excessive or diminished sweating, or complaints of feeling hot. When the Medical Staff arrived he was still responsive but stated that he could not breathe. By 1457, however, he was becoming combative and somewhat delirious. EMS arrived at the local clinic at 1510 and the PSO became unresponsive shortly afterward. At 1645, he was in a local hospital and being placed on a ventilator prior to being airlifted. At 1910, he was airlifted to a Medical Center in Lubbock

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org

Appx230


and he went into cardiac arrest at 1940.

An elevated temperature was not noted in the medical records. It does not appear that cooling blankets were used on the PSO. Upon admission to the first hospital (Artesia General) at around 1545, he was obtunded, not breathing, cyanotic, and tachycardic. His creatine kinase level (CK) at 1545 was elevated to 595 (normal = 22-269) and his CKMB was 8.5 (expected 0.3-4.0). His admitting cardiac troponin was normal (0.06) but he was hypoglycemic with a blood glucose = 60. His ECG was interpreted as "normal sinus rhythm" at 1534 but a "possible inferior infarct, age undetermined" was noted at 1552. A provider noted in an admitting note, however, that hyperthermia was the clinical impression. During his hospital admission, he developed swelling in his forearm with possible compartment syndrome. He also suffered from acute renal failure, hyperkalemia, and rhabdomyolysis. He pursued a downhill course and died in the hospital at 2200 on 5/1/09. An autopsy was performed.

His recent medical records indicate he was treated for an upper respiratory infection on 4/24/09 and 4/20/09. On 4/8/09, he presented to the Health Unit after complaining of nausea and dizziness following swimming. On 3/5/09, he had presented with allergy-type symptoms.

The patient did not have a history of sickle cell disease or sickle cell trait. He was an African-American male born in Nigeria.

At the time of his collapse, the temperature was approximately 90 degrees Fahrenheit with a relative humidity of 7%. Artesia, NM is approximately 3400 feet above sea level.

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org

Appx231



**Questions for Medical Review of PSOB Claims**
**(**Updated January 30, 2009)

Background:  In order for the PSOB Office to determine whether a claim is payable under the PSOB Act, the PSOB Office must make specific findings as a matter of law.  The professional opinion of competent medical experts is often needed to assist the PSOB Office in making these findings.

To ensure that this claim is resolved efficiently and fairly by the PSOB Office, it requests that you: (1) review the medical records and other documentation relating to the death of the individual named in the attached cover memo; and (2) respond to the questions set forth below.

**Based on the medical records and all other documentation reviewed with respect to the death of the individual named in the cover memo and on consideration of the following definition:**

An "injury" means "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virii, or bacteria, but does not include —

(1)  Any occupational disease; or

(2)  Any condition of the body caused or occasioned by stress or strain."

1)  Is it more likely than not that the decedent sustained a traumatic physical wound or a traumatized physical condition of the body on April 30, 2009?

**It is possible that the PSO died as a consequence of heatstroke.  He was exercising in a hot environment at altitude at the time of his collapse; however, he had done so before with no ill effects.  It is also possible that antihistamine use made him more prone to hyperthermia than usual.  His symptoms leading up to his collapse were somewhat atypical for heatstroke and he did not complain of being hot prior to losing consciousness.  Further, though there was a clinical impression of heat-related illness, an elevated body temperature was not recorded.  I cannot, to a reasonable degree of medical probability, state that the PSO died of heatstroke.  I can state that the adverse climatic conditions contributed at some level to his death.**

2)  In regard to the traumatic physical wound or traumatized physical condition of the body identified in response to question 1, was such wound or condition, by itself, sufficient to have caused the decedent's death?

**Based on the records provided, I cannot confirm a diagnosis of heatstroke, though it remains a possibility in this case.  I believe that the PSO would not have collapsed on 4/30/09 if he was not exercising in an adverse environment and that the climate played some role in his death.  I cannot state, however, that the climate was the most significant factor in this fatality.**

3)  Aside from the wound or condition of the body identified in response to question 1, did any other factor or combination of factors (for example, chronic, congenital, progressive, or preexisting condition, illness, or disease) contribute to the death as much as such wound or condition?

**Yes.  There is microscopic evidence of severe sickle cell disease.  The combined stressors of a viral illness, physical exertion, hot climate, .dehydration, and altitude exposure could have triggered a sickle cell crisis**

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org

Appx232



4) Did the decedent have a chronic, congenital, progressive, or preexisting condition, illness, or disease that, by itself or in combination with any other factor(s), was sufficient to have caused the wound or condition of the body identified in response to question 1?
**Yes. I believe, more likely than not, that the PSO would not have collapsed on 4/30/09 if he did not have a sickle cell crisis.**

5) If the answer to #4 is "no," then what factors, may have caused such traumatic wound or traumatized condition?
**The PSO's collapse and subsequent demise were brought about by the combination of a congenital condition (sickle cell trait or disease) and exercise in a hostile environment. Antihistamine use, dehydration, and a viral illness could also have played a smaller role in this death.**

## SUMMARY:

This 29-year-old PSO collapsed after a 1.5 mile run in New Mexico on 4/30/09. The symptoms surrounding his collapse included disorientation, agitation, and combative behavior, followed by an inability to breathe. The symptoms and his hospital course militate against an arrhythmia related to his enlarged heart. To a reasonable degree of medical probability, I can rule out both heart attack and stroke as the underlying cause of death.

In my review of the autopsy slides, abundant sickle cells were noted. His clinical course would be compatible with a sickle cell crisis brought on by intense physical exertion in a hot environment at altitude. Possible dehydration and a probable recent viral illness would be risk factors. The PSO was an African-American, but there is no documentation of sickle cell trait in the records provided.

Heat-related death is also a possibility. He was exerting himself in New Mexico in 90-degree weather prior to his collapse. In addition, the records indicate he was recently prescribed antihistamines, medications that can increase the risk for heat stroke. No elevation in body temperature, however, is recorded in the medical records at the time of his collapse.

In summary, I believe, more likely than not, that exercise in an adverse climate contributed to death. If those conditions did not exist, he likely would not have collapsed on 4/30/09. That being said, I feel the most significant factor contributing to death in this case was a sickle cell crisis. If appropriate laboratory samples are available, testing for sickle cell disease or trait could be performed. Close family members should be screened for this condition.

Respectfully,

Stephen J. Cina, M.D.

Julie S. Cina, M.B.A., CEO
640 SW 167th Way
Pembroke Pines, FL 33027

970-310-5197
(fax) 954-239-9603
www.autopsyreview.org



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

*Washington, D.C. 20531*

# PUBLIC SAFETY OFFICERS' BENEFITS OFFICE CLAIM DETERMINATION

**Case Number:** 2010-022

**Full Name:** Nathaniel A. Afolayan

**Age:** 29

**Title:** Border Patrol Agent

**Department/Agency:** U.S. Custom and Border Protection

**City, State, Zip Code:** Washington, District of Columbia 20229

**Case Summary:** According to information provided to the Public Safety Officers' Benefits (PSOB) Office, on April 30, 2009, Border Patrol Agent Nathaniel A. Afolayan completed a mandatory 1.5 mile run. Following the run he told his supervisor that he needed some time to rest; he went to a shady area, and fainted onto the track. Border Patrol Agent Afolayan was taken to the Health Unit and stated that he could not breathe, he was then transported to a local hospital and was subsequently air lifted to the Covenant Medical Center where he was pronounced dead on May, 1, 2009. The death certificate lists the cause of death as heat illness due to cardiomegaly.

| **Beneficiaries:** | **Name** | **Relationship** | **Date of Birth** |
|---|---|---|---|
| | Lisa E. Afolayan | Wife | N/A |
| | Natalee E. Afolayan | Daughter | 01/17/06 |
| | ▮▮▮ Afolayan | Daughter | 10/12/07 |

**Determination:** Based on the information in the record (including the report submitted by the U.S. Custom and Border Protection, the Claims for Death Benefits submitted by his wife, Lisa E. Afolayan, and a review by an independent forensic pathologist), the PSOB Office has determined that the claimant has not established that the death of Border Patrol Agent Nathaniel A. Afolayan is covered under the PSOB Act [42 U.S.C. § 3796, *et seq.*]. The evidence provided to the PSOB Office has not established that Border Patrol Agent Afolayan died as a direct and proximate result of an injury sustained in the line of duty.

The PSOB Act covers public safety officers who die as a direct and proximate result of a personal injury sustained in the line of duty. 42 U.S.C § 3796(a). The regulations implementing the PSOB Act provide the following pertinent definitions at 28 C.F.R. § 32.3 in determining whether or not a benefit shall be paid:

> *Injury* means a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virii, or bacteria, but does not include—
> (1) Any occupational disease; or
> (2) Any condition of the body caused or occasioned by stress or strain.

> *Direct and proximate cause* — Except as may be provided in the Act, at 42 U.S.C. 3796(k), something directly and proximately causes a wound, condition, or cardiac-event, if it is a substantial factor in bringing the wound, condition, or cardiac-event about.

> *Substantial factor* — A factor substantially brings about a death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke if—
> (1) The factor alone was sufficient to have caused the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke; or
> (2) No other factor (or combination of factors) contributed to the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke to so great a degree as it did.

The death certificate listed the cause of death as heat illness due to cardiomegaly, however, Dr. Stephen Cina, M.D., an independent forensic pathologist, noted that I cannot, to a reasonable degree of medical probability, state that [Border Patrol Agent Afolayan] died of heatstroke." He further noted that "I cannot state ... that the climate was the most significant factor in this fatality." Dr. Cina noted "microscopic evidence of severe sickle cell disease" but allowed that, "The combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure could have triggered a sickle cell crisis." Dr. Cina also noted that though heat-related illness was listed as a presumptive diagnosis, there is no documented elevation of body temperature or evidence that cooling measures were taken." He then noted "In my review of the autopsy slides, abundant sickle cells were noted. His clinical course would be compatible with a sickle cell crisis brought on by intense physical exertion in a hot environment at altitude. Possible dehydration and a probable recent viral illness would be risk factors."

The facts of this case indicate that climatic conditions may have contributed at some level to Border Patrol Agent Afolayan's death, but the evidence is insufficient to show that these conditions were a substantial factor. The severe sickle cell disease and the stress and strain of exercise were also factors, and no evidence has been provided demonstrating that climatic conditions alone could have caused Border Patrol Agent Afolayan's death, nor that any other factor contributed to his death to so great a degree as the climatic conditions.

Accordingly, the PSOB Office has concluded that the record does not show that Border Patrol Agent Afolayan died as the direct and proximate result of an injury sustained in the line-of-duty, and therefore, the claimant is ineligible to receive the benefit to be paid under the PSOB Act.[1]

A claimant who would like to seek further consideration of this claim may file a request for a Hearing Officer determination with the PSOB Office, pursuant to 28 C.F.R. § 32.42. Such request must be filed within 33 days of the date of the cover letter accompanying this Determination. A request that is filed in a timely manner will be considered under subpart E of 28 C.F.R. part 32, and the claimant shall be afforded a reasonable time thereafter to provide additional evidence and argument in furtherance of the claim, if so desired. The PSOB Act and regulations may be found on the internet at psob.gov

_____   FSS

Benefits Specialist
Public Safety Officers' Benefits Office

_____

Director
Public Safety Officers' Benefits Office

_____

Office of the General Counsel
Office of Justice Programs

**DATE OF DETERMINATION:** 0 6 MAR 2012  _____

---

[1] **N.B.:** If a representative (such as an attorney) has provided any services in connection with this claim, the representative *must* obtain authorization pursuant to 28 C.F.R. § 32.7 before seeking any compensation whatsoever for such services from the claimant. *See* 42 U.S.C. § 3796c(a).

UNITED STATES DEPARTMENT OF JUSTICE
PUBLIC SAFETY OFFICERS' BENEFITS PROGRAM
BUREAU OF JUSTICE ASSISTANCE

- - - - - - - - - - - - - - - - - x
                   :
In the Matter of:        :
                   :  PSOB Claim No.
PUBLIC SAFETY OFFICERS  :  2010-022
BENEFITS PROGRAM:      :
                   :
ORAL HEARING RE:      :
    LISA AFOLAYAN      :
                   :
- - - - - - - - - - - - - - - - - x

2445 Fifth Avenue
Suite 350
San Diego, California

Tuesday, November 27, 2012


THE HEARING in the above-entitled matter

commenced at 10:08 a.m., pursuant to notice.


BEFORE:  MR. JOSEPH B. MISTRETT, Hearing Officer


Diversified Reporting Services, Inc.
(202) 467-9200

APPEARANCES:


Hearing Officer:

        JOSEPH B. MISTRETT
        5100 Dorset Avenue, Suite 513
        Chevy Chase, Maryland  20815
        (716) 269-9396


For Claimant:

        MICHAEL P. BARANIC, ESQ.
        Gattey and Baranic, PLC
        2445 Fifth Avenue, Suite 350
        San Diego, California  92101
        (619) 232-8142
        mbaranic@gattey.com


ALSO PRESENT:

        RON ZERMENO, V.P., NBPC LOCAL 1613
        LISA AFOLAYAN, CLAIMANT

1          Doctor?

2          THE WITNESS:  Yes.

3          THE REPORTER:  Can you just back up to

4    "medical doctor degree" and then "an internship"?

5          THE WITNESS:  Sure.  An internship for a year

6    and then a residency in pathology for four years --

7          THE REPORTER:  Doctor?

8          MR. BARANIC:  Dr. Sperry?

9          THE WITNESS:  Yes.

10          MR. BARANIC:  The phone's cutting out real

11    bad.

12          (Discussion off the record.)

13          BY MR. BARANIC:

14     **Q     Dr. Sperry, I think we left off, you were**

15    **outlining young academic history and your professional**

16    **training.**

17     A    Yes.

18     **Q     And if you'd go ahead and continue that, or**

19    **actually walk us through your academy training again,**

20    **that way the record's clear.**

21     A    Sure.  I graduated from college in 1975.  I

22    received my M.D. degree in 1978.  I did an internship

1  between 1978 and 1979.  And I spent two years in the

2  United States Public Health Service between 1979 and

3  1981.  I then did an anatomic and clinical pathology

4  residency --

5      **Q    Dr. Sperry, what type of residency was that?**

6      A    Anatomic and clinical pathology.

7      **Q    And what did you have next, as far as your**

8  **history?**

9      A    Then I did a forensic pathology fellowship at

10  the latter part of 1985, and that finished my formal

11  training.  And I'm certified by the American Board of

12  Pathology in anatomic pathology, clinical pathology,

13  and forensic pathology.

14      **Q    When were you certified in those fields?**

15      A    In May of 1986 -- excuse me -- May of 1985 for

16  the anatomic and clinical pathology and May of 1986 for

17  forensic pathology.

18      **Q    And have you testified previously as an expert**

19  **witnesses?**

20      A    Yes.

21      **Q    On approximately how many occasions?**

22      A    I've testified live in court 677 times in 31

1  states, the District of Columbia, and for the U.S.

2  military in Germany and Japan.

3     **Q    Okay.  I have before us a three-page report**

4  **that you prepared regarding Nathaniel Afolayan.  Are**

5  **you familiar with that report?**

6     A    Yes.

7     **Q    And did you review any documentation in**

8  **preparation of this report?**

9     A    Yes.

10    **Q    And what documentation did you review in**

11 **preparation of this report?**

12    A    I reviewed medical records that dated back to

13 2003, and then materials that were provided by PSOB as

14 materials considered in issuing its determination of

15 eligibility, and medical documents obtained from the

16 FLETC, including the autopsy report of Mr. Afolayan.

17    **Q    And did you form any opinions regarding the**

18 **cause of death for Mr. Afolayan?**

19    A    Yes.

20    **Q    What are those opinions?**

21    A    Mr. Afolayan died as the result of a sickle

22 cell crisis that was precipitated by physical exertion

1   with accompanying dehydration that developed during his

2   performance in a 1.5-mile run as part of his physical

3   training examination for qualification to be a U.S.

4   Border Patrol agent.

5       **Q      Now, are you familiar with the distinction**

6   **between sickle cell disease and sickle cell trait?**

7       A   Oh, yes.

8       **Q      What's the distinction between the two?**

9       A   The distinction is a genetic one.  To have the

10  full-blown sickle cell disease, this requires that both

11  of the chromosomes in the human body that can carry the

12  sickle cell condition has to have the sickle cell gene.

13  And so this means that a person with sickle cell

14  disease has the genetic -- it's called SS, meaning all

15  of the hemoglobin, or the material in the red blood

16  cells that carries oxygen, is of the S variety.

17          Now, sickle cell trait means that the genetic

18  makeup of a person has one half normal hemoglobin and

19  one half the sickle cell hemoglobin, approximately.  So

20  that means that a person with the sickle cell trait has

21  the genetic makeup of HS, meaning normal hemoglobin and

22  sickle cell hemoglobin, and as a consequence they are a

1  carrier of this disease, and this is known as sickle

2  cell trait.  But it's a genetic condition.  In that

3  sense it is not considered a disease.

4      **Q    In Mr. Afolayan's case, based on your review**

5  **of his medical records, did he have the sickle cell**

6  **disease or the sickle cell trait?**

7      A    He had the sickle cell trait.

8      **Q    And have you done any research on the**

9  **distinction between sickle cell disease and sickle cell**

10  **trait in relation to either a military or law**

11  **enforcement training?**

12      A    Yes.

13      **Q    And what does that research -- what did you**

14  **discover in that research?**

15      A    Well, the people or individuals with the

16  sickle cell trait, as this is not considered to be an

17  illness or a disease, this is not a condition that is

18  exclusionary for military or law enforcement service.

19  And this was set forth in 1981 by the United States

20  Department of Defense, that mandated that such

21  restrictions for military service for people with

22  sickle cell trait be removed.

1        So as a consequence, since 1981, people with

2   the sickle cell trait have been fully qualified to

3   serve in the military and in any law enforcement agency

4   that I'm aware of in the United States, and it is not

5   an exclusionary condition in any way.

6       **Q    Now, in the case of Mr. Afolayan, are you**

7   **familiar what -- are you familiar with what the**

8   **climatic conditions were at the time of his**

9   **participating in the 1.5-mile run?**

10      A    Yes.  As I recall, it was hot, with the

11  temperatures in the nineties.

12      **Q    As far as individuals that have the sickle**

13  **cell trait, is there any effect on altitude as far as**

14  **the potential for developing into a sickle cell crisis?**

15      A    Altitude will have an effect on reducing the

16  amount of oxygen that can be taken into the body

17  through breathing.  And so a combination of altitude

18  and exertion in a hot environment can precipitate a

19  sickle cell crisis in people with the sickle cell

20  trait.

21      **Q    In the PSOB determination letter in which the**

22  **claims were denied in this case, it indicates that Mr.**

1   stress will precipitate these cells to change from

2   their round shape to actually a sickle shape, or

3   crescent moon shape.  And they become sludgy and block

4   up small blood vessels throughout the body.  And this

5   can even be precipitated by very minor things.  So true

6   sickle cell disease is a very serious issue.  And the

7   sludging of the blood cells does prevent oxygen from

8   getting to tissues that are being supplied by the

9   little blood vessels that get plugged up.  So that's

10   how when a sickle cell crisis begins, what occurs is

11   the different organs throughout the body, including the

12   brain and the heart and muscles, all start to be

13   deprived of oxygen because the blood is clogged up by

14   the sickle cells and not flowing freely.

15   **Q   Is it your belief, Dr. Sperry, from your**

16   **extensive review of the records here that that's what**

17   **happened?  Because I recall seeing that Mr. Afolayan's**

18   **body just shut down.**

19   A   Yes.  That -- in this situation with Mr.

20   Afolayan, he had the sickle cell trait, and in

21   people -- in individuals who have the trait, when they

22   may be subjected to extremes of physical exertion and

1  become dehydrated, and especially at an increased

2  altitude, this may precipitate a sickle cell crisis.

3  But you have to have that combination of factors

4  together.

5      **Q    And I'm sorry.  Those factors again were --**

6  **you're talking about physical exertion; what else?**

7      A    Physical exertion, heat, dehydration, and the

8  sickle cell trait.

9      **Q    From your review of the medical records, did**

10  **you find evidence of dehydration?**

11      A    Dehydration is a relative kind of thing.  That

12  is, someone who is running 1 1/2 miles in a hot

13  environment is going to sweat, and the degree of

14  dehydration that's necessary to initiate a sickle cell

15  crisis is not severe or profound dehydration that would

16  cause someone, say, to collapse just because of a lack

17  of fluids in their system.  But you have -- you know,

18  those -- all those conditions have to be present in

19  order for the sickle cell crisis to be precipitated.

20  So some element of dehydration has to be present, and

21  that goes hand in hand with the physical exertion in a

22  hot environment.

# California Department of Public Health



RK B HORTON, MD, MSPH
*Director*

ARNOLD SCHWARZENEGGER
*Governor*

January 17, 2008

R. DENISE MARLOW, CSR EXHIBIT __1__
DATE __11-27-12__
WITNESS: __N/A__
__2__ PAGE(S)

Lisa Afolayan
1142 lilac Road
San Jacinto, CA 92582

Dear Mrs. Afolayan:

It was a pleasure talking with you and providing information to you about your hemoglobin test results. The purpose of this letter is to review the information we discussed and to provide you with a written summary of your blood test.

As we discussed, your lab results show that you have the usual adult hemoglobin (AA) and that you do not have a hemoglobin trait. **Mr. Nathaniel Afolayan** was also tested and his lab results show that he is a carrier of sickle cell trait (AS), which is **NOT** a disease. Since only one of you carries sickle cell trait, future children of the two of you do **NOT** have the possibility of inheriting sickle cell disease. As a couple, you have a 50% possibility with each pregnancy to have a future child with sickle cell trait. As we discussed, copies of your lab reports were sent to your baby's doctor.

We recommend that you keep copies of this letter with your family medical information. The brochure "For Parents of Babies with Sickle Cell Trait" is enclosed for you to share with your family.

If you have any further questions about the information in this letter, or about any of the information we have discussed, please contact me at (866) 954-2229.

Sincerely,

*Molly D—, MS, CVL*

Molly Dunn, MS, CGC
Certified Genetic Counselor
Newborn Screening Section
Trait Follow-Up Program

Enclosures

cc: Steve Kwon, M.D.
2-07-290-21-210-3

Newborn & Prenatal Screening Programs/Genetic Disease Branch/Primary Care & Family Health
850 Marina Bay Parkway, Room F175, Richmond, CA 94804
Phone 510/412-1502 • Fax 510/412-1548
Internet Address: www.cdph.ca.gov/GDB

Appx341



*Hemoglobinopathy Reference Laboratory*
*747 52nd St. Oakland, CA. 94609*

Newborn Screening Follow-up Report

| | | |
|---|---|---|
| Patient's Name: | Birthdate | Relation to propositus: |
| **AFOLAYAN, NATHANIEL** | 03/25/80 | Father of : AFOLAYAN, LEA |
| Ethnicity: NIGERIA | Age: 27.75 year | |

Counseling/AGC Center:

Authorization/Accession #:      2-07-290-21-210-3                        Lab# 25109

| Sample Collected | Received | Test Date | Lab Report Date | Hemogram: |
|---|---|---|---|---|
| 12/18/07 | 12/19/07 | 12/2?/07 | 12/28/07 | RBC:  5.0 (x10 6/mm$^3$) |

Hemoglobins seen by:

Thin Layer Isoelectric Focusing:                A, S, A2, F

Hb A2 & F appears to be within normal range.

Densitometric Scanning:                A=56%, S=41%

Citrate agar electrophoresis:

Confirmatory solubility:                POSITIVE

Quantitative Hb (HPLC):   A2:        % (NL: <3.5%)
                          F:          % (NL: <2.5%)
                                     if age > 1 year)

Comments:

Hgb:  14.7 (gm/dL)
MCV:  80.9 (fL)
RDW:  13.8

Hemogram was done on
12/19/2007
Sample 1 days old.

FEP:        (µg/dL RBC)
Normal : < 90 (µg/dL RBC)

Mahin Azimi, CLS, Supervisor
(510) 450-7688

---

**INTERPRETATION:**

The hemoglobin electrophoretic pattern and the positive solubility test are consistent with a diagnosis
of sickle cell trait. Hemoglobin traits are clinically benign carrier conditions. Hemoglobin trait carrier
counseling at a Sickle Cell Counseling Center is recommended.

Carolyn Hoppe, M.D.                12/28/07
                                   Date

Directors: Bertram Lubin, M.D. (510) 450-7601; Elliott Vichinsky, M.D. (510) 428-3651; Carolyn Hoppe, M.D. (510) 428-3193
Hemogram is done in the Clinical Lab at Children's Hospital & Research Center
The above results assume correct sample labeling and indicated family relationships

R. DENISE MARLOW, CSR EXHIBIT 5
DATE 11-27-12
WITNESS: N/A
3 PAGE(S)

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

November 15, 2012

Re: Nathanial A. Afolayan

I have reviewed documents and records concerning Nathanial A. Afolayan, who died on May 1, 2009. These materials include medical records provided by the decedent's spouse dating back to 2003, materials provided by the PSOB as materials considered in issuing its determination of eligibility, and medical documents obtained from the Federal Law Enforcement Training Center to include the Autopsy Report of Nathanial A. Afolayan.

Nathanial Afolayan was a 29 year old male from Africa. He had been in the process of completing his training as a Border Patrol Agent, when, on April 30, 2009, he was undergoing his final Physical Training exam in Artesia, New Mexico. He had just finished a 1.5 mile run when he exhibited physical distress, which rapidly progressed to incoherence and collapse. He was transported to the hospital, where he continued to deteriorate, and was placed on a ventilator. He subsequently was transferred to a hospital in Lubbock, Texas, where he developed acute renal failure, rhabdomyolysis (intrinsic destruction of the skeletal muscle), and he died on May 1, 2009. An autopsy was performed, which concluded that Mr. Afolayan had died of "Heat Illness", with "Cardiomegaly" as a contributing factor, and the manner of death was concluded to be "Accident." A subsequent review by Dr. Stephen Cina confirmed the diagnosis of cardiomegaly (heart weight 585 grams), with microscopic chronic ischemic changes, but also revealed the presence of red cell sickling within the autopsy tissue specimens. Dr. Cina concluded that exercise in an adverse climate (90 degree weather) was a contributing factor to Mr. Afolayan's death, but also that the most significant factor contributing to his death was a sickle cell crisis. At that point in time, there was no evidence that was known to either Dr. Cina, the pathologist who performed the autopsy, nor apparently anyone else regarding whether or not Mr. Afolayan had any genetic evidence of sickle cell disease or sickle cell trait.

In reviewing the materials provided by Mr. Afolayan's widow, there is a letter from Molly Dunn, a Certified Genetic Counselor, dated January 17, 2008, addressed to Mrs. Afolayan. In that letter, Ms. Dunn discusses genetic testing that was carried out both on Mr. and Mrs. Afolayan, which revealed that Mr. Afolayan was a carrier of the sickle cell

Sperry Forensic Pathology Consultants
170 Nixon Road
Senoia, Georgia 30276-3291
Telephone: (770) 599-9528
e-mail Dr. Sperry: stiffdoc@bellsouth.net

gene, and thus had the sickle cell trait. Testing had been carried out on a specimen from Mr. Afolayan collected on December 18, 2007, which revealed his hemoglobin to be 56% A, and 41% S, which confirms the sickle cell trait condition. The report noted that this pattern of sickle cell trait was a clinically benign condition, and the letter from Ms. Dunn also emphasizes that the condition of sickle cell trait is NOT [sic] a disease. The sickle cell carrier trait is found in approximately 8% of African American individuals.

In retrospect, the clinical symptoms exhibited by Mr. Afolayan following his 1.5 mile run in hot weather, followed by the development of respiratory and neurological deterioration, renal failure, rhabdomyolysis and death, is a known and recognized pattern of the rarely encountered complications of the sickle cell trait condition, which evolves in to a sickle cell crisis following a period of exertion, often in hot weather, and accompanied by some degree of exertion-related dehydration. Fortunately, these deaths are rarely encountered.

The sickle cell trait is not considered to be an illness or a disease. The presence of this condition is not an exclusionary criterion for military or police service. In 1981, the United States Department of Defense mandated that restrictions for military service by individuals with sickle cell trait be removed, and with certain exceptions, routine screening of recruits for this condition are not performed. Although it is recognized by the U. S. Military that individuals with sickle cell trait have an increased statistical risk for death (although these deaths are extremely rare), it has also been shown that prevention of heat-related illness and extensive education on proper hydration and avoidance of heat stroke has essentially eliminated this risk among military recruits. Based upon my review of Mr. Afolayan's records, it is my conclusion that he did not understand the significance of having the sickle cell trait, as the correspondence from Ms. Dunn emphasized that this was not a disease. Additionally, in the United States Marines, testing for HbS is performed, in order to identify individuals who may be at risk for a sickle cell crisis if placed in extreme environmental conditions; however, separation from training is only considered if the percentage of HbS is greater than 45%. In Mr. Afolayan's case, his HbS concentration was 41%, and thus he would not have been separated from training had he been a Marine recruit. Even had the presence of the sickle cell trait been known, this would not have been an exclusionary condition for service in the United States Armed Forces, nor in any Law Enforcement Agency of which I am aware.

It is my opinion, to a reasonable degree of medical certainty, that Nathanial A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run as part of his physical training examination for qualification to become a U. S. Border Patrol Agent. This physical training took place in a hot environment, which is a

known contributing factor in the evolution of a sickle cell crisis in persons who carry the sickle cell trait. Thus, I am in agreement with both Drs. Cina and Natarajan, that Nathanial A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died. The manner of death is properly classified as an accident, and the death is a direct result of the training regimen that he was undergoing to become a U. S. Border Patrol Agent.

Kris Sperry, M. D.

R. DENISE MARLOW, CSR EXHIBIT 9
DATE 11-27-12
WITNESS: N/A
11 PAGE(S)

Department of Homeland Security
U.S. Customs and Border Protection
Office of Internal Affairs

AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF:  San Diego

I, Alex Jacob Alderman, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Alex Jacob Alderman

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
Since Feb. 16, 2009

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS9, Murrieta Border Patrol Station

PRIOR TO YOUR BORDER PATROL CAREER, WHAT TYPE OF
EMPLOYMENT DID YOU HAVE?
I worked with my dad in various construction jobs and rehabbing apartments.

DO YOU HAVE ANY EXPERIENCE IN THE MEDICAL FIELD?  IF SO, WHAT?
At one point I was certified as a first responded.  This was in 2007, and then I
believe I was recertified while at the academy in 2009.

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
02/09-05/09, Class  856 / Section A

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
Class, not section

AA  07/07/2011

Appx403

HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i) AFOLAYAN? DID YOU SOCIALIZE WITH HIM OFF DUTY?
Good friend. I socialized with him off duty.

WHO WERE YOUR ASSIGNED BORDER PATROL PT INSTRUCTORS WHILE YOU WERE AT THE ACADEMY?
Supervisor Valdez and Angarita

DO YOU MAINTAIN ANY CONTACT WITH EITHER SBPA ANTONIO ANGARITA OR SBPA BERNIE VALDEZ? IF SO WHICH, AND WHAT DOES YOUR CONTACT CONSIST OF?
No

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA BERNIE VALDEZ?
I think graduation day at basic, May 6, 2009.

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA ANTONIO ANGARITA?
May 6, 2009.

DURING YOUR TRAINING AT THE BP ACADEMY, DID YOU RECEIVE ANY FIRST AID AND/OR CPR TRAINING?
Yes

DO YOU RECALL RECEIVING ANY TRAINING DURING THE ACADEMY IN WEATHER RELATED ILLNESSES? HEAT ILLNESSES/HYPOTHERMIA, ETC? IF SO, WHAT SUBJECTS DID YOU GUYS LEARN ABOUT?
I don't recall

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC? IF SO, WHAT WAS THE DATE?
I don't recall the exact date.

DID YOU RECEIVE CPR/FIRST AID TRAINING BEFORE OR AFTER YOUR OC CERTIFICATION?
I don't remember

WAS THE OC CERTIFICATION PROCESS RECORDED ON VIDEO/DISK? DID YOUR ENTIRE SECTION GET CERTIFIED ON THE SAME DATE AS YOU?
Not that I am aware of. My section got certified on the same date.

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
Bernie Valdez

AA    07/07/2011

IN EXPLICIT DETAIL, STEP BY STEP, CAN YOU EXPLAIN THE WHOLE OC
CERTIFICATION PROCESS, TO INCLUDE ANY ROLE PLAYING ACTIVITES
AND PRE EXPOSURE BRIEFING(S), IF THERE WERE ANY.
The week prior to the spray we went through some training with some fake OC.

The day of the OC, in the matroom, Angarita and Valdez, briefed us, but I don't
recall what they said exactly. They then took us outside and lined us up in a line
by the OC spraying area. In groups of 3 they took us out running, doing wind
sprints and various exercises. They took us individually to the side, where they
would tell us to say our name and class number and then had us close our eyes
and sprayed us. From there they took us to a room where they gave us a foam
baton, and there would be a guy that we would have to take down. After that
they would escort us to an area where we could clean off.

After the decontamination, we were made to walk around the track for about 20
minutes. No reason was given as to why. I don't recall if it was our class leader
or an instructor who told us to march around the track. We marched as a group.

BY NAME, WHO ELSE WAS PRESENT WHEN YOU WERE SPRAYED, TO
INCLUDE ROLE PLAYERS?
I just remember Bernie Valdez. There was another instructor, but I don't recall
who. I don't remember who was in my group of 3.

HOW MANY PEOPLE WERE CERTIFIED AT A TIME?
The whole section. Our section had about 20 people at the time.

COULD YOU OBSERVE ANY OF YOUR CLASSMATES GETTING SPRAYED?
IF SO, HOW WAS THE OC DEPLOYED AND WHAT INSTRUCTOR SPRAYED
THE OC?
No.

SINCE YOU COULD NOT SEE, COULD YOU HEAR WHAT WAS GOING ON?
IF SO, DESCRIBE, IN DETAIL WHAT YOU HEARD.
Yes. The first person to go, Ahad, I remember her screaming/crying basically. I
think her screaming/crying was during her scenario, it may have also been after
in the decontamination area, as well. For everyone else, I just heard them
screaming commands at the subject they were trying to subdue.

DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD
HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE
FROM WHICH YOU WOULD RECEIVE THE SPRAY, THAT YOU WOULD BE
SPRINTING BEFOREHAND, SAFETY PRECAUTIONS, ETC? IF SO, WHAT
WERE YOU TOLD AND BY WHO?
They told us the way they would spray it and the most effective way to use OC, I
think a couple feet back, and that they would spray us from the bottom, up, and I
believe over again. Basically from the chest to the face. Bernie Valdez said this

AA 07/07/2011

during a previous lecture when they were talking about the best way to use OC. When they taught, they recommended to be about 3 feet from the subject for most effective spraying. I don't recall if he said this to tell us that this would be how it would be sprayed onto us during certification.

WHAT INSTRUCTOR SPRAYED YOU AND HOW CLOSE WAS THEIR CAN OF OC TO YOUR FACE WHEN THE OC WAS DEPLOYED? (4-6/6-8)
Valdez, estimated 3 feet back. Prior to closing my eyes, Valdez was approximately 3 feet in front of me. I do not know the distance that the spray was deployed due to my eyes being closed.

WERE YOU TOLD THAT YOU COULD USE EYE PROTECTION AND WAS THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.
I remember being told that, I don't remember who said it. I think it was kind of looked down on, it was just a general feeling I got from people at the academy (classmates.) We weren't encouraged to use glasses, I don't think the instructors discouraged us; it was just the general feeling overall that it would be looked down on.

DID YOU SEE ANY EYE PROTECTION THAT WAS AVAILABLE TO BE USED?
I don't recall seeing anything.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
I wasn't aware that was an option.

HOW MANY SECONDS DO YOU RECALL THE SPRAY BEING? DID YOU ONLY GET ONE BURST?
Probably around 5 seconds. They used the rest of the can they were using, then part of a second can. I got two bursts. I estimate the first burst, from the can that was spent, was about 2 seconds.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR SPRAY WAS REASONABLE? IF NO, EXPLAIN.
I've never given it any thought if it was not reasonable. I am sure I would have felt the same effects whether I had a 5 second or a 3 second burst.

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE DONE WITH YOUR SCENARIO?
Yes.

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN?
No.

AA    07/07/2011

DO YOU KNOW WHAT EFFECTS THAT THE OC HAD ON BPA(i) AFOLAYAN
FOLLOWING THE SPRAY?, IF SO, WHAT WERE THE EFFECTS ON HIM,
AND DID THEY DIFFER FROM YOURS?
I wasn't present when it happened, but I know that when he got back to the room,
he said he had worked it up in his mind to be more than what it was. After
decontamination, the OC stays in your hair, and after you shower, it reactivates.
I believe that's what happened to him as well. He thought it was going to be
worse than it was.

My reaction to the spray seemed to be worse than his. Mine was painful. After
we released I went to my room and sat in front of the AC for a while, and would
try to wipe it from my hair and face before I had to shower. Immediately after my
eyes were burning, my skin felt like it had an extremely bad sunburn. My nasal
passages were clogged, I was blowing my nose and spitting.

His reaction was not as severe as mine. His didn't seem as bad as when he took
a shower. I don't recall about his specific reactions to OC, mine just seemed
more severe to me.

I do not know the severity of his reaction in the minutes following the spray. After
Nate retuned to the room, approximately an hour later, his reaction did not seem
as severe as mine had been.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT
OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT
DID YOU HEAR AND WHO SAID IT?
I had heard rumors that it affected lighter people, but then I also heard rumors
that it affected darker skinned people more. I do believe either Valdez or
Angarita say that it affected lighter skinned people more, during one of the
training days prior to the spray.

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i)
AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL
CONDITION?
We went to the gym a few times together, not very often. He was in excellent
shape, probably the best shape in the class.

DID BPA(i) AFOLAYAN GO TO THE MEDICAL UNIT AFTER HIS SPRAY?
I know at some time, he went to the medical unit for nasal issues, but I don't
know if it was before or after the spray. I never thought twice about it, but if I
remember correctly, it just seemed like it was common congestion.

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO,
DESCRIBE.
It was very hot out, clear day.

AA  07/07/2011

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
I had heard that they had some flag system, but I don't remember if it had to do with the heat. I don't remember them adjusting the PT for weather.

EITHER BEFORE, DURING OR AFTER THE PT RUN, DID YOU HEAR OF ANY PT INSTRUCTORS OR BP STAFF YELL ANYTHING AT BPA(i) AFOLAYAN? IF SO, WHAT DID YOU HEAR/OBSERVE AND WHO SAID IT?
I had heard that after the run, Nate had a hard time breathing, so he was leaning on Fazio, and at some point, they leaned up against the wall and Angarita was next to him, telling him to breathe, then he just fell back and collapsed. I don't remember anything about any yelling at Nate.

AFTER HIS PASSING, WERE YOU EVER TOLD BY ANY INSTUCTORS OR BP STAFF, ABOUT THE CAUSE OF HIS DEATH OR SPECULATION ON THE CAUSE OF HIS DEATH? WHO DID YOU HEAR THIS FROM AND WHAT DID THEY SAY?
Angarita gave our section a breakdown of what happened maybe on the last day that we had PT. Angarita gave a very emotional breakdown of everything that happened. He told us basically his view of how everything happened that day. He said that after Nate collapsed they took him to the medical facility and when he was holding him, trying to keep him under control, he felt his chest pounding and he was trying to tell the firefighters and medical staff on scene that he could feel his chest pounding at an incredible rate.

He said after the final, they leaned him against the wall due to him having a hard time breathing. I think he looked away for some reason, and during that time, Nate collapsed. They put him on a gator, and took him to the medical facility. I believe they said he was still conscious at the time, that he was flailing around trying to get the academy medical staff off of him and that the staff said he needed to get to the hospital. Angarita helped get Nate to the ambulance and that's when he felt his heart beating.

The day after he passed, there was a debriefing, with a few supervisors present. I don't remember who gave the actual debriefing but our entire class was there and I remember our lead Supervisor, female instructor for B, and also Section A's Reynoso. I don't think they gave us a cause of death. I had heard speculation from a Spanish instructor, who I don't recall his name, that Nate had been taking supplements, and I perceived that he thought that supplements had caused Nate's death. This Spanish instructor was in the building, but not assigned to our class. Fazio was also there when he said this.

AA 07/07/2011

AFTER HIS DEATH, DID YOU HEAR FROM ANY CLASSMATES THAT THEY HEARD FROM ANY INSTUCTORS OR BP STAFF, ABOUT THE CAUSE OF HIS DEATH OR SPECULATION ON THE CAUSE OF HIS DEATH? IF SO, WHO DID YOU HEAR THIS FROM AND WHAT DID THEY SAY?
I had heard classmates tell me, in general, that the general speculation around the entire academy is that he was using supplements and that that was the cause of his death.

DO YOU KNOW HOW HE DIED AND IF SO, HOW DID YOU LEARN OF THE CAUSE OF HIS DEATH?
No, I don't know the cause of his death.

DID YOU EVER HEAR ANYTHING ABOUT EMS AND FLETC MEDICAL STAFF ARGUING OVER THE TREATMENT OF BPA(i) AFOLAYAN DURING THE TIME HE WAS IN THEIR CARE? IF SO, WHAT DID YOU HEAR, WHAT WAS SAID, WHEN AND FROM WHO?
All I heard is they were trying to hold him down, but he was trying to get up because it was easier for him to breathe. Angarita said to the staff for them to let him just sit up so he could breathe. I don't know if at this point they allowed him to sit up. And at some point, FLETC medical just said he needed to go to the hospital.

DID YOU HEAR SBPA ANTONIO ANGARITA MAKE ANY COMMENTS ABOUT BPA(i) AFOLAYAN AND HIS CONDITION, MANNER OF DEATH, ETC? IF SO, WHEN AND WHAT WAS SAID?
See above

WHO ELSE WAS PRESENT WHEN YOU HEARD SBPA ANGARITA SAY THIS?
See above

DID YOU HEAR SBPA BERNIE VALDEZ MAKE ANY COMMENTS ABOUT BPA(i) AFOLAYAN AND HIS CONDITION, MANNER OF DEATH, ETC? IF SO, WHEN AND WHAT WAS SAID?
I believe he made a statement basically saying that Nate was an excellent trainee. I think he gave a short statement but nothing even close to what Angarita gave. I can't say that I remember what he said during his statement.

DID YOU OR ANY CLASSMATES ATTEND BPA(i) AFOLAYAN'S BURIAL? IF NO, WHY NOT?
No, we had asked the instructors if we could fly out as we were still in the academy and we were told that we could not. I believe it was because you could not miss a certain number of days of the academy without being dismissed.

AA 07/07/2011

ARE YOU AWARE OF THE BP STAFF AT ARTESIA NOT ALLOWING AGENTS ATTEND THE FUNERAL BECAUSE OF THE UPCOMING SPANISH PROGRAM FOR YOUR CLASS?
The Spanish guys couldn't go. I don't know if the native speakers were out of the academy by then and were allowed to go, I just know we (the ones staying for Spanish) were not allowed to go.

DID AFOLAYAN EVER TELL YOU THAT HE WAS TAKING SUPPLEMENTS?
No

WERE YOU ROOMATES WHILE AT THE ACADEMY WITH BPA(i) AFOLAYAN?
Yes

IN BEING ROOMATES, DID YOU GUYS SHARE A ROOM, OR JUST A BATHROOM?
A room and a bathroom.

DID YOU EVER OBSERVE SUPPLEMENTS, VITAMINS OR PRESCRIPTION MEDICINES IN HIS POSSESSION? WHAT DID YOU SEE?
I never observed supplements. I had seen a clear bottle of what looked to me to be vitamins that I would see him take every once in a while. I saw that he had a nasal spray and there were a few bottles of prescribed medicine that I am pretty sure that came from the facility on base.

IF BPA(i) AFOLAYAN WAS TAKING SUPPLEMENTS, DO YOU THINK YOU WOULD HAVE NOTICED?
Yes.

DID YOU EVER OBSERVE BPA(i) AFOLAYAN DRINKING ENERGY DRINKS SUCH AS MONSTER OR 5 HOUR ENERGY DRINKS?
I never witnessed Nate drink any energy drinks. At one point, Nate brought back a four pack of a natural based energy drink. Nate left that four-pack on the T.V. stand and never consumed them. I believe the female supervisor searching my room asked who they belonged to. I answered that they were Nate's. I do not recall seeing them after they left.

WERE THERE RUMORS OR SPECULATION AMONGST THE CLASS THAT BPA(i) AFOLAYAN WAS TAKING SUPPLEMENTS? IF SO, WERE THESE RUMORS AROUND PRIOR TO BPA(i) AFOLAYAN'S DEATH?
As a majority, everyone knew who he was and that he wouldn't do that, but there was some speculation. These speculations/rumors were just around after his death.

WHO DID YOU HEAR THESE RUMORS FROM?
I don't remember specifically.

AA  07/07/2011

Appx410

AFTER HIS DEATH, ARE YOU AWARE OF ANY BP STAFF ENTERING BPA(i)
AFOLAYAN'S ROOM AND SEARCHING IT? IF SO, HOW MANY TIMES AND
WHAT WERE THEY LOOKING FOR?
Yes.

Prior to his passing, but after he was hospitalized, I was coming back from the
shooting range, and my section leader got a phone call that I needed to meet
someone outside my room. When I got off the bus, I went straight to my room.
The door was already open, and a male Supervisor was standing at the door,
and there was a female Supervisor inside. I think she had gone through end
tables, and drawers. I believe they had a bag that they were putting his stuff into.
I think they already had his medicines in there. They asked me if he had in his
medicine, and I said that I thought so and I asked if they wanted me to look in his
backpack and they said yes. Within his backpack were I think, 3 bottles of
medicines, and they took them. They told me that they were looking for
medications or supplements. When I got there, they had a key to his locker. I
saw them unlock his locker and took the bottle of what I believed to be vitamins,
and I believe they took some other stuff. After that they left.

They came in a second time, after Nate's passing. The female contacted me on
the phone, told me to pack up Nate's belongings and to place them on his bed.
While I was in class, that's when they came in the room and had taken the rest
out. This occurred within the week following Nate's death, but I don't recall what
day.

DO YOU RECALL IF AN INVENTORY OF ITEMS WERE BEING
DOCUMENTED ON THE SEARCH YOU WERE PARTIALLY PRESENT FOR?
Not that I am aware of

DO YOU KNOW IF AFOLAYAN WENT TO THE HEALTH UNIT AFTER BEING
SPRAYED WITH OC? IF SO, WHY WAS HE SEEKING MEDICAL
ASSISTANCE?
I don't know.

AFTER BPA(i) AFOLAYAN'S DEATH, DID YOU SPEAK TO HIS WIDOW, LISA
AFOLAYAN? IF SO, WHAT WAS THE CONTEXT OF THAT/THOSE
CONVERSATION(S)?
Yes. The first time, she called me and basically thanked me for reading Nate's
speech that he had written for the graduation ceremony. (He was elected by our
class to give a class speech.)

I have seen her here at the station before and I think I just said Nate was a great
guy, nothing about the death.

AA   07/07/2011

R. DENISE MARLOW, CSR EXHIBIT 10
DATE 11-27-12
WITNESS: N/A
11 PAGE(S)

Department of Homeland Security
U.S. Customs and Border Protection
Office of Internal Affairs

AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF: San Diego

I, Victor Hugo Muglia Arias, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Victor Hugo Muglia Arias

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
Almost 2.5 years

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS9/1, San Clemente, CA

PRIOR TO YOUR BORDER PATROL CAREER, WHAT TYPE OF
EMPLOYMENT DID YOU HAVE?
I was going to college and I was a meat clerk at Ralph's.

DO YOU HAVE ANY EXPERIENCE IN THE MEDICAL FIELD? IF SO, WHAT?
No experience

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
02/16/09 - 05/05/09, Class 856, Section B

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
Yes

HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i)
AFOLAYAN? DID YOU SOCIALIZE WITH HIM OFF DUTY?
I socialized with him. We talked, he was in my class. He was my friend.

WHO WERE YOUR ASSIGNED BORDER PATROL PT INSTRUCTORS WHILE
YOU WERE AT THE ACADEMY?
Bernie Valdez and Antonio Angarita

DO YOU MAINTAIN ANY CONTACT WITH EITHER SBPA ANTONIO
ANGARITA OR SBPA BERNIE VALDEZ? IF SO WHICH, AND WHAT DOES
YOUR CONTACT CONSIST OF?
No

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA BERNIE VALDEZ?
Our graduation day, we took a picture.

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA ANTONIO
ANGARITA?
The same day, same time (As Valdez)

DURING YOUR TRAINING AT THE BP ACADEMY, DID YOU RECEIVE ANY
FIRST AID AND/OR CPR TRAINING?
Yes we did, both.

DO YOU RECALL RECEIVING ANY TRAINING DURING THE ACADEMY IN
WEATHER RELATED ILLNESSES? HEAT ILLNESSES/HYPOTHERMIA, ETC?
IF SO, WHAT SUBJECTS DID YOU GUYS LEARN ABOUT?
I believe we did, just the basic heat related subject. I remember going over the
different stages of heat stoke, exhaustion, etc, and what to look for and what
steps to take to help them recover.

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC? IF
SO, WHAT WAS THE DATE?
No, but it was within the last two weeks of the academy.

DID YOU RECEIVE CPR/FIRST AID TRAINING BEFORE OR AFTER YOUR
OC CERTIFICATION?
Not sure, but if I had to guess, it would be before, because OC was one of the
later things.

WAS THE OC CERTIFICATION PROCESS RECORDED ON VIDEO/DISK?
DID YOUR ENTIRE SECTION GET CERTIFIED ON THE SAME DATE AS
YOU?
I don't think so.

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
For me it was Valdez.

IN EXPLICIT DETAIL, STEP BY STEP, CAN YOU EXPLAIN THE WHOLE OC
CERTIFICATION PROCESS, TO INCLUDE ANY ROLE PLAYING ACTIVITES
AND PRE EXPOSURE BRIEFING(S), IF THERE WERE ANY.
I think the week before we started learning how to use the OC. We learned what
happens when the OC is used, and how to treat somebody who has been
exposed. They taught us that it took about 45 minutes for the effects to wear off.
We role played and practiced on one another, and how to take it out, and how to
spray and the movements.

I don't remember if there was a pre-brief before the spray, but we did go in the
matroom before they took us out. In the matroom everyone warmed up, then
they took us outside, and then lined us up alphabetically. Then one by one or
two by two (I don't remember) they made us do sprints, push ups, a couple of
jumping jacks, and they put us in position to get sprayed. Valdez asked me my
class number and what station I was going, and then he sprayed me. Then
Valdez guided me to a room where someone was in a redman suit, and told me
that the redman was my opponent and he's trying to kill me, and to react. I got
my baton and subdued him, once I subdued him, I was done.

One of my classmates, I don't remember which one, guided me to the water and
I washed my face as best I could, and I got a towel to dry off. I endured the pain
until it was over.

BY NAME, WHO ELSE WAS PRESENT WHEN YOU WERE SPRAYED, TO
INCLUDE ROLE PLAYERS?
Valdez, Angarita, and a third PT instructor who I don't know.

HOW MANY PEOPLE WERE CERTIFIED AT A TIME?
One at a time from what I remember.

COULD YOU OBSERVE ANY OF YOUR CLASSMATES GETTING SPRAYED?
IF SO, HOW WAS THE OC DEPLOYED AND WHAT INSTRUCTOR SPRAYED
THE OC?
No, we were on the opposite side of the wall.

SINCE YOU COULD NOT SEE, COULD YOU HEAR WHAT WAS GOING ON?
IF SO, DESCRIBE, IN DETAIL WHAT YOU HEARD.
Yes. I could only hear the scenarios, not the OC spraying.



DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE FROM WHICH YOU WOULD RECEIVE THE SPRAY, THAT YOU WOULD BE SPRINTING BEFOREHAND, SAFETY PRECAUTIONS, ETC? IF SO, WHAT WERE YOU TOLD AND BY WHO?
I don't remember them saying that we would be sprinting beforehand. As far as how it was going to be deployed, there's only one way. And the distance, I don't remember.

WHAT INSTRUCTOR SPRAYED YOU AND HOW CLOSE WAS THEIR CAN OF OC TO YOUR FACE WHEN THE OC WAS DEPLOYED? (4-6/6-8)
Valdez. The can was maybe 4 feet away from my face when I got sprayed. Immediately before my spray, my eyes were open, but after the spray my eyes automatically closed as a reaction to the spray.

WERE YOU TOLD THAT YOU COULD USE EYE PROTECTION AND WAS THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.
I don't remember them telling us there was eye protection or that we could use them, and nobody used them.

DID YOU SEE ANY EYE PROTECTION THAT WAS AVAILABLE TO BE USED?
No, I was probably more scared thinking about how painful it was; I didn't see them.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
I didn't think about it, I just stood there. I was not told that I could stand sideways.

HOW MANY SECONDS DO YOU RECALL THE SPRAY BEING? DID YOU ONLY GET ONE BURST?
1 or 2, I don't remember. One burst.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR SPRAY WAS REASONABLE? IF NO, EXPLAIN.
Yes

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE DONE WITH YOUR SCENARIO?
Yes

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN?
IF SO, DO YOU RECALL THE EFFECTS THAT THE OC HAD ON HIM
IMMEDIATELY FOLLOWING THE SPRAY?, IF SO, WHAT WERE THE
EFFECTS ON HIM, AND DID THEY DIFFER FROM YOURS?
Yes. He got it pretty bad like all of us. He had burning, mucous, and hard to
breath, like me. After the 45 minutes were up, we walked it off.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT
OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT
DID YOU HEAR AND WHO SAID IT?
Yes, they said it several times in the matroom. Valdez said it. Valdez said that it
was going to hurt, and it's was going to hurt darker people more; and then Valdez
pointed at Nate, as he was only the African-American in the class. I don't
remember if Valdez said it as a joke, but the class laughed after he said this.

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i)
AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL
CONDITION?
Yes, a couple of times we were paired up in training. He was in really good
shape and ripped.

ON APRIL 30, 2009, THE DAY OF YOUR PT FINAL, DO YOU RECALL WHAT
ACTIVITIES OR BLOCKS OF INSTRUCTION YOUR CLASS SECTION TOOK
PART IN PRIOR TO YOUR SECTION GOING TO PT? DID ANY OF THESE
ACTIVITIES TAKE PART IN THE OUTDOOR ENVIRONMENT?
(After reviewing the class academy schedule)
We had Enforce, and Pursuit driving lab, but to be honest, I don't remember.
Maybe the pursuit driving was outside. I don't remember the morning part at all,
but looking at the schedule refreshed my memory and I do remember doing
Enforce then marching to PT.

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO,
DESCRIBE.
Hot and dry.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN
ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
No, I don't think so.

WHAT CLOTHING WAS YOUR CLASS WEARING WHEN IT PARTICIPATED
IN THE FINAL PT TEST?
We were wearing our class shirts, and our pt shorts, socks, and shoes.

DESCRIBE YOUR CLASS T-SHIRT.
Black short sleeved cotton with something printed on the back.

DID ANY CLASS MEMBER HAVE CONCERNS ABOUT WEARING A BLACK
SHIRT DURING EXTREMELY HOT WEATHER AND ENGAGING IN PHYSICAL
ACTIVITY? IF SO, WHO HAD CONCERNS, AND WERE THESE CONCERNS
BROUGHT TO THE ATTENTION OF ANY BP STAFF/PT INSTRUCTORS?
We did, but everyone wanted to wear it because it was our class shirt. I want to
say Afolayan and some other people had the concerns. I think the concerns
were just within us (students). I remember we were on a bus coming from
firearms, when we had this discussion. Nate said that it was going to be too hot
to wear black shirts. We voted, and more people wanted to wear the shirts than
not, so we wore them. This did include the entire section voting.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS THERE A FLAG
COLOR SYSTEM IN PLACE THAT WOULD INDICATE THE PT LEVEL
SOMEONE SHOULD / SHOULD NOT BE TRAINING AT FOR THE
PARTICULAR WEATHER AT THE TIME?
If there was I don't remember seeing it or hearing about it.

EITHER BEFORE, DURING OR AFTER THE PT RUN, DID YOU WITNESS
ANY PT INSTRUCTOR OR BP STAFF YELL ANYTHING AT BPA(i)
AFOLAYAN? IF SO, WHAT DID YOU HEAR/OBSERVE AND WHO SAID IT?
Right after when he was bent over, they were like "get up, you're not tired." I
believe it was Angarita that said this, he said it yelling as all PT instructors do.

BEFORE THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS
PHYSICALLY STRUGGLING? IF SO, WHAT DID YOU OBSERVE?
No

DURING THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS
PHYSICALLY STRUGGLING? IF SO, WHAT DID YOU OBSERVE?
No I did not notice, I was just trying to run.

AFTER THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS
PHYSICALLY STRUGGLING?
Yes, after he was physically tired and he was bent over. When the instructor told
him to get up and he didn't start moving, I knew something was wrong.

EXPLICITELY, STEP BY STEP, WHAT HAPPENED AFTER BPA(i)
AFOLAYAN'S 1.5 MILE RUN?
I finished the run, and I was walking it off and taking sips of water. I saw that
Nate just had his hands on his knees and then heard the instructor (Angarita) tell
him, in a yelling manner, to get up and to walk it off. (Angarita was about 20 feet
away, still taking the time of other students coming in.) Nate didn't move, he just
kept his hands on his knees, and Angarita then asked him, I believe still yelling, if
he needed to go to the shade. Nate answered yes, and right then Angarita took
him to the shade.



R. DENISE MARLOW, CSR EXHIBIT _11_
DATE _11-27-12_
WITNESS: _N/A_
_/3_ PAGE(S)

## AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF: San Diego

I, Jeffrey Carl Austin, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Jeffrey Carl Austin

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
Coming up on 2.5 years next month

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS9, Murrieta Station

PRIOR TO YOUR BORDER PATROL CAREER, WHAT TYPE OF
EMPLOYMENT DID YOU HAVE?
I did mortgages and worked at a high school for a little while doing security.

DO YOU HAVE ANY EXPERIENCE IN THE MEDICAL FIELD? IF SO, WHAT?
No

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
02/16/09-05/09.  856/SectionB

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
Yes, both.



HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i)
AFOLAYAN?  DID YOU SOCIALIZE WITH HIM OFF DUTY?
We didn't hang out after work, but we talked.  We flew home together once, to
visit our families.  I would have considered him a friend.

WHO WERE YOUR ASSIGNED BORDER PATROL PT INSTRUCTORS WHILE
YOU WERE AT THE ACADEMY?
Valdez and Angarita

DO YOU MAINTAIN ANY CONTACT WITH EITHER SBPA ANTONIO
ANGARITA OR SBPA BERNIE VALDEZ?  IF SO WHICH, AND WHAT DOES
YOUR CONTACT CONSIST OF?
No

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA BERNIE VALDEZ?
It's been not since the academy.  He emailed me a while asking where I took my
PT exam, but I never responded.  That was it.

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA ANTONIO
ANGARITA?
Not since the academy.

DURING YOUR TRAINING AT THE BP ACADEMY, DID YOU RECEIVE ANY
FIRST AID AND/OR CPR TRAINING?
Yes, first aid and CPR.  It was part of the academy.

DO YOU RECALL RECEIVING ANY TRAINING DURING THE ACADEMY IN
WEATHER RELATED ILLNESSES?  HEAT ILLNESSES/HYPOTHERMIA, ETC?
IF SO, WHAT SUBJECTS DID YOU GUYS LEARN ABOUT?
We kind of reviewed it, but other than that, no.

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC?  IF
SO, WHAT WAS THE DATE?
Towards the end of the academy.

DID YOU RECEIVE CPR/FIRST AID TRAINING BEFORE OR AFTER YOUR
OC CERTIFICATION?
I don't recall

WAS THE OC CERTIFICATION PROCESS RECORDED ON VIDEO/DISK?
DID YOUR ENTIRE SECTION GET CERTIFIED ON THE SAME DATE AS
YOU?
I don't know, I'm not sure.

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
I believe it was Angarita


7/17/11

IN EXPLICIT DETAIL, STEP BY STEP, CAN YOU EXPLAIN THE WHOLE OC
CERTIFICATION PROCESS, TO INCLUDE ANY ROLE PLAYING ACTIVITES
AND PRE EXPOSURE BRIEFING(S), IF THERE WERE ANY.
We showed up, lined up in formation, and walked down to the OC area. We
lined up and Valdez announced the order that the OC was going to go. It was
biggest to smallest. We lined up and they called the first two guys which was me
and Malta. Malta and I were both doing the exercises, but we were separated by
about 10 yards. They then told me to stop and Angarita told me say what station
I was going to and I believe my social, then Angarita sprayed me. After you got
sprayed, someone, assuming to be Angarita, walked me to an outside room, and
another instructor was in a red-man suit, and I was given a foam baton, and I had
to strike the instructor until they called "out of role." After being called "out of
role", I went to the sink area to clean off. There was so much going on, I really
don't remember.

HOW MANY PEOPLE WERE CERTIFIED AT A TIME?
Two at a time by two different instructors.

COULD YOU OBSERVE ANY OF YOUR CLASSMATES GETTING SPRAYED?
IF SO, HOW WAS THE OC DEPLOYED AND WHAT INSTRUCTOR SPRAYED
THE OC?
No. I couldn't see for about an hour.

SINCE YOU COULD NOT SEE, COULD YOU HEAR WHAT WAS GOING ON?
IF SO, DESCRIBE, IN DETAIL WHAT YOU HEARD.
Just people saying they couldn't see. I could not hear the instructors saying
anything.

DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD
HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE
FROM WHICH YOU WOULD RECEIVE THE SPRAY, THAT YOU WOULD BE
SPRINTING BEFOREHAND, SAFETY PRECAUTIONS, ETC? IF SO, WHAT
WERE YOU TOLD AND BY WHO?
They said it was going to burn, and that some people react differently. I don't
remember the instructors saying how far away they would be when we got
sprayed or that we would be exercising beforehand. I remember them saying to
flush out the eyes, and if you kept flushing them out, it would reactivate the OC.

WHAT INSTRUCTOR SPRAYED YOU AND HOW CLOSE WAS THEIR CAN OF
OC TO YOUR FACE WHEN THE OC WAS DEPLOYED? (4-6/6-8)
Angarita. I would say he was 6-8 feet away, if I had to take a guess at it. I was
looking at Angarita up until the point he sprayed me, then my eyes closed.

WERE YOU TOLD THAT YOU COULD USE EYE PROTECTION AND WAS
THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.

7/7/1

Afterwards. When we were all done, Valdez said someone grab the box of goggles that you could have used. I laughed, because prior to that, I didn't know there were goggles available to be used. Before, while we were stretching, different classmates asked if "no one is using goggles, right?" No one did.

One of the instructors said that if there was anyone who wore contacts, to take them out and to use glasses instead. If I would have known goggles were available, I would have left my contacts on and used goggles instead.

DID YOU SEE ANY EYE PROTECTION THAT WAS AVAILABLE TO BE USED?
Not until after we were done.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
He (Angarita) didn't give us an option.

HOW MANY SECONDS DO YOU RECALL THE SPRAY BEING? DID YOU ONLY GET ONE BURST?
Not even a few seconds, it was really fast. I think I just got one misting.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR SPRAY WAS REASONABLE? IF NO, EXPLAIN.
yes

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE DONE WITH YOUR SCENARIO?
Yes, we were told to rinse off our faces.

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN? IF SO, DO YOU RECALL THE EFFECTS THAT THE OC HAD ON HIM IMMEDIATELY FOLLOWING THE SPRAY?, IF SO, WHAT WERE THE EFFECTS ON HIM, AND DID THEY DIFFER FROM YOURS?
I don't remember him being there, but he was in my section. I didn't pay attention to anyone else. I don't know what effects the OC had on Nate.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT DID YOU HEAR AND WHO SAID IT?
I somehow remember that it tends to burn them more; for some reason that stands out to me. I don't remember who said it, it was said in a general manner and not directed to any one person.

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i) AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL CONDITION?
Yes. He was top-notch; he was like a machine.

ON APRIL 30, 2009, THE DAY OF YOUR PT FINAL, DO YOU RECALL WHAT ACTIVITIES OR BLOCKS OF INSTRUCTION YOUR CLASS SECTION TOOK PART IN PRIOR TO YOUR SECTION GOING TO PT? DID ANY OF THESE ACTIVITIES TAKE PART IN THE OUTDOOR ENVIRONMENT?
(after looking at schedule)
I don't remember doing it, but I recognize the classes (Enforce and driving.) Driving was outside at the driving course. I don't know what CC1 is.

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO, DESCRIBE.
Really hot. Very hot.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
Yes. I remember a few times, due to wind conditions, instead of running outside, either Angarita or Valdez, would put us on the treadmills. This seemed to be more due to the air quality not the heat.

WHAT CLOTHING WAS YOUR CLASS WEARING WHEN IT PARTICIPATED IN THE FINAL PT TEST?
Class shirts on, and they were black.

DESCRIBE YOUR CLASS T-SHIRT.
Black, short sleeve, t-shirts, with silkscreening.

DID ANY CLASS MEMBER HAVE CONCERNS ABOUT WEARING A BLACK SHIRT DURING EXTREMELY HOT WEATHER AND ENGAGING IN PHYSICAL ACTIVITY? IF SO, WHO HAD CONCERNS, AND WERE THESE CONCERNS BROUGHT TO THE ATTENTION OF ANY BP STAFF/PT INSTRUCTORS?
I do not recall anyone saying anything.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS THERE A FLAG COLOR SYSTEM IN PLACE THAT WOULD INDICATE THE PT LEVEL SOMEONE SHOULD / SHOULD NOT BE TRAINING AT FOR THE PARTICULAR WEATHER AT THE TIME?
I remember there being a black flag that if it was up we couldn't go out and PT, but I really didn't pay attention to it. I have no idea where the flag was. I don't recall the instructors ever talk about the flag color.

EITHER BEFORE, DURING OR AFTER THE PT RUN, DID YOU WITNESS ANY PT INSTRUCTOR OR BP STAFF YELL ANYTHING AT BPA(i) AFOLAYAN? IF SO, WHAT DID YOU HEAR/OBSERVE AND WHO SAID IT?
No, I was just focusing on finishing the run. I don't remember anyone getting yelled at.


7/7/11

R. DENISE MARLOW, CSR EXHIBIT 12
DATE 11-27-12
WITNESS: N/A
11 PAGES

Department of Homeland Security
U.S. Customs and Border Protection
Office of Internal Affairs

## AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF: San Diego

I, Reyna Del Carmen Cabrera, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Reyna Del Carmen Cabrera

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
Since February 2009

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS09, San Clemente, CA

PRIOR TO YOUR BORDER PATROL CAREER, WHAT TYPE OF
EMPLOYMENT DID YOU HAVE?
Banking

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
I think it was 02/18/09-05/16/09. 856 Section A

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
In my class, but not my section.

HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i)
AFOLAYAN? DID YOU SOCIALIZE WITH HIM OFF DUTY?
We did socialize off duty. We were more like acquaintances and hung out in
group settings, but I considered him a friend.

WHAT CLASSMATES DID BPA(i) AFOLAYAN HANG OUT WITH DURING THE ACADEMY?
I really don't know and I can't remember who was in the group when we hung out.

WHO WERE YOUR ASSIGNED BORDER PATROL PT INSTRUCTORS WHILE YOU WERE AT THE ACADEMY?
Angarita and Bernie Valdez

DO YOU MAINTAIN ANY CONTACT WITH EITHER SBPA ANTONIO ANGARITA OR SBPA BERNIE VALDEZ? IF SO WHICH, AND WHAT DOES YOUR CONTACT CONSIST OF?
No. By coincidence I saw Angarita in Vegas once and I sent him an email regarding it. This was probably in Christmas of 2009.

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA BERNIE VALDEZ?
Not since the academy

WHEN WAS THE LAST TIME YOU SPOKE WITH SBPA ANTONIO ANGARITA?
I sent him an email regarding me seeing him in Vegas. It was close to Christmas or a little bit after Christmas, 2009.

DURING YOUR TRAINING AT THE BP ACADEMY, DID YOU RECEIVE ANY FIRST AID AND/OR CPR TRAINING?
Yes, it was first responder training.

DO YOU RECALL RECEIVING ANY TRAINING DURING THE ACADEMY IN WEATHER RELATED ILLNESSES? HEAT ILLNESSES/HYPOTHERMIA, ETC? IF SO, WHAT SUBJECTS DID YOU COVER?
I want to say yes, but all our training is mushed together so I am not certain if it was when I got back or if was at the academy.

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC? IF SO, WHAT WAS THE DATE?
No, I don't remember the exact date, but I recall it was a week before the PT final.

DID YOU RECEIVE CPR/FIRST AID TRAINING BEFORE OR AFTER YOUR OC CERTIFICATION?
I want to say it was in conjunction, but I don't really remember.

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
Valdez

IN EXPLICIT DETAIL, STEP BY STEP, CAN YOU EXPLAIN THE WHOLE OC
CERTIFICATION PROCESS, TO INCLUDE ANY ROLE PLAYING ACTIVITES
AND PRE EXPOSURE BRIEFING(S), IF THERE WERE ANY.
They told us that a lot of things can happen such as bowel movements, throwing
up, but that the one thing we couldn't do was to freak out and to stop doing what
we needed to do. The OC spray residue clings or stays on the body and clothes.
We were instructed to wash thoroughly with soap and water and that when we
took a shower not to let water run down our genital area.

We practiced spraying for about a week before our certification spray. We
practiced spraying from different hands, and taking the OC out of the holster.

The day of the OC certification, they lined us up in the PT room and we went
outside and marched single file. They lined us up behind a huge wall and I could
hear at least 5 people go ahead of me. When I went around the wall, the PT
instructor had me do some exercises, and then asked me if it was really what I
wanted to do, that I could be in banking and that he really didn't have to spray me
if I wanted to quit right then. I told him it was what I wanted to do, and then
immediately he sprayed me. My immediate reaction was to close my eyes, and
then he said you need to open them and when I opened them there was a
burning sensation. He then gave me a foam baton and instructions that there
was a guy in front of me and I had to place him under arrest. At the beginning I
started hitting the role player with two hands, and Valdez told me it wasn't
baseball. I then hit him several times and got him to fall down. I placed his arm
behind him and then Valdez called "out of role."

After being called out of role, I went to the back and there was water. I had
heard someone say that the water could make it worse, but I washed off as much
as I could. I knew it was going to hurt, but I knew I would be okay, so I washed
as much as I could.

DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD
HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE
FROM WHICH YOU WOULD RECEIVE THE SPRAY AND/OR SAFETY
PRECAUTIONS, ETC? IF SO, WHAT WERE YOU TOLD AND BY WHO?
They did tell us the distance, but I don't remember the distance right now. They
did not tell us about the sprinting, and they told us just not to freak out, to keep
our heads clear and to focus on what we were doing. It was Angarita who said
this.

WHAT INSTRUCTOR SPRAYED YOU AND HOW CLOSE WAS THEIR CAN OF
OC TO YOUR FACE WHEN THE OC WAS DEPLOYED? (4-6/6-8)
Valdez. At the point that I closed my eyes, the can of OC was maybe 6 or 12
inches from my face.

WERE YOU TOLD THAT YOU COULD USE EYE PROTECTION AND WAS
THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.
No, I don't remember being told.

DID YOU SEE ANY EYE PROTECTION THAT WAS AVAILABLE TO BE USED?
No.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT
OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
No, he was standing right in front of me, and I wasn't told standing sideways was
an option.

HOW MANY SECONDS DO YOU RECALL THE SPRAY BEING? DID YOU
ONLY GET ONE BURST?
Maybe 3 seconds. It was really quick. I think it was one burst, but I really don't
remember.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR
SPRAY WAS REASONABLE? IF NO, EXPLAIN.
I believe so. I didn't question it.

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE
DONE WITH YOUR SCENARIO?
Yes.

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN?
DO YOU KNOW WHAT EFFECTS THAT THE OC HAD ON BPA AFOLAYAN?
HOW DO YOU KNOW THIS?
I can't remember, but we got certified first. Our section went first. I don't know
what effects the OC had on Nate.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT
OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT
DID YOU HEAR AND WHO SAID IT?
No, but the next day or the day after that, my classmate, Ahad, who is half black
and half Puerto Rican, said that OC affects black people more, and Angarita
responded that that was nonsense, that it affects everyone the same, and that
there's a small percentage that doesn't get affected at all.

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i)
AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL
CONDITION?
No, I wasn't in his section. I know that at one point during the academy training, I
was a little flustered and said I couldn't do the 1.5 mile run and getting over the
wall and he said that we could run together so I could get better. I ran with him a
couple of times. He was in top physical condition.



Appx441

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO, DESCRIBE.
It was really hot. I remember the dirt just being like really dusty.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
None that they told us. We never knew what we were going to do until we did it.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS THERE A FLAG COLOR SYSTEM IN PLACE THAT WOULD INDICATE THE PT LEVEL SOMEONE SHOULD / SHOULD NOT BE TRAINING AT FOR THE PARTICULAR WEATHER AT THE TIME?
If there was, I didn't see it, and no one ever told me; as I recall, I was never in class if and when this was told to us.

EXPLICITELY, WHAT DO YOU KNOW ABOUT HOW BPA(i) AFOLAYAN'S FINAL PT RUN?
I really don't know what happened, I wasn't there.

AT ANY OTHER TIME DURING PT TRAINING WITH BPA(i) AFOLAYAN, DID YOU SEE HIM ACT IN A SIMILAR MANNER AS YOU KNEW HE REACTED AFTER THE FINAL PT RUN?
No, he was just concerned about the swim.

FROM WHAT YOU KNOW, WHAT FIRST AID WAS RENDERED TO BPA(i) AFOLAYAN? WHO TOLD YOU THIS?
I don't remember who told me but I remember being told from various people that while Angarita was watching Nate at the wall, Nate collapsed and when he did, one of the fastest runners went to get the defibrillator. They then carried him to the medical shed and waited for the ambulance to come.

KNOWING WHAT YOU KNOW ABOUT HIS CONDITION, DO YOU THINK THE FIRST AID GIVEN TO BPA(i) AFOLAYAN WAS ADEQUATE. WOULD YOU HAVE TREATED HIIM SIMILARLY?
I think so because he was physically fit. I don't think they thought it was anything major, just heat exhaustion. They did what they could. He didn't look sick, he looked fine.

Knowing what I know, I would have thought it was heat exhaustion and would have treated him similarly. We all thought it was something mild. It wasn't until we heard that he got flown from New Mexico to Texas that we knew it was something really bad.

Department of Homeland Security
U.S. Customs and Border Protection
Office of Internal Affairs

AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF: Riverside

I, Ginno Marcello Gallina Mora, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Ginno Marcello Gallina Mora

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
Just over two years.

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS-9, Murrieta Station

PRIOR TO YOUR BORDER PATROL CAREER, WHAT TYPE OF
EMPLOYMENT DID YOU HAVE?
I was a computer drafter, Driver. GG

DO YOU HAVE ANY EXPERIENCE IN THE MEDICAL FIELD? IF SO, WHAT?
None except for taking first responder classes after the Border Patrol Academy. I
had taken CNA (Certified Nurse Assistant), but it was a long time ago, when I was
about 17.

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
Feb 16, 2009 – May 5, 2009.  856/B

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
Yes.

*GG*
July 5, 2011

HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i)
AFOLAYAN? DID YOU SOCIALIZE WITH HIM OFF DUTY?
It was very limited; we really did not have much contact. No socialization off
duty. I saw him one time off duty at the gym.

DURING YOUR TRAINING AT THE BP ACADEMY, DID YOU RECEIVE ANY
FIRST AID AND/OR CPR TRAINING?
Yes

DO YOU RECALL RECEIVING ANY TRAINING DURING THE ACADEMY IN
WEATHER RELATED ILLNESSES? HEAT ILLNESSES/HYPOTHERMIA, ETC?
IF SO, WHAT SUBJECTS DID YOU GUYS LEARN ABOUT?
I don't recall

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC? IF
SO, WHAT WAS THE DATE?
Towards the end of the academy, before the PT final, if I recall within a week
prior to the PT finial.

DID YOU RECEIVE CPR/FIRST AID TRAINING BEFORE OR AFTER YOUR
OC CERTIFICATION?
Before

WAS THE OC CERTIFICATION PROCESS RECORDED ON VIDEO/DISK?
No, I don't believe so.

DID YOUR ENTIRE SECTION GET OC CERTIFIED ON THE SAME DATE AS
YOU?
Yes

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
SBPA Angarita

IN EXPLICIT DETAIL, STEP BY STEP, CAN YOU EXPLAIN THE WHOLE OC
CERTIFICATION PROCESS, TO INCLUDE ANY ROLE PLAYING ACTIVITES
AND PRE EXPOSURE BRIEFING(S), IF THERE WERE ANY.
Angarita and Valdez briefed us in the matroom. They basically said we were
going to get sprayed and that there would be a scenario where we would have to
fight after being sprayed with OC. They told us that we had to control our subject
and call out our location to call for help. They told us that the location would be
"Mr. Valdez' Playground." They also gave us the option to wear goggles, but no
one did. I wanted to wear the goggles, but I didn't want to be the only one.

We then went outside, we were lined up by last names or by height I don't recall
exactly. When it was my turn I believe it was me and I think, BPA Guillen, and
we were asked to run, do pushups and jumping jacks. After that they call us one

at a time. I was sprayed first and I was told that I had the option to close my eyes and stop breathing or not. I chose to close my eyes and hold my breath and I was then sprayed. It was Angarita who sprayed me.

After being sprayed I was trying to get my breath, and Angarita took me to an outside open room (walls only). There was another instructor suited up in there. When I walked in there, I was trying to keep my eyes open, Angarita told me that the other instructor was my target and to go get him. I went in there, identified myself, and I had to strike him with my plastic baton to subdue him. I was able to get him down and Angarita said that the scenario was over.

Angarita took me outside, and we were able to wash ourselves with water and soap to get the stuff off. There was also a fan going.

BY NAME, WHO ELSE WAS PRESENT WHEN YOU WERE SPRAYED, TO INCLUDE ROLE PLAYERS?
Me, Guillen and Angarita. The other classmates are behind the wall, so they can not see from where they are standing. They could only hear what was happening.

HOW MANY PEOPLE WERE CERTIFIED AT A TIME?
Two at a time.

COULD YOU OBSERVE ANY OF YOUR CLASSMATES GETTING SPRAYED? IF SO, HOW WAS THE OC DEPLOYED AND WHAT INSTRUCTOR SPRAYED THE OC?
No.

SINCE YOU COULD NOT SEE, COULD YOU HEAR WHAT WAS GOING ON? IF SO, DESCRIBE, IN DETAIL WHAT YOU HEARD.
You could only hear what is going on inside the scenario, but you can not hear the spraying. The scenarios and the spaying are taking place simultaneously.

DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE FROM WHICH YOU WOULD RECEIVE THE SPRAY, THAT YOU WOULD BE SPRINTING BEFOREHAND, SAFETY PRECAUTIONS, ETC? IF SO, WHAT WERE YOU TOLD AND BY WHO?
They said that it was going to be one spray and the said the distance, but I don't remember what they said. They said you could close your eyes, or wear goggles. This was said by either Valdez or Angarita in the matroom.

WHAT INSTRUCTOR SPRAYED YOU AND HOW CLOSE WAS THEIR CAN OF OC TO YOUR FACE WHEN THE OC WAS DEPLOYED?
Angarita. At the point that I closed my eyes, his body was about 2 feet away from me. It was pointed out during the OC scenarios that, prior to the

*July 5. 2011*

certification, that if you were too close to your subject, the OC would not be as effective.

WERE YOU TOLD THAT YOU COULD USE EYE PROTECTION AND WAS THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.
Yes. I would not say it was not either encouraged or discouraged.

DID YOU SEE ANY EYE PROTECTION THAT WAS AVAILABLE TO BE USED?
They were in the gator, golf cart. I saw that they were in the back of the gator because I was instructed by Agarita to put the Goggles in the back of the gator as we left the matroom.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
That was not an option.

HOW MANY SECONDS DO YOU RECALL THE SPRAY BEING? DID YOU ONLY GET ONE BURST?
Maybe just a second or two, across the face (from the feeling, as my eyes were closed.) One burst only.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR SPRAY WAS REASONABLE? IF NO, EXPLAIN.
Yes, because I heard that other classes got sprayed worse. No one in my class said that.

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE DONE WITH YOUR SCENARIO?
Yes, we were given soap and water. I believe there were also towels there.

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN? IF SO, DO YOU RECALL THE EFFECTS THAT THE OC HAD ON HIM IMMEDIATELY FOLLOWING THE SPRAY?, IF SO, WHAT WERE THE EFFECTS ON HIM, AND DID THEY DIFFER FROM YOURS?
Yes, I don't remember seeing him after his spraying.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT DID YOU HEAR AND WHO SAID IT?
Yes, I think it was mentioned either on the same day or one of the prior days during OC training. If I remember correctly it was a different instructor that said that. I think he said it in regards to Afolayan but I don't recall how it was brought up. He said this in front of the whole class in the matroom. I perceived this statement as it was said as a matter of fact, as to give Afolayan heads up.

July 8, 2011

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i)
AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL
CONDITION?
Yes, during PT. He was a stallion – very strong and well in shape. We were
taught how to take a person down from behind, and Afolayan suited up. When it
was my turn, when I tried to take him down, there was no way, he was strong.
He was basically carrying me.

ON APRIL 30, 2009, THE DAY OF YOUR PT FINAL, DO YOU RECALL WHAT
ACTIVITIES OR BLOCKS OF INSTRUCTION YOUR CLASS SECTION TOOK
PART IN PRIOR TO YOUR SECTION GOING TO PT? DID ANY OF THESE
ACTIVITIES TAKE PART IN THE OUTDOOR ENVIRONMENT?

(After being shown class schedule)
Alien processing and IDENT. Pursuit driving would have had to take place
outside. That was from 9:30 to 10:30. I don't remember what the first one was.

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO,
DESCRIBE.
It was very hot. I remember because our class shirts were dark, and everybody
wanted to use them for our final PT run, and I didn't want to use them because
they were dark and thick.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN
ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
As I recall there was a flag and if it was down then there was no PT outside. I
recall there was one time that we were excused from outside PT due to smog
outside and it was not safe.

WHAT CLOTHING WAS YOUR CLASS WEARING WHEN IT PARTICIPATED
IN THE FINAL PT TEST?
Shorts and our class t-shirt.

DESCRIBE YOUR CLASS T-SHIRT.
Black cotton, thick and short sleeved.

DID ANY CLASS MEMBER HAVE CONCERNS ABOUT WEARING A BLACK
SHIRT DURING EXTREMELY HOT WEATHER AND ENGAGING IN PHYSICAL
ACTIVITY? IF SO, WHO HAD CONCERNS, AND WERE THESE CONCERNS
BROUGHT TO THE ATTENTION OF ANY BP STAFF/PT INSTRUCTORS?
I was the only run that mentioned it. I mentioned it in our bus, with the
classmates that were there, when we going to lunch from driver's training. No
concerns were brought forward; it was just between us (the classmates.)

July 5, 2011

DURING THE TIME YOU WERE AT THE ACADEMY, WAS THERE A FLAG COLOR SYSTEM IN PLACE THAT WOULD INDICATE THE PT LEVEL SOMEONE SHOULD / SHOULD NOT BE TRAINING AT FOR THE PARTICULAR WEATHER AT THE TIME?
There was a flag posted at the front of the Academy, near the PT building. I think the flag would go up or down based on the weather and smog (due to the refinery). I vaguely recall, if the flag is up, we could PT, if it was down, then there was no PT outside. The flag could be seen by anyone at the PT building.

EITHER BEFORE, DURING OR AFTER THE PT RUN, DID YOU WITNESS ANY PT INSTRUCTOR OR BP STAFF YELL ANYTHING AT BPA(i) AFOLAYAN? IF SO, WHAT DID YOU HEAR/OBSERVE AND WHO SAID IT?
Yes. When we came in from our run, we were directed to walk around and to not stop moving. Afolayan would normally come in before me, but that day, he came in behind me. When he came in he looked exhausted. When he finished he seemed like he was weak. I heard him ask BPA Fazio to help him walk, which Fazio did right away. Afolayan put his arm around Fazio and when Angarita saw this he yelled at Afolayan to "walk it off." Angarita seemed to yell at Afolayan as a mind game, and not due to the distance between them. Once Angarita yelled at him, Afolayan let go of Fazio; he walked on his own for a little bit and then stopped. He placed his hands on his knees and was spitting but not normal spit the spit was very thick and stringy. Then Angarita came and began to speak to him. Afolayan was in the sun when Angarita approached, but upon Afolayan telling Angarita that he was having trouble breathing, Angarita immediately moved him to the shade.

BEFORE THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS PHYSICALLY STRUGGLING? IF SO, WHAT DID YOU OBSERVE?
No

DURING THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS PHYSICALLY STRUGGLING? IF SO, WHAT DID YOU OBSERVE?
No

AFTER THE FINAL PT RUN, DID YOU NOTICE BPA(i) AFOLAYAN WAS PHYSICALLY STRUGGLING? IF SO, WHAT DID YOU OBSERVE?
See above. It was right after the finish line.

AT ANY OTHER TIME DURING PT TRAINING WITH BPA(i) AFOLAYAN, DID YOU SEE HIM ACT IN A SIMILAR MANNER AS HE DID AFTER THE FINAL PT RUN?
No, never.

DID YOU SEE ANY FIRST AID BEING RENDERED TO BPA(i) AFOLAYAN AFTER THE 1.5 MILE RUN WAS COMPLETED? IF SO, WHAT DID YOU OBSERVE?

July 5, 2011

Yes. As I stated above after Angarita saw that he was struggling as Angarita was approaching Afolayan; Afolayan struggled to state that he was having trouble breathing. He took him to the shade and I heard Angarita telling him to breath. Afolayan was standing there for like two minutes when he fell backwards. Angarita was in front of Afolayan when he fell backwards.

DID YOU OBSERVE THAT BPA(i) AFOLAYAN WAS GIVEN SOME WATER TO DRINK OR WET TOWELS/RAGS TO COOL OFF WITH?
No towels. I don't remember water, but everyone had their canteens at the finish line waiting for them. I never saw Afolayan go for his canteen in fact his hands were empty.

WAS THERE WATER READILY AVAILABLE IN THE AREA WHERE THE 1.5 MILE RUN ENDED? IF SO, EXPLAIN.
Yes. Individual canteens.

EXPLICITELY, STEP BY STEP, WHAT HAPPENED AFTER BPA(i) AFOLAYAN'S COLLAPSED?
When he fell back, his head bounced on the track. His eyes rolled up and he was shaking. I don't know if it was from the fall or from something that was within his body (i.e. seizure, convulsing). After seeing Afolayan fall and the state he was in me and Fazio started praying, so I closed my eyes. When I opened my eyes, Mr. Valdez was already there with the gator and Mr. Angarita was holding Afolayan's head trying to talk to Afolayan. Afolayan was not responsive. After that they called some classmates to help pick up Afolayan and put him in the gator. I remember there was water, but I don't know if it was splashed at Afolayan or placed in the gator to cool it off. Afolayan was then taken to the Academy clinic.

WHILE THE 1.5 MILE RUN WAS GOING ON, WERE YOU RUNNING CLOSE TO BPA(i) AFOLAYAN? IF SO, HOW DID HE APPEAR TO BE HANDLING THE RUN?
No, he came behind me. I didn't see him the whole time until he crossed the finish line. To me this was not normal because he was always ahead of me during all our runs.

RECALLING HOW YOU OBSERVED BPA(i) AFOLAYAN'S CONDITION THAT AFTERNOON, FROM YOUR TRAINING IN CPR/FIRST AID, WHAT WOULD HAVE BEEN THE PROPER MANNER TO TREAT HIM?
When he came in and was struggling, my first thought was that it was the heat. When I saw Angarita take him to the shade I thought this was a good thing because it was out of the sun. Other than that, I don't know because it happened so rapidly. CPR wasn't needed because he was still breathing.

July 5, 2011

Appx455

Department of Homeland Security
U.S. Customs and Border Protection
Office of Internal Affairs

R. DENISE MARLOW, CSR EXHIBIT _14_
DATE _11-27-12_
WITNESS: _N/A_
_____ PAGE(S)

## AFFIDAVIT

Department of Homeland Security

U.S. Customs and Border Protection

STATE OF: California

COUNTY OF: San Diego

I, Victor Manuel Santomauro, after being duly sworn state the following:

WHAT IS YOUR FULL NAME?
Victor Manuel Santomauro

HOW LONG HAVE YOU BEEN EMPLOYED BY U.S. CUSTOMS AND BORDER
PROTECTION, UNITED STATES BORDER PATROL (USBP)?
2 years and 5 months

WHAT IS YOUR TITLE, PAY GRADE AND USBP DUTY STATION?
Border Patrol Agent, GS9, San Clemente, CA

WHEN DID YOU GO THROUGH THE BORDER PATROL ACADEMY AND
WHAT WAS YOUR CLASS NUMBER, AND CLASS SECTION?
February 19 – May 6, 2009. 856/Section B

WAS BPA(i) NATHANIEL AFOLAYAN IN YOUR CLASS/SECTION?
Yes

HOW WOULD YOU CLASSIFY YOUR RELATIONSHIP WITH BPA(i)
AFOLAYAN? DID YOU SOCIALIZE WITH HIM OFF DUTY?
Classmate. Not particularly (socialize). Got along with him.

DO YOU RECALL WHAT DATE YOU WERE CERTIFIED TO CARRY OC? IF
SO, WHAT WAS THE DATE?
End of April sometime, don't remember the date.

WAS THE OC CERTIFICATION PROCESS RECORDED ON VIDEO/DISK?
DID YOUR ENTIRE SECTION GET CERTIFIED ON THE SAME DATE AS
YOU?
Not sure. The Class, Section A went the day before, and Section B went in the afternoon, the following day.

WHO WAS THE INSTRUCTOR THAT SPAYED YOU WITH OC?
Antonio Angarita

IN DETAIL CAN YOU EXPLAIN THE WHOLE OC CERTIFICATION PROCESS,
TO INCLUDE ANY ROLE PLAYING ACTIVITES IF THERE WERE ANY.
We met up in the mat room, SBPA Valdez, PT instructor, briefed us that we were
going to get sprayed, and the effects (mucous membrane, eye irritation). He said
to stay calm and that it would be over after a while. We lined up, marched
outside to the OC spray area. We lined up from tallest to shortest, on the outside
of the concourse, and from there either SBPA Valdez or PT Instructor Angarita,
would take 2 or 3 at a time (I don't remember) to where the OC was going to take
place at the concourse. I was close to the end of the line, and just waiting my
turn until I was sprayed. We were on the outer wall of the concourse, but could
not visually see the spray.

We were taken, we had to do maybe some pushups, like 25 or something like
that, just kind of warm up and a small little sprint, like 20 yards and back, and
they started the scenario with the spray after we warmed up for a little bit.
Anagarita asked me what station I was from and I said San Clemente and he told
me that I had just been involved in an OC spray scenario and he made me tilt my
head back and asked me again what station I was from, he told me to close my
mouth and eyes and sprayed me in the face. He told me I was just involved in an
OC spray. It started to hurt my eyes and he told me to stay calm and compose
myself. After a couple of seconds, I opened my eyes and he walked me over to
where the redman was and told me I had to subdue the subject that was coming
at me.

WHO ELSE WAS PRESENT WHEN YOU WERE SPRAYED, TO INCLUDE
ROLE PLAYERS?
Another agent next to me, but I don't recall who it was.

HOW MANY PEOPLE WERE CERTIFIED AT ONCE?
The whole section, one or two at a time.

DID YOU OBSERVE ANY OF YOUR CLASSMATES GETTING SPRAYED? IF
SO, WHO, HOW WAS THE OC DEPOLYED AND WHAT INSTRUCTOR
SPRAYED THE OC?
No.

DURING THE TIME PRIOR TO THE OC CERTIFICATION, WERE YOU TOLD HOW IT WAS GOING TO BE DEPLOYED, FOR INSTANCE, THE DISTANCE, THAT YOU WOULD BE SPRINTING BEFORE, SAFETY PRECAUTIONS, ETC? IF SO, WHAT WERE YOU TOLD?
SBPA Valdez, in the matroom, told us it was going to be 3-6 feet away, and what the effects were going to be on us. He told us not to panic and that the effects would go away.

HOW CLOSE WAS THE BPA ANGARITA'S CAN OF OC TO YOUR FACE WHEN THE OC WAS DEPLOYED?
From what I am gauging 3-6 feet.

WAS EYE PROTECTION AVAILABLE AND WAS THEIR USAGE ENCOURAGED? PLEASE EXPLAIN.
We didn't have eye protection. I don't recall if we had a choice to use eye protection.

WERE YOU ALLOWED TO STAND SIDEWAYS DURING THE DEPLOYMENT OF THE OC? WERE YOU TOLD THAT THIS WAS AN OPTION?
I don't recall if it was an option or not, they just told us to stand straight ahead and tilt our head back.

DO YOU THINK THE AMOUNT OF OC YOU RECEIVED DURING YOUR SPRAY WAS REASONABLE? IF NO, EXPLAIN.
I think it was reasonable.

WERE YOU ALLOWED TO DECONTAMINATE AS SOON AS YOU WERE DONE WITH YOUR SCENARIO?
Yes, they walked us over and we were allowed to wash our faces with water and towels.

DID YOU GET CERTIFIED ON THE SAME DATE AS NATHANIEL AFOLAYAN? IF SO, DO YOU RECALL THE EFFECTS THAT THE OC HAD ON HIM IMMEDIATELY FOLLOWING THE SPRAY?, IF SO, WHAT WERE THE EFFECTS ON HIM, AND DID THEY DIFFER FROM YOURS?
Yes. I didn't see or was concerned about anyone, I was trying to get the OC out of my face and eyes.

AT ANY TIME, DID YOU HEAR ANY INSTRUCTORS SAY ANYTHING ABOUT OC AFFECTING DARKER PEOPLE MORE THAN OTHERS? IF SO, WHAT DID YOU HEAR AND WHO SAID IT?
During a lecture, a couple of days before the certification spray, SBPA Valdez said OC affects people with fair skin worse.

DID YOU OFTEN ENGAGE IN PHYSICAL TRAINING WITH BPA(i)
AFOLAYAN? IF SO, IN YOUR OPINION, WHAT WAS HIS PHYSICAL
CONDITION?
As a section we all did physical training. On one or two occasions, I saw him in
the weight room and we worked out briefly. He was in excellent shape.

ON APRIL 30, 2009, THE DAY OF YOUR PT FINAL, DO YOU RECALL WHAT
ACTIVITIES OR BLOCKS OF INSTRUCTION YOUR CLASS SECTION TOOK
PART IN PRIOR TO YOUR SECTION GOING TO PT? DID ANY OF THESE
ACTIVITIES TAKE PART IN THE OUTDOOR ENVIRONMENT?
Right before PT, we did a computer lab, I think IDENT. From there we marched
to PT. I don't remember what else happened beforehand.

DO YOU RECALL WHAT THE WEATHER WAS ON APRIL 30, 2009? IF SO,
DESCRIBE.
It was hot. I don't remember the exact temperature, but it was hot.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS PT MODIFIED IN
ANY WAY, TO SUIT THE WEATHER FOR THAT DAY? IF SO, HOW?
No, not that I can recall.

WHAT CLOTHING WAS YOUR CLASS WEARING WHEN IT PARTICIPATED
IN THE FINAL PT TEST?
Our issued white socks, green PT shorts, and we elected to wear our class shirt
for our final which was black short sleeved t-shirt.

DID ANY CLASS MEMBER HAVE CONCERNS ABOUT WEARING A BLACK
SHIRT DURING EXTREMELY HOT WEATHER AND ENGAGING IN PHYSICAL
ACTIVITY? IF SO, WHO HAD CONCERNS, AND WERE THESE CONCERNS
BROUGHT TO THE ATTENTION OF ANY BP STAFF/PT INSTRUCTORS?
There was talk in the locker room that it was kinda hot and that we should wear
the regular grey issued PT shirt. Because of tradition, we opted to wear our
class shirt. I don't remember who took part in the conversation that I overheard.
From what I recall this was just locker room discussion and not brought to the
attention to PT instructors. It was understood that traditionally the BP classes
would wear their class shirts when taking their last PT final and to my knowledge,
we were not directed by PT instructors to wear our class shirts.

DURING THE TIME YOU WERE AT THE ACADEMY, WAS THERE A FLAG
COLOR SYSTEM IN PLACE THAT WOULD INDICATE THE PT LEVEL
SOMEONE SHOULD / SHOULD NOT BE TRAINING AT FOR THE
PARTICULAR WEATHER AT THE TIME?
I wasn't aware of any flag coloring system.



Stephen J. Cina, M.D., P.C.
Forensic Pathology Consultants

**Questions for Medical Review of PSOB Claims**
(Updated January 30, 2009)

<u>Background</u>: In order for the PSOB Office to determine whether a claim is payable under the PSOB Act, the PSOB Office must make specific findings as a matter of law. The professional opinion of competent medical experts is often needed to assist the PSOB Office in making these findings.

To ensure that this claim is resolved efficiently and fairly by the PSOB Office, it requests that you: (1) review the medical records and other documentation relating to the death of the individual named in the attached cover memo; and (2) respond to the questions set forth below.

**Based on the medical records and all other documentation reviewed with respect to the death of the individual named in the cover memo and on consideration of the following definition:**

An "injury" means "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virii, or bacteria, but does not include —

(1) Any occupational disease; or
(2) Any condition of the body caused or occasioned by stress or strain."

1) Is it more likely than not that the decedent sustained a traumatic physical wound or a traumatized physical condition of the body on April 30, 2009?

**It is possible that the PSO died as a consequence of heatstroke. He was exercising in a hot environment at altitude at the time of his collapse; however, he had done so before with no ill effects. It is also possible that antihistamine use made him more prone to hyperthermia than usual. His symptoms leading up to his collapse were somewhat atypical for heatstroke and he did not complain of being hot prior to losing consciousness. Further, though there was a clinical impression of heat-related illness, an elevated body temperature was not recorded. I cannot, to a reasonable degree of medical probability, state that the PSO died of heatstroke. I can state that the adverse climatic conditions contributed at some level to his death.**

2) In regard to the traumatic physical wound or traumatized physical condition of the body identified in response to question 1, was such wound or condition, by itself, sufficient to have caused the decedent's death?

**Based on the records provided, I cannot confirm a diagnosis of heatstroke, though it remains a possibility in this case. I believe that the PSO would not have collapsed on 4/30/09 if he was not exercising in an adverse environment and that the climate played some role in his death. I cannot state, however, that the climate was the most significant factor in this fatality.**

3) Aside from the wound or condition of the body identified in response to question 1, did any other factor or combination of factors (for example, chronic, congenital, progressive, or preexisting condition, illness, or disease) contribute to the death as much as such wound or condition?

**Yes. There is microscopic evidence of severe sickle cell disease. The combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure could have triggered a sickle cell crisis**

**<u>AMENDMENT (2/22/13):</u> The microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait. Microscopically, this is identical to a crisis from sickle cell disease.**



4) Did the decedent have a chronic, congenital, progressive, or preexisting condition, illness, or disease that, by itself or in combination with any other factor(s), was sufficient to have caused the wound or condition of the body identified in response to question 1?

**Yes. I believe, more likely than not, that the PSO would not have collapsed on 4/30/09 if he did not have a sickle cell crisis.**

5) If the answer to #4 is "no," then what factors, may have caused such traumatic wound or traumatized condition?

**The PSO's collapse and subsequent demise were brought about by the combination of a congenital condition (sickle cell trait or disease) and exercise in a hostile environment. Antihistamine use, dehydration, and a viral illness could also have played a smaller role in this death.**

## SUMMARY:

This 29-year-old PSO collapsed after a 1.5 mile run in New Mexico on 4/30/09. The symptoms surrounding his collapse included disorientation, agitation, and combative behavior, followed by an inability to breathe. The symptoms and his hospital course militate against an arrhythmia related to his enlarged heart. To a reasonable degree of medical probability, I can rule out both heart attack and stroke as the underlying cause of death.

In my review of the autopsy slides, abundant sickle cells were noted. His clinical course would be compatible with a sickle cell crisis brought on by intense physical exertion in a hot environment at altitude. Possible dehydration and a probable recent viral illness would be risk factors. The PSO was an African-American, but there is no documentation of sickle cell trait in the records provided.

Heat-related death is also a possibility. He was exerting himself in New Mexico in 90-degree weather prior to his collapse. In addition, the records indicate he was recently prescribed antihistamines, medications that can increase the risk for heat stroke. No elevation in body temperature, however, is recorded in the medical records at the time of his collapse.

In summary, I believe, more likely than not, that exercise in an adverse climate contributed to death. If those conditions did not exist, he likely would not have collapsed on 4/30/09. That being said, I feel the most significant factor contributing to death in this case was a sickle cell crisis. If appropriate laboratory samples are available, testing for sickle cell disease or trait could be performed. Close family members should be screened for this condition.

## ADDENDUM 2/22/13:

I have had the opportunity to review additional records including the transcripts of colleagues present when the PSO collapsed, the consultation report of Dr. Sperry, and the hearing transcript. Essentially, my opinion is unchanged and my microscopic diagnosis of sickle cell disease/trait has been confirmed. To within a reasonable degree of medical probability, the PSO would not have died if he did not have pre-existent sickle cell trait. He also would not have died if he was not exercising in a hot, hostile environment. Each of these factors was a contributory factor in his death. The role of nutritional supplements in this fatality cannot be determined as their ingestion seems to be based on rumor and was not confirmed.

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

May 22, 2013

Re: Nathanial A. Afolayan

This is an amendment to the report I authored dated November 15, 2012, regarding the death and the circumstances surrounding the death of Nathanial A. Afolayan. Since that time, following my testimony at the hearing in this matter, I have received and reviewed the "Amended Report" of "Non-HH Review of Case 2010-022 (Afolayan, Nathanial), authored by Stephen J. Cina, M. D., P. C., of Forensic Pathology Consultants, dated February 22, 2013. .

In his report, Dr. Cina essentially reiterates the report he initially authored in this matter, with significant omissions, including medical facts that appear to have been left out purposely. From my initial review of the records in this matter, as iterated in my report, it is a medical fact that Mr. Afolayan had the sickle cell trait, as proven in a blood specimen collected from him on December 18, 2007, which irrefutably proves this medical condition. As I had previously stated, the sickle cell trait is NOT a disease, and the presence of this condition (based upon Mr. Afolayan's Hemoglobin S concentration of 41%) is NOT considered grounds for medical separation from duty in the United States Armed Forces, nor within any Local, State, or Federal Law Enforcement Agency in the United States.

Dr. Cina reiterates the autopsy findings in his report; however, he omits the diagnosis of Sickle Cell Trait, and it is also obvious that the pathologist who initially performed the autopsy was completely unaware of this condition within Mr. Afolayan's medical history, and did not discern the presence of this finding during his autopsy. Thus, omitting the Sickle Cell Trait from the autopsy report, and subsequently relying upon this omission as some sort of factual statement, is a serious error. Otherwise, I do not have disagreements with the anatomic findings as listed, as they are the natural course of events of an individual who develops multiorgan system failure from the Sickle Cell Trait following extreme exertion in a hot environment, and who has not been provided adequate and proper rest and hydration during the course of the exertion.

Inexplicably, Dr. Cina's report states (on page 4) that: "The patient did not have a history of sickle cell disease or sickle cell trait. He was an African-American male born in Nigeria." This is completely incorrect, as the testing from December 18, 2007, proved that Mr. Afoloyan did indeed possess the Sickle Cell Trait, but NOT Sickle Cell Disease.

Sperry Forensic Pathology Consultants
170 Nixon Road
Senoia, Georgia 30276-3291
Telephone: (770) 599-9528
e-mail Dr. Sperry: stiffdoc@bellsouth.net

Appx478

On page 5, Dr. Cina amends his report to confirm that the microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait. I completely agree with this conclusion. Furthermore, in answer to question #4 on page 6, I concur that PSO Afoloyan would not have collapsed on 4/30/09 if he did not have a sickle cell crisis, that in my opinion, was directly initiated by the training exertion he had undergone immediately before his collapse.

Once again, on page 6 of his report, Dr. Cina states that, "The PSO was an African-American, but there is no documentation of sickle cell trait in the records provided." From the information in the records I was provided, as I have reiterated in my initial report and in this amendment, Nathanial Afoloyan's records that were provided contain documents which PROVE, beyond any doubt, that he had the Sickle Cell Trait. Were these records omitted in the material provided to Dr. Cina? Was this omission purposeful, in an attempt to deceive him and others? I cannot answer these queries, but I find the fact that Dr. Cina apparently did not receive the same records that I received and reviewed to be suspect.

In summary, I continue to be in agreement with the opinions of Drs. Cina and Natarajan, that Nathanial A. Afoloyan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from him having the Sickle Cell Trait. But for the exertion of running 1.5 miles in a hot environment, he would not have died. Thus, his death is directly and unequivocally related to the training requirements of his job as a PSO, in order to become a U. S. Border Patrol Agent. To a reasonable degree of medical certainty, his death would have been preventable if he had been offered proper hydration and appropriate rest during the course of his exertion-related activities, as these measures have been proven to ameliorate the onset and progression of Sickle-Cell Trait-induced crises, and are utilized regularly during the training of soldiers in all branches of the United States Military. In my opinion, it is unequivocal that Mr. Afoloyan died directly from the training requirements that he had to undergo in order to become a Border Patrol Agent.

The above opinions are rendered to a reasonable degree of medical certainty.

Kris Sperry, M.D.

170 Nixon Road
Senoia, Georgia 30276-3291
Telephone: (770) 599-9528
e-mail Dr. Sperry: stiffdoc@bellsouth.net

In re: Claim for Death Benefits  )          PSOB Claim No. 2010-22

    By Mrs. Lisa Afolayan    )          NATHANIEL A. AFOLAYAN


## HEARING OFFICER DETERMINATION


## PROCEDURAL HISTORY

Lisa Afolayan filed a claim for death benefits under the Public Safety Officers' Benefit ("PSOB") Act, 42 U.S.C. ch. 46, subch. 12 (implementing regulations at 28 C.F.R. part 32), received by the PSOB Office on October 28, 2009.  In a communication dated April 4, 2012, the Claimant was officially served with notice that the claim had been denied by the PSOB Office under 28 C.F.R. § 32.14(a).  The Claimant's appeal request  for a Hearing Officer Determination of the denial for death benefits was subsequently submitted to the Public Safety Officers' Benefits (PSOB) Office, under 28 C.F.R. § 32.17, in a communication dated May 4, 2012.

This appeal determination is based on a de novo consideration by the Hearing Officer pursuant to 28 C.F.R. § 32.43(d), of the record made available by the PSOB Office, and information acquired independently by the Hearing Officer.


## BACKGROUND

Nathaniel A. Afolayan, who was 29 years of age at the time of his death, was in the final stage of his training as a United States Border Patrol Agent. The Border Patrol Academy, where the training took place, is located in Artesia, New Mexico.

30, 2009, the temperature at 2:30 p.m. was 87.8 degrees, with a relative humidity of 6% or 7%. (Obtained from www.weatherunderground.com)

Utilizing a heat index conversion calculator (www.hpc.ncep.noaa.gov/html/heatindex), a temperature of 88 degrees with a relative humidity of 7% yields a heat index of 83. (Even if we use the highest temperature that day -- 92 degrees – the resulting heat index would be 86.) The heat index measures how hot it really feels when relative humidity is factored in.

A chart prepared by the NOAA (National Oceanic and Atmospheric Administration) National Weather Service has four categories related to heat index. In order from the least severe to the most dangerous, the classifications are "caution," "extreme caution," "danger," and "extreme danger." The least severe classification urging "caution" encompasses heat indices ranging from 80 degrees to 90 degrees. This is the category where the heat index on the day in question falls, even if we use the highest recorded temperature of 92 degrees. Thus, while the temperature was what many might consider "hot," it was not extremely hot or extraordinarily hot. (By comparison, a heat index between 91 and 103 degrees requires "extreme caution;" between 104 and 124 degrees represents "danger;" and 126 degrees and above poses "extreme danger.")

Undoubtedly adding to the sense that it was a "very hot" day was the fact that the members of the class voted and decided to wear their black class shirts while participating in the final physical test. According to the affidavit of Agent Victor Arias (hearing exhibit 10), " . . . Afolayan and some other people had the concerns . . . Nate said that it was going to be too hot to wear black shirts. We voted, and more people

wanted to wear the shirts than not, so we wore them . . .." In its website on the heat index, the National Weather Service lists as a safety tip the following: "Wear lightweight, light-colored clothing to reflect heat and sunlight." www.nws.noaa.gov/os/heat/index

The regulations also specify that a qualifying injury:

" does not include --- . . .
(2) Any condition of the body caused or occasioned by stress or strain."
"Stress or strain" under the regulations "includes physical stress or strain."  In their respective reports, Dr. Cina and Dr. Sperry both agreed that "physical stress or strain" was clearly a causative factor here relating to the initiation of sickle cell crisis.[8] Furthermore, the running component of the final physical fitness test required the completion of a 1.5-mile run in 13 minutes or under. That is the approximate equivalent of an eight and one-half-minute mile which would appear to qualify as "physical stress or strain." In his May 2, 2009 Memorandum to Scott Luck, Chief Patrol Agent at the Border Patrol Academy, Border Patrol Agent Antonio Angarita, Physical Techniques Department, observed that "BPA(T) AFOLAYAN completed his 1.5-mile run in 11:06. Upon completing his run, BPA(T) AFOLAYAN and the other interns displayed the common signs of physical stress associated with exercising at such a heightened level of performance." (Emphasis added) Thus, Agent Angarita confirms that participation in the run amounted to "physical stress." In addition, that Mr. Afolayan completed the running test in eleven minutes, six seconds means that his pace was under an eight-minute mile; clearly this amounted to "physical stress and strain" which, under the regulation quoted above, does not constitute a qualifying injury.

---

[8] See Dr. Cina's amended report dated 2/22/13, and Dr. Sperry's amended report dated May 22, 2013.

To complete this analysis, attention is again directed to the wording of 42 U.S.C. §3796(a) – i.e., " . . . that [the] public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty . . ."   The regulations define "[d]irect and proximate cause" as follows:

> [S]omething directly and proximately causes a wound, condition, or cardiac-event, if it is a substantial factor in bringing the wound, condition, or cardiac-event about.

And even though, as the preceding discussion demonstrates – i.e., that this was not an "injury" under the regulations because it was "caused or occasioned by stress or strain" – the "direct and proximate cause" requirement of "substantial factor" would also defeat the claim. The regulations define a "substantial factor" in this manner:

> A factor substantially brings about a death, injury, disability, wound, [or] condition . . . if –
> (1) The factor alone was sufficient to have caused the death, injury, disability, wound, [or] condition . . .; or
> (2) No other factor (or combination of factors) contributed to the death, injury, disability, wound, [or] condition . . . to so great a degree as it did.

As to subsection (1) above, was the "climatic condition" (i.e., the temperature on the day in question) alone sufficient to have caused Mr. Afolayan's death?  Clearly not, as both experts agreed.

Based upon the testimony and the reports of both expert witnesses, the temperature alone would not have caused Mr. Afolayan's death; consequently, it was not a "substantial factor" under section (1) of the regulation defining that term.

Nor can it be found, under section (2) of that regulation, that "[n]o other factor (or combination of factors) contributed to the death . . . to so great a degree as it

(i.e., the temperature or "climatic condition") did." Again, we turn to the report of Dr.

Cina, dated July 15, 2011, and more specifically, his response to Question 2:

> Based on the records provided, I cannot confirm a diagnosis of heatstroke, though it remains a possibility in this case. I believe that the PSO would not have collapsed on 4/30/09 if he was not exercising in an adverse environment and that climate played some role in his death. I cannot state, however, that the climate was the most significant factor in this fatality.

In fact, in his summary, Dr. Cina stated unequivocally that "the most significant

factor contributing to death in this case was a sickle cell crisis."

Having a direct bearing on this issue was Dr. Sperry's testimony during the

hearing when he testified about the many factors involved here:

> [I]n this situation with Mr. Afolayan, he had the sickle cell trait, and in people – in individuals who have the trait, when they may be subjected to extremes of physical exertion and become dehydrated, and especially at an increased altitude, this may precipitate a sickle cell crisis. But you have to have that combination of factors together. (Tr. 46-47)

After Dr. Sperry explained that "a sickle cell crisis defines a transition between

normal red blood cells and them changing into the sickle form and physically blocking

blood flow . . .", this exchange took place between Dr. Sperry and the hearing officer:

> Q   So that became the – clearly the largest contributor of death here?
> A   Yes. That is what precipitated the collapse and ultimate organ system failure, was the evolution of the sickle cell crisis. (Tr. 48-49)

In light of these responses and opinions by both experts, it is clear that the "climatic

condition" (the hot day) was not a "substantial factor" as that term is described in

subsection (2) of the appropriate guideline set forth above. Therefore, I am unable to

conclude that Mr. Afolyan died as the direct and proximate result of a personal injury

sustained in the line of duty.

**CONCLUSION**

Nathaniel Afolayan's dedication to becoming a Border Patrol Agent is obvious from an examination of this record. He trained relentlessly according to his (then) fellow agents-in-training. He was one-week away from graduation when a "perfect storm" of factors triggered a sickle cell crisis which deprived this young man of his life, and his wife and their two daughters of their husband and father. I cannot express adequate sympathy to them for this tragic loss.

It is against this sad backdrop that I am required to follow the regulations which govern the application of 42 U.S.C. §3796. In light of the analysis set forth herein, it is my determination that this claim must be, and hereby is, denied.


Joseph B. Mistrett

PSOB Hearing Officer                              Dated: January 10, 2014




In re:  Claim for Death Benefits            )            PSOB Claim No. 2010-022

     by Mrs. Lisa Afolayan            )            NATHANIEL A. AFOLAYAN


EVIDENCE LOG

1.  File received from the PSOB Office

Re: Nathaniel A. Afolayan
DOD: May 1, 2009
PSOB Claim No.: 2010-022

Dear Ms. Janke:

Attached are documents that I wish to submit for the appeal PSOB has graciously afforded me for the death of my husband, Nathaniel Afolayan, on May 1, 2009, while attending the Border Patrol Academy. I must admit that gathering this new information was an eye-opening experience for me. I learned so much about how physical exertion effects the human body and how it deteriorates the vital organs causing death.

Attached you should find the following documents:

1. A document telling about Nathaniel A. Afolayan life and history.

2. A document prepared by Dr. Darinka Mileusnic-Polchan, MD, PhD, Chief Medical Examiner, Knox and Anderson County, Associate Clinical Professor of Pathology, UTMCK, Knox County Regional Forensic Center, in Knoxville, TN.

3. A listing of PSOB claims that were paid and still pending from officer deaths caused by overexertion/dehydration/exhaustion/rhabdomyolosis. This listing shows that a precedent was set by PSOB in the 1980's for approval of officer deaths dying from overexertion/dehydration/exhaustion/rhabdomyolosis. And other claims were paid in the years that followed.

I hope that Nathaniel's file will also be available for reference since there are comments from his classmates regarding the intensity of the training and the fact that it was noticeable, to not only his classmates but his instructors, that something was wrong with Nathaniel's athletic performance during those final training sessions.

Both Dr. Mileusnic-Polchan and I available to answer any questions that may arise. Please feel free to contact us.

Sincerely yours,

Ms. Lisa Afolayan

Nathaniel A. Afolayan

An American Hero

Nathaniel Abidemi Afolayan was born on March 26, 1980 to David and Kate Afolayan in Ibadan, Nigeria. Nate moved to the United States with his father and two older brothers, Kunle and Ayo Afolayan, when he was 11 years old. Nate attended Tulare High School (CA) where he was very active in sports and played on the varsity basketball team. Nate graduated from Tulare High School in 1997. After High School, Nate began working on his bachelor's degree at the California State University. During this time, Nate stayed busy not only with school, but was active in the gym as he prepared for his employment with the San Bernardino County Probation Department. Nate graduated in 2001 with his bachelor's degree in Political Science. That same year, Nate was proud and honored to receive his Certificate of Naturalization and become a United States Citizen.

Nate and I met and started dating while working in Juvenile Probation. Nate left the Probation Department approximately a year later and began to work at a car dealership where he quickly promoted to Sales Manager. On November 22, 2003, Nate and I were married in a small chapel ceremony surrounded by family and friends. On ███████ 2006, our daughter Natalee was born. I decided to leave my probation job to stay home, which left Nate as the sole provider for his family. On ███████, 2007, our second daughter, ██, was born. Nate continued to work at the dealership but had a strong desire to serve his chosen country and community. Nate decided to leave the dealership and devote his time into becoming a law enforcement officer. Nate spent a year filling out applications, taking law enforcement agility tests, and interviewing for different agencies. During this time, Nate spent several hours each day in the gym making sure he was physically fit and mentally ready to serve any law enforcement agency that would hire him. In 2009 after being declared medically fit, Nate was accepted into the United States Border Patrol.

On February 16, 2009, Nathaniel Afolayan, a 29-year-old, physically fit, healthy man, was sworn in as a Border Patrol Agent and sent to the Academy in Artesia, New Mexico. He knew the training would be intense; but he also knew he had prepared physically to live his life dream of becoming a law enforcement officer. Nate would call me when he found a few minutes and told me the training was non-stop and both physically and mentally challenging; yet he loved it. The Academy was only 12 weeks long so it was important for the Academy to train and condition the Agents as fast and as hard as they could. The Agents were required to pass all areas of instruction and physical training in order to graduate.

One evening he told me that the trainees were sprayed in the face with pepper spray at an inappropriate, extremely-close range. He had to go to the medical clinic and was told he had an upper respiratory infection as a result of being sprayed. Another day he had some sort of water training. After jumping in, he became dizzy and couldn't breathe. He again went to the clinic where they cleared him to return. A few days before his final run, Nate called and told me he was concerned because his urine was reddish brown. I told him to drink more water. He stated he had been drinking a "ton" of water. I advised him to visit the clinic since his final run was coming up

soon. He went to the clinic and it was determined he had muscle strains in his quadricep and hamstring muscles. He was cleared from the clinic and returned to physical training the next day.

Nate was well respected by his instructors and peers. His classmates would often ask Nate to help them in the gym after instructional hours. Nate was one of the top 5 ranked in the physical fitness trainings in his class. Nate was also nominated by his instructors and peers to give the graduation speech for Class 856 of the U.S. Border Patrol. Unfortunately, Nate didn't get to present his speech; Alex Alderman, an Academy classmate, read Nate's speech during the graduation. That graduation was held on May 1, 2009, only 5 days after Nate's death.

The Border Patrol Class 856 was still going through training on April 30, 2009, and the afternoon was sunny and about 93 degrees in New Mexico. Nate's class section was scheduled to complete their final Physical Technique Training. The trainees were required by the Border Patrol to complete this training in order to graduate from the Academy. After completing the 1.5-mile run, Nate experienced shortness of breath and leaned on a classmate, Tony Fazio. Agent Fazio was yelled at by an instructor to let go of Nate. Nate was asked by the instructor if he was ready to go home. He questioned Nate with "You don't want to go home now, do you?" The instructor then directed Nate to a wall that provided shade so Nate could catch his breath. According to several classmates, Nate was showing obvious signs of distress which they had never seen before. Nate was left at the wall by himself. As soon as the instructor and classmate turned their back and started to walk away, Nate collapsed and fell backwards hitting his head so loud that others heard the thump. At that point, Nate appeared to be incoherent as stated by SPA Angarita. Nate was then transported to the Health Unit with a Gator that had been sitting in the hot sun. The Health Unit's report on this incident stated, "Once inside the Health Unit, the staff tried to get the Intern's (Nate's) vitals but Intern Afolayan became combative. Intern Afolayan would not cooperate as he kept becoming unresponsive." Finally, 13 minutes after Nate was brought to the Health Unit, the medical staff finally realized they should probably call an ambulance. When EMT's arrived, they were seen arguing with the medical staff over Nate's medical emergency. The EMT's did transport Nate to Artesia, New Mexico, but did not take or record his temperature.

The staff at the Border Patrol Academy waited 3 hours to notify me of what had happened. The staff had stated that Nate "fainted" after his final run. The conversation was short; I was distraught and exceptionally confused about what I was told. The person on the phone stated they needed to call me back once they got more information. Approximately 20 minutes later, a staff member at the Academy called me back to inform me that Nate was being airlifted to Covent Medical Hospital in Lubbock, Texas, because "the Artesia medical center was not able to handle his condition." I asked, "What hospital is not equipped to handle someone who has fainted?" When the staff member seemed like he didn't want to answer that question, my suspicions were aroused that maybe I wasn't being told all of the facts of the situation.

Since there is a time difference between California and New Mexico, it was too late to even try to take a flight to Lubbock, Texas. I asked the Border Patrol if they could help to get me to Nate as soon as possible. I was told I could find and pay for my own flight to Lubbock the next day and they would take me to the airport. I found a very expensive, last-minute flight to Lubbock

early the next morning. I was picked up at my home by a Border Patrol Agent and dropped off at the front door of the airport. Once I arrived at the hospital in Lubbock, Nate's condition began to deteriorate quickly. He was quickly scheduled to go into surgery due to compartment syndrome (A condition in which increased pressure within one of the body's anatomical compartments results in insufficient blood supply to tissue within that space.). The anesthesiologist refused to put Nate under stating, "He will be gone if I do." At that point Nate was taken to the Intensive Care Unit. The doctor broke the shocking, life-altering news to me that there was nothing more they could do for Nate. Every organ in his body had shut down. They needed my permission to turn off the life-support equipment. While trying to accept everything I had just been told, the Code Blue sounded a few times. Every time, it was for Nate. The nursing staff finally took me to be with Nate. I'll never forget seeing the male nurse on top of Nate giving chest compressions with all he had; as he tried to save Nate's life, sweat poured down his face. A nurse held me tightly, fearing that I might collapse while watching them try to save Nate's life. I yelled, "That's it! I can't take it anymore!"

In a matter of seconds, as the nurse stopped trying to save Nate's life, my life and our daughters' lives were forever changed. All our dreams and plans as a family were gone. I would no longer have a husband and our daughters would grow up without their father. How do you tell children that are 18 months old and 3 years old that their father will never be there to help raise them? The only comfort I had during those last moments of saying goodbye to Nate was that I knew Nate had died in the line of duty while training to serve his country as a Border Patrol Agent. I wasn't surprised when he told me he wanted to become a law enforcement officer because I knew it was his passion. I recognized that he would be putting his own life on the line to protect and serve others; yet I supported his decision. Little did I know that he would die training to achieve his dream.

I planned Nate's funeral for the May 7 with the hopes that some of his classmates could attend. Some of the class needed to stay after graduation to take Spanish lessons; and some were able to return home. The classmates from California attended the funeral; the others, although they stated they would pay their own expense getting to and returning from the funeral, were denied time off training to attend. After the funeral I was told by Nate's classmates that it was obvious to them and instructors that Nate's performance during training had declined. They and the instructors asked Nate about how he was feeling. His replies were always that he was tired and needed to catch his breath. But, according to classmates, he was encouraged by instructors to continue on since graduation was a week away.

A naturalized American citizen gave his all trying to become a law enforcement agent with the United States Border Patrol to protect and serve his country; yet 10 years later, I am appealing to our Federal Government to **recognize his supreme sacrifice in the line of duty.**



## KNOX COUNTY REGIONAL FORENSIC CENTER

Office of the Chief Medical Examiner
2761 Sullins Street, Knoxville, TN 37919

January 28, 2019

Re:     Nathaniel A. Afolayan
        Border Patrol Agent
        U.S. Custom and Border Protection
        Case Number 2010-022

To Whom It May Concern,

Thank you for the opportunity to review the case of the 29 year-old border patrol agent, Nathaniel A. Afolayan, who died on May 01, 2009.

The submitted materials reviewed by me consisted of the following: a copy of the autopsy report performed by Sridhar Natarajan, M.D., M.S. on May 03, 2009 (FAL09-0159, 8 pages), The Federal Law Enforcement Training Center (FLETC) Health Unit medical records (7 pages), Artesia General Hospital medical records (21 pages), Covenant Medical Center, Lubbock, Texas records (29 pages), U.S. Department of Justice Public Safety Officers' Benefits (PSOB) Office Claim Determination dated March 06, 2012 (3 pages), U.S. Department of Justice cover letter and Hearing Officer Determination regarding PSOB Appeal (23 pages), report by Kris Sperry, M.D. (3 pages) and glass slides of tissue sections generated as recuts of the original paraffin tissue blocks generated during autopsy (#11).

The 29 year-old United States Border Patrol Agent, Nathaniel A. Afolayan, was in the final stage of his training through the Border Patrol Academy. The training lasted from February through the end of April 2009 and took place in Artesia, New Mexico. He would have graduated with his class in May 2009. Based on the pertinent Federal Regulations (8 CFR [section] 287), Agent Afolayan was a "public safety officer" as defined in the PSOB Act.

In my conversations with Mrs. Lisa Afolayan, the decedent's widow, Agent Afolayan was physically fit and never had any significant health problems prior to his deployment to Artesia. As long as she had known him, he tended to push himself to the limit physically and never complained of weakness or muscle pains or fainting spells. Several instructors and agents who trained with him testified in the past hearings that agent Afolayan was in either excellent or outstanding physical shape and would often go to the gym after class.

1

Appx513



Office of the Chief Medical Examiner
2761 Sullins Street, Knoxville, TN 37919

Mr. and Mrs. Afolayan had two children. During the routine postnatal testing of their second child, it was discovered that she had sickle cell trait. The subsequent testing in December of 2007 revealed that agent Afolayan was a carrier of sickle cell trait. He had the heterozygous genotype, which meant that his hemoglobin composition was 56 percent Hemoglobin A (normal allele) and 41 percent Hemoglobin S (abnormal allele). Sickle cell trait is an inherited blood disorder that affects about 8 percent of African Americans. In general, these individuals enjoy normal life spans with no medical problems related to the trait. It is not a disease. Sickle cell trait phenotype with this particular AS genotype ratio did not prohibit agent Afolayan from living a normal life filled with usual activities including enrollment in either military or law enforcement service.

Agent Afolayan's health issues began to manifest approximately two months after his training-related relocation to Artesia, New Mexico. His first visit to the FLETC Health Unit on March 5, 2009, appeared to be a case of common cold. The subsequent visits became more frequent. More importantly, the nature of the complaints transitioned toward more systemic symptoms indicative of an evolving health concern. On March 25th, agent Afolayan experienced generalized soreness and weakness that began in the afternoon while running. On April 8th he was back in the FLETC Health Unit, brought in by his instructor after swimming. He had been under the water for a while holding his breath when he experienced dizziness, nausea and weakness. On April 20th he was back again complaining of generalized body aches and lack of energy. The medical chart entry summed it up as "cold symptoms" (indicated in the chart with quotation marks) indicating the symptoms were too general and vague. On April 24th, agent Afolayan returned to the clinic stating the chills were gone and no more blood was present in his sputum. Since chills and blood in the sputum were not previously mentioned in his chart, it was evident that not all symptom were recorded at all visits, as one would have expected. On April 28th, two days prior to the terminal collapse, agent Afolayan came to the Health Unit complaining of the bilateral quadriceps and biceps femoris muscle (front thigh and hamstring muscle) pain after running, weight training and basketball. One important symptom that was not recorded in the chart but emphasized by Mrs. Afolayan was dark blood-like staining of the urine. Based on my conversation with Mrs. Afolayan, she was the one who suggested her husband go to the clinic again because of intensifying muscle pains and dark red-brown, bloody-appearing urine. It is important to note that throughout all these visits, agent Afolayan's blood pressure and body temperatures remained within the normal ranges. The heart rate varied from bradycardic (54 on the 8th of April) to normal.

On April 30th, 2009, two days after the last visit to the FLETC Health Unit, agent Afolayan was completing the final physical fitness test. The subsequent investigation placed considerable emphasis on high environmental temperatures as a contributing factor in Nathaniel Afolayan's death. The interviewed agents stated that it was very hot and dry on that day (officially, the highest recorded temperature was 92° Fahrenheit with a relative humidity of 7%). Agent Afolayan was among the agents who were concerned about wearing thick black class shirts. On

2



that day, the National Weather Service published a safety tip that suggested wearing "lightweight, light-colored clothing to reflect heat and sunlight." Another important factor mentioned only peripherally was the Artesia, New Mexico altitude of about 3500 feet. Dr. Sperry suggests that a combination of altitude and exertion in a hot environment is a dangerous triad that can precipitate a sickle cell crisis. Based on all the listed atmospheric and climatic factors, I find it important to expand on Dr. Sperry's statement that in some individuals, especially people with sickle cell trait, the dangerous triad could also initiate a vicious cycle of exertional rhabdomyolysis.

Upon completion of a mandatory 1.5 mile run in 11 minutes and 6 seconds (well below the required 13 minutes or less), Nathaniel Afolayan started acting funny, became weak, disoriented and suddenly collapsed on the field. The fellow agents carried him into the FLETC Health Unit while he was tossing, flailing and mumbling incoherently in a delirium-like state. The health Unit staff had a hard time settling and stabilizing the patient. The EMS arrived at 15:10 to transport him to the local Artesia General Hospital. He arrived there at 15:30. No body temperature was taken on arrival. The systolic blood pressure was normal but the diastolic elevated (101 mmHg). Approximately three hours later, at 18:07, the body temperature was 97.3° Fahrenheit. Unfortunately, it is not clear from the medical records how this reading was obtained. The Emergency Room personnel described the patient as obtunded, unresponsive, cyanotic, tachycardic and in respiratory distress. The first laboratory results on the admission blood indicated developing renal failure and severe acidosis (pH 6.89). The first urine specimen taken at 16:25 was positive for blood (2+) and protein (3+) and negative for drugs. Due to his grave condition, Agent Afolayan was emergently airlifted to Covenant Medical Center in Lubbock, Texas shortly after 19:30. Subsequent laboratory tests confirmed progressive renal failure with a creatinine of 2.5 mg/dL and a blood urea nitrogen of 15 mg/dL. Creatine kinase of 995 U/L with a creatine kinase-MB concentration of 8.5% indicated skeletal muscle and myocardial damage, respectively. Troponin I was elevated as well at 2.05 ug/L. Lactic acid was substantially elevated at 16 mmol/L as well as liver function tests (AST 1675 U/L and ALT 1329 U/L). Disseminated intravascular coagulation panel was positive for marked coagulopathy. Clinically, agent Afolayan was in renal, respiratory and neurologic failure and entering the final stages of shock. Repeated echocardiograms demonstrated a progressively decreasing ventricular function and a diminishing ejection fraction from 40% to 30%, which paralleled the plummeting blood pressure. Clinically, the severe oliguria was attributed to acute renal failure due to rhabdomyolysis and fibromyolysis. The overriding clinical conclusion was that agent Afolayan was in multiple organ system failure due to a combination of heat stroke and rhabdomyolysis. He died on May 01, 2009 at 22:41, approximately 32 hours after the initial collapse.

The autopsy appeared detailed. Dr. Natarajan's conclusion was that the main cause of death of Nathaniel Afolayan was heat illness. Cardiomegaly was listed as the contributing cause of death. As such, the manner of death was ruled as accident. The overall macroscopic descriptions of the external and internal findings were relatively straightforward. I have not had a chance to review

3



Dr. Cina's report; however, his opinions have been cited in several other reports, including Dr. Sperry's report. After reviewing the medical records, autopsy findings and histologic slides, both forensic pathologists agreed that agent Afolayan's death was multifactorial due to the sickle cell related exertional collapse in hot weather accompanied by exertion-related dehydration. Specifically, Dr. Sperry concluded that Nathaniel Afolayan died of "heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having sickle cell trait, and but for the exertion of running 1.5 miles in a hot environment, he would not have died."

The histologic sections taken at the time of the autopsy offer several important clues as to the crucial connection between the clinical presentation days before Nathaniel Afolayan's terminal collapse, the terminal event itself and the autopsy findings. Both sickled and unsickled cells are packed in the hepatic sinusoids and caused blood pooling around splenic follicles. Although some sickling is present in the rest of the vital organs such as the brain, heart and the lungs; its sequelae including plugging of the small vessels and capillaries are not striking. This might explain why the original pathologist did not put emphasis on it. The brain sections are few and show incipient terminal hypoxia-ischemia with occasional red neurons. Nevertheless, two important histologic findings have not been discussed in the reviewed material such as myoglobinuria and rhabdomyolysis. The renal sections demonstrate acute renal tubular necrosis and distended glomerular capillaries blocked with amorphous material and jammed erythrocytes. Most importantly, distended proximal and distal renal tubules are packed with amorphous, granular, rusty-purple myoglobin. Tubular myoglobin casts are abundant and extensive throughout the bilateral renal sections. This finding represents the key histopathologic substrate for myoglobinuria, which is the result of rhabdomyolysis or breakdown of damaged skeletal muscles. Both the heart muscle and the sampled quadriceps skeletal muscle show patchy areas of sarcolemmal breakdown and ballooning, fraying and frank dissolution of myocytes. There is multifocal loss of skeletal myocyte striations due to myofibril degradation. Multifocal neutrophil margination is noted in adjacent capillaries, particularly in the heart muscle. The subendocardial zones of the sampled heart muscle show the most prominent myocytolysis. These histopathologic findings are well aligned with the clinical findings of rhabdomyolysis that was described in the medical records.

Exertional rhabdomyolysis is a syndrome characterized by skeletal muscle breakdown, muscle enzyme and myoglobin release and subsequent acute renal failure that is precipitated by strenuous physical exertion. The classic triad presents with muscle aches, weakness and dark urine. The muscular signs and symptoms are usually confined to the particular overworked muscle group(s). All three of these symptoms were present in Nathaniel Afolayan's case for days prior to his terminal collapse. It is unfortunate that the diagnosis was missed on several occasions, particularly on April 28, 2009 when the agent presented at the FLETC Health Unit having experienced the triad.

The sickle cell trait is considered a benign condition that does not preclude someone from

4


participating in athletics or other physical activities. However, sickle cell trait has been associated with episodes of sudden collapse during or immediately after strenuous physical activity. These sudden exertional deaths are frequently multifactorial and related to exertional heat stress (or heat stroke) and exertional dehydration with or without rhabdomyolysis. It is still not fully understood whether sickle-cell trait itself or some other unrecognized underlying metabolic deficit makes a small subgroup of patients with sickle cell trait, especially patients of African American ancestry, more susceptible to the development of exertional rhabdomyolysis. The main risk factors for exertional rhabdomyolysis in individuals with sickle cell trait include hot environments, high altitudes, exercise induced asthma or asthma-like symptoms and pre-existing fatigue. Extensive research that looked at both college and professional athletes and military recruits has concluded that individuals with sickle cell trait did not have a greater risk of death than did those without sickle cell trait. However, sickle cell trait was associated with a 54 percent greater risk of exertional rhabdomyolysis, a potentially fatal syndrome associated with strenuous physical activity.

In conclusion, Agent Nathaniel Afolayan experienced repeated episodes of weakness and muscle pain in March and April of 2009 while completing his training as a United States Border Patrol Agent. Agent Afolayan was fit and accustomed to strenuous exercise prior to his relocation to Artesia, New Mexico. Mrs. Afolayan confirmed that the sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation. In fact, in his case, the sickle cell trait was an incidental finding following the birth of their second child. Based on the available personal and medical history, Nathaniel Afolayan was always physically active and pushed himself hard during workouts without having experienced any troubles until the second and third months of his training. It became apparent that for the first time in his life, Nathaniel Afolayan was exposed to a different set of circumstances that initiated repeated episodes of weakness, muscle pains and myoglobinuria from rhabdomyolysis, which finally led to his death on May 01, 2009. Rhabdomyolysis was confirmed clinically and through the histopathologic evaluation. The only new variables that created a different set of circumstances for him were the climatic condition (heat), exertional dehydration (dry environment) and altitude that together initiated the vicious cycle of rhabdomyolysis and acute renal failure. Ultimately, these events led to organ system failure and precipitated his demise. Had the potential for developing exertional rhabdomyolysis been recognized during repeated FLETC Health Unit visits in April, especially on April 28, 2009, and adequate medical attention received, agent Afolayan would not have died. Sickling of the red blood cells was present but by itself was insufficient to be solely responsible for the agent's death. In other words, strenuous exercise and sickle cell trait alone would not have inevitably lead to sickle cell crisis and death. Nonetheless, the sickle cell trait coupled with the physical exertion under a new set of unfavorable circumstances that included environmental and atmospheric conditions (dry heat and altitude) made agent Afolayan more susceptible to develop catastrophic rhabdomyolysis and die.

My conclusion is that U.S. Border Patrol Agent Nathaniel Afolayan died of complications of

5



rhabdomyolysis due to strenuous physical activity in a hot dry environment. The underlying contributing factors were sickle cell trait in combination with high altitude, which made the agent more susceptible to developing the catastrophic form of rhabdomyolysis.

Should you have any additional questions or need further clarification, please do not hesitate to contact me. The opinions regarding the cause and manner of death are always subject to change and amendment if any additional investigative information becomes available.

Sincerely,

Darinka Mileusnic-Polchan, MD, PhD
Chief Medical Examiner
Knox County Regional Forensic Center

6

## Historical Cases of PSOB Claims Paid for
## Heat Stroke, Dehydration, Overexertion and Exhaustion,
## All of Which Initiate Rhabdomyolysis

**APPROVED PSOB CLAIM:** The first claim PSOB paid for an overexertion/severe dehydration cause of death claim was made following the death of Pittsfield, MA, **Police Officer Timothy M. Shepard** on **November 2, 1988**. He was overcome by **heat stroke and dehydration** while training during his first day at the former Western Massachusetts Regional Police Academy in Agawam, MA. Cadets in the class reported they were pushed to the limits of their endurance with hours of running, push-ups and other exercises that day on just a few small cups of water; 15 other cadets of the class of 50 were hospitalized for exhaustion and dehydration. Officer Shepard had undergone a liver transplant, lapsed into a coma, and later died from complications.

**APPROVED PSOB CLAIM:** Another PSOB claim was paid to the surviving son of **Police Officer Charles McDonald** of the Forest Park (OH) Police Department died on **June 9, 2001**. Officer McDonald was trying out for the Hamilton County Police Association's SWAT team when he began experiencing chest pains. During the training he **overexerted himself** and was transported to a local hospital. He lapsed into a coma because a **toxic chemical was released into his bloodstream (rhabdomyolysis)** and died the day after the training. Officer McDonald's family appealed PSOB denials and years actually passed until the claim was paid by PSOB.

**APPROVED PSOB CLAIM: ICE Agent Lorenzo Roberto Gomez** spent his morning setting up Special Response Team training scenarios and then participated in them to show his dedication to leading the team through each scenario. While his team rested, he set up the next scenario, failing to take time to personally rest and hydrate. He collapsed at the training, was taken to the hospital and later died on **November 8, 2003**, from **rhabdomyolysis, caused by overexertion and exhaustion.** Mrs. Gomez's original PSOB claim was denied, her appeal was denied, and the claim was finally paid 7 years after her husband's death. The long-term delays from PSOB experienced by the Gomez family added tremendous stress and delayed their grief process significantly.

**PENDING:** Davey, FL, **Police Officer Rogerio Morales** collapsed at a SWAT training on January 10, 2011. After completing a half-mile run and then participating in an obstacle courses, Officer Morales collapsed and was nonresponsive. He was transported to a local hospital where he died 3 days later, **January 13, 2011**, from overexertion/rhabdomyolosis. His wife's PSOB claim was denied, her appeal was denied, and her final appeal, a BJA Director's hearing, has

been pending for more than 4 years. Today, Mrs. Morales struggles to move on without any feedback from PSOB on where her final appeal stands.

*SUMMARY: The payment of Federal PSOB death benefits to the surviving family of Officer Timothy Shephard set precedent that exhaustion, overexertion, dehydration, and heat stroke were compensable causes of death. Since rhabdomyolysis is an after-effect of exhaustion, overexertion, dehydration, and heat stroke, rhabdomyolysis should also be a compensable cause of death.*



U.S. Department of Justice

Office of Justice Programs

Bureau of Justice Assistance

*Washington, D.C. 20531*

**Director Determination**
Lorenzo Gomez
PSOB Claim 2008-128

Pursuant to the Public Safety Officers' Benefits (PSOB) Act, 42 U.S.C. ch. 46, subch. XII (implementing regulations at 28 C.F.R. part 32), on December 11, 2007, Ms. Maria Christina Gomez (the Claimant) filed a claim for benefits established under 42 U.S.C. § 3796(a) with the PSOB Office, on behalf of herself, her children, Breann Tyara Gomez and Savannah Nichole Gomez, and three children of Donna-Maria Laverty, Aerick Alexander Gomez, Roberto Thomas Gomez, and Lorenzo Albert Gomez, in connection with the death of Lorenzo Roberto Gomez. The PSOB Office denied the claim in a determination dated February 5, 2009. The Claimant was notified of such denial by letter dated February 18, 2009. The Claimant requested a determination of the claim by a PSOB Hearing Officer in a letter dated March 18, 2009. On April 24, 2009, the claim was assigned to Hearing Officer Robert McMeekin. Hearing Officer McMeekin issued a determination denying benefits on April 26, 2013. This determination was presented to the Claimant by letter dated July 9, 2013. The Claimant then requested a determination of the claim by the Director of the Bureau of Justice Assistance (BJA) by letter received July 23, 2013.

Pursuant to 28 C.F.R. § 32.54(a), I have conducted a de novo review of the entire record in this claim (per the attached evidence log). Based on this review, I conclude that the Claimant is entitled to benefits under the PSOB Act. Accordingly, for the reasons set forth below, this claim for PSOB Act benefits is approved.

**Procedural Background**

In a determination dated February 19, 2009, the PSOB Office denied benefits on the basis that Agent Gomez did not suffer an injury under 28 C.F.R. § 32.3.[1] In its determination the PSOB Office concluded that Agent Gomez's physical exertion, not extreme climatic conditions, contributed to his death. In reaching this conclusion, the PSOB Office relied upon the opinion of a medical examiner who stated that the likely cause of Agent Gomez's traumatic physical condition, rhabdomyolysis, was the stress and strain of training.[2] Finding no evidence that the fatal condition was caused by an external force, the PSOB Office concluded that it could not be considered an injury under implementing regulations and denied the claim.[3]

---

[1] PSOB Office determination, PSOB No. 2008-128 2 (Feb 5, 2009).
[2] *Id.*
[3] *Id.*

In a subsequent appellate determination dated April 26, 2013, a Hearing Officer continued the denial on generally the same basis. In reaching his conclusion, the Hearing Officer acknowledged that Agent Gomez may have suffered a traumatized condition of the body, but found no evidence that it was directly and proximately caused by an external force, and relied upon an independent medical report to this effect.[4] Concluding that the fatal rhabdomyolysis was caused by physical exertion, and therefore excluded from the definition of injury as due to stress or strain, the Hearing Officer denied the claim.

## Factual Background

Lorenzo Roberto Gomez worked as an Immigration Enforcement Agent with the Bureau of Immigration and Customs Enforcement (ICE). On November 7, 2003, he participated in physical endurance and tactical training, involving strenuous exercise and drills. The trainees undertook many of these exercises and drills in full tactical gear, including a ballistic tactical vest, Kevlar helmet, Nomex gloves, knee pads, and a tactical duty belt, all of which totaled 50-60 pounds. The exercises and drills included a 1.5-mile march, involving both jogging and marching, and including equipment hauling for half of the march, all in full gear; pushups in full gear; two tactical shooting courses in full gear; two 1.5-mile runs; and a 165-pound "dummy drag."[5]

During the debriefing immediately following training, Agent Gomez collapsed at approximately 12:45 p.m., and complained of ringing in his ears and dizziness. An ambulance took him to Sierra Medical Center, who admitted him with complaints of headache, dizziness, and vomiting. Shortly before 7:00 a.m. on November 8, 2003, he died unexpectedly. The cause of death is listed as "acute tubular necrosis of kidneys due to (or as a consequence of) rhabdomyolysis."

## Claimant Status

The PSOB Act provides, in pertinent part,

> In any case in which the Bureau of Justice Assistance . . . determines . . . that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit . . .
>    (2) if there is at least 1 child who survived the public safety officer and a surviving spouse of the public safety officer, 50 percent to the surviving child (or children, in equal parts) and 50 percent to the surviving spouse.[6]

The Act also provides:

> "child" means any natural, illegitimate, adopted, or posthumous child or stepchild of a deceased or totally and permanently disabled public safety officer who, at the time of the public safety officer's fatal or catastrophic injury, is—

---

[4] *Id.* at 5
[5] Memorandum, El Paso Tactical Intervention and Control Team, November 6, 2003.
[6] 42 U.S.C. § 3796(a).

2

(A) 18 years of age or under;
(B) over 18 years of age and a student as defined in section 8101 of title 5, United States Code; or
(C) over 18 years of age and incapable of self-support because of physical or mental disability.[7]

The record indicates that the Claimant, Maria Christina Gomez, and the decedent, Lorenzo Gomez, were married on August 22, 1998.[8] She therefore qualifies as a spouse, as defined in the PSOB Act's implementing regulations, and is eligible to receive benefits under the PSOB Act.

Two children, Savannah (born January 24, 1997)[9] and Breann (born July 14, 2000),[10] were born of this relationship. Savannah and Breann qualify as children, as defined in the PSOB Act and implementing regulations, and are therefore eligible to receive benefits under the PSOB Act.

The claimant also listed three children not born of her marriage to Agent Gomez: Lorenzo (born July 4, 1984), Roberto (born September 21, 1987), and Aerick (born October 4, 1988).[11] The record indicates that these children were born of Agent Gomez's prior marriage to Donna Maria Gomez.[12] Roberto and Aerick qualify as children, as defined in the PSOB Act and implementing regulations, and are therefore eligible to receive benefits under the PSOB Act.

Lorenzo, however, was 19 years old at the time of Agent Gomez's death. The Claimant did not provide evidence that Lorenzo was a student, as defined at 5 U.S.C. § 8101, or was incapable of self-support on the date of Agent Gomez's death. Accordingly, I do not find that Lorenzo is a child, as defined in the PSOB Act, and any portion of the death benefits to which he might be entitled will be held by the PSOB Office, pending proof of eligibility to such portion.

**Discussion**

*Public Safety Officer Status*

The threshold inquiry for a claim for PSOB death benefits is whether the decedent was, in fact, a public safety officer. The PSOB Act defines a public safety officer as "an individual serving a public agency in an official capacity, with or without compensation, as law enforcement officer, as a firefighter, or as a chaplain."[13] The Act goes on to define "law enforcement officer" as "an individual involved in crime and juvenile delinquency control and

---

[7] 42 U.S.C. § 3796b(3).
[8] Marriage License, County of El Paso, Texas, recorded August 31, 1998.
[9] Certificate of Birth, County of El Paso, Texas, received Feb. 13, 1997.
[10] Certificate of Birth, County of El Paso, Texas, received July 21, 2000.
[11] Findings and Order, Probate and Family Court Department, Commonwealth of Massachusetts, April 13, 1990; *see also* Employer's Order to Withhold Earnings for Child Support, District Court of El Paso, TX, 171st Judicial District, Cause No. 91-8698 (Apr. 13, 1998).
[12] *Id.*
[13] 42 U.S.C. § 3796b(9)(A).

3



**U.S. Department of Justice**

**Office of Justice Programs**

*Bureau of Justice Assistance*

Washington, D.C. 20531

June 2, 2022

Kyle Lyons-Burke
John P. Elwood
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave., NW
Washington, DC 20001
kyle.lyons-burke@arnoldporter.com
john.elwood@arnoldporter.com

Re:     *Border Patrol Agent Nathaniel A. Afolayan, PSOB Claim No. 2010-022*

Dear Messrs. Lyons-Burke and Elwood:

        On April 15, 2022, the United States Court of Appeals for the Federal Circuit issued a remand order in *Afolayan* v. *Department of Justice* to the Bureau of Justice Assistance ("Bureau") for proceedings consistent with its opinion.

        The court remanded the matter for the Bureau to (1) determine "whether the climatic conditions surrounding Agent Afolayan's death were a 'direct and proximate' cause of his injuries," and, if so, to (2) determine "whether Agent Afolayan's sickle cell trait could properly be considered in evaluating alternate causation." *See Afolayan* v. *Dept. of Justice*, No. 2021-1452, slip op. at 14 (Fed. Cir., Apr. 15, 2022).

        Should your client wish the Bureau to consider any further argument or evidence in light of the Court's opinion, please submit that via e-mail to me at hope.d.janke@usdoj.gov within 60 days of the date of this letter. For any questions you might have, please do not hesitate to call me directly at (202) 307-2858.

                                        Sincerely,

                                        Hope Janke
                                        Director
                                        Public Safety Officers' Benefits Office

Appx591

# Arnold&Porter

Re: Nathaniel A. Afolayan
DOD: May 1, 2009
PSOB Claim No.: 2010-022

Dear Ms. Janke:

Ms. Lisa Afolayan wishes to submit additional argument in support of her claim for death benefits in light of the Federal Circuit's opinion in *Afolayan v. DOJ*, No. 2021-1452, 2022 WL 1124965, (Fed. Cir. Apr. 15, 2022). The Federal Circuit remanded this case back to the Bureau of Justice Assistance ("BJA") for consideration of two issues: 1) Whether climatic conditions were a direct and proximate cause of Agent Afolayan's injuries and death; and 2) Whether the BJA's consideration of Agent Afolayan's sickle cell trait as a "cause" of his injuries and death would violate the Genetic Information Nondiscrimination Act ("GINA"). *Id.* at *6. The answer to both questions is yes, and the BJA should award Lisa Afolayan the PSOBA benefits to which she is entitled.

First, Agent Afolayan died while running in what the BJA's own expert called a "hostile environment." Every single medical expert who reviewed Agent Afolayan's case identified the climate—heat, low humidity, altitude—as a key factor in causing Agent Afolayan's death. Moreover, the conditions were unusual. Agent Afolayan's training took place at 3,400 feet above sea level, well above the height at which most Americans live. Moreover, the months leading up to Agent Afolayan's death had been cool, with the average April temperature 20 degrees lower than it was on the day of his death. This extreme temperature increase greatly increased the risks that Agent

**Arnold&Porter**

Afolayan would be injured and, in fact, the heat played a significant role in causing his death. As one expert noted, Agent Afolayan had many times engaged in similar stressful exercise without event; "[t]he only new variables that created a different set of circumstances for [Afolayan] were the climatic condition (heat), exertional dehydration (dry environment) and altitude" which together "led to organ system failure and precipitated [Afolayan's] demise." Dr. Darinka Mileusnic-Polchan Medical Evaluation (Jan. 28, 2019) 5.

Second, GINA was passed specifically to prevent discrimination or adverse action based on traits such as sickle cell trait. In fact, Congress explicitly identified discrimination based on sickle cell trait as a reason the law was necessary. There is no doubt that Agent Afolayan's sickle cell trait is entitled to protection. Further, there is no doubt that denying his widow death benefits because of his sickle cell trait would constitute discrimination "with respect to the compensation, terms, conditions, or privileges of [his] employment." 42 U.S.C. § 2000ff-1(a)(1). BJA cannot consider Agent Afolayan's sickle cell trait as a reason to deny his widow death benefits without violating GINA.

## I.     Background

### A.     Federal Circuit Opinion

The Federal Circuit remanded this case because the Acting Director was "less than clear as to whether the climatic conditions [on the day of Agent Afolayan's death] qualified as a direct and proximate cause [of his death] *if* they were the predominant factor." *Afolayan*, 2022 WL 1124965, at *2 (emphasis added). The Court stated that

2

**Arnold&Porter**

the climatic conditions include "heat, humidity, and altitude," and that the statute requires "nonroutine or out-of-the-ordinary climatic conditions for compensation." *Id.* at *3-4.

Further, if the climatic conditions were a direct and proximate cause of Agent Afolayan's death, then the BJA must consider "whether sickle cell trait is appropriately considered in determining whether another 'factor . . . contributed to the death . . . to so great a degree' as unusual climatic conditions." *Id.* at *4 (quoting 28 C.F.R. § 32.3). Specifically, the Court noted that "[t]he Genetic Information Nondiscrimination Act ("GINA") prohibits employers from 'fail[ing] or refus[ing] to hire, or to discharge, any employee, or otherwise [ ] *discriminat[ing] against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee.'*" *Id.* at *5 (quoting 42 U.S.C. § 2000ff-1 (emphasis and alterations in original)). The Court remanded "so that the Bureau may consider whether sickle cell trait should be considered to be a relevant alternative cause when such a benign trait is not disqualifying from employment in the Border Patrol." *Id.*

## B.  Legal Background

### 1.  Genetic Information Nondiscrimination Act

Title II of GINA provides that it is an unlawful employment practice for an employer:

> (1) to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or

3

**Arnold&Porter**

(2) to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.

42 U.S.C. § 2000ff-1(a).  GINA defines "genetic information" as "with respect to any individual, information about . . . such individual's genetic tests." 42 U.S.C. § 2000ff(4)(A)(i).

Although GINA does not define "terms, conditions, or privileges of employment," "the Supreme Court has noted that . . . the inclusion of 'terms, conditions, [and] privileges of employment' language in a statutory provision . . . signals that the provision at issue covers a wide range of conduct *within* the employment context." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 817 (10th Cir. 2020) (second alteration in original).  Specifically, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . . ' in employment.' " *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

The Supreme Court has held that a wide variety of employment-related benefits constitute "compensation" subject to the discrimination laws.  For example, "[t]here is no question that . . . retirement benefits constitute a form of 'compensation'" under Title VII and that their denial on a discriminatory basis was therefore a violation of that statute. *Ariz. Governing Comm'n for Tax Deferred Annuity &*

4

**Arnold&Porter**

*Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1079 (1983) (Marshall, J., concurring in the judgment in part).

### 2. Sickle Cell Trait

Carrying sickle cell trait is virtually synonymous with being Black. *See* Ifeoma Ajunwa, *Genetic Data and Civil Rights*, 51 Harv. C.R.-C.L. L. Rev. 75, 106 (2016) ("[A]lthough the sickle[]cell gene is prevalent in people of sub-Saharan decent, it can also be found in some Indian and middle-eastern populations. However, sickle cell was perhaps the first 'racialized' genetic disease in America, as it became associated with people of African descent."). Legislators, courts, and commentators all recognized decades before GINA's enactment that the inextricable link between sickle cell trait and being Black presents serious racial discrimination issues. "In response to th[e] discovery [that sickle cell anemia primarily impacts Black people], many states mandated sickle cell anemia screening for African[]Americans." Joanne Barken*, Does the Genetic Information Nondiscrimination Act of 2008 Offer Adequate Protection?*, 75 Brook. L. Rev. 545, 551 (2009). Despite such programs' benevolent intentions, "[h]ealthy carriers of the gene suffered adverse employment actions, and a false stigma developed that African[]Americans were inherently more susceptible to genetic disease than individuals of other races." *Id.*; *see also, e.g.*, Heather R. Quick, *Privacy for Safety: The NCAA Sickle-Cell Trait Testing Policy and the Potential for Future Discrimination*, 97 Iowa L. Rev. 665, 686 (2012) ("[D]iscrimination in the employment context due to being a carrier of the sickle[]cell trait can happen and has [happened].").

5

**Arnold &Porter**

In 1972, recognizing that African Americans with sickle cell trait were being discriminated against, Congress passed the National Sickle Cell Anemia Control Act ("NSCACA") in 1972, which withheld federal funds from states unless they made sickle cell screening programs voluntary. Barken, *supra*, at 551-52. Well before GINA's passage, the Ninth Circuit held that African American employees stated a claim for racial discrimination under Title VII based on the fact that their employer, Berkely Laboratory, screened only them for sickle cell trait and then denied them employment on the basis of their positive results. *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1272 (9th Cir. 1998). It is acknowledged that "Berkeley Laboratory's mandatory sickle cell trait testing would be in violation of the prohibition against genetic testing under GINA if litigated today." Phillip K. Vacchio & Joshua L. Wolinsky, *Genetic Information Nondiscrimination Act of 2008: It's in Title VII's Genes*, 29 Hofstra Lab. & Emp. L.J. 229, 269 (2011); *see also* Elizabeth Pendo, *Race, Sex, and Genes at Work: Uncovering the Lessons of Norman-Bloodsaw*, 10 Hous. J. Health L. & Pol'y 227, 248 (2010) ("If *Norman-Bloodsaw* were decided today, it appears that LBL's policy of testing employees for sickle cell trait would violate GINA . . . .").

In passing GINA, "Congress identified the facts of . . . *Norman-Bloodsaw* . . . as a key example of genetic discrimination in the workplace," Pendo, *supra*, at 228, explaining that "Congress clearly has a compelling public interest in relieving the

6

fear of discrimination and in prohibiting its actual practice in employment and health insurance."; GINA, Pub. L. No. 110-233, § 2(4), 122 Stat. 881, 882 (2008).

## C.    Factual Background

### 1.    Agent Afolayan's Injuries Death

In 2009, after being declared medically fit, Nate Afolayan was accepted into the United States Border Patrol. Letter from Lisa Afolayan, *Nathaniel A. Afolayan: An American Hero* 1. On February 16, 2009, Nate was sworn in as a Border Patrol Agent and sent to the training academy in southern New Mexico as Agent Nate Afolayan. *Id.*

The Border Patrol Academy is located in Artesia, New Mexico, in the Chihuahuan Desert. *See* Significant Incident Report (Apr. 30, 2009) 1; *see also* Glenn E. Griffith et al., U.S. Geological Survey, Ecoregions of New Mexico (2006), available at http://ecologicalregions.info/data/nm/nm_front.pdf. While at the academy, Afolayan was ranked among the top 5 trainees in his class in physical fitness. Letter from Lisa Afolayan, *Nathaniel A. Afolayan: An American Hero* 2. He was nominated by his instructors and his peers to give the graduation speech for his class, Class 856 of the United States Border Patrol. *Id.*; Aff. of Alex Jacob Alderman 9. Agent Afolayan's classmates described him as "in really good shape and ripped," Aff. of Victor Hugo Muglia Arias 5; "in excellent shape, probably the best shape in the class," Aff. of Alex Jacob Alderman 5; "top-notch; he was like a machine," Aff. of Jeffrey Carl Austin 4; "a stallion – very strong and well in shape," Aff. of Ginno Marcello Gallina Mora 5; and "in excellent shape," Aff. of Victor Manuel Santomauro 4. One of Agent

7

**Arnold&Porter**

Afolayan's classmates, "ran [with Agent Afolayan] a few times" and noted he "was in top physical condition." Aff. of Reyna Del Carmen Cabrera 4. He had done 1.5-mile runs repeatedly while at the Academy. *See* Aff. of Ginno Marcello Gallina Mora 7.

On April 30, 2009, five days before he was supposed to graduate, Agent Afolayan's class went on a mandatory 1.5-mile run, part of their "final physical fitness test" before graduation. Appendix to Director Determination 5. The day was sunny, and all of Afolayan's classmates remembered that it was "[r]eally hot. Very hot." Aff. of Jeffrey Carl Austin 5; *see also* Aff. of Victor Manuel Santomauro 4 ("It was hot. I don't remember the exact temperature, but it was hot."); Aff. of Ginno Marcello Gallina Mora 5 ("It was very hot."); Aff. of Reyna Del Carmen Cabrera 5 ("It was really hot. I remember the dirt just being like really dusty."); Aff. of Victor Hugo Muglia Arias 5 ("Hot and dry."). The highest recorded temperature that day was 92 degrees, the relative humidity was 7% and the run took place in the afternoon sun at 2:45 pm, at approximately 3,400 feet above sea level. Dr. Darinka Mileusnic-Polchan Medical Evaluation (Jan. 28, 2019) 2-3; Director Determination 1.

For their final run, "traditionally the BP classes would wear their class shirts when taking their last [physical training] final." Aff. of Victor Manuel Santomauro . The class shirts were "[b]lack cotton, thick and short sleeved." Aff. of Ginno Marcello Gallina Mora 5. Some of the students, including Agents Mora and Afolayan, did not want to wear the class shirts "because they were dark and thick." *Id.* Agent Afolayan

8

# Arnold & Porter

"said that it was going to be too hot to wear black shirts." Aff. of Victor Hugo Muglia Arias 6. The class voted and decided to wear the shirts. *Id.*

After completing his run, Afolayan experienced shortness of breath. Letter from Agent Antonio J. Angarita to Chief Patrol Agent Scott A Luck, Border Patrol Intern Nathaniel Afolayan 1. A minute later, he collapsed. Significant Incident Report 2. Afolayan was taken to the Health Unit, where the staff attempted to get his vital signs. *Id.* Afolayan became combative, uncooperative, and unresponsive. *Id..* The Health Unit called an ambulance to take him to the hospital. *Id..* Afolayan was then airlifted to Lubbock, Texas for further treatment. *Id.* at 3. Once brought to Lubbock, Afolayan stopped breathing and was placed on a ventilator. *Id.* at 2. On May 1, 2009, Nate died. *Id.* at 4. He was only 29 years old, Autopsy Examination Report 8, and in peak physical condition.

## 2. Sickle Cell Trait

Almost two years earlier in December 2007, genetic testing revealed that Nate Afolayan had the sickle cell trait. Letter from Genetic Counselor to Lisa Afolayan (Jan.17, 2008) 1. Nate Afolayan was informed of his test results in a letter on January 17, 2008 to his wife, Lisa. *Id.* The letter informed the Afolayans that Nate "is a carrier of sickle cell trait (AS), which is NOT a disease." *Id.* The letter further explained that Nate's "[h]emoglobin traits are clinically benign carrier conditions." *Id.* at 2.

"Sickle cell trait is an inherited blood disorder that affects about 8 percent of African Americans." Dr. Darinka Mileusnic-Polchan Medical Evaluation (Jan. 28,

9

**Arnold&Porter**

2019) 2.  "In general, these individuals enjoy normal life spans with no medical problems related to the trait."  *Id.*  Nate Afolayan, in particular, had "the heterozygous genotype, which meant that his hemoglobin composition was 56 percent Hemoglobin A (normal allele) and 41 percent Hemoglobin S (abnormal allele)."  *Id.* "Sickle cell trait phenotype with this particular AS genotype ratio did not prevent [A]gent Afolayan from living a normal life filled with usual activities including enrollment in either military or law enforcement service."  *Id.*

No law enforcement service excludes applicants with the sickle cell trait.  See Dr. Kris Sperry Medical Evaluation (Nov. 15, 2012) 2.  One organization that does test for the sickle cell trait is the U.S. Marine Corps.  The Marines test for sickle cell trait "in order to identify individuals who may be at risk for a sickle cell crisis if placed in extreme environmental conditions."  *Id.*  "Although it is recognized by the U.S. Military that individuals with sickle cell trait have an increased statistical risk for death (although these deaths are extremely rare), it has also been shown that prevention of heat-related illness and extensive education on proper hydration and avoidance of heat stroke has essentially eliminated this risk among military recruits." *Id.*

### 3.    Expert Medical Opinions

Four doctors offered opinions on the cause of Agent Afolayan's death.

### a.    Dr. Sridhar Natarajan

Dr. Sridhar Natarajan, M.D., M.S. is the Chief Medical Examiner of Lubbock County, Texas.  Autopsy Examination Report 9.  He performed an autopsy on Agent

US 172225951v4

**Arnold&Porter**

Afolayan's body shortly after his death and filed both the death certificate and an Autopsy Examination Report. *Id.* at 1. Dr. Natarajan concluded that "the Cause of Death of Nathaniel Afolayan, a 29 year old African American male, was due to Heat Illness. Contributory to his death was Cardiomegaly (Cardiac Disease)." *Id.* at 9.

### b. Dr. Stephen Cina

In 2011, Dr. Stephen Cina, M.D., a forensic pathology consultant, performed a medical review of Agent Afolayan's medical records at the Justice Department's request for the purpose of evaluating Lisa Afolayan's PSOB claims. Dr. Stephen Cina Medical Evaluation (Apr. 14, 2011) 1. Dr. Cina opined that Agent Afolayan's "collapse and subsequent demise were brought about by the combination of a congenital condition (sickle cell trait or disease) and exercise in a *hostile* environment. Antihistamine use, dehydration, and a viral illness could also have played a smaller role in this death." *Id.* at 17.

Dr. Cina concluded, "more likely than not, that exercise in an adverse climate contributed to death. If those conditions did not exist, he likely would not have collapsed on 4/30/09. That being said, [Dr. Cina] feel[s] the most significant factor contributing to death in this case was a sickle cell crisis." *Id.* In Dr. Cina's opinion, the sickle cell crisis could have been "triggered" by "[t]he combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure." *Id.* at 16.

### c. Dr. Kris Sperry

Forensic pathologist Dr. Kris Sperry, M.D. also reviewed Agent Afolayan's medical records and provided an opinion on the causes of his death. Dr. Kris Sperry

11

US 172225951v4

**Arnold & Porter**

Evaluation (Nov. 15, 2012) 1. Dr. Sperry concluded "to a reasonable degree of medical certainty, that Nathaniel A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run." *Id.* at 2. "This physical training took place in a hot environment, which is a known contributing factor in the evolution of a sickle cell crisis." *Id.* at 2-3. "Thus, [Dr. Sperry was] in agreement with both Drs. Cina and Natarajan, that Nathanial A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died." *Id.* at 3.

### d. Dr. Darinka Mileusnic-Polchan

Finally, Dr. Darinka Mileusnic-Polchan, M.D., the Chief Medical Examiner at the Knox County, Tennessee Regional Forensic Center, offered an opinion on Agent Afolayan's death. Dr. Darinka Mileusnic-Polchan Evaluation (Jan. 28, 2019) 1. Dr. Mileusnic-Polchan noted that, on the day Agent Afolayan collapsed, "the highest recorded temperature was 92º Fahrenheit with a relative humidity of 7%." Appx297. Further, "Agent Afolayan was among the agents who were concerned about wearing thick black class shirts." *Id.* at 2. "Another important factor . . . was the Artesia, New Mexico altitude of about 3500 feet." *Id.* at 3. "[A] combination of altitude and

12

exertion in a hot environment is a dangerous triad" that, in "people with sickle cell trait ... could also initiate a vicious cycle of exertional rhabdomyolysis." *Id*.

As Dr. Mileusnic-Polchan recognized, "Agent Afolayan was fit and accustomed to strenuous exercise prior to his relocation to Artesia, New Mexico." *Id*. at 5. Afolayan's "sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation." *Id*. Dr. Mileusnic-Polchan identified that "[t]he only new variables that created a different set of circumstances for [Afolayan] were the climatic condition (heat), exertional dehydration (dry environment) and altitude . . . ." *Id*. She concluded: "Ultimately, these events led to organ system failure and precipitated [Afolayan's] demise." *Id*.

## II. Argument

### A. The Adverse Climatic Conditions Were A Direct And Proximate Cause of Agent Afolayan's Death

As the Federal Circuit identified, the relevant climatic conditions that Agent Afolayan was exposed to were the heat, low humidity, and high altitude. *See Afolayan*, 2022 WL 1124965, at *3. In Agent Afolayan's situation, all three climatic conditions were unusual and contributed to his death.

First, Artesia, New Mexico is 3,500 feet above sea level, two thirds of a mile. Dr. Darinka Mileusnic-Polchan Evaluation (Jan. 28, 2019) 5. By contrast, New York City's highest elevation is 410 feet above sea level, Chicago's is 673, and Washington, D.C.'s highest elevation is only 410 feet above sea level. *See* U.S. Geologic Survey, *Elevations of the 50 Largest Cities (by population, 1980 Census)*

13

**Arnold & Porter**

https://www.usgs.gov/educational-resources/elevations-50-largest-cities-population-1980-census (last visited July 28, 2022). That is higher than the highest habitations in 35 of the 50 states. *See List of highest United States cities by state or territory*, https://bit.ly/3B9t5SY (last visited July 28, 2022). At the very least, the altitude at which Agent Afolayan undertook his training is "unusual" in the United States. *See Afolayan*, 2022 WL 1124965, at *3.

Dr. Cina and Dr. Mileusnic-Polchan both identified this high altitude as a cause of Agent Afolayan's death. Dr. Cina opined that Agent Afolayan's injuries and subsequent death may have been "triggered" by "altitude exposure," among other factors. Similarly, Dr. Mileusnic-Polchan identified the "altitude" as one of the "new variables" that caused Agent Afolayan's injuries and subsequent death.

Second, Dr. Mileusnic-Polchan also pointed to Agent Afolayan's dehydration, traceable to the low humidity of 7%, as another factor that caused Agent Afolayan's injuries and death.

Third, every medical professional who examined Agent Afolayan's case identified the high heat on the day of his death as a cause of his injuries and death. First, Dr. Natarajan concluded that "the Cause of Death of Nathaniel Afolayan, a 29 year old African American male, was due to Heat Illness." Autopsy Examination Report 9. Second, Dr. Cina identified the "hot environment" as playing a role in causing Agent Afolayan's injuries and death. Dr. Stephen Cina Medical Evaluation (Apr. 14, 2011) 5. Third, Dr. Sperry opined that Agent Afolayan's training took place

14

**Arnold & Porter**

in a "hot environment" and he died as the result of a "heat related illness." Dr. Kris Sperry Evaluation (Nov. 15, 2012) 2-3. Finally, Dr. Mileusnic-Polchan identified the "hot environment" as a cause of Agent Afolayan's death, and one of "[t]he only new variables that created a different set of circumstances" not present in Afolayan's long history of strenuous exercise. Dr. Darinka Mileusnic-Polchan Evaluation (Jan. 28, 2019) 5.

On the day Agent Afolayan died, the highest recorded temperature was 92 degrees Fahrenheit, *id.* at 2, and the temperature was approximately 88 degrees at the time of the run that led to Agent Afolayan's death. Appendix to Director Determination 5. In the two months before Agent Afolayan's death, the temperature only reached even 88 degrees on two other occasions. *See Rosewell, NM Weather History (March 2009)* https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-3 (last visited July 28, 2022); *Rosewell, NM Weather History (April 2009)* https://www.wunderground.com/history/monthly/us/nm/roswell/KROW/date/2009-4 (last visited July 28, 2022).[1] In April, the average temperature was 62 degrees, 22 degrees colder than the temperature on the day of Agent Afolayan's death. *Id.*

"Heat" is relative, not absolute. For an athlete used to training in 100 degree temperatures, the 88 degree day of Agent Afolayan's run may have felt cool and

---

[1] These temperatures are from a weather station in Roswell, New Mexico, which is 40 miles north and the closest weather station to Artesia, New Mexico.

15

refreshing.  But for those like the members of Agent Afolayan's Border Patrol training class, 88 degrees was 20 degrees higher than the average temperatures in the location they were training, and thus much hotter than they were used to.  This is borne out by the testimony of Agent Afolayan's classmates.  To a person, Agent Afolayan's classmates recalled that day being "[r]eally hot.  Very hot."  Aff. of Jeffrey Carl Austin 5; *see also* Aff. of Victor Manuel Santomauro 4 ("It was hot.  I don't remember the exact temperature, but it was hot."); Aff. of Ginno Marcello Gallina Mora 5 ("very hot"); Aff. of Reyna Del Carmen Cabrera 5 ("really hot"); Aff. of Victor Hugo Muglia Arias 5 ("Hot and dry").

This increased temperature in April created a "hot, hostile environment," Dr. Stephen Cina Medical Evaluation (Apr. 14, 2011) 17, that Agent Afolayan was unusual.  And a lack of "acclimatization to hot conditions" leads to "an increased risk of heat-related illness."   Binkley et. al, *National Athletic Trainers' Association Position Statement: Exertional Heat Illnesses*, 37 J. Athl. Train. 329, 336 (2002).  This is precisely what happened.

The effects of this unusual heat were further magnified by the "[b]lack cotton," "dark and thick" training shirts that the class wore on their final run.  Aff. of Ginno Marcello Gallina Mora 5.  Some members of the class, including Agent Afolayan, were concerned about wearing the shirts; in fact, Agent Afolayan himself protested that "it was going to be too hot to wear black shirts."  Aff. of Victor Hugo Muglia Arias 6.  However, the class voted and decided to wear the shirts.  *Id*.  Agent Afolayan's

16

concerns were well-founded. Clothes that "do not allow for heat dissipation," "excessive clothing," and "dark-colored clothing" "should be avoided" because they can "cause a greater absorption of heat from the environment." Binkley et. al, *supra*, at 335.

This combination of unusually high temperatures (20 degrees above average for the month) and thick, dark clothing greatly increased Agent Afolayan's risk of a heat-related illness. Combined with the high altitude and dehydration in a dry environment, these climatic conditions created the unusual "hostile environment" that led to his injuries and death. Dr. Stephen Cina Medical Evaluation (Apr. 14, 2011) 17.

B.      GINA Prohibits Consideration Of Agent Afolayan's Sickle Cell Trait As A "Cause" Of His Death

Sickle cell trait has been used to discriminate against African Americans for decades. *See generally Norman-Bloodsaw*, 135 F.3d at 1272. Recognizing this problem, Congress explicitly identified the facts of *Norman-Bloodsaw* in GINA, and connected discrimination based on sickle cell trait to Congress's "compelling public interest in relieving the fear of discrimination and in prohibiting its actual practice in employment." 122 Stat. 881.

"To plead a prima facie case under GINA, a plaintiff must show: (1) that he was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from his genetic tests." *Myopo v. FIS Mgmt Servs., LLC*, No. CV-17-04307, 2019 U.S. Dist. LEXIS 210592, at *8 (D. Ariz. Dec. 6, 2019) (citing

17

**Arnold&Porter**

*Carroll v. Comprehensive Women's Health Serv.*, No. 3:16cv1509, 2017 U.S. Dist. LEXIS 158490, at *16 (M.D. Penn. Sept. 27, 2017)). The question the Federal Circuit posed is whether it would violate GINA for the government to deny PSOBA benefits to Agent Afolayan's widow *because of* Agent Afolayan's sickle cell trait.

The question answers itself. There is no question that Agent Afolayan was a federal employee. There is no question that public safety officer death benefits are a "privilege" of employment as a federal safety officer. *Cf., e.g., Ariz. Governing Comm'n*, 463 U.S. at 1079 (Marshall, J., concurring in the judgment in part) ("retirement benefits constitute a form of compensation"). And there is no question that information about Agent Afolayan's sickle cell trait constitutes "genetic information" under GINA. *See* 122 Stat. 881 (identifying discrimination because of sickle cell trait as an example of the discrimination GINA is meant to eliminate). Simply put, information about an employee's sickle cell trait is precisely the type of genetic information that GINA protects. The BJA may not use Agent Afolayan's sickle cell trait as a reason to deny his wife the benefits to which she is entitled.

Sincerely,

John Elwood

ARNOLD & PORTER
KAYE SCHOLER LLP

18



**Director Determination**
Border Patrol Agent Nathaniel Afolayan
PSOB Claim No. 2010-022

Lisa Afolayan filed a claim with the Public Safety Officers' Benefits ("PSOB") Office of the Bureau of Justice Assistance ("BJA"), seeking benefits on behalf of herself and her two minor daughters, Natalee and L█, (the "Claimants"), based on the May 1, 2009, death of her husband, Agent Nathaniel Afolayan, United States Border Patrol.

Pursuant to the PSOB Act and the PSOB implementing regulations, and as the BJA Director, I have conducted a *de-novo* review of the record in this claim as described in the evidence log at the end of the attached Appendix.

Agent Nathaniel Afolayan was in training at the Border Patrol Academy in Artesia, New Mexico, on April 30, 2009. By all accounts, he was well respected by his Academy classmates and was looking forward to protecting the Nation's borders. Shortly after completing a mandatory 1.5-mile run at 2:45 p.m. in temperatures reaching the upper 80s, he collapsed. Despite being airlifted to Covenant Medical Center in Lubbock, Texas, he died the next day, May 1, 2009. The amended Certification of Death lists the immediate cause of death as "Heat Illness," with other significant conditions contributing to death listed as "Cardiomegaly (Cardiac Disease)."

To be eligible for PSOB death benefits, the evidence in the administrative record must show that the decedent died as "the direct and proximate result of a personal injury sustained in the line of duty." Here, the overwhelming weight of the medical evidence in the record of this claim persuades me that Agent Afolayan died–not from a wound or condition shown to have itself been "the direct and proximate result" of climatic conditions, such as heat, or another external force/factor cognizable as an "injury" under PSOB regulations–but, rather, as a result of several factors acting together, including physical exertion, sickle cell trait, heat, altitude, and dehydration.

Accordingly, as the evidence does not persuade me that Agent Afolayan died as the direct and proximate result of a personal injury sustained in the line of duty, for the reasons given

above and discussed in detail in the attached Appendix, this claim for PSOB Act benefits is denied.

_Michael J. Costigan_      9/14/20

Michael Costigan           Date
Acting Director

### Appeal Rights

Relief from this determination may be sought via appeal to the United States Court of Appeals for the Federal Circuit, pursuant to 34 U.S.C. § 10287. Such appeal must be filed "not later than 90 days after the date of which the Bureau [of Justice Assistance] serves notice" of this determination on the Claimants. *Id.* Notice of this determination is served by the PSOB Office on the date that it is "(1) [m]ailed, by U.S. mail, addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office]; . . . (2) [d]elivered to a courier or other delivery service, addressed to the individual (or to his representative) at his (or his representative's) last address known to such Office[,]" 28 C.F.R. § 32.2(c); or (3) having been so prescribed, sent "by the PSOB Office [to] an individual by electronic means (such as by telefacsimile or electronic mail addressed to the individual (or to his representative) at his (or his representative's) last address known to [the PSOB Office])," 28 C.F.R. § 32.2(g)(2).

### Fees for Representation

If a representative (such as an attorney) has provided any services in connection with this claim, the representative *must* obtain authorization pursuant to 28 C.F.R. § 32.7 before seeking any compensation whatsoever for such services from the Claimant. *See* 34 U.S.C. § 10285(a).

2

**Director Determination**
Border Patrol Agent Nathaniel Afolayan
PSOB Claim No. 2010-022

**Procedural History**

By form dated October 28, 2009, Lisa Afolayan filed a claim with the Public Safety Officers' Benefits ("PSOB") Office of the Bureau of Justice Assistance ("BJA" or the "Bureau"), seeking benefits for herself and her two minor daughters, Natalee and L███. The claim is predicated on the death of her husband, Agent Nathaniel Afolayan.[1] Agent Afolayan was training to become a U.S. Border Patrol Agent[2] at that agency's academy in Artesia, New Mexico, when he collapsed after a mandatory 1.5-mile training run.[3] He died the next day, May 1, 2009.

In a determination dated March 6, 2012, the PSOB Office denied the claim, on the basis that the evidence did not show that Agent Afolayan died as the direct and proximate result of an injury sustained in the line of duty.[4] Relying in large part on the medical opinions of Dr. Stephen Cina, an independent forensic pathologist, the PSOB Office noted that although "[t]he death certificate listed the cause of death as heat illness due to cardiomegaly," Dr. Cina was unable to conclude to a degree of medical probability that Agent Afolayan died of

---

[1]    When Claimants filed for PSOB death benefits, the PSOB Act was codified at 42 U.S.C. §§ 3796 *et seq.* Since that time, the Office of Law Revision Counsel reorganized certain existing provisions of the United States Code in a new Title 34. Pursuant to this reorganization, the provisions of the PSOB Act are now located in Title 34, chapter 101, subchapter XI, and accordingly, the citations in this determination are to the new location of the PSOB Act in the Code.

The PSOB Act generally is applied as in effect on the line-of-duty injury on which the claim is predicated. *See generally* 28 C.F.R. § 32.4(d). As explained in text below, however, this approach is not possible with respect to the instant claim, as the actual occurrence of such an injury, and hence the date thereof, cannot be ascertained from the record. Except as otherwise may be expressly noted, therefore, references herein to the statute are as in effect on the date of death, including as may be applicable pursuant to Pub. L. No. 115-36, § 6(2), 131 Stat. 849, 852 – 853 (2017); and Pub. L. No. 112-239, § 1086(d), 126 Stat. 1632, 1969 (2013), as amended. In contrast, and except as may be noted otherwise, the PSOB implementing regulations (which are codified at 28 C.F.R. part 32) are referred to herein as in effect on the date of this determination. *See* 34 U.S.C. § 10287.

[2]    At the time of his death, Nathaniel Afolayan was training to become a U.S. Border Patrol Agent at that agency's training academy. The terms Agent, Trainee, Intern, and Cadet are used interchangeably throughout the claim documents to describe his status during the training. For consistency and to avoid confusion, the term "Agent" generally is used herein to describe Nathaniel Afolayan's status within his employing agency.

[3]    Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, dated May 14, 2010.

[4]    PSOB Office Claim Determination, 2-3, dated March 6, 2012.

3

heatstroke. Given Dr. Cina's histologic findings of abundant sickle cells and that Agent Afolayan's condition "would be compatible with a sickle cell crisis brought on by intense physical exertion in a hot environment at altitude," the PSOB Office concluded "that climatic conditions may have contributed at some level to Border Patrol Agent Afolayan's death, but the evidence is insufficient to show that these conditions were a substantial factor."[5] The Claimants, through Counsel, requested determination of the claim by a Hearing Officer.

The claim was assigned to PSOB Hearing Officer Joseph Mistrett, who held a hearing on November 27, 2012, in the San Diego office of Claimants' Counsel.[6] Mrs. Afolayan testified in the hearing, along with Dr. Kris Sperry, a forensic pathologist, and Agent Alex Alderman, a Border Patrol Academy classmate of Agent Afolayan. Fourteen exhibits were introduced at the hearing, including Dr. Sperry's report,[7] academic articles on the sickle cell trait, the weather history of Artesia, and affidavits from a number of individuals in Agent Afolayan's training class. Following the hearing, Hearing Officer Mistrett sought an updated medical opinion from Dr. Cina.[8]

In a determination dated January 10, 2014, Hearing Officer Mistrett denied the claim, on the basis that the biggest contributor to Agent Afolayan's death was his sickle cell crisis and not the climatic conditions encountered in his 1.5-mile run. Accordingly, he was unable to conclude that Agent Afolayan's death was the direct and proximate result of a personal injury sustained in the line of duty.[9] Notice of the determination was served on the Claimants on February 10, 2014.

The Claimants did not immediately appeal the Hearing Officer's determination. On June 13, 2018, Mrs. Afolayan contacted the PSOB Office, explaining why she did not do so. Her explanation was found to constitute evidence of good cause for extending the appeal-filing deadline, and Claimants' February 4, 2019, appeal to the Bureau Director, which otherwise would have been out-of-time, was accepted.

Claimants appeal included a letter by Mrs. Afolayan about her husband; a report by Darinka Mileusnic-Polchan, M.D.; a list of PSOB claims involving deaths caused by overexertion, dehydration, or rhabdomyolysis; and argument as to why this claim was similar to certain claims previously approved by the PSOB Program.[10] On January 24, 2020, Mrs.

---

5   *Id.*

6   Hearing Transcript, dated November 27, 2012.

7   Independent Medical Evaluation, Kris Sperry, MD, dated November 15, 2012.

8   Independent Medical Evaluation, Stephen Cina, MD, dated February 22, 2013.

9   Hearing Officer Determination, 18-20, dated January 10, 2014.

10  Email from Lisa Afolayan to Hope Janke, PSOB Director, dated February 4, 2019.

Afolayan filed another letter in support of the claim, which included further information about the previously approved PSOB claims and another copy of the report by Dr. Mileusnic-Polchan.

## Background

At the time of his death, Nathaniel Afolayan was a Border Patrol Agent (Intern) employed by U.S. Customs and Border Protection.[11] Agent Afolayan was enrolled in Session 856 of the Border Patrol Academy at Artesia, New Mexico.[12] The Border Patrol Academy is twelve weeks in length; Agent Afolayan was in the last week of the training when he died.

At approximately 2:45 p.m. on April 30, 2009, Agent Afolayan and his fellow agents-in-training were participating in their final physical fitness test, which included a mandatory 1.5-mile run. Each trainee had to complete the run in 13 minutes or less.[13] Around the time of Agent Afolayan's run the temperature was roughly 88 degrees Fahrenheit, and the relative humidity was between 6 and 7 percent.[14] After completing the run in 11 minutes and 6 seconds, Agent Afolayan indicated he did not feel well and shortly thereafter collapsed.

Agent Afolayan was initially taken to the Border Patrol Academy's Health Unit for medical assistance. Because his condition continued to decline, he was taken to Artesia General Hospital. When his condition still did not respond to medical treatment, he was airlifted, at 7:10 p.m., to Covenant Medical Center in Lubbock, Texas. He died the next day at 10:41 p.m.[15] Treatment records for Agent Afolayan from Covenant Medical Center indicate diagnoses related to heat illness and/or rhabdomyolysis.[16]

---

[11]    Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, dated May 14, 2010. *See also* Memorandum from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, Border Patrol Academy, dated May 2, 2009.

[12]    Memorandum from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, Border Patrol Academy, dated May 2, 2009. The altitude in Artesia, New Mexico, is approximately 3400 feet above sea level.

[13]    CBP Border Patrol Academy Description, printed February 1, 2010.

[14]    *See* Hearing Officer Determination, dated January 10, 2014, where Hearing Officer Joseph B. Mistrett wrote, "According to weather records for Artesia, New Mexico on April 30, 2009, the temperature at 2:30 p.m. was 87.8 degrees, with a relative humidity of 6% or 7%."

[15]    Significant Incident Report, 3, dated April 30, 2009.

[16]    *See e.g.,* Medical Documents, Covenant Health System, dated from April 30, 2009, through May 1, 2009 (Dr. Tello: "I am not sure whether the culprit in all of this is a heat stroke or rhabdomyolysis or both."; Dr. Starnes: Assessment as "[a]cute renal failure, currently oliguric and likely acute tubular necrosis from rhabdomyolysis."; Dr. Duriex: "Hypertension and shock, possibly due to sepsis, possibly due to metabolic issues. ... Oliguria secondary to renal failure from the rhabdomyolysis, fibromyolysis, medication or infection based.").

The initial death certificate, certified on May 5, 2009, listed the cause of death as "pending." The September 1, 2009, amendment to the death certificate listed the immediate cause of death as "Heat Illness," and identified "other significant conditions contributing to death" as "cardiomegaly (cardiac disease)."[17]

In a determination dated October 21, 2009, a Hearing Representative for the Office of Workers' Compensation Programs ("OWCP"), approved Mrs. Afolayan's claim for death benefits, reversing an earlier denial by the agency. A review of OWCP's October determination indicates that the initial denial was based on a finding that there was insufficient medical evidence to establish the claim. Following the submission of additional medical evidence on appeal (comprising an autopsy report by Dr. Sridhar Natarajan and a statement by a Border Patrol official conducting the fitness exam), OWCP found Mrs. Afolayan's burden of proof—establishing that the employee's death occurred while in the performance of duty—was met and approved the claim.[18]

*Expert Medical Opinions*

The PSOB record contains medical opinions from four different pathologists as to the cause of Agent Afolayan's death. Those opinions, along with other medical evidence, are discussed below.

Sridhar Natarajan, M.D., M.S.

Dr. Sridhar Natarajan, the Lubbock County, Chief Medical Examiner, performed an autopsy on Agent Afolayan on May 3, 2009. He noted, among other things, a lack of trauma ("muscles and bones are symmetric and without evidence of significant acute trauma"),[19] extensive hemorrhage in the lower bowel and liver, and acute tubular necrosis in the kidneys.[20] Dr. Natarajan stated in his report that "[Agent] Afolayan showed signs and symptoms of heat illness and rapidly deteriorated."[21] He also noted that the autopsy revealed an enlarged heart, "which made him more sensitive to a strenuous environment."[22] Ultimately, he determined that the cause of death was "heat illness" with "cardiomegaly (cardiac disease)" as a contributing

---

[17]     Certificate of Death for Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Sridhar Natarajan, MD, MS, Lubbock County Medical Examiner, Date Issued September 1, 2009.

[18]     Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, undated.

[19]     Autopsy Examination Report, conducted Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009.

[20]     *Id.* at 6-7.

[21]     *Id.*

[22]     *Id.*

6

factor.[23]

Stephen Cina, M.D.

Dr. Stephen Cina, an independent forensic pathologist, reviewed the record at the request of BJA, documenting his findings in three separate medical opinions, the most recent dated February 22, 2013.[24] Following his review of the record including medical records from Agent Afolayan and Dr. Kris Sperry's medical opinion (discussed below), Dr. Cina stated that he was unable to conclude "to a reasonable degree of medical probability" that Agent Afolayan died from a heatstroke. In support of this conclusion, he noted that "[Agent Afolayan's] symptoms leading up to his collapse were somewhat atypical for heatstroke and he did not complain of being hot prior to losing consciousness" and "though there was a clinical impression of heat-related illness, an elevated body temperature was not recorded."[25] Nevertheless, Dr. Cina acknowledged that "adverse climatic conditions contributed at some level to [Agent Afolayan's] death."[26]

In response to a question as to whether "any other factor or combination of factors (for example, chronic, congenital, progressive, or preexisting condition, illness, or disease) contribute[d] to the death as much as [the injury identified in a previous question,]" Dr. Cina responded—

> Yes. There is microscopic evidence of severe sickle cell disease. The combined stressors of a viral illness, physical exertion, hot climate, dehydration, and altitude exposure could have triggered a sickle cell crisis.[27]

Acknowledging that Agent Afolayan's exercise in an adverse climate contributed to his death, Dr. Cina ultimately concluded that "the most significant factor contributing to death in this case was a sickle cell crisis."[28]

After reviewing evidence gathered during the hearing officer's review to include Dr. Sperry's report, Dr. Cina stated in his final opinion that "essentially, my opinion is

---

[23] *Id.*

[24] The first such review, performed on April 14, 2011, was largely for purposes of determining whether Agent Afolayan's death was the result of a heart attack, which was relevant for 42 U.S.C. § 3796(k)—now 34 U.S.C. § 10281(k). Independent Medical Review, Dr. Stephen Cina, dated April 14, 2011.

[25] Independent Medical Evaluation, Dr. Stephen Cina, p. 5, dated February 22, 2013.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 6.

unchanged and my microscopic diagnosis of sickle cell disease/trait has been confirmed."[29] He opined, "To within a reasonable degree of medical probability, [Agent Afolayan] would not have died if he did not have pre-existent sickle cell trait. He also would not have died if he was not exercising in a hot, hostile environment. Each of these factors was a contributory factor in his death."[30]

Kris Sperry, MD

Dr. Kris Sperry, a forensic pathologist, testified at the request of the Claimants at the November 27, 2012, hearing. Two weeks before the hearing, he wrote a report in which he opined that, "to a reasonable degree of medical certainty . . . Nathanial [sic] A. Afolayan died as the result of a sickle cell crisis that was precipitated by physical exertion with accompanying relative dehydration that developed during his performance in a 1.5 mile run."[31] Dr. Sperry went on to acknowledge that the physical training performed by Agent Afolayan in a hot environment was a "known contributing factor in the evolution of a sickle cell crisis in persons who carry the sickle cell trait."[32] He concluded by stating that he agreed with Drs. Cina and Natarajan in "that Nathanial [sic] A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from his having the sickle cell trait, and that but for the exertion of running 1.5 miles in a hot environment, he would not have died."[33]

In a later amended report, dated May 23, 2013, Dr. Sperry commented on Dr. Cina's February 2013, report. Dr. Sperry noted Dr. Cina's omission of Agent Afolayan's sickle cell diagnosis.[34] Dr. Sperry noted further, however, that Dr. Cina had amended his report "to

---

[29]  Id. ("The microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait. Microscopically this is identical to a crisis from sickle cell disease.").

[30]  Id.

[31]  Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated November 15, 2012.

[32]  Id. at 2-3.

[33]  Independent Medical Evaluation, Dr. Kris Sperry, p. 3, dated November 15, 2012. Although Dr. Cina stated that the hot environment was a factor in Agent Afolayan's fatal condition, he did not expressly conclude (unlike Dr. Sperry) that Agent Afolayan died from a heat-related illness: "Based on the records provided, I cannot confirm a diagnosis of heatstroke, though it remains a possibility in this case. . . . I cannot state, however, that the climate was the most significant factor in this fatality." Independent Medical Evaluation, Dr. Stephen Cina, dated February 22, 2013.

[34]  Independent Medical Evaluation, Dr. Kris Sperry, p. 2, dated May 22, 2013. I note that Dr. Sperry expressed concern in this report that Dr. Cina may not have been provided with the same records that he (Dr. Sperry) reviewed. As Hearing Officer Mistrett correctly noted on page 13 of his determination, Dr. Sperry did not realize that Dr. Cina's amended report included language from an earlier report:

> What actually occurred here is that Dr. Cina incorporated his earlier July 15, 2011 report in his amended report. Thus, when Dr. Cina states that, "The PSO was an African-American, but there is no documentation of sickle cell trait in the records provided," that observation was made in Dr. Cina's earlier, pre-hearing report. At that time, Dr. Cina had no knowledge of hearing exhibit 1, the letter dated January 17, 2008, from Molly Dunn, Certified Genetic Counselor, to

8

confirm that the microscopic findings are compatible with a sickle cell crisis in a person with established sickle cell trait" and stated, "I completely agree with this conclusion."[35]

Ultimately, Dr. Sperry concluded that "[he] continue[d] to be in agreement with the opinions of Drs. Cina and Natarajan, that Nathanial [*sic*] A. Afolayan died as the consequence of a heat related illness, specifically the precipitation of a sickle cell crisis that arose from him having the Sickle Cell Trait."[36]

<u>Darinka Mileusnic-Polchan, M.D., Ph.D.</u>

Dr. Mileusnic-Polchan, Chief Medical Examiner at the Knox County Regional Forensic Center in Knoxville, Tennessee, also provided a medical opinion at the request of the Claimants. In an opinion dated January 28, 2019, she concluded that "Agent Nathaniel Afolayan died of complications of rhabdomyolysis due to strenuous physical activity in a hot dry environment."[37] She added that "[t]he underlying contributing factors were sickle cell trait in combination with high altitude, which made the agent more susceptible to developing the catastrophic form of rhabdomyolysis."[38]

Dr. Mileusnic-Polchan's opinion includes a more expansive discussion of rhabdomyolysis than that offered by either Dr. Sperry or Dr. Cina. She opines that Agent Afolayan was suffering from exertional rhabdomyolysis at least a couple days before his 1.5-mile run on April 30th. Looking back at the medical records from Agent Afolayan's visits to the Border Patrol Academy's Health Unit, and relying upon a symptom Mrs. Afolayan remembers her husband's reporting to her (although it is not mentioned in the Health Unit's records), Dr. Mileusnic-Polchan asserts that Agent Afolayan had the "classic triad" of "exertional rhabdomyolysis"—muscle aches, weakness, and dark urine—"for days prior to his terminal collapse." Suggesting that Agent Afolayan was suffering from exertional rhabdomyolysis for some time before he participated in the 1.5-mile run, Dr. Mileusnic-Polchan states, "It is unfortunate that the [exertional rhabdomyolysis] diagnosis was missed on several occasions,

---

Mrs. Afolayan. . . . I make this observation merely to set the record straight. Furthermore, Dr. Sperry's mistaken suggestions have no bearing whatsoever on the determination herein rendered.

[35]    Independent Medical Evaluation, Dr. Kris Sperry, pp. 1-2, dated May 22, 2013.

[36]    *Id.* at 2. Certain language in Dr. Sperry's report, and that of Dr. Mileusnic-Polchan, appears to assert that the Border Patrol Academy could have done more to prevent this incident. "To a reasonable degree of medical certainty, [Agent Afolayan's] death would have been preventable if he had been offered proper hydration and appropriate rest during the course of his exertion-related activities, as these measures have been proven to ameliorate the onset and progression of Sickle-Cell Trait-induced crises, and are utilized regularly during the training of soldiers in all branches of the United States Military." I make no findings whatsoever as to this issue.

[37]    Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, pp. 5-6, dated January 28, 2019.

[38]    *Id.* at 6. In her report, Dr. Mileusnic-Polchan noted that although the sickle cell trait was not associated with an increased risk of death in athletes and military recruits, "sickle cell trait was associated with a 54 percent greater risk of exertional rhabdomyolysis, a potentially fatal syndrome associated with strenuous physical activity."

9

particularly on April 28, 2019, when the agent presented at the FLETC Health Unit having experienced the triad." In her report, she described the condition, its symptoms, and explained, as follows, her opinion of how these were manifested in Agent Afolayan:

> Exertional rhabdomyolysis is a syndrome characterized by skeletal muscle breakdown, muscle enzyme and myoglobin release and subsequent acute renal failure that is precipitated by strenuous physical exertion. The classic triad presents with muscle aches, weakness and dark urine. The muscular signs and symptoms are usually confined to the particular overworked muscle group(s).[39]

While acknowledging research showing that persons with sickle cell trait have an increased risk of exertional rhabdomyolysis, Dr. Mileusnic-Polchan stated that "strenuous exercise and sickle cell trait alone would not . . . inevitably lead to sickle cell crisis and death."[40] Noting that Agent Afolayan had not previously encountered difficulties in strenuous exercise, she stated that "[n]onetheless, the sickle cell trait coupled with the physical exertion under a new set of unfavorable circumstances that included environmental and atmospheric conditions (dry heat and altitude) made agent Afolayan more susceptible to develop catastrophic rhabdomyolysis and die."[41]

<u>Other medical evidence</u>

In the course of the hearing, Claimants introduced evidence showing that Agent Afolayan was first diagnosed with the sickle cell trait on December 2007.[42]

## Discussion

A claimant seeking a death benefit under the PSOB Act must establish that it is "more likely than not"[43] that the decedent was a public safety officer, who died as "the direct and

---

[39]   *Id.* at 4.

[40]   *Id.* at 5.

[41]   *Id.* As evidence that the circumstances in Artesia were unlike anything encountered by Agent Afolayan, Dr. Mileusnic-Polchan noted that "Mrs. Afolayan confirmed that the sickle cell trait never interfered with any type of the agent's physical activity prior to his relocation" and went on to state that "in his case, the sickle cell trait was an incidental finding following the birth of their second child."

[42]   Hemoglobinopathy Reference Laboratory, Children's Hospital & Research Center Oakland, Caralyn Hoppe, MD, dated December 28, 2009.

[43]   28 C.F.R. § 32.5(a) ("Except as otherwise may be expressly provided in the Act or [the implementing regulations], a claimant has the burden of persuasion as to all material issues of fact, and by the standard of proof of 'more likely than not.'").

proximate result of a personal injury sustained in the line of duty" within the meaning of the PSOB Act and its implementing regulations.[44]

*Claimant Status*

For Claimants to be eligible beneficiaries under the PSOB Act, they must establish that they qualify as one of the individuals described at 34 U.S.C. § 10281(a)(1)-(6). The record shows that Nathaniel Afolayan and Lisa Afolayan were married on November 22, 2003, and they had two children. Natalee was born ▮▮▮▮▮, 2006, and L▮ was born ▮▮▮▮▮, 2007. Accordingly, assuming this claim were otherwise approved, Claimants, Lisa Afolayan, and her two minor daughters would be statutorily-eligible survivors and would be eligible to share in the death benefit under 34 U.S.C. § 10281(a)(2).

*Public Safety Officer Status*

The first step in determining a PSOB claim is determining whether the claimant's decedent was a public safety officer as defined by the PSOB Act and its implementing regulations at the time of the events upon which the claim is predicated.

The PSOB Act defines the term "public safety officer," in pertinent part, as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer."[45] The Act further defines a law enforcement officer "as an individual involved in crime . . . control or reduction, or enforcement of the criminal laws . . . including, but not limited to, police, corrections, probation, parole, and judicial officers."[46] Generally speaking, within the meaning of the PSOB regulations, an individual is *involved* in crime control or reduction, or enforcement of the criminal laws if, as an officer (or candidate officer) of a public agency, he "has legal authority or -responsibility to arrest" persons alleged or found to have violated the criminal laws, and the officer's agency recognizes that he has such legal authority or-responsibility.[47]

Under implementing regulations published in 2018, a "candidate-officer" is defined as "an individual who is officially enrolled or -admitted, as a cadet or trainee, in candidate-officer training."[48] Relevant to this claim, "candidate-officer training means a formal and officially recognized program of instruction or of training . . . that is specifically intended to result, directly

---

[44]     34 U.S.C. § 10281(a) ("In any case in which the Bureau of Justice Assistance . . . determines, under regulations issued pursuant to [the PSOB Act,] that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit . . . as follows . . . .").

[45]     34 U.S.C. § 10284(9)(A).

[46]     34 U.S.C. § 10284(6).

[47]     28 C.F.R. § 32.3 (defining *Involvement*).

[48]     28 C.F.R. § 32.3 (defining *Candidate-officer*).

11

or immediately upon completion, in . . . [c]ommissioning of such individual as a law enforcement officer."[49]

Unquestionably, the U.S. Border Patrol is a public agency, and its Border Patrol Agents are ordinarily law enforcement officers within the meaning of the PSOB Act and implementing regulations. To determine whether Agent Afolayan, as a candidate-officer who had completed all but one week of training at the Border Patrol Academy, had the requisite legal authority or -responsibility to make arrests at the time of his death, the PSOB Office inquired as to his authority. In a letter to the PSOB Office, Alan Bersin, then-Commissioner of U.S. Customs and Border Protection, wrote the following:

> In accordance with [relevant] sections of Title 8, Code of Federal Regulations, Section 287 (8 CFR § 287), more specifically 8 CFR § 287.5(c) and 8 CFR § 287.1(g) regarding arrest authority and basic immigration law enforcement training for Border Patrol agents, I have determined that the training completed by BPA (I) Afolayan is substantially equivalent to successful completion of the Border Patrol training course, and therefore he had law enforcement authority and powers of arrest at the time of his death. A copy of section 287 is enclosed.[50]

I find Commissioner Bersin's response persuasive and consistent with the authority granted to him under title 8, Code of Federal Regulations, and, as a result, I find that Agent Afolayan, at the time of his death, had the legal authority to arrest persons alleged or found to have violated the criminal laws.[51] Accordingly, I find that, in this set of circumstances, Agent Afolayan was a public safety officer, *i.e.*, a law enforcement officer, as defined by the PSOB Act and its regulations.

*Line-of-Duty Injury*

<u>Injury</u>

For a claim to be payable under 34 U.S.C. § 10281(a), the evidence must establish it is "more likely than not"[52] that the public safety officer "died as the direct and proximate result of a

---

[49]    28 C.F.R. § 32.3 (defining *Candidate-officer training*).

[50]    Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, March 15, 2011, with 8 C.F.R. Chapter 1 § 287, Field Officers Powers and Duties.

[51]    28 C.F.R. § 32.3 (defining *Involvement*).

[52]    28 C.F.R. § 32.5(a).

personal injury sustained in the line of duty."[53] PSOB implementing regulations, at 28 C.F.R. § 32.3, define "injury," in pertinent part, as follows:

> *Injury* means a traumatic physical wound (or traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, climatic conditions, infectious disease, radiation, virus, or bacteria and includes (with respect to a WTC responder) a WTC-related health condition, but does not include—
>
>                             \* \* \*
>
> (2) Any condition of the body caused or occasioned by stress or strain."

The same section of regulations defines *Stress or strain* as "includ[ing] physical stress or strain, mental stress or strain, post-traumatic stress disorder, and depression."

An injury is directly and proximately caused by an external force (*e.g.*, a physical blow) or other listed factor (*e.g.*, climatic conditions) if the force or factor was a substantial factor in bringing the condition about—*i.e.*, if the force or factor was alone sufficient to have caused the condition or no other factor (or combination of factors) contributed to the injury to as great a degree as it did.[54] Thus, a claimant must establish that an external force or factor was a substantial factor in bringing about an officer's wound or condition.

Further, an officer must have sustained such an injury in the line of duty.[55] As applicable here, a "line of duty activity or action" is—

> [an] activity or an action that [a public safety officer] is obligated or authorized by statute, rule, regulation, condition of employment or service, official mutual-aid agreement, or other law, to perform . . . under the auspices of the [officer's] public agency . . . .[56]

---

[53]     34 U.S.C. § 10281(a).

[54]     *See* 28 C.F.R. § 32.3 (defining *Direct and proximate result of an injury*). Under 28 C.F.R. § 32.3 (definition of *Substantial factor*)—

     A factor substantially brings about a death, injury, disability, wound, [or] condition . . . if—
         (1) The factor alone was sufficient to have caused the death, injury, disability, wound, [or] condition . . . ; or,
         (2) No other factor (or combination of factors) contributed to the death, injury, disability, wound, [or] condition . . . to so great a degree as it did.

[55]     34 U.S.C. § 10281(a); *see* 28 C.F.R. § 32.3 (definition of *Line of duty injury*).

[56]     28 C.F.R. § 32.3 (definition of *Line of duty activity or action*).

In the course of the hearing, the Claimants asserted error based on the PSOB Office determination's reference to Agent Afolayan's "sickle cell disease," when the medical evidence showed that Agent Afolayan had "sickle cell trait" rather than the disease.[57] In their appeal of the Hearing Officer's determination, Claimants offer the opinion of Dr. Mileusnic-Polchan in support of the assertion that Agent Afolayan died from exertional rhabdomyolysis, which Dr. Mileusnic-Polchan opines he had been exhibiting symptoms of prior to the day of his 1.5-mile run. Although Dr. Mileusnic-Polchan acknowledges that Agent Afolayan's sickle-cell trait contributed to his death, it seems she is indicating that his exertional rhabdomyolysis was the biggest contributor to his death. In addition, Claimants offer information about previous PSOB claim determinations in which PSOB benefits were awarded where the public safety office died of rhabdomyolysis.[58] Claimants' argument, then, is that their claim should be treated similarly to those claims and that benefits be awarded accordingly.

As indicated below, the medical evidence in this claim indicates that Agent Afolayan's fatal condition was the result of a combination of factors: cardiomegaly (heart disease), sickle cell trait, physical exertion, a hot and dry environment, altitude, and dehydration. The evidence does not persuade me, however, that it is "more likely than not" that Agent Afolayan died as the direct and proximate result of an "injury" sustained in the line of duty within the meaning of the PSOB Act and implementing regulations.

Although generally agreeing as to the contributors of Agent Afolayan's acute medical distress, the medical experts in this claim disagreed as to the precise condition that was the direct and proximate cause of Agent Afolayan's death. Dr. Mileusnic-Polchan concluded that Agent Afolayan "died from complications of exertional rhabdomyolysis due to strenuous physical activity in a hot dry environment" identifying "sickle cell trait in combination with high altitude" as contributing factors.[59] Drs. Cina and Sperry both concluded that Agent Afolayan died as a result of a sickle cell crisis.[60]

---

[57]   *See e.g.*, Hearing Transcript, 8:16-19 dated November 27, 2012 ("this case really turns on the determination letter's characterization of Nate's death as a result of the sickle cell disease as opposed to sickle cell trait"). *See also* Hearing Transcript at 24:11-22 - 25:9-22 and 42:21-23 - 43:1-15.

[58]   *See* Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated; Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, pp. 3-5, dated January 28, 2019.

[59]   Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, p. 4, dated January 28, 2019.

[60]   Dr. Cina stated that "the most significant factor contributing to death in this case was a sickle cell crisis." Independent Medical Review, Dr. Stephen Cina, dated July 15, 2011; Independent Medical Review, Dr. Stephen Cina, dated February 22, 2013.

14

Dr. Sperry testified that the sickle cell crisis in Agent Afolayan was caused by several factors:

> [Dr. Sperry] A: Yes. That -- in this situation with Mr. Afolayan, he had the sickle cell trait, and in people -- in individuals who have the trait, when they may be subjected to extremes of physical exertion and become dehydrated, and especially at an increased altitude, this may precipitate a sickle cell crisis. But you have to have that combination of factors together.
>
> [Hearing Officer] Q: And I'm sorry. Those factors again were—you're talking about physical exertion; what else?
>
> [Dr. Sperry] A: Physical exertion, heat, dehydration, and the sickle cell trait.[61]

Dr. Cina also concluded that Agent Afolayan's fatal condition was caused by several factors including exertion, heat, and sickle cell trait, writing, "I believe, more likely than not, that exercise in an adverse climate contributed to death. . . . That being said, I feel the most significant factor contributing to death in this case was a sickle cell crisis."[62] In his final amended opinion, Dr. Cina stated that Agent Afolayan "would not have died if he did not have pre-existent sickle cell trait. He also would not have died if he was not exercising in a hot, hostile environment. Each of these factors was a *contributory factor* in his death."[63]

Dr. Mileusnic-Polchan found exertional rhabdomyolysis to be the direct and proximate cause of Agent Afolayan's death, apparently concluding the sickle-cell trait to be less of a contributor to his death. Dr. Sperry and Dr. Cina both acknowledge that Agent Afolayan's hospital records showed him to be suffering from rhabdomyolysis, but, at odds with Dr. Mileusnic-Polchan, neither indicates that rhabdomyolysis was clinically present at the time Agent Afolayan participated in his final run.

As mentioned above, to establish eligibility for death benefits under the PSOB Act, the evidence must establish that the public safety officer died as "the direct and proximate result of a personal injury sustained in the line of duty."[64] An officer sustains an "injury" within the meaning of the PSOB Act and implementing regulations when the evidence establishes that he or she has sustained a "traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments,

---

[61]     Hearing Transcript, 46:19-22 to 47:1-8, dated November 27, 2012.

[62]     Independent Medical Review, Dr. Stephen Cina, dated July 15, 2011; Independent Medical Review, Dr. Stephen Cina, dated February 22, 2013.

[63]     Independent Medical Review, Dr. Stephen Cina, dated February 22, 2013. Emphasis added.

[64]     34 U.S.C. § 10281(a); *see* 28 C.F.R. § 32.3 (defining *Direct and proximate result of an injury*).

blunt objects, or physical blows), [or other listed factors including] . . . climatic conditions[65 or] infectious disease"[66] An external force or other listed factor (*e.g.*, climatic conditions) directly and proximately causes a traumatic physical wound or traumatized condition of the body when it is the *substantial factor—i.e.*, the single biggest contributor—to such a traumatic physical wound or condition.[67]

None of the expert medical opinions in the record identifies climatic conditions or an external force/factor cognizable under the PSOB definition of *Injury* as the *substantial factor* in any of the medical conditions asserted to have been the cause of Agent Afolayan's death.[68]

Drs. Cina and Sperry, who identified sickle cell crisis as the cause of Agent Afolayan's death, concluded that the cause of the sickle cell crisis was a combination of physical exertion, heat, dehydration, altitude, and the sickle cell trait.[69] Nether stated that heat or climatic conditions was the single biggest contributor to Agent Afolayan's death. Dr. Cina went as far as to expressly reject heat (climatic conditions) as the substantial factor: "I cannot state, however, that the climate was the most significant factor in this fatality."[70] Dr. Cina ultimately found that

---

[65]    28 C.F.R. 32.3 (defining *Injury*). *Cf. Juneau v. Dep't of Justice*, 583 F.3d 777, 782 - 783 (Fed. Cir. 2009) (glossing this term in this definition as requiring "expos[ure] to . . . unusually adverse climatic conditions"); *Durco v. United States*, 14 Cl. Ct. 424, 426 (1988) (brief exposure to very cold conditions unsuccessfully alleged to be the direct and proximate cause of fatal heart attack).

[66]    28 C.F.R. 32.3 (defining *Injury*). *Cf. Juneau*, 583 F.3d at 782 - 783 ("[A] traumatic condition, even one caused by actions taken in the line of duty as a law enforcement officer, is not sufficient to warrant payment of benefits under the PSOB Act. The traumatic condition must also be caused by an injury . . . ." And this regulatory definition of *Injury* "lays out the causes of traumatic bodily conditions that render those conditions 'injuries' under the PSOB Act."); *Brister v. United States*, No. 01-180C, slip op. at 5 (Fed. Cl., Mar. 27, 2002) ("The standard here is whether [the] death was the *direct and proximate result* of a traumatic injury, sustained in the line of duty. This higher standard requires more concrete evidence of specific injury."); *Gudzunas v. United States*, No. 446-83-C, slip op. at 2 - 6 (Cl. Ct., Jul. 2, 1984) (affirming the agency finding that although assault by an inmate resulted in "'hits to both sides of head, bruised left wrist, and arm, and . . . both knees[,]'" the decedent's fatal heart attack was not "'the direct and proximate result of the personal injury he received'"; it was, rather, "due to underlying atherosclerotic heart disease."); *Askew v. United States*, No. 542-83C, slip op. at 2 - 3 (Cl. Ct., Aug. 27, 1984) (affirming the agency finding that although the stress and strain of a struggle with a suspect that produced "fresh abrasions and bruises on the shins of both legs and fading bruises on the forearms" may have been a precipitating cause, the proximate cause of decedent's fatal heart attack was cardiovascular disease).

[67]    *See* 28 C.F.R. § 32.3 (defining *Substantial factor*).

[68]    To the extent that the "OC" (a/k/a pepper) spray mentioned in the administrative investigation of Agent Afolayan's death, *see, e.g.*, Hearing Transcript, Exhibit 9—Affidavit, Alex Jacob Alderman, dated July 7, 2011, could be characterized as an external force contributing to his condition, there is no significant mention of this as a causal factor in any of the expert medical opinions; in no way does the evidence even suggest it contributed in any meaningful way to Agent Afolayan's death.

[69]    *See e.g.*, Hearing Transcript, 46:19-22 to 47:1-8, dated November 27, 2012; Independent Medical Review, Dr. Stephen Cina,  pp. 5-6, dated February 22, 2013.

[70]    Independent Medical Review, Dr. Stephen Cina, p. 5, dated February 22, 2013.

16

"[e]ach of these factors [sickle cell trait and exercise in a hot hostile environment] was a contributory factor in [Agent Afolayan's] death."[71]

Dr. Mileusnic-Polchan is less than clear about the role of external forces or factors in Agent Afolayan's fatal exertional rhabdomyolysis. She described his rigorous physical fitness, which never seemed to pose any health issues for him prior to his coming to the Border Patrol Academy, and identified the "only new variables that created a different set of circumstances for him were the climatic condition (heat), exertional dehydration (dry environment) and altitude that together initiated the vicious cycle of rhabdomyolysis."[72] She concluded that the cause of Agent Afolayan's fatal exertional rhabdomyolysis was "strenuous physical activity in a hot dry environment" with "sickle cell trait in combination with high altitude" as "contributing factors."[73] Her conclusion suggests that to the extent that she identifies a substantial factor, it is physical exertion and a hot environment, a combination of factors. Nowhere in her opinion, however, does she identify heat or a hot environment (climatic conditions) as the single biggest contributor to Agent Afolayan's fatal rhabdomyolysis.

In the absence of evidence showing that climatic conditions or an external force/factor cognizable under the PSOB regulations defining injury was the *substantial factor* in Agent Afolayan's fatal condition (whether exertional rhabdomyolysis or sickle cell crisis), there is no "injury" within the meaning of the PSOB Act and implementing regulations.

Additionally, it is undisputed that physical exertion was a contributory factor in Agent Afolayan's fatal condition(s) and death. Dr. Cina wrote that Agent Afolayan engaged in "intense physical activity"[74] and "intense physical exertion"[75] prior to his collapse. Dr. Sperry, in his written reports and testimony, identified "physical exertion" and "the exertion of running 1.5 miles" as contributing to Agent Afolayan's death.[76] Additionally, Dr. Mileusnic-Polchan, in her January 28, 2019, report, mentions "strenuous exercise" and "strenuous physical activity" as bringing about the exertional rhabdomyolysis that she believes caused the death of Agent Afolayan.[77] Nonetheless, 28 C.F.R. § 32.3 defines "injury" as expressly excluding "[a]ny

---

[71]  *Id.* at 6.

[72]  Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, p. 5, dated January 28, 2019.

[73]  *Id.* at 6.

[74]  Independent Medical Review, Dr. Stephen Cina, p. 7, dated April 14, 2011.

[75]  *Id.* at 11.

[76]  *See e.g.,* Hearing Transcript, 39-40, dated November 27, 2012. *See also* Independent Medical Evaluation, Dr. Kris Sperry, dated November 15, 2012.

[77]  Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, pp. 5-6, dated January 28, 2019. To the extent that Dr. Mileusnic-Polchan indicates that Agent Afolayan was showing clinical signs of suffering from exertional rhabdomyolysis at least several days before his final run, there is no evidence of the physical exertion that precipitated such rhabdomyolysis or the climatic conditions on the date(s) when he may have engaged in such exertion. The evidence in the record indicates that, outside of class, Agent Afolayan played basketball, went on

17

condition of the body caused or occasioned by stress or strain" and defines "stress or strain" as "includ[ing] physical stress or strain[.]"[78] Accordingly, to the extent that Agent Afolayan's physical exertion in completing the 1.5-mile run was the substantial factor neither such exertion, nor *any condition* primarily caused by such exertion (*e.g.*, exertional rhabdomyolysis or sickle cell crisis), constitutes an "injury" under the PSOB Act and implementing regulations.

In sum, I am not persuaded by the evidence in the record that Agent Afolayan suffered an injury, as that term is defined under the PSOB program.

<u>Other PSOB Cases Involving Rhabdomyolysis</u>

Included with Claimants' appeal is a document titled "Historical Cases of PSOB Claims Paid for Heat Stroke, Dehydration, Overexertion and Exhaustion, All of Which Initiate Rhabdomyolysis," which appears to summarize the circumstances of four claims for PSOB death benefits, three of which are asserted to have been approved.[79] Claimants assert that "[t]he payment of Federal PSOB death benefits to the surviving family of Officer Timothy Shepard set

---

runs, and lifted weights. And it seems that some of these activities may not have been part of the official training program for Border Patrol Agents. If these activities precipitated his rhabdomyolysis, there would be the additional question whether such activities were in the line of duty.

[78]     *Accord, e.g., Juneau*, 583 F.3d at 782 ("[C]onditions caused by 'stress or strain' are excluded from the definition of 'injury,' even if those conditions can be characterized as 'traumatic.'"); *Yanco* v. *United States*, 258 F.3d 1356, 1360, 1363 - 1365 (Fed. Cir. 2001) (". . . Congress's intent in enacting the Benefits Act was to provide a death benefit for the survivor or survivors of a law enforcement officer who dies as the result of what one would understand to be some kind of a physical assault or trauma to the body. . . . In short, the legislative history points away from an intent on the part of Congress to have the statutory term 'personal injury' include . . . strain. . . . We thus conclude that the regulations . . . which define the term 'personal injury' so as to exclude stress and strain represent, in the words of *Chevron*, a 'permissible construction of the statute.'"), *aff'g* 45 Fed. Cl. 782, 790 - 793 (2000); *Greeley* ex rel. *Greeley* v. *United States*, 50 F.3d 1009, 1011 - 1012 (Fed. Cir. 1995) (strain of extinguishing fire unsuccessfully alleged to be the direct and proximate cause of fatal heart attack); *Russell* v. *United States*, 231 Ct. Cl. 1022, 1023, 1024 - 1025 (1982) (*per curiam*) (strain of struggle with suspect unsuccessfully alleged to be the direct and proximate cause of fatal heart attack); *Smykowski* v. *United States*, 647 F.2d 1103, 1104 - 1106 (Ct. Cl. 1981) (strain of struggle with suspect unsuccessfully alleged to be the direct and proximate cause of fatal heart attack: "[T]he agency's position excluding stress, strain, and heart disorders from the coverage of the Act [is] amply justified by the statutory language, legislative history, and medical statistics."); *Morrow* v. *United States*, 647 F.2d 1099, 1100 - 1103 (Ct. Cl. 1981) (strain of extinguishing fire unsuccessfully alleged to be the direct and proximate cause of fatal heart attack); *Canfield* v. *United States*, No. 339-79, slip op. at 2 (Fed. Cir., Dec. 29, 1982), 703 F.2d 583, 585 (table) (strain of struggle with prisoner unsuccessfully alleged to be the direct and proximate cause of fatal heart attack; holding that the agency's "interpretation is well within the purposes and intent of the statute" and reversing the holding of No. 339-79C, slip op. at 7 - 25 (Cl. Ct., Jul. 27, 1982) that the agency's requirement that there be a "traumatic injury" was impermissible); *North* v. *United States*, 555 F. Supp. 382, 385 - 388 (Cl. Ct. 1982) (strain of extinguishing fire unsuccessfully alleged to be the direct and proximate cause of fatal heart attack); *Cook* v. *United States*, No. 05-1050C, slip op. at 3 - 11 (Fed. Cl., Jun. 15, 2006) (strain of struggle with unruly person unsuccessfully alleged to be the direct and proximate cause of fatal heart attack).

[79]     Historical Cases of PSOB Claims Paid, Rhabdomyolysis, undated. One of the four PSOB claims (re: Police Officer Rogerio Morales) included therein currently is pending before the Bureau and thus, by definition, is neither a "PSOB Claim[] Paid" nor the subject of a final agency determination that might properly be asserted to provide a precedent bearing upon the determination of the instant claim.

precedent that exhaustion, overexertion, dehydration, and heat stroke were compensable causes of death" asserting further that "rhabdomyolysis should also be a compensable cause of death" as it is a byproduct of exhaustion, overexertion, dehydration, and heat stroke.[80] I consider each of these "Historical Cases," in turn.[81]

### *Agent Lorenzo Gomez*

On November 7, 2003, Immigration and Customs Enforcement Agent ("Agent") Lorenzo Gomez participated in physical endurance and tactical training, involving strenuous exercise and drills, many of which were performed in full tactical gear, including a ballistic tactical vest, Kevlar helmet, Nomex gloves, knee pads, and a tactical duty belt, totaling an estimated 50-60 pounds. The exercises included a 1.5-mile march, involving both jogging and marching; pushups in full gear; two tactical shooting courses in full gear; two 1.5-mile runs; and a 165-pound dummy drag.[82] In a determination dated July 20, 2015, the BJA Director concluded that Agent Gomez died as the direct and proximate result of a personal injury sustained in the line of duty.[83] The *Gomez* claim differs in two significant aspects from the instant claim, however.

First, based in large part on an expert medical opinion that concluded that Agent Gomez's tactical gear limited his body's ability to dissipate heat, the BJA Director determined that such gear constituted an external force acting on his body, and that this external force was the direct and proximate cause of the heat-related injury, which in turn ultimately caused his rhabdomyolysis.[84] Second, there was no indication that any other factor, be it some pre-existing condition (such as sickle cell trait or cardiomegaly) or physical exertion, contributed to Agent Gomez's fatal exertional rhabdomyolysis to so great a degree as the effect that the gear had on Mr. Gomez's ability to regulate his internal bodily temperature. By contrast, at the time of his collapse, Agent Afolayan was wearing shorts and a short-sleeve T-shirt on his 1.5-mile run. And none of the medical opinions before me here points to his clothes or the climatic conditions as *the* direct and proximate cause of his death.

### *Police Officer Timothy Shepard*

The Bureau is unable to locate a copy of the 1988 determination involving Police Officer Timothy Shepard and thus is unable to determine what the specific facts of that claim, and the

---

[80]     *Id.*

[81]     See *Groff* v. *United States*, 493 F.3d 1343, 1352 (Fed. Cr. 2007) ("[T]he BJA treats at least some of its decisions on issues arising under the statute as creating precedents that govern later decisions in similar cases.").

[82]     BJA Director Determination, *Lorenzo Gomez*, 2008-128, 2, dated July 20, 2015.

[83]     *Id.* at 8.

[84]     In *Gomez*, the Director expressly relied on Agent Gomez' having been wearing 50-60 pounds of tactical gear consisting of a ballistic tactical vest, Kevlar helmet, nomex gloves, knee pads, and a tactical duty belt. BJA Director Determination, *Lorenzo Gomez*, 2008-128, 2, 5-6, dated July 20, 2015.

specific basis of that determination, may have been.[85] As PSOB determinations are very fact-specific, and as the PSOB Act and its implementing regulations have changed considerably in the 32 years since the Shepard claim was determined, I am unable (in the absence of the determination) to ascertain how (if at all) it might affect or guide the outcome here.[86]

### *Police Officer Charles McDonald*

The third claim identified by Claimants, based on the death of Police Officer Charles McDonald, also differs significantly from the instant case. On June 8, 2001, Police Officer Charles McDonald participated in a physical fitness evaluation for assignment to a County SWAT team. Following completion of the fitness assessment, Officer McDonald complained of leg pain and shortness of breath and was transported by paramedics to Anderson Mercy Hospital for evaluation where he was placed on life support. "On the following day Officer McDonald was transported to Good Samaritan Hospital for further treatment, where he died as a result of disseminated intravascular coagulation due to exertional rhabdomyolysis."[87] The PSOB Office initially denied the claim for benefits on the basis of a medical opinion concluding that Officer McDonald's death was the result of exertional rhabdomyolysis due to a pre-existing positive sickle cell trait.

On appeal to a Hearing Officer, Claimant introduced an expert opinion from a Board Certified nephrologist and Professor at Tulane University's School of Medicine, who concluded that "Officer McDonald developed exertional rhabdomyolysis predominantly and primarily due to heat prostration while running in heavy clothing on a hot day. "[The expert] note[d] that sickle cell trait, although predisposing, was only a minor secondary cause."[88] The Hearing Officer ultimately approved death benefits after finding that severe exertion (with heavy clothing) resulted in a traumatic injury (exertional rhabdomyolysis), that such exertion was the substantial factor in Officer's McDonald's death, and that there was "'reasonable doubt' that Officer McDonald's death from 'exertional rhabdomyolysis' actually resulted from his pre-existing sickle cell trait."[89]

---

[85]   Similarly, the minimal information the Bureau has been able to locate, in its files, about the Shepard claim (*i.e.*, the PSOB Program Claim Control Cards, which are included in the record) is largely administrative in nature and provides no information about the actual basis for the determination, other than to indicate that the injury there occurred (or allegedly occurred) "during trng [*sic*] exercises" and that the claim there involved (or was alleged to have involved) "heat stroke & blood clot in his brain.".

[86]   If, for example, the Shepard determination were erroneous, it would have no bearing here. *Cf., e.g., OPM* v. *Richmond*, 496 U.S. 414, 434 (1990) ("As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds.").

[87]   Hearing Officer Determination, Charles McDonald, p.1, dated August 18, 2004. [491]

[88]   *Id.* at 4.

[89]   *Id.* at 9-10.

20

The determination in *McDonald* differs significantly from the instant claim in several ways. The Hearing Officer in McDonald relied on commentary in the 1977 regulations providing that the exception to the definition of "injury" for conditions caused by stress or strain does not apply when "that stress resulted in or was caused by a traumatic injury that was a substantial factor in the officer's death."[90] The regulations that the Hearing Officer applied in *McDonald*, and the 1977 commentary, were subsequently superseded by regulations defining injury and related terms in 2006, 2008, and 2018.[91] These more-recent regulations do not recognize the exception indicated in the 1977 commentary. Second, the record in the *McDonald* case did not indicate that sickle cell trait was the substantial factor in Officer McDonald's fatal condition. That trait, instead, was a secondary factor. And finally, in making his determination, the Hearing Officer applied the (former) so-called "reasonable doubt" regulation, which is no longer in effect, to tip the balance in favor of approving the claim, upon concluding that the evidence was in equipoise. In sum, the evidence, and the rules applicable to (and applied by the Hearing Officer in) *McDonald*, were substantially different from the evidence in this claim and the rules that apply here.

Based on my review of these prior cases offered by Claimants, I do not find that any of them dictates approval of the claim here. Having carefully reviewed the evidence in the record, I am not persuaded that an external factor/force cognizable under the PSOB regulations was "the direct and proximate cause" of Agent Afolayan's death. The biggest contributor to his fatal condition, instead, was sickle cell crisis (which is not an external factor/force) or physical exertion (which is excluded from the regulations' definition of *injury*). Accordingly, I am not persuaded that Claimants have established that Agent Afolayan suffered an "injury" within the meaning of 34 U.S.C. 10281(a) and its implementing regulations.

### Substantial Weight

By law, BJA must give substantial weight to "evidence and all findings of fact presented by a State, local, or Federal administrative or investigative agency regarding eligibility for death or disability benefits."[92] The record of this claim shows that Mrs. Afolayan was awarded OWCP death benefits based on findings by that agency, including— (1) that Agent Afolayan was employed as a Border Patrol Cadet for the Department of Homeland Security, (2) that he collapsed and died after a required 1.5-mile training run, and (3) that he was on training duty when he began to complain about not feeling well.[93] As required by law, I give these factual findings substantial weight.

---

[90]    42 Fed. Reg. 23252, 23254 (May 6, 1977) ("Deaths caused by traumatic injuries do not therefore include deaths directly attributable to exertion or stress encountered in the performance of duty, *unless that stress resulted in or was caused by a traumatic injury that was a substantial factor in the officer's death*.") (emphasis added).

[91]    *See, e.g.*, 71 Fed. Reg. 46028, 46039-41 (Aug. 10, 2006) (revising the definitions of *Injury* and *Stress or strain*).

[92]    34 U.S.C. § 10285(b)(2).

[93]    Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, dated October 21, 2000.

The OWCP's determination, however, that Agent Afolayan's death resulted from a personal injury while in the performance of duty[94] is a medico-legal conclusion based on evidence provided by lay and expert witnesses including Dr. Natarajan, who concluded that Agent Afolayan's "death was due to heat illness during strenuous physical exercise in a hot environment."[95] As the OWCP's determination is ultimately a legal conclusion rather than a finding of fact, and one based on a legal régime that permits injury to be established by stress or strain, and that is sharply unlike the law and regulations governing the PSOB Program,[96] BJA is not required to give such determination substantial weight.[97]

---

[94] *See id.* at 3 ("In death cases, the claimant has the burden of proof to establish that the employee's death occurred while in the performance of duty. The Federal Employees' Compensation Act (FECA) provides that that the United States shall pay compensation for the death of an employee resulting from personal injury sustained while in the performance of duty. . . . Review of the evidence confirms that the claimant's burden of proof has been met.").

[95] Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, dated October 21, 2000.

[96] *See* 20 C.F.R. § 10.5(ee) ("Traumatic injury means a condition of the body caused by a specific event or incident, or series of events or incidents, within a single workday or shift. Such condition must be caused by external force, *including stress or strain,* which is identifiable as to time and place of occurrence and member or function of the body affected.") (emphasis added).

[97] *Cf. Demutiis* v. *United States,* 291 F.3d 1373 (Fed. Cir. 2002) (A local "'line of duty' determination involv[ing] the same ultimate question as that under the [PSOB] Act—did [the] death occur in the line of duty?[—] is a legal determination," and a legal requirement that the Bureau give substantial weight to the evidence and findings of fact presented by administrative and investigative agencies does not apply "to their legal conclusions. Although the Bureau could give the [local agency]'s legal conclusion whatever weight, if any, it deemed appropriate, it was not required to give it any weight."). *See, e.g., Yanco* v. *United States,* 258 F.3d at 1360-1363 (upholding agency PSOB determination despite contrary State pension benefits rulings by State and local agencies).

22

The above determination is based upon the Bureau of Justice Assistance Director's *de novo* review of the record before the agency, which includes the following:

A.   Evidence, correspondence, and other information associated with the record that was before the Public Safety Officers' Benefits (PSOB) Office:

| | |
|---|---|
| 001 | Claim for Death Benefits submitted by Lisa Afolayan, dated October 28, 2009; |
| 004 | Report of Public Safety Officer's Death, submitted by Alan Bersin, Commissioner, U.S. Customs and Border Protection, dated May 14, 2010; |
| 007 | Certificate of Death for Agent Nathaniel Afolayan, Date of Death: May 1, 2009, certified by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, Date Issued September 1, 2009; |
| 009 | Certificate of Marriage, Nathanial Afolayan and Lisa Owen, dated November 22, 2003; |
| 010 | Certificate of Live Birth, Natalee Afolayan, dated ▮▮▮, 2006; |
| 011 | Certificate of Live Birth, L▮ A▮▮, dated ▮▮, 2007; |
| 012 | U.S. Border Patrol Agent Badge, Agent Nathanial Afolayan, dated May 6, 2009; |
| 013 | Letter from Brad Mayberry, Senior Claims Examiner, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, dated October 30, 2009; |
| 015 | Letter from Jan Miller, Hearing Representative, U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs, to Lisa Afolayan, undated; |
| 016 | Decision of the Hearing Representative, Office of Workers' Compensation Programs, Jan Miller, Hearing Representative, undated; |
| 019 | Autopsy Examination Report, conducted by Dr. Sridhar Natarajan, Lubbock County Medical Examiner, dated August 28, 2009; |
| 027 | Federal Employees Compensation System, Agent Nathaniel Afolayan, dated January 6, 2010; |
| 031 | Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, Law Enforcement Authority and Arrest Powers, undated, with the following: |
| 032 | 8 C.F.R. Chapter 1 § 287, Field Officers Powers and Duties, undated; |
| 042 | Letter from Alan Bersin, Commissioner, U.S. Customs and Border Protection, to Hope Janke, PSOB Director, undated, with the following: |
| 043 | Letter from Antonio Angarita, Border Patrol Agent, to Scott Luck, Chief Patrol Agent, dated May 2, 2009; |
| 045 | Significant Incident Report, dated April 30, 2009; |
| 051 | Border Patrol Operations Courses, undated; |
| 054 | Position Description, undated; |
| 059 | Safety Investigation Data Form, dated April 30, 2009; |

061     Medical Document, Illness Detail and Procedures Performed, undated;

064     Medical Document, Illness Detail and Procedures Performed, dated April 30, 2009;

066     The Officer Down Memorial Page, dated May 14, 2009;

067     Miri Marshall, *Border Patrol Agent Dies in Training*, KFOXTV.com, May 10, 2009;

068     Individual Injury Report, Nathaniel Afolayan, dated April 28, 2009;

069     Patient Visit Data, FLETC Health Unit, dated from March 5, 2009 through April 30, 2009;

075     Letter from Health Unit Staff to PT Instructor, dated from March 5, 2009 through April 20, 2009;

079     Health Questionnaire, dated February 18, 2009;

080     Medical Documents, Artesia General Hospital, dated from April 30, 2009 through May 15, 2009;

101     Aerocare Transport Worksheet, dated April 30, 2009;

102     Authorization for Examination And/Or Treatment, Covenant Medical Center, signed by Arturo Agero, Supervisory Border Patrol Agent, dated May 1, 2009;

103     Medical Documents, Covenant Health System, dated from April 30, 2009, through May 1, 2009;

132     Orthopaedic Medical Group of Riverside, Inc., Dr. Donald Kim, dated October 8, 2008;

138     Pacific Sleep Medicine Services, Dr. Stuart Menn, dated November 11, 2008;

141     Psychiatry Evaluation, Dr. Prakashchandra Patel, dated October 8, 2008;

146     Medical Notes and Prescription, dated January 2, 2008;

148     Medical Documents, Quest Diagnostics Incorporated, dated from April 4, 2007, through August 19, 2008;

152     Medical Documents, United Familycare Rialto, dated from April 19, 2006, through November 7, 2007;

156     Medical Notes, Physical Exam, dated from October 2, 2006 through August 18, 2008;

161     Letter from Felicia Wintz, PSOB Benefits Specialist, to Dr. Sridhar Natarajan, dated March 29, 2011;

162     Questions for Medical Review, undated;

171     Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated April 14, 2011;

182     Letter by Anthony Fazio, U.S. Border Patrol Academy Class #856, undated;

184     Independent Medical Review, Dr. Stephen Cina, forensic pathologist, dated July 15, 2011;

190     Curriculum Vitae, Dr. Stephen Cina, forensic pathologist;

212     PSOB Claim Determination, dated March 6, 2012;

215     Notification of Public Safety Officers' Benefits Office Claim Determination from Hope Janke, PSOB Director, to Lisa Afolayan, dated April 4, 2012;

216     Notification of Public Safety Officers' Benefits Office Claim Determination from Hope Janke, PSOB Director, to Alan Bersin, Commissioner, U.S. Custom and Border Protection, dated April 4, 2012;

B.   Evidence, correspondence, and other information associated with the record that was before the Hearing Officer, including that in paragraph A above:

217     Facsimile Transmittal Sheet from Michael Baranic, to Felicia Logan-Epps, PSOB Appeal Specialist, dated May 4, 2012;
218     Request for Hearing Officer Appeal from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated May 4, 2012;
219     Letter from Michael Baranic, to Felicia Logan-Epps, PSOB Appeals Specialist, dated June 13, 2012;
220     Letter from Hope Janke, PSOB Director, to Michael Baranic, Case Assigned to Hearing Officer Joseph Mistrett, dated July 25, 2012;
221     Claimant's Expert and Witness List, dated November 27, 2012;
225     Hearing Transcript, dated November 27, 2012, with the following Exhibits:
297     Exhibit 1—
297     Letter from Molly Dunn, M.S., Certified Genetic Counselor, to Lisa Afolayan, dated January 17, 2008; and
298     Hemoglobinopathy Reference Laboratory, Children's Hospital & Research Center Oakland, Dr. Caralyn Hoppe, dated December 28, 2009;
299     Exhibit 2—Dr. Bruce Mitchell, *Sickle Cell Trait and Sudden Death, Bringing it Home*, Journal of the National Medical Association, Vol. 99, No. 3, dated March 2007;
305     Exhibit 3—Dr. John Kark, *Sickle Cell Trait*, dated December 20, 2000, sickle.bwh.harvard.edu/sickle_trait.html,;
324     Exhibit 4—*Sickle Cell Trait, Sickle Cell Disease, What is the Difference?* California Department of Health Services, undated;
326     Exhibit 5—Independent Medical Evaluation, Dr. Kris Sperry, dated November 15, 2012;
329     Exhibit 6—Curriculum Vitae, Dr. Kris Sperry, forensic pathologist;
352     Exhibit 7—Weather History for Artesia, New Mexico, dated April 30, 2009;
356     Exhibit 8—City Data, Artesia, New Mexico, dated November 27, 2012;
359     Exhibit 9—Affidavit, Alex Jacob Alderman, dated July 7, 2011;
370     Exhibit 10—Affidavit, Victor Hugo Muglia Arias, dated July 8, 2011;
381     Exhibit 11—Affidavit, Jeffrey Carl Austin, dated July 7, 2011;
394     Exhibit 12—Affidavit, Reyna Del Carmen Cabrera, dated July 8, 2011;
405     Exhibit 13—Affidavit, Ginno Marcello Gallina Mora, dated July 5, 2011;
418     Exhibit 14—Affidavit, Victor Manuel Santomauro, dated June 29, 2011;
427     Independent Medical Evaluation, Dr. Stephen Cina, dated February 22, 2013;
434     Independent Medical Evaluation, Dr. Kris Sperry, dated May 22, 2013;

25

| 436 | Hearing Officer Determination, dated January 10, 2014; |
| 458 | Letter from Hope Janke, PSOB Director, to Michael Baranic, Hearing Officer Denies Claim, dated February 10, 2014; |
| 459 | Letter from Hope Janke, PSOB Director, to Michael Baranic, Attorney Fees, dated February 10, 2014; |

C.  Evidence, correspondence, and information associated with the record that was before the BJA Director, including that in paragraphs A and B above:

| 460 | Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated; |
| 462 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated June 13, 2018; |
| 463 | Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Filing Period Extension Granted, dated December 10, 2018; |
| 464 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated February 4, 2019, with the following: |
| | 465 | Letter from Lisa Afolayan to Hope Janke, PSOB Director, undated; |
| | 466 | Letter entitled Nathaniel Afolayan, An American Hero, undated; |
| | 469 | Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019; |
| | 475 | Historic Cases of PSOB Claims Paid, undated; |
| 477 | Email communication from Orlando Vasquez, PSOB Office, to Lisa Afolayan, dated February 7, 2019, with the following: |
| | 478 | Letter from Hope Janke, PSOB Director, to Lisa Afolayan, Acknowledgement of Receipt of Request for Appeal to BJA Director, dated February 7, 2019; |
| 479 | BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015; |
| 491 | Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004; |
| 502 | Email communication from Lisa Afolayan to Hope Janke, PSOB Director, dated January 27, 2020, with the following: |
| | 503 | Letter from Lisa Afolayan to Hope Janke, PSOB Director, dated January 24, 2020, with the following: |
| | | 506 | Letter from William Powers, PSOB Director, to Chief Cosmo Spezzaferro, Pittsfield Police Department, *Timothy Shepard*, (claim number not provided) dated February 27, 1989, with the following: |
| | | | 507 | Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated February 27, 1989; |
| | | 508 | Letter from William Powers, PSOB Director, to Holly Shepard, *Timothy Shepard*, dated May 16, 1989; |
| | | 509 | Article entitled, *Widow of cadet to get federal benefits*, undated; |
| | | 511 | Appeal Summary, *Charles McDonald*, 2001-201, dated October 5, 2004, with the following: |

512     Hearing Officer Determination, *Charles McDonald*, 2001-201, dated August 18, 2004;

523     Letter from Dr. Darinka Mileusnic-Polchan, To Whom It May Concern, dated January 28, 2019;

529     Letter from Hope Janke, PSOB Director, to Maria Gomez, *Lorenzo Gomez*, 2008-128, dated September 9, 2015, with the following:

        530     BJA Director Determination, *Lorenzo Gomez*, 2008-128, dated July 20, 2015;

543     PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34; and

545     PSOB Program Claim Control Card for Timothy Shepard, Case No. 89-34 (incomplete).



## CERTIFICATION OF PSOB COUNSEL

FROM:    Michael G. Daugherty
             PSOB Counsel

RE:        Nathaniel Afolayan, PSOB Claim No. 2010-022

I have reviewed the above-captioned file and the associated determination. In my view the determination is consistent with the terms of the PSOB Act and its implementing regulations. Accordingly, I conclude that the determination is legally sufficient and concur in the determination that the claim <u>is not</u> legally payable.

**Michael
Daugherty**
    Digitally signed by Michael
Daugherty
Date: 2020.09.14 13:50:09 -04'00'

Michael G. Daugherty                        Date